ACCEPTED
03-14-00667-CV
3957344
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/29/2015 6:24:01 PM
JEFFREY D. KYLE
CLERK

**NO. 03-14-00667-CV**

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/29/2015 6:24:01 PM
JEFFREY D. KYLE
Clerk

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Appellant,*

v.

EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, PENNZOIL-QUAKER STATE COMPANY, AND SHELL OIL COMPANY,

*Appellees.*

**APPELLEES' BRIEF**

John R. Eldridge
State Bar No. 06513520
*john.eldridge@haynesboone.com*
Kent Rutter
State Bar No. 00797364
*kent.rutter@haynesboone.com*
Adam Sencenbaugh
State Bar No. 24060584
*adam.sencenbaugh@haynesboone.com*
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Telecopier: (713) 547-2600

ATTORNEYS FOR APPELLEES

**ORAL ARGUMENT REQUESTED**

**DESIGNATION OF RECORD REFERENCES**

This brief follows the format suggested by the Bluebook: *e.g.*, Clerk's Record: "(CR:1.)" *See* THE BLUEBOOK, A UNIFORM SYSTEM OF CITATION, Practitioners' Note P.7 at 19-20 (Columbia Law Review Ass'n et al. eds., 18th ed. 2005).

The record in this appeal consists of the clerk's record, a supplemental clerk's record, the reporter's record, and an administrative record. The supplemental clerk's record has been requested but has not yet been filed with the Court. This brief uses the following conventions in citing the record:

**Clerk's Record:**

CR:[page]

**Supplemental Clerk's Record:**

Supp. CR at [page]

**Reporter's Record:**

RR [vol]:[page]

**Administrative Record:**

AR [page]

# TABLE OF CONTENTS

DESIGNATION OF RECORD REFERENCES ........................................................i

TABLE OF CONTENTS................................................................................ ii

TABLE OF AUTHORITIES ...........................................................................v

RESPONSE TO ISSUES PRESENTED .................................................................ix

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............................1

    A.    History of the Voda Site.................................................................1

    B.    EPA performs a removal action for the Voda Site.................................1

    C.    The TNRCC initiates the state listing process without reevaluating the Voda Site following the EPA's removal action ...................................................................................2

    D.    The TCEQ issues an administrative order for the Voda Site pursuant to § 361.188 and § 361.272 of the SWDA ..............................3

    E.    PRPs named in the AO seek a rehearing but are denied.......................5

    F.    ExxonMobil and Shell challenge the AO in Travis County District Court.........................................................................6

    G.    The parties engage in broad discovery at the trial court .......................7

    H.    The State reverses course and argues that review is limited to an administrative record..................................................................8

SUMMARY OF THE ARGUMENT .......................................................................9

STATEMENT OF JURISDICTION.....................................................................11

ARGUMENT ............................................................................................13

I.    Appellees' Response to Appellant's Issue One.............................................13

    A.    The TCEQ can issue administrative orders under § 361.188 and § 361.272, and both share common attributes relevant to this appeal..................................................................13

B. The statutory history of the SWDA shows that administrative orders have always been subject to the same appellate standards ...................................................................15

    1. The original SWDA established a permitting program to regulate solid waste ..............................................15

    2. Following the Congressional passage of CERCLA, the Texas legislature amended the SWDA to create a Texas state Superfund program ..................................................17

    3. The codified SWDA makes all administrative orders subject to these same provisions ..............................................22

C. The current statute does not create mutually exclusive orders with separate waivers of sovereign immunity..........................23

    1. Appearing in different sections using different language does not make the orders mutually exclusive..............................................................................23

    2. The SWDA appellate provisions distinguish between appeals of Superfund orders and appeals of permitting decisions, not separate kinds of Superfund orders.............................................................................25

    3. Forcing all appeals of Superfund orders into § 361.321 creates an absurd result ...........................................28

II. Appellees' Response to Appellant's Issue Two ............................................29

A. The language of the AO demonstrates the Order was issued under § 361.188 and § 361.272 .........................................30

B. Counsel for the Executive Director asked the Commissioners to issue the Order under both § 361.188 and § 361.272 ...................................................................32

C. Understanding that the AO invokes both § 361.188 and § 361.272, the State described the Order as having been issued under both sections for years......................................33

1.  The TCEQ repeatedly and unequivocally described the AO as being issued under § 361.188 and § 361.272........................................................33

2.  The State disclosed that it issued the AO under both sections to obtain advantages of a § 361.272 order..................36

D.  Following the listing procedures of Subchapter F does not insulate the AO from review under Subchapter K..............37

E.  Reviewing an administrative order under § 361.322 does not make Subchapter F redundant.......................................38

F.  If the Commission is correct that it exceeded its powers under the SWDA then the AO must be set aside.................40

III.  Appellees' Response to Appellant's Issue Three .........................41

A.  Texas courts are not constitutionally limited to review of administrative orders only as to matters of law .................42

B.  The Texas Supreme Court's decision in *City of Waco* is not controlling in this SWDA appeal .......................................48

C.  The APA provisions authorizing pure substantial evidence review on a contested-case record are not applicable to this appeal.......................................................................................53

1.  The APA does not apply, and the available guidance leads to different conclusions than advocated by the State.........................................................................................54

2.  Outside of threshold standing questions, pure substantial evidence requires a true contested-case record under the APA ...........................................55

CONCLUSION..............................................................................................59

CERTIFICATE OF COMPLIANCE......................................................61

CERTIFICATE OF SERVICE ................................................................62

APPENDIX ............................................................................Tabs A-K

# TABLE OF AUTHORITIES

**CASES**

*Bland Indep. Sch. Dist. v. Blue*,
34 S.W.3d 547 (Tex. 2000)............................................................................11

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ........................................................................12

*City of Waco v. Tex. Comm'n on Envtl. Quality*,
346 S.W.3d 781 (Tex. App.—Austin 2011, pet. granted)..................................49

*Collins v. Tex. Natural Res. Conservation Comm'n*,
94 S.W.3d 876 (Tex. App.—Austin 2002, no pet.)............................................58

*Commercial Life Ins. Co. v. Tex. State Bd. of Ins.*,
808 S.W.2d 552 (Tex. App.—Austin 1991, writ denied).......................43, 44, 46

*County of Cameron v. Brown*,
80 S.W.3d 549 (Tex. 2002)............................................................................12

*Dep't of Pub. Safety v. Petty*,
482 S.W.2d 949 (Tex. Civ. App.—Austin 1972, writ ref'd n.r.e.) ...................46

*G.E. Am. Commc'n v. Galveston Cent. Appraisal Dist.*,
979 S.W.2d 761 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ...................56

*Gen. Servs. Comm'n v. Little-Tex Insulation Co.*,
39 S.W.3d 591 (Tex. 2001)............................................................................42

*Gerst v. Nixon*,
411 S.W.2d 350 (Tex. 1967) ..................................................................... 47, 48

*Heat Energy Advanced Tech., Inc. v. W. Dallas Coal. for Envtl. Justice*,
962 S.W.2d 288 (Tex. App.—Austin 1998, pet. denied) .................................41

*Heckman v. Williamson Cty.*,
369 S.W.3d 137 (Tex. 2012) .........................................................................11

*Houston Mun. Emps. Pension Sys. v. Ferrell*,
248 S.W.3d 151 (Tex. 2007) .........................................................................11

*Key Western Life Ins. Co. v. State Bd. of Ins.*,
350 S.W.2d 839 (Tex. 1961) ...................................................................40, 46

*Macias v. Rylander*,
995 S.W.2d 829 (Tex. App.—Austin 1999, no pet.)..............................44, 45, 46

*Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*,
53 S.W.3d 310 (Tex. 2001)...................................................................41

*R.R. Street & Co. v. Pilgrim Enters.*,
166 S.W.3d 232 (Tex. 2005) ................................................................18

*Ramirez v. Tex. State Bd. of Med. Exam'rs*,
927 S.W.2d 770 (Tex. App.—Austin 1996, no writ) ..............................55, 56, 59

*Smith v. Houston Chemical Services, Inc.*,
872 S.W.2d 252 (Tex. App.—Austin 1994, writ denied)..................................57

*Subaru of Am., Inc. v. David McDavid Nissan, Inc.*,
84 S.W.3d 212 (Tex. 2002).....................................................................40

*Tex. Comm'n of Licensing & Regulation v. Model Search Am., Inc.*,
953 S.W.2d 289 (Tex. App.—Austin 1997, no writ) .........................................43

*Tex. Dep't of Ins. v. State Farm Lloyds*,
260 S.W.3d 233 (Tex. App.—Austin 2008, no pet.)..........................................59

*Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*,
145 S.W.3d 170 (Tex. 2004) ................................................................ 42, 43

*Tex. Natural Res. Conservation Comm'n v. Sierra Club*,
70 S.W.3d 809 (Tex. 2002)................................................................. 27, 28

*Texas Comm'n on Envtl. Quality v. City of Waco*,
413 S.W.3d 409 (Tex. 2013) ....................................................................*passim*

*Texas Comm'n on Envtl. Quality v. Kelsoe*,
286 S.W.3d 91 (Tex. App.—Austin 2009, pet. denied) ...................................57

*Texas Comm'n on Envtl. Quality v. Sierra Club*,
No. 03-12-00335-CV, 2014 WL 7464085 (Tex. App.—Austin
Dec. 30, 2014, no pet. h.)................................................................51, 52, 56

*Tex. State Bd. of Exam'rs in Optometry v. Carp*,
  388 S.W.2d 409 (Tex. 1965) ................................................................47

*Texas Water Comm'n v. Dellana*,
  849 S.W.2d 808 (Tex. 1993) ...............................................................51

*TJFA, L.P. v. Tex. Comm'n on Envtl. Quality*,
  No. 03-10-00016-CV, 2014 WL 3562735 (Tex. App.—Austin
  July 16, 2014, no pet.) (mem. op.)......................................................27

*United Copper Indus., Inc. v. Grissom*,
  17 S.W.3d 797 (Tex. App.—Austin 2000, pet. dism'd).............................. 57, 58

*United States v. Bestfoods*,
  524 U.S. 51 (1998)............................................................................18

## STATUTES

TEX. CONST. art. II, § 1 ......................................................................42

42 U.S.C.A. §§ 9601–9628...............................................................17, 18

Tex. Health & Safety Code Ann. § 361.003(24) (West 2010) ...................17, 26, 28

Tex. Health & Safety Code Ann. § 361.061 (West 2010)....................................27

Tex. Health & Safety Code Ann. § 361.181 (West 2010).........................13, 14, 31

Tex. Health & Safety Code Ann. § 361.188(b) (West 2010) ..........................23, 24

Tex. Health & Safety Code Ann. § 361.271 (West 2010)....................................15

Tex. Health & Safety Code Ann. § 361.272 (West 2010)................................ 14, 31

Tex. Health & Safety Code Ann. § 361.274 (West 2010)...................................5, 36

Tex. Health & Safety Code Ann. § 361.275 (West 2010)....................................15

Tex. Health & Safety Code Ann. § 361.276 (West 2010)................................ 15, 36

Tex. Health & Safety Code Ann. § 361.321 (West 2010)....................................26

Tex. Health & Safety Code Ann. § 361.322 (West 2010)...............................*passim*

Tex. Health & Safety Code Ann. § 401.229(a) (West 2010) ...............................52

Tex. Gov't Code Ann. §§ 2001.171-178 (West 2008) ............................................54

Tex. Gov't Code Ann. § 2001.060 (West 2008)...................................................55

Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2008).........................................55

Tex. Water Code Ann. § 5.351 (West 2008) .......................................................51

<u>SECONDARY SOURCES</u>

Act approved June 2, 1969, 61st Leg., R.S., ch. 405,
   1969 Tex. Gen. Laws 1320, 1320 (repealed 1989) *recodified by*
   Act approved June 14, 1989, 71st Leg., R.S., ch. 678,
   1989 Tex. Gen. Laws 2230......................................................................15, 16

Act approved June 15, 1973, 63rd Leg., R.S., ch. 576,
   1973 Tex. Gen. Laws 1595......................................................................16, 17

Act approved June 12, 1985, 69th Leg., R.S., ch. 566,
   1985 Tex. Gen. Laws 2166 (repealed 1989) *recodified by* Act
   approved June 14, 1989, 71st Leg., R.S., ch. 678,
   1989 Tex. Gen. Laws 2230........................................................18, 19, 20, 21

Act approved June 14, 1989, 71st Leg., R.S., ch. 703,
   1989 Tex. Gen. Laws 3212, 3217...............................................................21.22

BLACK'S LAW DICTIONARY at 857 (7th ed. 1999) ..................................................11

# RESPONSE TO ISSUES PRESENTED

1.      The Solid Waste Disposal Act authorizes the Commission to issue administrative orders under § 361.188 and § 361.272, but these orders are not mutually exclusive and are subject to the same appellate provisions.

2.      The Commission issued the Administrative Order for the Voda Site pursuant to § 361.188 and § 361.272 of the Solid Waste Disposal Act.

3.      Judicial review of the Administrative Order for the Voda Site is constitutional and appropriate under § 361.322 of the Solid Waste Disposal Act.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

**A.       History of the Voda Site.**

The Voda Petroleum State Superfund Site (the "Voda Site") is comprised of approximately 6.12 acres located in Gregg County, Texas. (AR 2907.) The Voda Site was historically used by Voda Petroleum, Inc. as an oil blending and recycling facility from approximately 1981 to 1991, when all operations ceased and the Voda Site was abandoned. (AR 3126.)

**B.       EPA performs a removal action for the Voda Site.**

In the mid-1990s, both the Environmental Protection Agency ("EPA") and the Texas Natural Resources Conservation Commission ("TNRCC") investigated the Voda Site to determine whether historic operations had resulted in the release of hazardous substances. (AR 3030, 3495.) Part of this investigation included a Hazard Ranking System ("HRS") evaluation of the Voda Site. (AR 3495.) The Voda Site scored a 23.6 on the HRS scale, which was too low to qualify the Voda Site for the federal Superfund program. (AR 3509.) Instead, the Voda Site was referred in 1995 to EPA for an immediate removal action. (AR 3029.) EPA's Action Memorandum seeking approval for the removal action indicated that following the removal action "there is no potential for further state/local response." (AR 3033.)

EPA conducted the removal action in 1996, removing drums and above-ground tanks of grease and corrosive wastes, including associated soil exposed to these materials, and backfilling with clean soil. (AR 943.) After the removal action was complete, EPA's contractor sampled both on-site soils and groundwater as part of a post-removal assessment. (AR 3127.) EPA issued a post-closure report confirming the removal action had abated the imminent and substantial endangerment and that cleanup activities at the site had met EPA's health based cleanup standards for industrial land usage. (AR 3128, 61877.) Following its removal action, EPA sought recovery of its costs and entered into Administrative Orders of Consent ("AOCs") with companies that EPA had named as potentially responsible parties ("PRPs") for the Voda Site. (AR 61852.)

## C. The TNRCC initiates the state listing process without reevaluating the Voda Site following the EPA's removal action.

More than four years after the EPA removal action, the TNRCC proposed the Voda Site for listing on the Texas Superfund registry on November 17, 2000. (AR 46233.) Although the Texas Solid Waste Disposal Act ("SWDA") requires the agency to ensure that a site exceed 5.0 on the HRS score to proceed with listing, the Commission did not re-score the Voda Site to account for the EPA's work. The Commission sent correspondence to certain entities it believed had historically shipped materials to the Voda Site. (AR 16708-16710.) The Commission asserted that each recipient was potentially responsible for

environmental investigation and eventual remediation at the Voda Site, informed the recipients of the proposed listing, and included a Notice of Opportunity to Make Good Faith Offer to conduct a Remedial Investigation/Feasibility Study ("RI/FS"). (AR 08614-46109.) Several parties submitted written comments and objections, noting that there was no empirical data to support an imminent and substantial endangerment finding and no evidence to support listing the Voda Site on the Texas Superfund registry. (AR 41577-41578.) Nevertheless, the State went forward with its plan to list the Voda Site.

**D.    The TCEQ issues an administrative order for the Voda Site pursuant to § 361.188 and § 361.272 of the SWDA.**

A draft administrative order for the Voda Site was docketed for consideration by the Commissioners at a public meeting of the Texas Commission on Environmental Quality ("TCEQ")[1] on February 10, 2010. (AR 51125.) Agenda Item No. 7 pertaining to the Voda Site was described on the docket as "Consideration of a Final Administrative Order (Final Order) pursuant to Texas Health and Safety Code Sections 361.188 and 361.272 for the Voda Petroleum, Inc. State Superfund Site…." (AR 51127.)

Charmaine Backens, counsel for the Executive Director of the TCEQ, presented the draft administrative order to the Commissioners. Following a brief

---

[1]    The TNRCC was renamed the Texas Commission on Environmental Quality effective January 1, 2004.

description of the Voda Site and the remedial action plan, Backens testified that "the Executive Director respectfully requests…recommends [sic] issuing this Administrative Order for remedial activities at the Voda Petroleum State Superfund Site pursuant to Chapter 361, sections 188 and 272 of the Health and Safety Code." (AR 50382.)

A handful of PRPs were granted approximately five minutes to address the Commissioners regarding the agenda item, in which they argued that the Commissioners should delay issuance of the administrative order and allow the parties to present evidence to the Commission. *Id.* Counsel for the Executive Director responded that "the law governing this case does not provide for an adjudicatory hearing at this time" and noted that the Executive Director would not directly address these objections, suggesting instead that the appropriate remedy was to appeal to the district court. *Id.*

The Commissioners followed the Executive Director's recommendation and on February 12, 2010, issued a unilateral administrative order for the Voda Site pursuant to § 361.188 and § 361.272 of the SWDA ("the Order" or "AO"). (CR:29-108; App. A.) The AO named ExxonMobil and Shell—among

approximately 350 other entities—as responsible parties and ordered them to pay the TCEQ's response costs for the Voda Site.[2] *Id.*

### E. PRPs named in the AO seek a rehearing but are denied.

On March 12, 2010, Luminant, one of the parties named in the Order, filed a motion for rehearing before the Commission. (AR 50870.) Luminant argued that the SWDA requires the Commission to determine "the lowest cost alternative" to remediate the Voda Site and that another contractor was prepared to present a lower cost alternative remedy than had been adopted in the AO. (AR 50864.)

The TCEQ filed a written response to Luminant's motion, first noting that "the Commission issued the Order pursuant to Tex. Health and Safety Code §§ 361.188 and 361.272 (West 2010)." (AR 49650; App B.) The TCEQ then argued that Luminant was "not entitled to a rehearing because the law did not afford it a hearing in the first instance. *See* Tex. Health & Safety Code Ann. § 361.274 (West 2010) (stating that '[a]n administrative order under Section 361.272 does not require prior notice or an adjudicative hearing before the commission'.") *Id.* To drive the point home, the TCEQ concluded that "[b]ecause the Order was issued under Sections 361.272 and 361.188 (Administrative Order 1), it did not require an adjudicative hearing before the Commission." (AR 49650; App. B.) The

---

[2] Appellees ExxonMobil Oil Corporation, Exxon Mobil Corporation, Pennzoil-Quaker State Company, and Shell Oil Company are referred to collectively as "ExxonMobil and Shell" throughout this brief.

Commission did not timely grant Luminant's request, and the AO became final on April 8, 2010. (AR 10.)

## F. ExxonMobil and Shell challenge the AO in Travis County District Court.

On March 26, 2010, ExxonMobil and Shell filed their First Amended Original Petition appealing the AO in Travis County District Court. (CR:4-27; App. C.)[3] ExxonMobil and Shell challenged the AO and the Commission's actions under the SWDA as well as § 37.001 of the Texas Uniform Declaratory Judgments Act. *Id.*

On August 1, 2011, the TCEQ filed its Original Counter-Petition and Third-Party Petition, pleading as follows: "On February 12, 2010, the TCEQ issued an administrative order ("the Order") under §§ 361.188 and 361.272 of the Act...." (CR:127-169; App. D.)[4] The TCEQ brought claims for cost recovery against ExxonMobil and Shell and other PRPs pursuant to § 361.197(d), an action to enforce the AO pursuant to § 361.321 and § 361.322(g), and injunctive relief pursuant to § 361.273(2). *Id.*

---

[3]   Appellees filed their Original Petition on March 12, 2010. On May 18, 2010, the Amended Petition was consolidated, along with nine other lawsuits filed by a number of other entities named in the AO, into a new cause number. (CR:112-26.)

[4]   The TCEQ has filed two "supplements" to its Original Petition. However, neither supplement revised or amended the factual allegations discussed herein. (CR:450-54.)

**G.      The parties engage in broad discovery at the trial court.**

Although the State now argues judicial review of the AO is limited to the TCEQ's administrative record for the Voda Site, the State's discovery at the trial court contained no such limitations. Consistent with their live pleadings[5] and each successive amended scheduling order, the State spent nearly four years pursuing unrestricted discovery on ExxonMobil and Shell. The Commission propounded extensive written discovery on ExxonMobil and Shell and deposed corporate representatives for both entities on a wide variety of issues outside the administrative record. (Supp. CR at ___ [*TCEQ's First Written Discovery to ExxonMobil Corporation and Shell Oil Company* (served on September 10, 2013)]; (Supp. CR at ___ [*TCEQ's Notice of Oral Deposition* (served on Sep. 20, 2012)); *TCEQ's Notice of Oral Deposition* (served on Oct. 4, 2012)]. The State also engaged in extensive expert discovery, designating eight state employee expert witnesses, five non-state employee retained expert witnesses, and two non-retained testifying expert witnesses which are presently identified to testify at trial, despite the Commission's current claim that the testimony of their own experts is actually irrelevant to the case. (Supp. CR at ___ [*Texas Commission on Environmental Quality's Amended Designation of Experts* (served on May 10, 2013)].

---

[5]      Shortly before filing current Plea to the Jurisdiction, the Commission filed a Motion for Leave to Amend Pleadings and Discovery. However, the trial court denied this motion via written order on July 31, 2014.

**H.    The State reverses course and argues that review is limited to an administrative record.**

On December 18, 2013—approximately four years after the case was filed—the State filed a Motion for Revised Discovery Control Plan in the trial court. (Supp. CR at ___ [*Texas Commission on Environmental Quality's Motion for Revised Discovery Control Plan* (filed December 18, 2013)]. For the first time, the State advanced the argument that: (1) the AO was issued exclusively under § 361.188 of the SWDA; and (2) judicial review of the AO was therefore limited to an administrative record the TCEQ was in the process of compiling. *Id.* The trial court rejected the State's arguments and denied the motion via a written order signed on March 4, 2014. The Commission did not seek an interlocutory appeal of this order. (Supp. CR at ___ [*Order Denying Motion for Revised Discovery Control Plan* (filed March 4, 2014)].

On July 15, the TCEQ recycled precisely these same arguments in a new motion restyled as a "Plea to the Jurisdiction." (CR:729-859.) Although the State's newly-filed plea did not contain any reference to sovereign immunity—in fact, the words "sovereign immunity" did not even appear in the motion—the State argued in a reply brief and at a subsequent hearing that because the AO was a strictly "188 Order" judicial review under any standard other than § 361.321 violated the state's immunity from suit. Following a hearing on this motion, the trial court rejected the motion via written order on October 1, 2014. (CR:1151.)

## SUMMARY OF THE ARGUMENT

The TCEQ issued a unilateral administrative order pursuant to two provisions of the SWDA—§ 361.188 and § 361.272—ordering ExxonMobil and Shell to pay millions of dollars to reimburse the State's remediation of the Voda Site. ExxonMobil and Shell were denied an adjudicatory hearing prior to issuance and had no opportunity to present experts or cross-examine the State's witnesses regarding liability. Instead, the TCEQ invoked its broadest powers under the SWDA to block any hearing and attempted to hold persons named in the order jointly and severally liable for response costs. For nearly four years, these were uncontested procedural facts while the parties litigated the case at the district court.

Following the Texas Supreme Court's decision in *City of Waco*, the TCEQ made a strategic decision to expand the boundaries of that holding in this case. Although the AO was subject to judicial review based on a preponderance of the evidence at the district court, the State attempts to whitewash the AO's history and the Commission's own pleadings by claiming that it actually issued the Order solely under § 361.188, which the State believes now entitles it to pure substantial evidence review. But regardless of whether the Commission issued the Order pursuant to § 361.188, § 361.272, or both, the SWDA presents the same appellate remedy for both orders, and nothing from the statutory history or current text indicates that these orders are mutually exclusive. Even if the SWDA did intend to

split appellate remedies between different SWDA administrative orders, there is no doubt the TCEQ issued the AO for the Voda Site under § 361.272, and therefore § 361.322 is the appropriate appellate provision.

The Texas Supreme Court's decision in *City of Waco* does nothing to change this analysis. The *City of Waco* holding is limited to a threshold determination of whether a third-party seeking to intervene in a permitting case is an "affected person" sufficient to trigger a contested-case hearing. That case has no application to an appeal by parties named responsible in a unilateral administrative order, particularly when the relevant statute already provides an appropriate standard of review.

After spending an enormous amount of time and money prosecuting this case as both a § 361.188 and § 361.272 Order, the State is now erroneously emboldened by *City of Waco* to believe it can simply issue Superfund enforcement orders demanding millions of dollars in response costs without an agency hearing or *de novo* review at the district court. Instead, the State suggests that pure substantial evidence review of its own record is sufficient. But *City of Waco* deals solely with a permitting issue rather than the more onerous cost recovery enforcement. Moreover, the plain language of the SWDA unequivocally waives sovereign immunity to judicial review of the Order and provides for *de novo* review based on a preponderance of the evidence. In this type of action, *City of*

*Waco* does nothing to relieve the State of its ultimate burden to prove liability. Potentially responsible parties are entitled to their day in court, and the trial court has the power to hear their claims under a preponderance of the evidence standard.

**STATEMENT OF JURISDICTION**

ExxonMobil and Shell believe the Court is without jurisdiction to hear this appeal. A plea to the jurisdiction challenges the trial court's power to adjudicate the subject matter of the controversy. *Heckman v. Williamson Cty*., 369 S.W.3d 137, 149 (Tex. 2012); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Black's Law Dictionary defines "subject-matter jurisdiction" as "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things." BLACK'S LAW DICTIONARY at 857 (7th ed. 1999). In the context of judicial review of an administrative order, the issue of sovereign immunity requires an examination of whether a statute provides a right to judicial review of agency action. *Houston Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 158 (Tex. 2007).

There is no question that the SWDA authorizes judicial review of the AO in this case and that the State has waived immunity from suit. The trial court has the power to either uphold or set aside the Order and to award attorneys' fees to the prevailing party. What the parties actually dispute is precisely what evidence the trial court may consider in reviewing the Order. The State asserts the trial court is

limited to the Commission's administrative record, while ExxonMobil and Shell argue that the trial court can consider new evidence through a trial *de novo.* The State's plea is not a challenge to the trial court's subject matter jurisdiction, but instead a maneuver to set the procedures the trial court will use to enter an order that it unquestionably has the power to enter.

Assuming this evidentiary question did implicate the court's subject matter jurisdiction, the State cannot maintain a plea to the jurisdiction in this case because its own pleadings defeat its claim. In deciding a plea to the jurisdiction, the court must not weigh the claims' merits but should look to the pleadings and determine if they allege facts that affirmatively demonstrate the court's jurisdiction to hear the case. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009); *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). The State's live pleadings indicate that "[t]he Texas Legislature has defined the sole method for appealing the Order at Tex. Health & Safety Code § 361.322." (CR:675-87: App. E.) ExxonMobil and Shell agree, as their Amended Petition invokes § 361.322 and challenges the TCEQ to prove—by a preponderance of the evidence—that Appellees are liable for the elimination of any release at the Voda Site. Therefore, the court need not look past the parties' own pleadings to determine that they have alleged facts that affirmatively demonstrate both that the Court has jurisdiction to

hear this case and that the appropriate standard of review and burden of proof can be found in § 361.322 of the SWDA.

## ARGUMENT

**I.      Appellees' Response to Appellant's Issue One.**

The Texas Solid Waste Disposal Act ("SWDA" or "Act") does not create mutually exclusive Superfund orders with separate waivers of sovereign immunity. Although the Act empowers the Commission to issue an administrative order before a remedial investigation/feasibility study has been conducted or at the conclusion of the state Superfund listing process, either type of administrative order is subject to the same appellate provisions.

> **A.      The TCEQ can issue administrative orders under § 361.188 and § 361.272, and both share common attributes relevant to this appeal.**

The SWDA permits the Commission to issue an administrative order under Subchapter F regarding a site "that may constitute an imminent or substantial endangerment to public health and safety or the environment due to a release or threatened release of hazardous substances into the environment." Tex. Health & Safety Code Ann. § 361.181 (West 2010). Pursuant to the Act, an Order issued under § 361.188 comes at the conclusion of the listing process, which would include investigating the site proposed for listing and recommending a remedial action to cleanup any hazardous substances identified. *Id.* Such an order lists the

- 13 -

identified site on the state registry and provides the necessary details regarding the proposed remedy for the hazardous substances found during the investigation. *Id.*

The Act also permits the Commission to issue an administrative order under Subchapter K "to a person responsible for solid waste if it appears that there is an actual or threatened release of solid waste that presents an imminent and substantial endangerment to the public health and safety or the environment." *Id.* at § 361.272. This administrative order need not necessarily come at the conclusion of the Commission's investigation of a site believed to harbor hazardous substances. Instead, the order issued under § 361.272 must only identify a party allegedly responsible for "solid waste"—not hazardous substances—and order the party "to take any action necessary to provide and implement a cost effective and environmentally sound remedial action plan designed to eliminate the release or threatened release." *Id.* at § 361.272(b)(2).

Although the power to issue administrative orders is found in two separate sections of the SWDA, the two provisions are not mutually exclusive. Nothing in the statute forbids the Commission from issuing an administrative order listing a site alleged to contain "hazardous substances" and to issue that same order to a person responsible for "solid waste" that presents an imminent and substantial endangerment. Moreover, both types of orders share elements outlined in Subchapters I, K, and L of the Act, including but not limited to:

- The four-part definition of a "person responsible for solid waste." Tex. Health & Safety Code Ann. § 361.271 (West 2010);

- Statutory defenses to liability. *Id*. at § 361.275;

- Apportionment of liability among potentially responsible parties. *Id*. at § 361.276; and

- An appellate provision. *Id*. at § 361.322.

Although the power to issue administrative orders can be found in two parts of the SWDA—and orders under each subsection can arise at different times in response to different threats to human health or the environment—the essential features relevant to this appeal remain the same, and nothing within the SWDA makes § 361.188 and § 361.272 orders mutually exclusive.

**B.   The statutory history of the SWDA shows that administrative orders have always been subject to the same appellate standards.**

**1.   The original SWDA established a permitting program to regulate solid waste.**

The SWDA was enacted in 1969 to control "the collection, handling, storage, and disposal" of solid waste. Act approved June 2, 1969, 61st Leg., R.S., ch. 405, 1969 Tex. Gen. Laws 1320, 1320 (repealed 1989) *recodified by* Act approved June 14, 1989, 71st Leg., R.S., ch. 678, 1989 Tex. Gen. Laws 2230 (App. F.) In its original form, the SWDA divided powers between two state agencies—the Texas State Department of Health was tasked with regulating municipal solid

waste while the Texas Water Quality Board was assigned industrial solid waste. *Id.*

at 1321 (App. F.) The original statute gave broad power to these agencies to:

- "require and issue permits authorizing and governing the operation and maintenance of sites used for the disposal of solid waste," including the power to "revoke or amend any permit issues." *Id.* at 1322. (App. F.); and

- "establish minimum standards of operation for all aspects of the management and control" of solid waste, including the "collection, handling, storage, and disposal by incineration, sanitary landfill, composting, or other method." *Id.* at 1323. (App. F.)

To effectuate enforcement, the Act imposed civil penalties for entities that

engaged in the "collection, storage, handling, or disposal of solid waste, or the use

or operation of a site for the disposal of solid waste, in violation of the Act." *Id.* at

1326-27. (App. F.) Any "person affected by any ruling, order, decision, or other act

of the department or the board" enjoyed the right to "appeal by filing a petition in

the district court of Travis County." *Id.* at 1328. (App. F.) The original SWDA

contained no definition for the term "person affected," opening the door for a

broad judicial interpretation of standing to appeal permitting decisions. However,

the Legislature addressed this shortcoming in the following session, adding a

definition for "person affected" as:

> "any person who is a resident of a county in which a site, facility, or plant is to be located including any person who is doing business or owns land in the county or adjacent or contiguous county and any local government. Such person affected shall also demonstrate that he has suffered or will suffer actual injury economic damage."

Act approved June 15, 1973, 63rd Leg., R.S., ch. 576, 1973 Tex. Gen. Laws 1595 (current version at Tex. Health & Safety Code Ann. § 361.003(24) (West 2010)) (App. G.)

Missing from the original statute was the power to issue administrative orders like the Order at issue in this case. As enacted, the SWDA did not empower the state to clean up sites contaminated with solid waste or hazardous substances and to order persons the state believed responsible for solid waste to execute and/or fund such a cleanup. Instead, the statute regulated solid waste through the permitting program. Although a person affected by a permitting decision could seek judicial review under 8(g), this clause was not applicable to an administrative order to clean up a contaminated site simply because the SWDA did not grant the power to issue any such order under the terms of the original act.

### 2. Following the Congressional passage of CERCLA, the Texas legislature amended the SWDA to create a Texas state Superfund program.

The United States Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") in 1980, giving the federal government the power to identify parties responsible for the release of hazardous substances and compel those parties to clean up the sites via administrative orders or civil actions. 42 U.S.C.A. §§ 9601–9628. CERCLA also permitted the government to clean up contaminated sites using the Superfund—a

trust fund—and then recover costs from responsible parties through civil litigation. *Id.* CERCLA was triggered by the presence of abandoned hazardous waste dump sites like the infamous Love Canal site in New York. A critical feature of CERCLA was the creation of a broad liability scheme under which parties who arranged for disposal of waste (i.e, a dump site's customers) and transporters of the waste could be found jointly and severally liable for all remediation costs. No longer was liability limited to the site's permit holder or operator. *United States v. Bestfoods*, 524 U.S. 51, 55-56 (1998).

Five years after the passage of CERLCA, the Texas Legislature created the state's own Superfund program through a 1985 amendment to the SWDA. Act approved June 12, 1985, 69th Leg., R.S., ch. 566, 1985 Tex. Gen. Laws 2166 (repealed 1989) *recodified by* Act approved June 14, 1989, 71st Leg., R.S., ch. 678, 1989 Tex. Gen. Laws 2230 (App. H.). Like CERCLA, the new provisions of the SWDA created a broad liability scheme under which those who arrange for disposal of waste or transport of waste can be held liable for remediation costs at sites they do not own or operate. *See*, *e.g*., *R.R. Street & Co. v. Pilgrim Enters.*, 166 S.W.3d 232, 238 (Tex. 2005) ("SWDA, like CERCLA, provides mechanisms for the clean-up of solid waste and for both governmental entities and private parties to recover clean-up costs from those responsible for the waste."). However, instead of having the new liability scheme stand separately from the existing solid

waste permitting statute as Congress had done, the Texas Legislature embedded these new provisions into the SWDA.

The 1985 amendments expanded the SWDA beyond permitting and empowered the state to issue administrative orders to persons responsible for solid waste,

> "restraining such person or persons from allowing or continuing the threatened release and requiring those persons to take actions necessary to provide and implement a cost effective and environmentally sound remedial action plan to designed to eliminate the release or threatened release."

Act approved June 12, 1985, 69th Leg., R.S., ch. 566, 1985 Tex. Gen. Laws 2166, 2176 (repealed 1989) *recodified by* Act approved June 14, 1989, 71st Leg., R.S., ch. 678, 1989 Tex. Gen. Laws 2230 (App. H.)

The 1985 amendments further empowered the state to survey and list "every hazardous waste facility which may constitute an imminent and substantial endangerment to public health and safety or the environment" and provided guidelines for the "cleanup of a facility identified." *Id*. at 2178, 2180 (App. H.) Within those guidelines, the state was empowered as follows:

> "whenever the department of water resources finds that there exists an actual or threatened release of hazardous wastes at a hazardous facility listed on the registry that presents an imminent and substantial endangerment to the public health and safety of the environment, it may order the owner and/or operator of such facility and/or any other person responsible for the release or threatened release at such facility (A) to develop a remedial action program, subject to the approval of the department of water resources, at such facility; and (B) to

- 19 -

implement such program within reasonable time limits specified in the order."

*Id.* at 2180 (App. H.) To ensure the same basic elements for all administrative orders issued under the new amendments, the statute made clear that "[t]he provisions in Sections 8(g), 9, 10, and 11 of this Act relating to administrative orders shall apply to orders issued pursuant to this paragraph." *Id.* (App. H.)

The 1985 amendments also added a new appellate provision to the SWDA to exclusively cover administrative orders issued pursuant to the new Superfund program. While leaving the earlier appellate provision for the permitting program unchanged, the new Section 9 placed the burden of proof on appeal of an administrative order squarely on the state, providing that:

> "The district court shall uphold an administrative order issued pursuant to Section 8(g) if the department or the department of water resources, by a preponderance of the evidence, proves: (1) that there is an actual or threatened release of solid waste that is an imminent and substantial endangerment to the public health and safety or the environment; and (2) that the person made subject to the administrative order is liable for the elimination of the release or threatened release, in whole or in part."

*Id.* at 2177 (App. H.)

In short, the 1985 amendments established the modern state Superfund program, empowering the state to issue administrative orders and seek to recover its costs under a handful of different circumstances, but made both types of orders

subject to certain procedural baselines, found in sections 8(g), 9, 10, and 11 of the revised statute, including:

- A standard definition for persons responsible for solid waste. *Id.* at 2176 (App. H.);

- Allowing persons responsible for solid waste to prove a statutory defense by a preponderance of the evidence. *Id.* (App. H.);

- Allowing persons responsible for solid waste to prove that the release is divisible, therefore avoiding the consequences of joint and several liability. *Id.* at 2176-77 (App. H.); and

- Granting the right to appeal an administrative order and placing the burden on the state based on a preponderance of the evidence for the appeal. *Id.* at 2177 (App. H.)

Nothing in the 1985 amendments gave the State the power to issue administrative orders under the new Superfund program without these provisions.

Subsequent amendments to the SWDA further clarified both the burden of proof for an appeal of an administrative order and the class of persons who could file such an appeal. The Legislature narrowed the standing for appeal of an administrative order in 1989 to "any person subject to an administrative order under 8(g)," replacing earlier language that effectively allowed any person to file a petition appealing an administrative order issued under that provision. Act approved June 14, 1989, 71st Leg., R.S., ch. 703, 1989 Tex. Gen. Laws 3212, 3217 (current version at Tex. Health & Safety Code Ann. § 361.322 (West 2010)) (App. I.) The same bill clarified the standard of review for challenging the remedy

selection, adding a subsection "(h) If the appropriateness of the selected remedial action is contested in the appeal of the administrative order, the remedial action shall be upheld unless the court determines that the remedy is arbitrary or unreasonable." *Id.* at 3217 (App. I.) The bill also revised subsection (e), clarifying that an appeal "does not prevent the state agency issuing the administrative order from proceeding with the remedial action program under Subchapter F unless the court enjoins the remedial action under its general equity jurisdiction." *Id.* (App. I.)

### 3. The codified SWDA makes all administrative orders subject to these same provisions.

Following codification, the SWDA retained the same procedural framework outlined above. The procedure to list a site on the state Superfund list was reorganized under "Subchapter F: Registry and Cleanup of Certain Hazardous Waste Facilities." The procedural building blocks of an administrative order discussed above were reorganized into "Subchapter I: Enforcement, Administrative Orders Concerning Imminent and Substantial Endangerment." The appellate provision was reorganized under "Subchapter K. Appeals; Joinder of Parties." The Commission retained the power to issue an administrative order either before or after the listing process, but all administrative orders retained these elements.

**C. The current statute does not create mutually exclusive orders with separate waivers of sovereign immunity.**

The State's brief traces largely the same statutory history, but erroneously concludes that the Legislature intended to create "two types of Superfund order" that the State argues are "separate and distinct." (Appellant's Brief at 9.) The State argues that the two types of orders are mutually exclusive for three reasons: (1) they are contained in different sections; (2) they are expressed in different language; and (3) they are subject to different appellate provisions that present an irreconcilable conflict. *Id.* But as discussed below, none of these factors support the conclusion that the Legislature intended to create mutually exclusive Superfund orders with separate appellate provisions, and the statutory history combined with the current structure of the Act lead to precisely the opposite conclusion.

**1. Appearing in different sections using different language does not make the orders mutually exclusive.**

Although the Act empowers the TCEQ to issue orders in more than one part of the statute, the text is clear that parties named in both § 361.188 and § 361.272 orders are subject to certain procedural protections which the TCEQ cannot revoke. This was true when the 1985 amendments creating the Superfund program were passed and remains true through the modern codification of the statute. Pursuant to § 361.188(b), "the provisions in Subchapters I, K, and L relating to administrative orders apply to orders issued under this section." Tex. Health &

Safety Code Ann. § 361.188(b) (West 2010). This is the same cross-reference that was in the statute when it was enacted in 1985. This incorporation of Subchapters I, K, and L into "orders issued under this section" is not limited to what the State self-servingly identifies as "relevant provisions." (Appellant's Brief at 16.) Instead it is open ended and inclusive, and demonstrates that the Legislature intended all "administrative orders" of the SWDA to share common procedural attributes, including the same appellate provisions. Tex. Health & Safety Code Ann. § 361.188(b) (West 2010).

The structural link between orders issued under § 361.188 and § 361.272 is not limited to this provision. Just as section § 361.188 of Subchapter F directly incorporates Subchapters I, K, and L, a similar link between the two types of orders is found within Subchapter K at § 361.322. That appellate provision—limited to administrative orders issued under the Superfund program—states that "[t]he filing of the petition does not prevent the commission from proceeding with the remedial action program under Subchapter F unless the court enjoins the remedial action under its general equity jurisdiction." Tex. Health & Safety Code Ann. § 361.322(e) (West 2010). Therefore, if the Commission issues an administrative order before it has commenced with the remedial action program under § 361.272, that cleanup program can continue just as it would have if the order was issued under § 361.188 during the pendency of the appeal.

Although they appear in different sections of the Act and are expressed in different language, § 361.188 and § 361.272 do not create mutually exclusive orders. Instead, regardless of whether a Superfund order comes at the conclusion of the listing and remedy selection process through § 361.188 or instead prior to the remedial action program through § 361.272, the SWDA guarantees certain protections to persons the state believes are responsible for solid waste.

### 2. The SWDA appellate provisions distinguish between appeals of Superfund orders and appeals of permitting decisions, not separate kinds of Superfund orders.

The State contends that because there are two separate appellate provisions contained within the SWDA, the Legislature must have intended that a different appellate provision would apply to each type of Superfund order, and thus the orders are mutually exclusive. However, the State's argument misunderstands the structure of the SWDA and the role both provisions play in the context of the entire Act. The two appellate provisions are principally aimed at different types of orders or actions of the Commission. Therefore, they grant appellate remedies to different categories of parties, establish different timetables to perfect an appeal, and feature different burdens of proof and standards of review.

Section 361.321 of Subchapter K tracks the language of the 1969 Act and states that "a person affected by a ruling, order, decision, or other act of the commission may appeal the action by filing a petition in a district court of Travis

- 25 -

County." Tex. Health & Safety Code Ann. § 361.321(a) (West 2010). The appeal must be perfected within 30 days of the date that the offending act of the Commission occurs. *Id*. at § 361.321(b). The provision grants an appellate remedy not limited to formal commission orders, but to virtually any action by the Commission. An appellant under § 361.321 is not a named party subject to an administrative order, but instead is "a person affected" by the actions of the Commission. *Id*. at § 361.321(b). The SWDA defines a "person affected" as one who "has suffered or will suffer actual injury or economic damage and, if the person is not a local government: (A) is a resident of a county, or a county adjacent or contiguous to the county, in which a solid waste facility is to be located; or (B) is doing business or owns land in the county or adjacent or contiguous county." Tex. Health & Safety Code Ann. § 361.003(24) (West 2010).

The modern § 361.321 does not state that it is limited to—or even applicable to—administrative orders for Superfund cases. *Id*. at § 361.321(b). This is entirely consistent with its statutory history, as the provision was adopted with the original version of the SWDA in 1969, which did not empower the state to identify parties responsible for the release of solid waste and to compel those parties to clean up waste sites. As discussed above, the codified SWDA retains a solid waste permitting program distinct from the Superfund program that allows the Commission to issue permits for the construction, operation, and maintenance of

solid waste disposal facilities. *See* Tex. Health & Safety Code Ann. § 361.061 (West 2010). Hence, § 361.321 is directed at parties aggrieved by this permitting process who can show that they meet the economic injury test under the statute—it is not directed at parties named liable in Superfund orders. Both its statutory history and its current role in the SWDA demonstrate clear legislative intent that § 361.321 is the appellate provision for the permitting program, not the Superfund program. *See, e.g.*, *Tex. Natural Res. Conservation Comm'n v. Sierra Club*, 70 S.W.3d 809, 811 (Tex. 2002) (appeal of solid waste permitting decision under § 361.321 following contested-case hearing at the agency); *TJFA, L.P. v. Tex. Comm'n on Envtl. Quality,* No. 03-10-00016-CV, 2014 WL 3562735, at *1 (Tex. App.—Austin July 16, 2014, no pet.) (mem. op.) (same).

In contrast, § 361.322 applies to "an administrative order issued under 361.272" of the SWDA. Tex. Health & Safety Code Ann. § 361.322(a) (West 2010). Instead of 30 days under § 361.321(b), the appeal must be perfected within 45 days of receipt of the order. *Id.* The section does not authorize appeals of solid waste permits or other Commission actions, but is limited to administrative orders issued under the Superfund program. *Id.*; *see also Sierra Club*, 70 S.W.3d at 812 (noting that § 361.322 was "not applicable" to appeal of permit decision). Instead of restricting appeals to a "person affected" by a Commission action as defined in the statute, § 361.322 is limited to a person "subject to" the administrative order on

appeal. *Id.* This too is consistent with the statutory history of the SWDA, as the Legislature created both the power to issue administrative Superfund orders and the right to appeal those orders within the 1985 amendments, granting the same appellate remedy for all Superfund orders. The State has never enjoyed the power to issue these administrative orders without the appellate provisions of the modern § 361.322.

### 3. Forcing all appeals of Superfund orders into § 361.321 creates an absurd result.

Ignoring the plain language of § 361.188(b)—which incorporates "all provisions relating to administrative orders" into § 361.188 orders—the State suggests that "[t]he proper reading of this section is that the relevant provisions of the other subchapters apply to Section 361.188 orders, to the extent they do not create contradictions or absurd results." (Appellant's Brief at 16.) Yet at the same time, the State asks the Court to force Superfund appeals into an appellate provision explicitly limited to entities surrounding the geographic area in which "a solid waste facility is to be located." Tex. Health & Safety Code Ann. § 361.003(24) (West 2010). But the statutory history of both appellate provisions shows that the Legislature never intended to force appeals of Superfund orders into the preexisting regime for permitting decisions. The separate appellate provisions of Subchapter K were adopted alongside their respective programs—the permitting

program and the Superfund program—to provide appellate remedies to parties aggrieved by either type of agency action.

Taking the State's argument to its logical conclusion, a party's standing to appeal a Superfund order under the SWDA would not depend on whether or not the entity was named in the administrative order per § 361.322, but instead would turn on the entity's geographic nexus to the site at issue pursuant to § 361.321. Assuming the site in question even qualified as a "solid waste facility" under the Act, parties who owned land or did business within the defined geographic zone would have a right to appeal, while parties missing this geographic link would have no clear appellate remedy. At the same time, the Commission is free to identify and name in an administrative order persons it believes responsible for solid waste without regard to their geography, and order them to remediate the site or pay the State's response costs. No such concept exists in the CERLCA jurisprudence, and the Legislature never intended to create such an anomalous appellate scheme for the Texas program.

## II. Appellees' Response to Appellant's Issue Two.

The Administrative Order for the Voda Site was issued under both § 361.188 and § 361.272 of the SWDA. The AO is directed at both solid wastes and hazardous substances, and plainly invokes the TCEQ's powers under § 361.188 and § 361.272. Immediately before and after the AO was issued, the Commission

unambiguously declared that it issued the Order pursuant to both sections of the Act, and the TCEQ has unequivocally pled the same procedural facts throughout this litigation. In fact, the Commission's live pleadings state that the Order was issued under both § 361.188 and § 361.272 and that the sole method for appealing the Order resides at § 361.322. Therefore, even if the State were correct that § 361.188 and § 361.272 orders are subject to different appellate provisions, the AO for the Voda Site was issued under § 361.272, making application of § 361.322 appropriate for this Order.

### A. The language of the AO demonstrates the Order was issued under § 361.188 and § 361.272.

The language used by the TCEQ in the AO demonstrates the Commission's intent and action to issue the Order under both § 361.188 and § 361.272. The very first paragraph of the AO invokes the Commission's power to issue the Order "as authorized by Sections 361.188 and 361.272 of the Act." (CR:29; App. A.) In detailing the Chemicals of Concern at the Voda Site, the AO specifically invokes "Sections 361.271 through 361.277 and 361.343 through 361.345" of the SWDA. (CR:48; App. A.) The Order also names ExxonMobil and Shell as "responsible parties ('RPs') pursuant to Section 361.271 of the Act" (CR:29; App. A.) and announces the TCEQ's conclusion that the "release or threatened release… has not been proven to be divisible pursuant to Section 361.276 of the Act." (CR:50; App. A.) In the event there are disagreements between the Agreeing Respondents and

- 30 -

the Executive Director, the AO states such disagreements will be handled pursuant to "Sections 361.321 and/or Sections 361.322 of the Act." (CR:86; App. A.) And the AO orders Respondents to preserve records "relating to each Respondent's potential liability or to any other person's potential liability for the Site under Section 361.271 of the Act." (CR:78; App. A.) All of these provisions flatly contradict the State's position that the AO was issued solely under § 361.188.

The dual nature of the AO is even more apparent when looking at the materials the Commission alleges are present at the Voda Site. Subchapter F of the SWDA authorizes the TCEQ to identify and list sites where the release of "hazardous substances" has allegedly endangered public health. Tex. Health & Safety Code Ann. § 361.181(a) (West 2010). The term "solid waste" does not appear within §§ 361.181-361.188 of the SWDA, which instead is focused exclusively on the listing, cleanup, and remediation of sites containing "hazardous substances." *Id.* In contrast, Subchapter K authorizes the Commission to issue an order to a person responsible for "solid waste" if a release of "solid waste…presents an imminent and substantial endangerment." *Id.* at § 361.272. This provision makes no mention of hazardous substances.

The AO for the Voda Site is not limited to "hazardous substances" as would be expected for an order limited solely to § 361.188, but instead declares parties responsible for "the solid waste and/or hazardous substances at the Site." (CR:29;

App. A.) The AO declares that certain substances "which are found at the Site, are solid wastes as defined in Section 361.003(34) of the Act" and further alleges that the PRPs are responsible for "solid wastes [that] were stored, processed, disposed of, or discarded at the Site." (CR:50; App. A.)

**B.      Counsel for the Executive Director asked the Commissioners to issue the Order under both § 361.188 and § 361.272.**

The State argues that "the TCEQ intended to issue a Section 361.188 order." (Appellant's Brief at 23.) Yet the words of the counsel for the Executive Director of the TCEQ—immediately before, during, and immediately after the AO was issued—demonstrate the Commission's intent to issue the AO pursuant to both § 361.188 and § 361.272, and a clear understanding that the TCEQ had done just that. The Commission's agenda item for the Voda Site was docketed as "Consideration of a Final Administrative Order (Final Order) pursuant to Texas Health and Safety Code Sections 361.188 **and** 361.272 for the Voda Petroleum, Inc. State Superfund Site…." (AR 51127: App. J (emphasis added).) When counsel for the Executive Director presented the administrative order to the Commission, she asked the Commissioners to issue the order "pursuant to Chapter 361, sections 188 **and** 272 of the Health and Safety Code." (AR 50382 (emphasis added).) And when the TCEQ opposed Luminant's rehearing request, it argued that "[b]ecause the Order was issued under Sections 361.272 **and** 361.188 (Administrative Order

1), it did not require an adjudicative hearing before the Commission." (AR 49650; App. B (emphasis added).)

**C.    Understanding that the AO invokes both § 361.188 and § 361.272, the State described the Order as having been issued under both sections for years.**

Since this case was filed in 2010, the State has understood the true nature of the Order by repeatedly and unequivocally pleading that the AO was issued under both § 361.188 and § 361.272 of the SWDA. These statements appeared in the TCEQ's Original Counter-Petition and Third-Party Petition, Response to Plea in Abatement, Motions for Entry of Default, and their Motions for Entry of Agreed Final Judgment. (CR:127-69; Tab D.) Following denial of the TCEQ's Motion for Leave to Amend, they remain the Commission's live pleading in the case. The State's claim that the Commission intended to issue a purely § 361.188 Order is flatly contradicted multiple times by the text of the Order and by the Commission's own justification for its actions.

**1.    The TCEQ repeatedly and unequivocally described the AO as being issued under § 361.188 and § 361.272.**

In its Original Counter-Petition and Third-Party Petition, the State pled that: "On February 12, 2010, the TCEQ issued an administrative order ("the Order") under §§ 361.188 **and** 361.272 of the Act…." (CR:158; App. D.) The State further pled that ExxonMobil and Shell "were 'liable for the elimination of the release or threatened release, in whole or in part,' within the meaning of TEX. HEALTH &

- 33 -

SAFETY CODE § 361.322(g)" and that "the Order should be upheld pursuant to TEX. HEALTH & SAFETY CODE §§ 361.321 and 361.322(g)." (CR:164; App. D.)

The State unequivocally repeated the same description of the AO—as an order issued under § 361.188 and § 361.272—in myriad other filings at the trial court:

- On October 20, 2011 Third-Party Defendant Howard Frelich filed a Plea in Abatement along with his Original Answer. In its Response to this Plea in Abatement, the TCEQ stated that "The Order was issued **pursuant to two sections** of the Texas Solid Waste Disposal Act: Tex. Health & Safety Code §§ 361.188 & 361.277 (sic)." As proof that the AO relied on both sections, the State cited to the very first paragraph of the AO—"**Order sec. I at 1**." (Supp. CR at ___ [*TCEQ's Response to Plea in Abatement by Third-Party Defendant Howard Freilich and Motion for Partial Summary Judgment* at 9-10 (filed November 14, 2011) (emphasis added) (attachments omitted)].

- On July 30, 2012, the State moved for entry of an agreed final judgment between the TCEQ and a group of approximately 154 potentially responsible parties ("PRPs"). In the agreed final judgment, the State pled that "the TCEQ issued the Order under Sections 361.188 **and** 361.272 of the Act...." (Supp. CR at ___ [*Agreed Final Judgment*, Cause No. D-1-GN-12-002297, *Young Chevrolet, Inc., et al. v. Texas Commission on Environmental Quality*, in the 345th Judicial District Court of Travis County, Texas at ¶ III. B. (filed July 30, 2012) (emphasis added) (attachments omitted)].

- On May 3, 2013, the State moved for entry of another agreed final judgment between the TCEQ and a single PRP, Ark-La-Tex Waste Oil Company, Inc. Once again, the State pled that "the TCEQ issued the Order under Sections 361.188 **and** 361.272 of the Act...." (Supp. CR at ___ [*Agreed Final Judgment*, Cause No. D-1-GN-13-003373, *Young Chevrolet, Inc., et al. v. Texas Commission on Environmental Quality*, in the 345th Judicial District Court of Travis County, Texas

- 34 -

at ¶ III. B. (filed September 26, 2013) (emphasis added) (attachments omitted)].

- On February 4, 2014, the State moved for entry of default against PRPs Billy D. Cox Truck Leasing, Inc. and SBC Holdings, Inc. f/k/a/ the Stroh Brewery Company. In ¶ 3 of those motions, the State noted that "The TCEQ issued a Superfund Order on February 12, 2010, ("the Order") under Tex. Health and Safety Code §§ 361.188 **and** 361.272…." (Supp. CR at ___ [*Motion for Partial Default Judgment Against Billy D. Cox Truck Leasing, Inc.* at ¶ 3 (filed February 4, 2014) (emphasis added); *Motion for Partial Default Judgment Against SBC Holdings, Inc., f/k/a The Stroh Brewery Company* at ¶ 3 (filed February 3, 2014) (emphasis added).].

Though the State has filed a handful of supplements to its pleadings at the trial court, the Commission's live pleadings directly contradict their core arguments on appeal. The State's Third Amended Answer acknowledged that "[t]he Texas Legislature has defined **the sole method** for appealing the Order at Tex. Health & Safety Code **§ 361.322**." (CR:678; App. E (emphasis added).) The TCEQ concluded this Answer by pleading that "the standard of review in the appeal **of this Order** is…whether: (a) TCEQ can prove, by a preponderance of the evidence, the two factors listed in § 361.322(g)(1) and (2); (b) Plaintiffs can show that the selection of the remedy by TCEQ was arbitrary or unreasonable; or (c) Plaintiffs can show that the Order as a whole is 'frivolous, unreasonable, or without foundation with respect to a party named by the order.' *Id.* at § 361.342." (CR:683; App. E (emphasis added).)

## 2. The State disclosed that it issued the AO under both sections to obtain advantages of a § 361.272 order.

The State's discovery disclosures make clear why the Commission chose to issue the AO under § 361.272 as well § 361.188. Pursuant to § 361.274, "[a]n administrative order under Section 361.272 does not require prior notice or an adjudicative hearing before the commission." Tex. Health & Safety Code Ann. § 361.274 (West 2010). In stating why ExxonMobil and Shell were not entitled to an agency hearing prior to issuing the AO, the State disclosed that "a party does not have a right to an adjudicative hearing prior to a § 361.272 Order, pursuant to Tex. Health & Safety Code § 361.274." (Supp. CR at ___ [*Texas Commission on Environmental Quality's Response to Request for Disclosure* at 3-4 (served September 6, 2012) (attachments omitted)].

Moreover, the State has steadfastly argued that ExxonMobil and Shell, as the well as other PRPs, are jointly and severally liable for contamination at the Voda Site. The statutory basis for joint and several liability under the SWDA is found in § 361.276, which states that "[i]f the release or threatened release is not proved to be divisible, persons liable under *Section § 361.272* or § 361.273 are jointly and severally liable for eliminating the release or threatened release." Tex. Health & Safety Code Ann. § 361.276 (West 2010) (emphasis added). Nothing in Subchapter F for a § 361.188 order establishes joint and several liability for responsible parties, and § 361.276 does not state that persons declared by TCEQ to

- 36 -

be a responsible party under a § 361.188 order are jointly and severally liable. At the trial court, the State disclosed that: "[t]he TCEQ is not required to prove allocation of liability, because the responsible parties are jointly and severally liable unless they can prove 'divisibility' by a preponderance of the evidence." (Supp. CR at ___ [*Texas Commission on Environmental Quality's Response to Request for Disclosure* at 3-4 (served September 6, 2012) (attachments omitted)]. In other words, the Commission invoked § 361.272 in an attempt to hold the PRPs for the Voda Site jointly and severally liable under the SWDA.

**D.      Following the listing procedures of Subchapter F does not insulate the AO from review under Subchapter K.**

Despite explicitly referencing numerous provisions of Subchapter K throughout the AO, the State argues that the AO arose exclusively under § 361.188 because the agency followed the listing requirements of Subchapter F of the SWDA. Therefore, the State argues, the AO can only be reviewable under the pure substantial evidence rule. But as discussed above, the issuance of an order under § 361.272 does not preclude the Commission from the listing process of § 361.181-188. Tex. Health & Safety Code Ann. § 361.322(e) (West 2010). Thus, § 361.322 authorizes the Commission to proceed with investigation and remedy selection during the appeal of the administrative order under § 361.322, and nothing in § 361.322 indicates that once the TCEQ proceeds with the remedial action program of Subchapter F, the appellate remedies of § 361.322 are mooted.

**E.    Reviewing an administrative order under § 361.322 does not make Subchapter F redundant.**

The State suggests that if an administrative order issued under § 361.188 were subject to review based on a preponderance of the evidence, it would make the listing procedures of Subchapter F effectively redundant. This suggestion misapprehends what occurs prior to issuance of an administrative order compared to what occurs at the district court upon judicial review.

The TCEQ purposefully invoked § 361.272 and § 361.274 such that ExxonMobil and Shell were not afforded a contested-case hearing prior to issuance of the AO for the Voda Site. The Commission did not prove—by a preponderance of the evidence to a neutral third party—that ExxonMobil and Shell were persons responsible for solid waste at the Voda Site. Had ExxonMobil and Shell been granted an adjudicative hearing, some procedures would be duplicated through judicial review. However, the AO was issued without any such hearing, and the district court will present the first opportunity for ExxonMobil and Shell to challenge the AO and the first time the Commission will be required to carry its statutory burden to prove ExxonMobil and Shell are responsible for solid waste.

The State further suggests that the extensive procedure to list a site on the Superfund registry should entitle the Commission to substantial evidence deference because the agency spent significant time and effort investigating the Site and choosing an appropriate remedy. Yet from the perspective of a party subject to an

administrative order, virtually none of the Commission's purported expertise is brought to bear on issues most relevant to the responsible party—namely, whether they are in fact a person responsible for solid waste or hazardous substances. In practice, the agency's identification of persons responsible for solid waste consists of little more than collecting invoices or manifests, many of which are decades old, and making a list of every entity mentioned in the paperwork. The SWDA does not mandate any standard for how this identification must take place nor what evidentiary threshold must be crossed before a party is named in an order.

Although the Commission can issue administrative orders without adjudicatory hearings, the potentially responsible party's opportunity to establish its innocence is delayed—not abrogated—by the SWDA. The appellate structure of the SWDA allows those parties to challenge their status as PRPs and places the burden on the Commission to ultimately prove them responsible at the district court. When liability for such Sites routinely reaches into the millions of dollars, the Legislature never intended the Commission's unilateral order to be the final word on liability.

In contrast, the Commission does expend technical resources in developing a remedy it believes suitable for a proposed site. This can occur either before the issuance of the administrative order under § 361.188 or after the issuance of the administrative order under § 361.272. In either event, the SWDA makes review of

that remedy selection subject to greater deference than whether a party is responsible for solid waste or whether the waste is divisible pursuant to the Act. When a person subject to the order challenges the selected remedy, the Commission is not required to prove it chose the best remedy by a preponderance of the evidence, but instead the selected remedy is upheld "unless the court determines that the remedy is arbitrary or unreasonable." Tex. Health & Safety Code Ann. § 361.322(h) (West 2010). In short, the Commission already receives greater deference for issues where technical expertise was brought to bear, but the Commission is not entitled to greater deference when simply naming parties it believes responsible for the release of solid waste or hazardous substances.

F.     **If the Commission is correct that it exceeded its powers under the SWDA then the AO must be set aside.**

If the State is correct that "[a] single order cannot arise under both Sections 361.188 and 361.272" (Appellant's Brief at 18.) the proper course of action is not to grant the plea to the jurisdiction but to overturn the Order as a violation of law. Administrative agencies "may exercise only those powers the law, in clear and express statutory language, confers upon them." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220 (Tex. 2002). Agencies cannot "create for themselves any excess powers" and courts avoid implying any additional authority to them. *Id.* (citing *Key Western Life Ins. Co. v. State Bd. of Ins.*, 350 S.W.2d 839, 848 (Tex. 1961)). When an agency exceeds the authority granted it by

statute, the court should set aside the agency action. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001); *Heat Energy Advanced Tech., Inc. v. W. Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 290 (Tex. App.—Austin 1998, pet. denied).

The Commission intended to and did issue an administrative order under both § 361.188 and § 361.272. Now, the State argues that the Commission has no such power under the statute. If this Court agrees that the Commission is without power to issue the AO under both § 361.188 and § 361.272, then the Court should set aside the Order as exceeding the Commission's power under the statute.

## III. Appellees' Response to Appellant's Issue Three.

Review of the AO pursuant to § 361.322 of the SWDA is proper under the Act and the Texas Constitution. The SWDA contains the applicable standard of review, placing the burden on the Commission to prove, by a preponderance of the evidence, that ExxonMobil and Shell are responsible for solid waste. The pure substantial evidence review procedures found in the APA are not applicable to this appeal, and the Texas Supreme Court's decision in *City of Waco* regarding certain threshold questions of standing for affected persons under the Texas Water Code is not relevant to this Order.

**A. Texas courts are not constitutionally limited to review of administrative orders only as to matters of law.**

The State argues that courts are empowered to review administrative orders only "as to matters of law" and that to do otherwise would offend the separation of powers doctrine of the Texas Constitution. (Appellant's Brief at 35.) Yet the separation of powers doctrine only prohibits the Legislature from authorizing *de novo* judicial review of quasi-legislative acts that address broad questions of public policy or promulgate rules for future application. The AO is not a quasi-legislative act, and thus judicial review under § 361.322 does not violate the separation of powers doctrine.

The Texas Constitution divides the state's government into three coequal branches, and forbids any branch from exercising a power properly vested in a coordinate branch. *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 600 (Tex. 2001). Article II, Section 1 of the Texas Constitution provides as follows:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. II, § 1.

Under Texas law, "a person may obtain judicial review of an administrative action only if a statute provides a right to judicial review, or the action adversely affects a vested property right or otherwise violates a constitutional right." *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc*., 145 S.W.3d 170, 172 (Tex. 2004). The separation of powers doctrine generally prohibits a court from reviewing the actions of an administrative agency absent statutory authorization. *Tex. Comm'n of Licensing & Regulation v. Model Search Am., Inc*., 953 S.W.2d 289, 291 (Tex. App.—Austin 1997, no writ).

This Court explained the test for determining whether judicial review of an agency's order violates the separation of powers doctrine in *Commercial Life Insurance Company v. Texas State Board of Insurance*, 808 S.W.2d 552, 554-55 (Tex. App.—Austin 1991, writ denied). The plaintiff in *Commercial Life* sought judicial review of a final order issued by the Texas State Board of Insurance. *Id.* at 553. The insurance code provided that "such causes of action 'shall be tried and determined upon a trial *de novo*' and, moreover, 'the substantial evidence rule shall not apply.'" *Id.* at 553-54. The Insurance Board argued that the statute violated the separation of powers doctrine and the Insurance Board's decision was subject only to substantial evidence review. *Id.* at 555. The trial court in *Commercial Life* accepted the Insurance Board's argument, refusing to hold a trial *de novo* as

required by the statute, and, based on the record, sustained the Insurance Board's order on the ground that it was supported by substantial evidence. *Id*. at 554.

This Court reversed. This Court first identified the proper test for constitutionality as "whether the reviewing court is required to exercise a function that is deemed nonjudicial." *Id.* at 556. Explaining this dichotomy, the Court wrote:

> An inquiry by a court is nonjudicial and unconstitutional if it looks to the future and changes existing conditions by making a new rule which is to be applied thereafter. However, a court engages in a judicial inquiry if it investigates, declares and enforces liabilities as they stand on present or past facts and under laws already in existence. Thus, the court's action is adjudicatory in nature if its action is particular and immediate rather than general and future.

> *Id.*

The Court held that the Insurance Board's decision was "quasi-judicial and not legislative in nature" such that trial *de novo* at the district court was permissible under the separation of powers doctrine. *Id.*

This Court reiterated the appropriate test for determining whether review of an administrative order violates the separation of powers doctrine eight years later in *Macias v. Rylander*, 995 S.W.2d 829, 832-33 (Tex. App.—Austin 1999, no pet.). In that case, the Texas Comptroller issued an order temporarily suspending Macias's broker's license. *Id.* at 831. Macias sought judicial review of the Comptroller's order. *Id.* Although the statute called for judicial review via trial *de*

*novo*, the Comptroller convinced the district court to review the Comptroller's order pursuant to the substantial evidence rule, arguing that pure *de novo* review violates the Texas Constitution. *Id*. at 832. The district court upheld the suspension based on substantial evidence review and Macias appealed. *Id*.

Writing for the Court, Justice Yeakel framed the issue on appeal as "whether a trial *de novo* of the Comptroller's charges against Macias violates the constitution, allowing only substantial-evidence review confined to the agency record." *Id.* at 832. Justice Yeakel first identified the relevant separation of powers doctrine, noting that "[i]f the function of the agency is legislative, judicial review is constrained by the substantial-evidence rule because the court may not substitute its judgment for that which is considered to be a legislative function." *Id.* at 832. In contrast, "when an agency has acted in a judicial or quasi-judicial capacity, a court may conduct a trial *de novo* without violating separation-of-powers principles." *Id.* at 833.

Drawing the distinction between the legislative and judicial, Justice Yeakel explained that "an administrative agency acts in a legislative capacity when it addresses broad questions of public policy and promulgates rules for future application 'to all or some part of those subject to its power.'" *Id*. But a "judicial inquiry…typically involves an investigation of present or past facts and a determination of liability based on laws already in existence." *Id*. Applying this

framework to the facts of *Macias*, Justice Yeakel held that the Comptroller's actions were judicial in nature because instead of "promulgating rules that would broadly affect customs brokers as a whole," the Comptroller had only "engaged in a factual inquiry into the conduct of a particular individual." *Id.* Finding that "the district court erred in conducting a substantial-evidence review of the Comptroller's order" the Court decided to "remand this case to the district court for consideration by trial *de novo*." *Id.*

The State advances the same argument presented by the Insurance Board in *Commercial Life* and the Comptroller in *Macias*, suggesting that the separation of powers doctrine requires that the trial court may only review the AO under the substantial evidence test as to matters of law. Yet the State makes no effort to explain how issuance of the AO was a quasi-legislative, as opposed to a quasi-judicial, act. Unlike a quasi-legislative action, the AO does not address "broad questions of public policy" nor promulgate "rules for future application." *Macias*, 995 S.W.2d at 833. Instead, it fits squarely within the quasi-judicial framework because it "investigates, declares and enforces liabilities as they stand on present or past facts and under laws already in existence." *Commercial Life Ins. Co.*, 808 S.W.2d at 556. The AO purports to make specific factual findings about materials ExxonMobil and Shell shipped to the Voda Site, the alleged release of those materials, and the harm allegedly caused—all predicates to alleged liability under

the SWDA. Therefore, review of the AO under the statutory provisions of the SWDA does not violate the separation of powers doctrine. *See also Key W. Life Ins. Co. v. State Bd. of Ins.*, 350 S.W.2d 839, 847 (Tex. 1961); *Dep't of Pub. Safety v. Petty*, 482 S.W.2d 949, 952 (Tex. Civ. App.—Austin 1972, writ ref'd n.r.e.).

The State relies upon *Texas State Board of Examiners in Optometry v. Carp*, 388 S.W.2d 409, 415-16 (Tex. 1965) to argue that review of the AO under § 361.322 would violate the separation of powers doctrine. Yet the Texas Supreme Court explicitly identified the activity at issue in *Carp*—adopting a code of professional responsibility applicable to all Optometrists in the state—as "quasi-legislative in nature." *Id.* at 414. The facts presented by *Carp* have no application to the AO, and the holding only highlights the distinction between quasi-legislative acts that set rules applicable to all parties and quasi-judicial acts that determine the rights of responsibilities of the parties subject to the particular order.

The State also relies on the 1967 decision in *Gerst* for the sweeping suggestion that all judicial review of agency decisions is limited to questions of law. *Gerst v. Nixon*, 411 S.W.2d 350, 352 (Tex. 1967). That case dealt with an application to the Savings and Loan Commission for a charter to open a new savings and loan association. The Court in *Gerst* defined certain acts—including the issuance of permits to do business under the Savings and Loan Act—as administrative functions that were not subject to judicial review *de novo*. *Id.* at

354. ("The granting or withholding of a permit, certificate or authority to do business in a statutorily regulated commercial endeavor is an administrative function."). Following the opportunity for a formal hearing at the agency level, the court in *Gerst* held that *de novo* review of this type of administrative function was impermissible, and determined that the trial court should review the decision on the application under the substantial evidence rule. *Id*. In short, *Gerst* was directed at a permitting decision that was reached following the opportunity for a hearing at the agency level, and has no application to the facts of this AO.

B. **The Texas Supreme Court's decision in *City of Waco* is not controlling in this SWDA appeal.**

The State relies on the Texas Supreme Court's decision in *Texas Commission on Environmental Quality v. City of Waco*, 413 S.W.3d 409 (Tex. 2013) (App. K) to argue that judicial review of the AO is limited to the "administrative record" provided by the TCEQ. Yet the State misapprehends the significance of that decision at both the Court of Appeals and Supreme Court levels.

The central issue in *City of Waco* was a threshold determination on whether a third-party could intervene and force a contested-case hearing for an existing permit modification. Under the Texas Water Code, interested third-parties may object to requested permit modifications during a comment period and may attempt to intervene and force the applicant into a contested-case hearing. However, only

an "affected person" has standing to receive a contested-case hearing. Therefore, a threshold determination must be made as to whether the objecting party is an "affected person" with standing to request a contested-case hearing.

In *City of Waco*, a concentrated animal feeding operation sought to modify its existing water-quality permit from the TCEQ. The City objected to the proposed permit modification and sought to initiate a contested-case hearing. The Commission determined that the City was not an "affected person" entitled to force a contested-case hearing, and the Executive Director issued the amended permit. The City appealed to the district court, which affirmed the Commission's decision. This Court reversed, holding that the Commission acted arbitrarily as a matter of law. *City of Waco v. Tex. Comm'n on Envtl. Quality*, 346 S.W.3d 781, 827 (Tex. App.—Austin 2011, pet. granted). This Court also summarized and restated a prior line of cases which held that pure substantial evidence review was not possible absent the opportunity to develop a record through a contested-case or adjudicative hearing. *Id.* at 818. However, this Court based its holding on its conclusion that the agency had "acted arbitrarily by relying on a factor that is irrelevant to the City's standing to obtain a hearing." *Id.* at 823. Therefore, the Commission's decision could be overturned as arbitrary "independently and apart from whether substantial evidence could be found to support those findings." *Id.* at 819.

The Texas Supreme Court reversed and reinstated the Commission's decision to deny the City's request. *City of Waco*, 413 S.W.3d at 425. The Texas Supreme Court found that the Commission's actions were not arbitrary and that there was evidence in the record to support the Commission's conclusion that the City was not entitled to force a contested-case hearing. *Id.* In finding that the Commission's action was not arbitrary, the Texas Supreme Court did not articulate what standard of review it used to uphold the TCEQ's threshold determination on whether the City was an affected person entitled to force a contested-case hearing. Nor did the Texas Supreme Court address this Court's extensive analysis regarding the inapplicability of pure substantial evidence review in the absence of a factual record developed in a contested-case proceeding. In fact, the words "substantial evidence" are absent from the Texas Supreme Court's analysis of the agency's actions. Instead, the Texas Supreme Court gave deference to the agency's answer to the threshold statutory question of whether the permit was exempt from the hearing requirement under the statute.

The State suggests that *City of Waco* should be interpreted to mean that all the Commission's actions are subject to review only under the substantial evidence standard, regardless of the statute involved or the procedures afforded the aggrieved party at the agency level. But this over-reads the limited issue at stake in *City of Waco*. The issue on appeal was not the agency's ultimate decision on the

merits of the permit, but what the Texas Supreme Court characterized as a "threshold determination of whether the party is an 'affected person'" sufficient to intervene in the application process of a third party. *Id.* at 410. While both cases involve activities by the TCEQ, their similarities largely end there, as the present case has no connection to the Texas Water Code, permitting, or the standing of third parties—rather it involves the appeal of an agency order under liability-declaring provisions of the SWDA. The TCEQ's determination on right-to-hearing decisions for third parties is not analogous to enforcement of a unilateral administrative order against an entity that the agency alone has determined to be responsible for environmental contamination.

More importantly, the decision in *City of Waco* came in the context of an appeal under § 5.351 of the Texas Water Code, which itself does not supply any standard of review. Tex. Water Code Ann. § 5.351 (West 2008). Through case law, the Texas Supreme Court has held that such decisions are subject to "substantial evidence review." *Texas Water Comm'n v. Dellana*, 849 S.W.2d 808, 809-10 (Tex. 1993). In contrast, this case is brought under the appellate provisions of the SWDA, which places an affirmative burden of proof on the agency to prove certain facts by a preponderance of the evidence to the satisfaction of the district court. Tex. Health & Safety Code Ann. § 361.322 (West 2010).

The State further argues that a post-*City of Waco* decision from this Court, *Texas Commission on Environmental Quality v. Sierra Club*, No. 03-12-00335-CV, 2014 WL 7464085 (Tex. App.—Austin Dec. 30, 2014, no pet. h.), "reinforced [the State's] interpretation." (Appellant's Brief at 39.)[6] In that case, a waste control company applied to the TCEQ for a permit to construct and operate two facilities for the disposal of low-level radioactive waste under the Texas Radiation Control Act ("TRCA"). Similar to the Water Code provisions at issue in *City of Waco*, the TRCA requires the TCEQ to hold a contested-case hearing on the merits of an application if a "person affected" requests one. Tex. Health & Safety Code Ann. § 401.229(a) (West 2010). Two members of the Sierra Club sought to intervene and force the applicant to defend its permit application through the contested-case process. *Id*. at *2. This Court identified "the critical, or threshold, inquiry in contested-case hearing requests—and importantly the focus of the parties to this appeal—is whether the person requesting the hearing is an 'affected person.'" *Id*. at *4. Applying the holding from *City of Waco*, the Court held it must review "a TCEQ determination regarding affected-person status for an abuse of discretion." *Id.* Upon review, this Court found a reasonable basis for the agency's decision to deny the hearing request. *Id.* at *9. And consistent with *City of Waco*, this Court

---

[6]    The opinion cited by Appellant was withdrawn by the Court on December 30, 2104, and substituted with the opinion discussed herein.

determined that the Commission was not required to hold a contested-case hearing simply to determine whether or not it was required to hold a contested-case hearing. *Id.* at 10.

No court interpreting or applying *City of Waco* has adopted the State's position that all TCEQ decisions—including those with specific statutory appellate provisions to the contrary—are subject to review only through pure substantial evidence. The cases citing *City of Waco* only reiterate its application to the limited, threshold inquiry of whether a party is an affected person sufficient to trigger a contested-case hearing. Consequently, the issues before the Court are neither controlled nor informed by *City of Waco* or its limited progeny.

## C. The APA provisions authorizing pure substantial evidence review on a contested-case record are not applicable to this appeal.

Ignoring the statutory language for judicial review of the AO, the State tries to shoehorn judicial review of the case into pure substantial evidence review under Texas Government Code § 2001.174 with the claim that the Court should "look to the APA" to "interpret the existing law of administrative review." (Appellant's Brief at 36.) Yet by its express terms, Texas Government Code § 2001.174 does not apply because there was no contested-case hearing at the TCEQ and because the SWDA already provides the appropriate standard of review. If the Court does choose to look to the APA, the lessons drawn should only reinforce the trial court's decision denying the State's plea.

**1.	The APA does not apply, and the available guidance leads to different conclusions than advocated by the State.**

The statutory basis for pure substantial evidence review advanced by the State is found in the Administrative Procedures Act ("APA"), Texas Government Code Chapter 2001. Texas Gov't Code Ann. §§ 2001.171-178 (West 2008). By its express terms, this APA provision is limited to the appeal of a contested-case hearing. *Id.* at § 2001.171. When an aggrieved party appeals an administrative order issued after a contested-case hearing, the APA provides that the scope of judicial review "is as provided by the law under which review is sought." *Id.* at § 2001.172. If the law under which review is sought grants a right to trial *de novo* of the administrative order, the APA provides the relevant procedures for this *de novo* review under § 2001.173. If the law under which review is sought instead allows only substantial evidence review of the contested-case order—or if it does not define a scope of review—the APA outlines the procedures for that review in § 2001.174. None of these three situations are applicable to the AO in this case.

Absent express application, to the extent the APA offers any guidance for how the Court should determine the proper procedure for the appeal of the AO, the State draws precisely the wrong conclusions. First, the Commission suggests the Court should ignore the statutory appellate provisions of the SWDA and simply substitute substantial evidence review under § 2001.174. But even when the APA applies, it does not supplant the statutory provisions of the law under which review

is sought as reflected in § 2001.172, but is expressly subject to the specific statute under which the administrative order is being reviewed. Second, the State has argued that administrative orders can only be reviewed as to questions of law based on the separation of powers doctrine. Yet Subchapter K of the APA establishes that administrative orders can be reviewed via trial *de novo* at the district court, even if they are issued following a contested-case hearing at the agency.

### 2. Outside of threshold standing questions, pure substantial evidence requires a true contested-case record under the APA.

The APA standard of "substantial evidence" permits the reviewing court to reverse if the decision is "not reasonably supported by substantial evidence considering the reliable and probative evidence in the *record as a whole.*" Texas Gov't Code Ann. § 2001.174(2)(E) (West 2008) (emphasis added). The "record as a whole" within which the court looks for substantial evidence is the contested-case record, not any type of informal record developed in a non-contested-case proceeding. In fact, the items identified as part of such a record in the APA—pleadings, evidence received, offers of proof, etc.—demonstrates that the "record as a whole" is an adjudicative record. *Id.* at § 2001.060. Therefore, pure substantial evidence review under the APA presupposes an open, adjudicative hearing where both sides may present evidence and cross-examine testifying witnesses. *See, e.g.,* *Ramirez v. Tex. State Bd. of Med. Exam'rs*, 927 S.W.2d 770, 773 (Tex. App.—

Austin 1996, no writ) (rejecting argument that Legislature created right of judicial review under substantial-evidence rule while depriving parties of opportunity for contested-case hearing); *G.E. Am. Commc'n v. Galveston Cent. Appraisal Dist.*, 979 S.W.2d 761, 767 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("Substantial evidence review cannot have been the proper standard because there is no record from the appraisal review board hearing.").

The *City of Waco* case recognized a limited exception to the link between pure substantial evidence review and a contested-case hearing, i.e., the "threshold determination of whether the person seeking the [contested-case] hearing is an affected person" sufficient to challenge a permitting decision. *Sierra Club*, 2014 WL 7463875, at *5. Those decisions can be reviewed by the trial court for abuse of discretion. None of the features applicable to this limited exception are present in this case. This is a Superfund case in which the TCEQ has declared ExxonMobil and Shell liable, not a permitting case brought by a third-party. ExxonMobil and Shell challenged a unilateral administrative order, not a denial of their contested-case hearing request. Perhaps most importantly, the relevant statute contains a standard of review, and there is no basis for substituting a standard of review other than the one called for in the statute.

The State ignores these prerequisites for pure substantial evidence review and points to a handful of cases to argue that the Court should apply pure

substantial evidence review to this appeal of a state Superfund order. Those cases are readily distinguished. The aggrieved party in *Smith v. Houston Chemical Services, Inc.*, 872 S.W.2d 252 (Tex. App.—Austin 1994, writ denied) was appealing a permitting decision under § 361.321 following a contested-case hearing on its application for a solid waste disposal permit. Likewise in *Texas Commission on Environmental Quality v. Kelsoe*, 286 S.W.3d 91 (Tex. App.—Austin 2009, pet. denied), the aggrieved party challenged a decision of the executive director about the administrative completeness of his application for a solid waste permit. However, the case was not decided on substantive grounds because the party failed to timely appeal the executive director's decision. *Id.* at 97.[7]

The State also relies upon *United Copper* to claim that the AO should only be reviewed under the pure substantial evidence rule. *United Copper Indus., Inc. v. Grissom*, 17 S.W.3d 797 (Tex. App.—Austin 2000, pet. dism'd). But like *City of Waco*, *United Copper* was focused on whether a third-party was an affected person sufficient to intervene in a permitting matter, and more specifically, what formal procedures the agency must adopt to make that threshold determination. United Copper applied to the Commission for an air quality permit to construct and

---

[7]   The Court's observation in *Kelsoe* about whether a contested-case hearing was required before the executive director could determine if a permit application was administratively complete—even if it were somehow relevant to this Superfund case—was dicta.

operate two copper melting furnaces. *Id.* at 799. Shortly after receiving notice of the application, Grissom, an adjacent landowner, sought a hearing on United Copper's permit. *Id.* at 800. The Commission denied his request, and Grissom appealed to the district court. *Id.* at 800-01. The district court found that the Commission erred by denying Grissom's request without first providing him an opportunity to present his evidence at a preliminary adjudicative hearing, and remanded the case to the Commission for such a hearing. *Id.* at 801. This Court affirmed, determining that Grissom was an affected person under the rule and that the agency had erred by denying Grissom a meaningful opportunity to present evidence in support of his hearing request. *Id.* at 806.

*United Copper* was curtailed by *Collins* two years later (which the State also relies upon) which itself was distinguished by the Texas Supreme Court in *City of Waco*. Whereas the landowner in *United Copper* was given a hearing to prove he was an affected person sufficient to intervene in the permitting process, the landowner in *Collins* (who received no such hearing) was unable to show that he was an affected person under the statute, and this Court upheld the agency's decision to deny his request for a contested-case hearing on the permit. *Collins v. Tex. Natural Res. Conservation Comm'n*, 94 S.W.3d 876, 885 (Tex. App.—Austin 2002, no pet.). In either event, the relative rights of third-parties to intervene in a

permit dispute has no application to an administrative order naming parties liable under the Superfund program.

This case is not an appeal of a permit decision under § 361.321 following a contested-case hearing, but instead challenges a unilateral state Superfund order under § 361.322. Because parties subject to the order have not been afforded any hearing prior to issuance of the AO, the trial court may only uphold the order if the Commission "proves by a "preponderance of the evidence" the factors in § 361.322(g). The "use of the term prove" suggests that the Legislature intended evidence to be presented—and that the agency could not rely on its own non-adjudicative agency record to justify its actions. *See Ramirez v. Tex. State Bd. of Med. Exam'rs*, 927 S.W.2d 770, 773 (Tex. App.—Austin 1996, no writ); *Tex. Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245 (Tex. App.—Austin 2008, no pet.) ("Absent an administrative record, no substantial evidence review is required or even possible.").

## CONCLUSION

For each of the reasons discussed above, Appellees request that this Court affirm the trial court's order denying Appellant's Plea to the Jurisdiction, or in the alternative, overturn the Order as a violation of the Commission's power under the SWDA.

Dated: January 29, 2015.

Respectfully submitted,

*/s/ John Eldridge*
John R. Eldridge
State Bar No. 06513520
*john.eldridge@haynesboone.com*
Kent G. Rutter
State Bar No. 00797364
*kent.rutter@haynesboone.com*
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas 77010-2007
Telephone: (713) 547-2000
Telecopier: (713) 547-2600

Adam H. Sencenbaugh
State Bar No. 24060584
*adam.sencenbaugh@haynesboone.com*
HAYNES AND BOONE, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8489
Telecopier: (512) 867-8606

***ATTORNEYS FOR APPELLEES EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, PENNZOIL-QUAKER STATE COMPANY, AND SHELL OIL COMPANY***

**CERTIFICATE OF COMPLIANCE**
**TEX. R. APP. P. 9.4(i)(3)**

I hereby certify that this Brief contains a total of <u>14,210</u> words, excluding the parts of the brief exempted under TEX. R. APP. P. 9.4(i)(1), as verified by Microsoft Word 2010. This Brief is therefore in compliance with TEX. R. APP. P. 9.4(i)(2)(B).

<u>*/s/ Adam Sencenbaugh*</u>
Adam Sencenbaugh

# CERTIFICATE OF SERVICE

In accordance with the Texas Rules of Appellate Procedure, certify that a true and correct copy of the *Appellees' Brief*, with appendix, was served by electronic service on the following parties or attorneys of record on this 29th day of January, 2015:

**Attorneys** | **Parties**

Thomas H. Edwards
Craig J. Pritzlaff
Linda Secord
Assistant Attorney General
Office of the Attorney General
Environmental Protection Division
P. O. Box 12548, Capitol Station
Austin, TX  78711-2548

Texas Commission on Environmental Quality

**NON PARTIES TO APPEAL:**

Janessa M. Glenn
R. Steven Morton
MOLTZ MORTON & GLENN, LLP
5113 Southwest Parkway, Suite 120
Austin, TX  78735-8969

Cabot Norit Americas, Inc.

John E. Leslie
JOHN LESLIE | PLLC
1216 Florida Dr., Suite 140
Arlington, TX  76015-2393

Howard Freilich/ d/b/a Quick Stop
Brake and Muffler

Cynthia J. Bishop
C BISHOP LAW PC
P. O. Box 612994
Dallas, TX  75261-2994

Baxter Oil Service

Paul Craig Laird II
ASHLEY & LAIRD, L.C.
800 W. Airport Fwy., Suite 880
Irving, TX  75062-6274

Billy D. Cox
128 Red Oak Ln.
Flower Mound, TX  75028-3501

David F. Zalkovsky, Agent
11302 Ferndale Rd.
Dallas, TX  75238-1020

George E. Kuehn
BUTZEL LONG
301 E. Liberty St., Suite 500
Ann Arbor, MI  48102-2283

Frank Kosar, d/b/a Rite Way Truck Rental

Billy D. Cox Truck Leasing, Inc.

Central Transfer & Storage Co.

SBC Holdings, Inc., f/k/a The Stroh
Brewery Company

*/s/ Adam Sencenbaugh*
Adam Sencenbaugh

# APPENDIX

App. A   —   Administrative Order (CR:29-108)

App. B   —   TCEQ's Response to Motion for Rehearing

App. C   —   Plaintiffs' First Amended Original Petition (CR:4-27)

App. D   —   Texas Commission on Environmental Quality's Original Counter-Petition and Third-Party Petition and Request for Disclosure (CR:127-169)

App. E   —   TCEQ's Third Original Answer, responding to Shell and Exxon Mobil, and Plea to the Jurisdiction (CR:675-687)

App. F   —   Act approved June 2, 1969, 61st Leg., R.S., ch. 405, 1969 Tex. Gen. Laws 1320, 1320 (repealed 1989) *recodified by* Act approved June 14, 1989, 71st Leg., R.S., ch. 678, 1989 Tex. Gen. Laws 2230

App. G   —   Act approved June 15, 1973, 63rd Leg., R.S., ch. 576, 1973 Tex. Gen. Laws 1595 (current version at Tex. Health & Safety Code Ann. § 361.003(24) (West 2010)

App. H   —   Act approved June 12, 1985, 69th Leg., R.S., ch. 566, 1985 Tex. Gen. Laws 2166 (repealed 1989) *recodified by* Act approved June 14, 1989, 71st Leg., R.S., ch. 678, 1989 Tex. Gen. Laws 2230

App. I   —   Act approved June 14, 1989, 71st Leg., R.S., ch. 703, 1989 Tex. Gen. Laws 3212, 3217 (current version at Tex. Health & Safety Code Ann. § 361.322 (West 2010)

App. J   —   TCEQ Agenda, February 10, 2010

App. K   —   *Texas Commission on Environmental Quality v. City of Waco*, 413 S.W.3d 409 (Tex. 2013)

# APP. A

Administrative Order
(CR:29-108)



## DOCKET NUMBER 2009-1706-SPF

| | | |
|---|---|---|
| IN THE MATTER OF | § | BEFORE THE |
| THE SITE KNOWN AS | § | TEXAS COMMISSION ON |
| VODA PETROLEUM, INC. | § | ENVIRONMENTAL QUALITY |
| STATE SUPERFUND SITE | § | |

### AN ADMINISTRATIVE ORDER

### I. Introduction

On ___February 10, 2010___, the Texas Commission on Environmental Quality ("Commission" or "TCEQ") considered the Executive Director's ("ED") allegations of the existence of a release or threat of release of solid wastes and/or hazardous substances into the environment on, at or from the Voda Petroleum, Inc. State Superfund Site ("Site") that poses an imminent and substantial endangerment to the public health and safety or the environment pursuant to the Solid Waste Disposal Act, TEX. HEALTH & SAFETY CODE, Chapter 361 (the "Act"), and the ED's requested relief including issuance of a Commission order to require persons responsible for such solid wastes or hazardous substances to perform the Work, including conducting the Remedial Activities, as authorized by Sections 361.188 and 361.272 of the Act.

After proper notice, the TCEQ makes the following Findings of Fact and Conclusions of Law:

### II. Findings of Fact

A. For purposes of this Administrative Order ("AO"), TCEQ has identified the following persons that are potentially responsible parties ("PRPs") for the solid waste and/or hazardous substances at the Site:

AAMCO Transmissions

A R Oil Co

A T P Results Inc

AT&T

Adena Exploration Inc

Allstate Transmissions

Amber Refining Inc

American Airlines Inc

American Auto

American Marazzi Tile Inc

American Norit Company Inc

American Spill Control Inc

Andrews Motor & Transmission

Anvil Shop

Aratex Services Inc

Archer Auto

Arco Oil and Gas Corporation

Ark-La-Tex Waste Oil Co Inc

Ashco Production Inc

Auto Precision Motors Inc

Autohaus

Aviation Properties Inc

Axelson Inc

Aycock Oil Corporation

B B Wells Waste Oil Inc

B E & K Inc

Basil Oil Field Service Inc

Baxter Oil Service

Bayou State Oil Corporation

Ben E Keith Company

Ben Griffin Tractor Company

Big Three Industrial Gas Inc

Billy D Cox Truck Leasing Inc

Bishops Auto

Blake Janet DBA D & D Radiator & Muffler

Borden Inc

Bright Truck Leasing Corporation

Brookhollow Exon Car Care

Brown & Root Inc

Brown Express Inc

Brunson Oil

Brushy Creek Saltwater Disposal Inc

Buck Resources Inc

Bule Diamond

Burland Enterprises Inc

CPL Industries

Cabot Corporation

Can-Am Distributors and Warehouse Inc of Texas

Capacity of Texas Inc

Carraway Co

Carrier Air Conditioning

Cematco Inc

Central Power and Light Company

Central Texas Iron Works

Central Transfer & Storage Co

Champie Hill Mobil

Champion International Corporation

Channel Shipyard Company Inc

Chaparral Steel Company

Chief Oil & Chemical

Cities Service Company

Cities Service Pipe Line Company

City Motor Supply Inc

City of Dallas

City of Garland

City of Jefferson

City of Plano

City of University Park

Clarke Checks Inc

Clements Oil Corporation

Cliffs Automotive

Coker Automotive Center Inc

Collin County

Complete Auto Transit Inc

Continental Can Company USA Inc

Continental Car Wash

Continental Trailways Inc

Converter Shop Inc

Coors Distributor

Custom-Bilt Cabinet and Supply Inc

Custom-Crete Inc

Daljet Inc

Dallas Area Rapid Transit

Dallas Dressed Beef Company Inc

Dallas Lift Trucks Inc

Dallas Power & Light Company

Damson Gas Processing Corp

Davison Petroleum Products

Davison, T M

Delmar Disposal Co

Deloach Texaco

Delta Distributors Inc

Diamond Shamrock

Dillingham & Smith Mechanical and Sheet Metal Contractors Inc

Dixie Oil

Donco Saltwater Disposal System

Double A & Y Corp

Dowell Schlumberger Incorporated

Dunlap-Swain

Durham Transportation Inc

E C Incorporated

East Texas Gas

Eastern ECC Company

Fina

The Firestone Tire and Rubber Company

First Interstate Bank of Dallas

Fort Sill

Fox & Jacobs

Franks Oil Service

Fred Jordan Inc

Fred Taylor GMC Truck Sales Inc

Freilich Howard DBA Quick Stop Brake & Muffler

Fruin-Colnon Corporation

G B Boots Smith Corporation

Gelco Truck Leasing Division Gelco Corporation

General Electric Company

General Telephone Company of the Southwest

General Tire Inc

General Truck Leasing Inc

Georgia-Pacific Corporation

Gifford-Hill Cement Company of Texas

Goff Willie

Grantham Oil Service

Greyhound Lines Inc

Grubbs Enterprises Ltd

Gulf States Oil & Refining Co

Gulf Stream Oil

H & H Oil Services

H & P Trans

Halliburton Energy Services Inc

Harris Bros Co

Harry Vowell Tank Trucks Inc

Hartsell Oil

Haynes Resources Inc

Hearne Ave Exxon

Herod Oil Inc

Hertz Penske Truck Leasing Inc

The Highland Pump Company Inc

Holloway Welding & Piping Co

Hunt Oil Company

Hydraulic Service and Supply Company

Industrial Lubricants Co

Industrial Solvents Gulf Division of Industrial Solvents Corporation

Ingersoll-Rand Company

Inland Container Corporation

International Electric Corporation

International Paper Company

J & E Die Casting Co Division of Cascade Die Casting Group Inc

James T Gentry Inc

Janks Texaco

Jeffco

Jerrys Waste Oil

John Crawford Firestone Inc

Johnson Controls Inc

Jones Environmental Inc

Joy Manufacturing Company

Jubilee Oil Service

Juna Oil & Gas Co Inc

K & F Oil & Gas Management Inc

KRNN

Kayo Oil Company

Kellys Truck Terminal Inc

Kennys Mobil

Kosar Frank DBA Rite Way Truck Rental

LA Transit

L D Baker Inc DBA Baker Gulf Service

L & J Recovery Ltd

LTV Energy Products Company

Lake Country Trucking Inc

Lance Inc

Larry Gulledge Exxon

Las Colinas Service Center Inc

Lockheed Missiles & Space Company Inc

Lone Star Dodge Inc

Lone Star Logistics Inc

Long Mile Rubber Co

The Lubrizol Corporation

M Lipsitz & Co Inc

M & M Oil Salvage Inc

MacMillan Bloedel Containers

Manvel Salt Water Disposal Company

Manville Sales Corporation

Marathon Battery Company

Martin-Decker

Mathews Trucking Company Inc

McAlister Construction Company

McBane Crude

McDonalds

Mega Lubricants Inc

Melton Truck Lines Inc

Metal Services Inc

Metro Aviation Inc

Metro Ford Truck Sales Inc

Millers Gulf

Minit Oil Change Inc

Mobil Oil Corporation

Modern Tire Service Inc

Mohawk Laboratories

Monsanto Company[1]

Moore James

---

[1] Only to the extent that Solutia Inc. is not excluded under applicable federal bankruptcy law.

Morgan Oil

Morgan, Troy L Jr

Mr Transmission

Murphy Brothers Service Center Inc

National Oilwell Inc

National Scientific Balloon Facility

National Supply Co

Naval Air Station Dallas

Navarro Petroleum Corp

Nobles Transmission

North Highland Mobil

Northwest Oil

Norwel Equipment Company

Nucor Corporation

Occidental Chemical Corporation

Oilwell Division of United States Steel Corporation

Olympic Fastening Systems Inc

On the Spot Oil Change

Owens Mobil

Oxendine, Von K DBA Oxendine Transmission

Oxy Cities Service NGL Inc

P N B Corporation

Pantera Crude Inc

Paramount Packaging Corporation Texas

Parawax

Parrott Oil Corp

Pauls Oils Service

Pearl Brewing Company

Pelican Energy of LA Inc

Pen Roy Oil of Odessa Inc

Pengo Industries Inc

Pennwalt Corporation

Pepsi Cola

Performance Friction Products Formerly Coltec Automotive Products
Division of Coltec Industries Inc

Peterbilt Motors Company

Petro Chem Environmental Services Inc

Petroleum Distributors Inc

Petroleum Market Products

Petroleum Refiners Unlimited Inc

Petroleum Stripping Inc

Pipes Equipment Co Inc

Pitts

Pool Company

Post Office Vehicle Maintenance Facility

Presbyterian Hospital of Dallas

Prestige Ford

Preston Management Company

Preston Oil Service

Production Operators Inc

R & C Petroleum Inc

R & K Auto Repair Inc

Ralph Wilson Plastics

Rayco Oil Company

Reed Tool Company

Reeves Oil Co Inc

Repetro Inc

Retail Graphics Printing Company

Rhodes Oil

Richards-Gebaur AFB

Roadway Express Inc

Robison Cecil

Rock Tenn Converting Company

Rockwall

Rollins Leasing Corp

Royle Container

Ruan Leasing Company

Ryder Truck Rental Inc

SETI

SKI Oil Incorporated

The Sabine Mining Company

Safeway

Santos Radiator

Schepps Dairy Inc

Schlumberger Well Services Division of Schlumberger Technology Corporation

Sears Roebuck and Co

Senco Marketing

Service Oil Co

Servion Inc

Shell Oil Company

Shippers Car Line Inc

Shore Company Inc

Shreveport Truck Center

Sitton Oil

Snappy Lube Inc

Snow Coil Inc

Sooner Refining Co Inc

South Coast Products Inc

Southeast Tex-Pack Express Inc

Southern Gulf

Southern Plastics Inc

Southland Sales Corporation

Southwest Disposal

Southwestern Bell Telephone Company

Southwestern Electric Power Company

Southwestern Petroleum Corporation

Specialty Oil

Sprague Electric Company

Star Solvents Inc

Steel City Crane Rental Inc

Stemco Inc

Steve D Thompson Trucking Inc

The Stroh Brewery Company

Sullivan Transfer & Storage

Summit White GMC Trucks Inc

Sun Engine Sales Inc

T E C Well Service Inc

Tan A Co

Tannehill Oil Products

Taylor Rental Center

Texaco Chemical Company

Texas Gas Transmission Corporation

Texas Industrial Disposal Inc

Texas Industries Inc

Texas Mill Supply – Longview Inc

Texas State Technical Institute Airport

Texas Utilities Generating Company

Thompson Trans

Toneys Garage

Trailways Inc

Tricon

Trinity Industries Inc

Triple L Disposal

Tri-State Oil Tools Inc

Triton Aviation Services Inc

Truckstops of America

Tuneup Masters Inc of Texas

Twin City Transmission Service Inc

Union Oil 76 Truck Stop

United Gas Pipe Line Company

United Press International

United States Army Corps of Engineers Mat Sinking Unit

Vanguard Sales

Varo Inc

Vault Oil & Gas

Viking Freight Service Inc

Voda Petroleum Inc

Volvo White Truck Corporation

W F B Tank Bottom Reclaiming Corp

W W Waste Oil

Warren Petroleum Company

Westmoreland Joint Venture

Western Auto Supply Company

Westland Oil Company Inc

Willamette Industries Inc

Woodline Motor Freight

Woods Operating Co Inc

Wray Ford Inc

Yates SWD Corp

Young Chevrolet Inc

Zavala Energy Inc

and these parties

1. are the owners or operators of the Site;

2. owned or operated the Site at the time of processing, storage, or disposal of any solid waste;

3.    by contract, agreement, or otherwise, arranged to process, store, or dispose of, or arranged with a transporter for transport to process, store, or dispose of solid waste owned or possessed by the PRPs or by any other person or entity at the Site; or

4.    accepted solid waste for transport to the Site as selected by the PRP.

B.    Reserved.

C.    The following PRPs entered into this AO as Agreeing Respondents but do not admit liability regarding the Site except for the purpose of enforcing this AO.

There are no Agreeing Respondents.

D.    When ranked, the Site had a State Superfund Hazard Ranking System ("HRS") score of 23.6.

E.    The portion of the Site used for ranking on the State Registry of Superfund Sites is described as follows:

All that certain lot, tract or parcel of land being situated in the David Ferguson Survey, Gregg County, Texas and being a part of a 6.12 acre tract of land conveyed from Chaco, Inc. to Ultra Oil, Inc. in deed recorded in Vol. 1212, Page 252, Deed Records, Gregg County, Texas and being more particularly described as follows:

BEGINNING at a 12" x 12" fence corner post on the north ROW of Duncan Road, said point being the SE corner of a 50 acre tract conveyed from Charles McBride to Chaco, Inc. in deed recorded in Vol. 1206, Page 83, Deed Records, Gregg County, Texas and also being the SE corner of the herein described tract;

THENCE along the SBL of the above mentioned 6.12 acre tract, also being the north ROW of Duncan Road:

N 89 deg. 47' 06" W, a distance of 199.02 feet;

S 63 deg. 18' 26" W, a distance of 57.72 feet;

S 89 deg. 55' 54" W, a distance of 120.65 feet to a ½" iron rod for this most southerly SW corner, same being N 89 deg. 55' 54" E, 200.00 feet from the SW corner of said 6.12 acre tract;

THENCE N 00 deg. 56' 53" W, a distance of 200.00 feet to a ½" iron rod for corner;

THENCE S 89 deg. 14' 07" W, a distance of 200.00 feet to a ½" iron rod for this most northerly SW corner, same being located on the east ROW of Charise Drive and the WBL of said 6.12 acre tract and being N 00 deg. 56' 53" W, 200.00 feet from the SW corner of same:

THENCE N 00 deg. 56' 56" W, along the east ROW of said Charise Drive, a distance of 271.25 feet to a 5/8" iron rod for this NW corner, same being the NW corner of said 6.12 acre tract;

THENCE N 89 deg. 03' E, along the NBL of said 6.12 acre tract, a distance of 578.45 feet to a 5/8" iron rod for this NE corner, same being the NE corner of said 6.12 acre tract;

THENCE S 00 deg. 04' 55" E along the EBL of said 6.12 acre tract, a distance of 452.78 feet to the Place of BEGINNING of the herein described tract and containing 5.201 acres.

The remainder, a contiguous 0.92 acre tract of land, is described as follows:

All that certain lot, tract or parcel of land being situated in the David Ferguson Survey, Gregg County, Texas and being a part of a 6.12 acre tract of land conveyed from Chaco, Inc., to Ultra Oil, Inc., in deed recorded in Vol. 1212, page 252, Deed Records, Gregg County, Texas, and being more particularly described as follows:

BEGINNING at a 5/8" iron rod set in the EBL of Charise Drive; THENCE North with the EBL of Charise Drive 200 feet to a ½" iron rod; THENCE North 89 deg. 14' 07" E, 200 feet to ½" iron rod for corner, THENCE S 00 deg. 56' 53" E, a distance of 200 feet to ½" iron rod for corner: THENCE S 89 deg. 55' 54" W with the said SBL of said 6.12 acre tract, 200 feet to the point of BEGINNING, containg [sic] 1 acre of land, more or less, together with all improvements situated thereon.

F. The Site consists of the area listed in Paragraph E above. In addition, the Site includes any areas outside the area listed in Paragraph E above where as a result, either directly or indirectly, of a release of solid waste or hazardous substances from the area described in Paragraph E above, solid waste or hazardous substances have been deposited, stored, disposed of, or placed or have otherwise come to be located.

G. The Site was proposed for listing on the State Registry of Superfund Sites in the *Texas Register* on November 17, 2000. 25 Tex. Reg. 11594-95 (Nov. 17, 2000).

H. The Site historically has been used as a waste oil recycling facility.

I.    The Chemicals of Concern at the Site include those substances listed in Exhibit B. The substances listed in Exhibit B have been processed, deposited, stored, disposed of, or placed or have otherwise come to be located on the Site.

J.    The substances listed in Exhibit B have been documented in surface and subsurface soil and groundwater at the Site.

K.    The substances listed in Exhibit B are:

1.    substances designated under Section 311(b)(2)(A) of the Federal Water Pollution Control Act, as amended (33 United States Code ("U.S.C.") Section 1321);

2.    elements, compounds, mixtures, solutions, or substances designated under Section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (42 U.S.C. Section 9601 et seq., as amended);

3.    hazardous wastes having the characteristics identified under or listed under Section 3001 of the Federal Solid Waste Disposal Act, as amended (42 U.S.C. Section 6921), excluding wastes, the regulation of which has been suspended by Act of Congress;

4.    toxic pollutants listed under Section 307(a) of the Federal Water Pollution Control Act (33 U.S.C. Section 1317);

5.    hazardous air pollutants listed under Section 112 of the Federal Clean Air Act, as amended (42 U.S.C. Section 7412); or

6.    any imminently hazardous chemical substances or mixtures with respect to which the administrator of the Environmental Protection Agency ("EPA") has taken action under Section 7 of the Toxic Substances Control Act (15 U.S.C. Section 2606).

L.    The substances listed in Exhibit B include the following: garbage; rubbish; refuse; sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility; or other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities, or hazardous substances, for the purposes of TEX. HEALTH & SAFETY CODE Sections 361.271 through 361.277 and 361.343 through 361.345.

M.    The substances listed in Exhibit B are solid wastes or hazardous substances.

N.	Solid wastes or hazardous substances at the Site listed in Exhibit B are, or potentially are, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.

O.	Potential pathways for human exposure to the solid wastes or hazardous substances listed in Exhibit B include incidental ingestion of, inhalation of or dermal exposure to surface and/or subsurface soil, and ingestion of or dermal exposure to groundwater.

P.	Exposure to levels of dichloroethylene, cis-1,2-; benzene; propylbenzene, n-; MTBE (methyl tertiary-butyl ether); tetrachloroethylene; toluene; trichloroethane, 1,1,1-; trichloroethylene; trimethylbenzene, 1,2,4-; trimethylbenzene, 1,3,5-; vinyl chloride; xylene, m-; xylene, o-; xylene, p-; dichloroethylene 1,1-; and dichloroethane, 1,2- found at the Site poses an unacceptable carcinogenic risk or an unacceptable toxicity risk.

Q.	The solid wastes or hazardous substances at the Site are not capable of being managed separately under the remedial action plan.

R.	On November 6, 2000, the Commission provided written notice of the proposed listing of the Site on the State Registry to each PRP identified as of that date at the PRP's last known address.

S.	On September 12, 2008, the Commission provided written notice of the public meeting and of the opportunity to comment on the proposed Remedy as specified in Sections 361.187(b) and (c) of the Act to each PRP identified as of that date at the PRP's last known address.

T.	On September 12, 2008, each PRP identified as of that date was provided an opportunity to fully fund or perform the proposed Remedial Activities, as specified in Sections 361.187(d) and 361.133(c) of the Act.

U.	No voluntary actions have been undertaken at the Site by any PRPs.

V.	The Remedy Selection Document ("RSD") for the Site is attached to this AO as Exhibit A.

W.	The remedy adopted in Exhibit A is selected as the Remedy to be implemented in accordance with this AO.

III.	Conclusions of Law and Determinations

A.	The PRPs listed in Section II (Findings of Fact) Paragraph A are responsible parties ("RPs") pursuant to Section 361.271 of the Act.

B.      Some of the substances referenced in Section II (Findings of Fact) Paragraph I, which are found at the Site, are hazardous substances as defined in Section 361.003(11) of the Act.

C.      Some of the substances referenced in Section II (Findings of Fact) Paragraph I, which are found at the Site, are solid wastes as defined in Section 361.003(34) of the Act.

D.      Hazardous substances were deposited, stored, disposed of, or placed or otherwise came to be located at the Site; and solid wastes were stored, processed, disposed of, or discarded at the Site.

E.      The Site is a facility as defined in Section 361.181(c) of the Act.

F.      The Site is a solid waste facility as defined in Section 361.003(36) of the Act.

G.      "Imminent and substantial endangerment" is defined by rule as follows: A danger is imminent if, given the entire circumstances surrounding each case, exposure of persons or the environment to hazardous substances is more likely than not to occur in the absence of preventive action. A danger is substantial if, given the current state of scientific knowledge, the harm to public health and safety or the environment which would result from exposure could cause adverse environmental or health effects. 30 TEX. ADMIN. CODE Section 335.342(9).

H.      There has been a release (as defined in Section 361.003(28) of the Act) or threatened release of hazardous substances or solid wastes into the environment at the Site that poses an imminent and substantial endangerment (as defined in 30 TEX. ADMIN. CODE Section 335.342(9)) to the public health and safety or the environment; and therefore, the Site will be listed on the State Registry of Superfund Sites as per Section V (Order) Paragraph A.

I.      The release or threatened release of hazardous substances or solid wastes into the environment at or from the Site has not been proven to be divisible pursuant to Section 361.276 of the Act.

J.      The actions required by this AO are reasonable and necessary to protect the public health and safety or the environment.

K.      The Site is ineligible for listing on the National Priorities List ("NPL") because the HRS score was below 28.5.

L.      Funds from the Federal Government are unavailable for the Remedial Activities at this Site because it is ineligible for the NPL.

IV.    Exhibits and Definitions

A.    The following exhibits are incorporated by reference into this AO:

"Exhibit A"    Remedy Selection Document

"Exhibit B"    List of Solid Wastes and Hazardous Substances at the Site

"Exhibit C"    Field Sampling Plan Contents Outline

B.    The following terms have the meaning set out below:

"Agreeing Respondent"    The PRPs listed in Section II (Findings of Fact) Paragraph C that fund or perform the Work and have agreed to the terms and conditions of this AO as evidenced by signing a consent form.

"Chemicals of Concern"    Any chemical that has the potential to adversely affect ecological or human receptors due to its concentration, distribution, and mode of toxicity.

"Day"    A calendar day.

"Defaulting Performing Party"    Any Performing Party that fails to comply with the terms or conditions of this AO.

"Demobilization"    The dismantling and removal of all construction equipment from the Site.

"Effective Date"    The Day ten (10) Days after the issue date of this AO.

"Executive Director (ED)"    The Executive Director of the TCEQ or a designee.

"include"    Use of the term include, in all its forms, in this AO is intended to express an enlargement or illustrative application specifying a particular thing already included within the preceding general words. It is not used as a term of limitation.

"Institutional Control"    A legal instrument which indicates the limitations on or the conditions governing use of the property which ensures protection of human health and the environment in accordance with 30 TEX. ADMIN. CODE Chapter 350 and as required by the Remedy.

"Parties"    Collectively, the Respondents and the Commission.

| | |
|---|---|
| "Performing Parties" | Collectively, the Agreeing Respondents and persons that did not enter into this AO but that fund or perform the Work. |
| "Post Construction Activities (PCA)" | All Remedial Activities at the Site, subsequent to issuance of the Approval of RA Completion, required to complete the Remedial Activities in accordance with this AO. |
| "Post Construction Cost Estimate" | An estimate of the cost to perform all of the PCA for as long as post construction activities are needed. |
| "Project Manager" | The individual designated by the ED to oversee implementation of the Work and to coordinate communications with the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties. |
| "Remedial Action (RA)" | Those Remedial Activities, except for Post Construction Activities, undertaken at the Site, including on-site physical construction and any required institutional controls, to implement the Remedy. The areal extent of the RA is not limited to the Site. It includes all suitable areas in proximity to the Site necessary for implementation of the Remedial Activities. |
| "Remedial Activities" | The RD, RA, PCA, and any other actions required to implement and maintain the Remedy pursuant to the RSD and 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350. |
| "Remedial Activities Contractors" | The individual, company, or companies retained by the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, by the Performing Parties to undertake any or all phases of the Remedial Activities. Remedial Activities Contractors cannot assume the role of any quality assurance official required by this AO. |
| "Remedial Design (RD)" | Those Remedial Activities during which engineering plans and technical specifications are developed for the Remedy. |

| | |
|---|---|
| "Remediation Goals" | Cleanup standards or other measures of achievement of the goals of the Remedy, consistent with the Act, 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350, determined by ED to be necessary at the Site to achieve and to maintain the Remedy. |
| "Remedy" | The Remedy adopted for the Site in the Remedy Selection Document to clean up or control exposure at the Site in accordance with all applicable laws and regulations and to be implemented in accordance with this AO. The Remedy includes all applicable requirements contained in the Act, 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350. |
| "Remedy Selection Document (RSD)" | The document that was developed for the Site, based on Site specific information, that specifies the Remedy, and that was adopted by the ED and TCEQ after the opportunity for public review and comment. |
| "Responsible Parties" | The PRPs listed in Section II (Findings of Fact) Paragraph A. |
| "Respondents" | Collectively, the Agreeing Respondents, the RPs, and the Performing Parties. |
| "Samples" | Samples of environmental media taken pursuant to and in accordance with this AO. |
| "Sections" | Those major divisions of this AO designated by Roman numerals. |
| "Site Coordinator" | The individual designated by the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, the Performing Parties to oversee the Remedial Activities Contractors and the implementation of the Remedial Activities and to coordinate communications with the ED. |
| "Site Representative" | A person designated by the Project Manager that is authorized to oversee the Remedial Activities. |

| "Substantial Completion" | The point, as determined by the ED in his sole discretion, at which the Work (or a specified part thereof) has been substantially completed in accordance with any work plans or documents required to be developed pursuant to this AO. |
| --- | --- |
| "Work" | All activities to be undertaken or performed in accordance with and as required by this AO. |

## V. Order

Therefore, the TCEQ orders:

A. The Site will be listed on the State Registry of Superfund Sites.

B. Reserved.

C. Respondents shall reimburse the Hazardous and Solid Waste Remediation Fee Account for all of the ED's costs of the Remedial Investigation ("RI") and the Feasibility Study ("FS"), including the oversight costs of these activities. Respondents shall reimburse the Hazardous and Solid Waste Fee Account for all uncompensated Pre-Remedial Investigation costs, including oversight costs of these activities.

The RPs and any Defaulting Performing Parties shall reimburse the Hazardous and Solid Waste Remediation Fee Account for all costs incurred by the ED in implementing and in overseeing the Work and for any costs incurred by the ED for activities other than the RI and FS to the extent that such costs have not been paid.

Reimbursement is to be made within forty-five (45) Days after the ED transmits a Demand Letter stating the amount owed. Payment is to be paid by cashiers check or money order. All payments and accompanying letters or documentation should contain the following information: "Voda Petroleum, Inc. State Superfund Site," "Cost Recovery Funds for the Hazardous and Solid Waste Remediation Fee Account (Fund 550) of the State of Texas," "PCA Code 50482," "Docket Number 2009-1706-SPF," and "TCEQ Project Manager, Carol Boucher, P.G." All payments and accompanying letters or documentation should be mailed to: Cashier's Office, MC-214, TCEQ, Re: Voda Petroleum, Inc. State Superfund Site, P.O. Box 13088, Austin, TX 78711-3088. All checks and money orders shall be payable to the "Texas Commission on Environmental Quality," or "TCEQ." The requirement to make such payments will survive the termination of this AO in accordance with Section XXXIII (Termination of the Administrative Order).

D.     This AO applies to and is binding upon Respondents, their agents, successors, and assigns. Respondents are jointly and severally responsible for carrying out the Work. Performance of any or all of the Work by the Performing Parties or Agreeing Respondents shall not excuse any other Respondent from such performance. Upon performance by any Respondent of Remedial Activities, either alone or in conjunction with other Performing Parties, such Respondent shall, from such performance forward, become a Performing Party.   Such performance by a Respondent of some of the Remedial Activities does not excuse the Respondent from performance of those Remedial Activities that took place prior to the Respondent becoming a Performing Party or any other preexisting requirement of this AO.  No change in the ownership or corporate status and no acquisition of a Respondent will alter its respective responsibilities under this AO.

E.     Respondents that own or lease real property at the Site shall provide a copy of this AO to all of their lessees or sublessees of the Site until such time as this AO is terminated in accordance with Section XXXIII (Termination of the Administrative Order) and to any prospective owners or successors before all or substantially all property rights, stock, or assets are transferred.

F.     Respondents shall provide a copy of this AO to all contractors, subcontractors, laboratories, and consultants retained by Respondents to perform any or all of the Work within thirty (30) Days after the Effective Date or on the date such services are retained, whichever date occurs later.  Notwithstanding the terms of any contract, Respondents remain responsible for compliance with this AO and for ensuring that their contractors and agents comply with this AO.

G.     Within forty-five (45) Days after the Effective Date each Respondent that owns real property at the Site shall record a copy or copies of this AO, with all exhibits, in the appropriate office where land ownership and transfer records are filed or recorded, and shall ensure that the recording of this AO is properly indexed to each and every property comprising any part or all of the Site so as to provide notice to third parties of the issuance and terms of this AO with respect to those properties.   Each Respondent that owns real property comprising all or any part of the Site shall, within sixty (60) Days after the Effective Date, send notice of such recording and indexing to the ED.  The obligations and restrictions of this AO run with the land and are binding upon any and all persons who acquire any interest in any real property comprising all or any part of the Site.

Not later than ninety (90) Days before any transfer of any property interest in any property included within the Site and in accordance with Section XII (Notices and Submittals) Respondents that own or lease such real property shall submit the transfer documents to the ED.

H.  In accordance with Section 361.1855 of the Act and for the purpose of selecting the Remedy, the ED has selected commercial/industrial as the appropriate land use for the Site. Any change in use of any or all of the Site must comply with Section 361.190 of the Act.

I.  A qualified Remedial Activities Contractor shall direct and supervise all aspects of the Remedial Activities. Within ten (10) Days after the Effective Date each Respondent that is not an Agreeing Respondent shall notify the ED of its intent to perform the Work.

In addition to fulfilling the requirements of Section VIII (Project Manager/Site Coordinator) Paragraph C, within ten (10) Days after the Effective Date, Agreeing Respondents or, if there are no Agreeing Respondents, Performing Parties shall notify the ED in writing of the name, title, qualifications, relevant licenses, and permits of the Site Coordinator and Remedial Activities Contractor proposed to be used in carrying out the Remedial Activities. The Agreeing Respondents shall demonstrate or, if there are no Agreeing Respondents, the Performing Parties shall demonstrate that each proposed Remedial Activities Contractor has any licenses necessary to do business in the State of Texas and permits necessary to perform any or all of the Remedial Activities. If at any time the Agreeing Respondents or, if there are no Agreeing Respondents, Performing Parties propose to use a different Remedial Activities Contractor, the Agreeing Respondents or Performing Parties, as appropriate, shall notify the ED before the new Remedial Activities Contractor performs any of the Remedial Activities. The Agreeing Respondents' Site Coordinator shall be the Project Manager's and Site Representative's point of contact for all Performing Parties. All Performing Parties must coordinate with and cooperate with any Agreeing Respondents in the performance of any and all of the Work.

J.  The Remedy may be modified as specified in 30 TEX. ADMIN. CODE Section 335.349. Except as specified in the previous sentence and in Section XVIII (Extension of Deadlines), the terms of this AO may be amended upon approval by the Commission after notice to all Respondents.

K.  Respondents shall provide all the necessary information and assistance for TCEQ's Community Relations personnel to implement the Community Relations Plan.

L.  All ED-approved final submittals, documents, plans, and reports required to be developed and approved by the ED pursuant to this AO will be incorporated in and enforceable under this AO.

M.  In complying with this AO, Respondents shall at all times comply with the requirements of the Act and 30 TEX. ADMIN. CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350, as applicable.

## VI. Remedial Activities

A. The Respondents shall undertake the Remedial Activities in the following phases:

Remedial Design ("RD");

Remedial Action ("RA"); and

Post Construction Activity ("PCA").

The ED may, in his sole discretion, waive, in writing, a requirement to submit any report, submittal, document or plan otherwise required to be submitted by this AO.

B. Remedial Design

1. Not later than ten (10) Days after the Effective Date, Respondents shall submit a Design Concept Memorandum ("DCM") to the ED for review, comment, and approval. Respondents must submit a DCM that includes:

   a. Description of key performance and design criteria for the Remedy necessary to meet the requirements of the Remedy Selection Document;

   b. Identification of all significant design options that may be considered by the design professional to meet the required performance and design criteria and the proposed option(s) to meet those criteria; and,

   c. Identification of potential problems and unresolved issues which may affect the timely completion of the RD, RA and PCA, and proposed solutions to those problems.

2. Within thirty (30) Days after the ED approves the DCM, Respondents shall:

   a. Obtain written landowner consent for any institutional control to be placed on the land records for any or all of the Site as required by this AO or by TCEQ rule and submit a copy of the consent to the ED; and

   b. Submit a Preliminary RD to the ED for review, comment, and approval.

3. The Respondents shall submit a Preliminary RD that meets the requirements as set forth in this Section and consists of a 30% completion of all sections of the following RD submittals:

RA Schedule;

RA Field Sampling Plan ("RA FSP");

Remedial Action Construction Quality Assurance Project Plan ("RA C-QAPP");

RA Plans and Specifications;

RA Health and Safety Plan ("RA HASP"); and

Post Construction Activity Plan ("PCA Plan").

4. The RA Schedule will describe the sequence, dependency on other activities, and duration of each activity to be conducted during the RA including Project Milestones (which will be subject to the provisions of Section XXI (Stipulated Penalties), Paragraph D) and the specific mobilization date to begin the RA.

5. The RA Sampling and Analysis Plan (RA SAP) and RA C-QAPP will describe the means of assuring quality during the RA and will specify a quality assurance official ("Respondent QA Official"), independent of the RA Contractors, to conduct a quality assurance program during the RA.

  a. The RA SAP will be comprised of the RA FSP and the "Texas Commission on Environmental Quality Superfund Cleanup Section, Remediation Division, Quality Assurance Project Plan for the Superfund Program" (Program QAPP) which is most current as of the Effective Date of this AO. The RA SAP will address sampling and analysis relating to environmental parameters which may present toxic risk to human health or the environment. Respondents and their contractors and subcontractors, including analytical laboratories, shall strictly adhere to all requirements of the approved RA SAP.

  b. The Program QAPP text will not be altered. Alterations to the Program QAPP necessitated by project specific circumstances will be effected by appropriate notation in Section 8.0 "Exceptions, Additions and Changes to the Program QAPP" of the RA FSP.

  c. The RA FSP will include:

    i) All data required by the Program QAPP and the contents outline attached as Exhibit C to this AO;

ii)     Data Quality Objectives ("DQO's") which provide for the collection and analysis of a sufficient quantity and quality of data to demonstrate attainment of the Remediation Goals and to demonstrate protection of off-site receptors from exposure to Chemicals of Concern during the RA; DQO's will be developed in accordance with EPA "Guidance for the Data Quality Objectives Process, EPA QA/G-4"; and

iii)    A perimeter air monitoring plan including the action levels necessary to protect off-site receptors from exposure to the Chemicals of Concern; the Chemicals of Concern to be sampled; the kinds of sampling techniques to be used to sample; the number, type, and location of monitors; the calibration methods and schedule; and the sampling and reporting frequency.

d.    In regard to laboratories and laboratory analytical work, Respondents shall:

i)      Ensure that all contracts with laboratories utilized by Respondents for analysis of Samples provide for access to those laboratories by the ED's personnel and the ED's authorized representatives to assure the accuracy of laboratory results related to the Site.

ii)     Ensure that each laboratory it may use is qualified to conduct the proposed work. This includes use of methods and analytical protocols for the Chemicals of Concern in the media of interest within detection and quantitation limits consistent with both QA/QC procedures and approved DQOs for the site. The Respondent QA Official shall provide written certification that it has reviewed the laboratory's Quality Assurance Plan and capabilities and has determined that:

(a)     The laboratory has a documented quality assurance program in place that is generally consistent with National Environmental Laboratory Accreditation Conference (NELAC) standards;

(b)     The laboratory has demonstrated and documented proficiency with each sample preparation and determinative combination to be used on the project;

(c)     The laboratory has documented standard operating procedures for each of the methods required for the project; and,

(d)     The laboratory has the capability of meeting the analytical objectives for the project.

A table which presents the laboratory's method detection limits and quantitation limits and the preliminary remediation goal for each analyte of concern, and a table that presents the laboratory's control limits for quality control parameters, i.e., surrogates, matrix spike/matrix spike duplicate samples, and laboratory control samples must be submitted along with the certification letter and must be submitted attached or inserted into the RA FSP.

iii)     Ensure that all laboratories used for analysis of Samples are acceptable to the ED. A laboratory may be deemed unacceptable for any of the following reasons:

(a)     repeated or numerous deficiencies found in the laboratory quality assurance program during the ED's or EPA's laboratory inspections;

(b)     repeated or numerous deficiencies in laboratory performance;

(c)     debarment by EPA; or

(d)     failure to comply with any requirement or criteria of the Program QAPP or this AO.

iv)     Ensure that all data submitted to the agency is produced by laboratories accredited by TCEQ according to 30 TEX. ADMIN. CODE Chapter 25 (relating to Environmental Testing Laboratory Accreditation and Certification) Subchapters A and B.

6.     The RA C-QAPP will describe the activities necessary to ensure that the Remedy is constructed to meet or exceed all design criteria, plans, specifications, and all applicable Remediation Goals. The RA C-QAPP will address sampling and analysis relating to physical properties of constructed engineered controls which must meet specified criteria to ensure the long-term performance of those features (e.g. physical soil properties of soil

backfill or constructed clay caps, physical properties of geotextiles and liner materials, leak testing of piping systems and containment vessels, etc.). At a minimum, the RA C-QAPP will include the following elements:

a.  The responsibility and authority of organizations and key personnel involved in designing and constructing the RA;

b.  The qualifications of the Respondent QA Official(s) and supporting inspection personnel;

c.  The observations and tests that will be used to ensure that the construction meets or exceeds all design criteria, plans and specifications and all applicable Remediation Goals;

d.  The sampling activities, sample size, methods for determining locations, frequency of sampling, acceptance and rejection criteria, and methods for ensuring that corrective measures are implemented; and

e.  Detailed reporting requirements.

7.  The RA Plans and Specifications will establish the sequences, procedures and requirements to be implemented at the Site including at a minimum:

a.  Demolition activities including monitor well closure, decontamination, environmental controls, and disposal.

b.  Excavation activities including: establishment of limits of initial excavation for surface and subsurface soils with provisions for field controls; excavation materials handling including stockpiling; excavation confirmation sampling; backfill procedures; air emissions control; stormwater management; cross-contamination prevention; and equipment and personnel decontamination procedures and facilities.

c.  Estimated quantities of material to be excavated and estimated quantities of materials to be disposed of off-site.

d.  Site restoration activities, including backfill materials, compaction, and final cover.

e.  Plans including at a minimum:

i)  Site plan;

ii)     Demolition plan;

iii)     Excavation plan, plan view;

iv)     Excavation plan, sections;

v)     Monitor well construction details;

vi)     Final Site grading plan;

vii)     Construction details; and

viii)     All other plans and specifications necessary to describe sequences, procedures, and requirements to conduct the Remedial Activities in a manner protective of human health and the environment.

8.     The RA HASP will specify the procedures that are sufficient to protect on-site personnel and the public from the physical, chemical and/or biological hazards of the site. The HASP will address all requirements of 29 CFR Chapter XVII - "Occupational Safety and Health Administration (OSHA), Department of Labor," 40 C.F.R. § 35.6015(a)(21) "Health and Safety Plan," and all applicable safety regulations, ordinances and statutes pertaining to the safety of on-site personnel and the public. The HASP and any revisions or addenda will be reviewed and signed by a Board Certified Industrial Hygienist.

The TCEQ relies on the Respondent in the preparation of an adequate HASP. However, TCEQ reserves the right to review and provide comments on the Respondent's HASP. If TCEQ provides comments, they constitute only general safety guidelines which are not intended to cause the Respondent to reduce the level of protection. Any language in the comments or in this AO which appears to give the TCEQ the right to direct or control the Respondent's means, methods and details of the Work shall be deemed to mean that the Respondent will follow TCEQ's desires only as to the results of the Work. The Respondent is solely responsible for preparing an adequate HASP, for complying with the RD and the applicable safety laws and regulations, for performing the Work in a safe manner and for protecting the health and safety of on-site personnel and the public. The Respondent shall address the TCEQ's comments and concerns and if necessary submit a revised HASP. TCEQ notation of "approval," "acceptance," or similar language in response to a HASP submittal for review shall not alter the responsibilities of the parties as described in this Section. In the event that TCEQ notes a HASP "approved" or "accepted" or uses similar language to

indicate that there are no further comments, such notation shall be deemed to mean only:

*We have reviewed your HASP under the AO provision reserving the right for TCEQ to review and provide comments constituting general safety guidelines (not intended to cause the Respondent to reduce the level of protection). The reviewer(s) might not be Board Certified Industrial Hygienist or any other type of safety professional. We have no comments (or further comments) at this time on your HASP. We recognize this HASP as your final HASP. If you change this HASP you must submit a revision or addendum for review and potential comment in accordance with this AO.*

**Do not rely on TCEQ review or comments (or lack thereof) on your HASP for any purposes.**

*By telling you we have no comments (or further comments) we are not assuming responsibility for your means, methods, details or sequences, nor are we assuming any duty of protection to you, your employees, your subcontractors or suppliers, or their employees, or to any third party. Any language in the comments or in this AO which appears to give the TCEQ the right to direct or control your means, methods and details of the Work shall be deemed to mean that you will follow TCEQ's desires only as to the results of the Work. You are solely responsible for preparing and implementing an adequate HASP, for complying with the RD and the applicable safety regulations, ordinances and statutes, for performing the Work in a safe manner and for protecting the health and safety of on-site personnel and the public.*

9.   The PCA Plan will describe all sequences, procedures and requirements for implementing the PCA. The PCA Plan will, at a minimum, include the following:

   a.   A Post Construction Sampling and Analysis Plan ("PC SAP") and Post Construction Quality Assurance Project Plan ("PC-QAPP") meeting the criteria established herein for the RA SAP and RA C-QAPP but addressing all sampling and analyses relating to PCA;

   b.   Post Construction Plans and Specifications necessary to assure that the Remedial Activities attain and maintain the Remediation Goals;

   c.   A PCA Schedule describing the sequence, dependency on other activities, and duration of each activity to be conducted during the PCA including Project Milestones (which will be subject to Section

XXI Stipulated Penalties Paragraph D), and the specific mobilization date to begin the PCA;

d. A Post Construction Cost Estimate providing an estimate for a qualified third party to perform all of the tasks necessary for post construction for as long as PCA are needed, in accordance with the PCA Schedule; and

e. A Post Construction Activities HASP ("PCA HASP") which meets all of the requirements specified above for the RA HASP but which is appropriate to protect on-site personnel and the public from any physical, chemical and/or biological hazards of the site relating to the Post Closure period and activities.

10. Within thirty (30) Days after the ED provides written comments to the Site Coordinator on the Preliminary RD, Respondents shall submit a Pre-Final RD to the ED for review, comment, and approval. The Pre-Final RD will consist of 95% RD submittals. Respondents shall address the ED's comments on the Preliminary RD and submit a summary note which clearly and explicitly indicates how each comment by the ED on the Preliminary RD has been satisfactorily addressed and which will also identify all other revisions or changes from the Preliminary RD.

11. Within twenty (20) Days after the ED provides the Site Coordinator with the ED's written comments on the Pre-Final RD, Respondents shall submit the Final RD, prepared and sealed by a Professional Engineer registered in the State of Texas, to the ED. The Final RD will consist of 100% complete RD submittals except the PCA Plan. A Professional Engineer shall include a certification that the design was prepared to attain all Remediation Goals upon implementation. Respondents shall address the ED's comments on the Pre-Final RD and submit a summary note which clearly and explicitly indicates how each of the ED's comments on the Pre-Final RD has been satisfactorily addressed and which will also identify all other revisions or changes from the Pre-Final RD.

12. The ED will notify the Site Coordinator of his approval or disapproval of the Final RD including written comments. Within fifteen (15) Days after the ED provides written comments to the Site Coordinator, Respondents shall resubmit the Final RD, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the previous draft of the Final RD has been satisfactorily addressed and which will also discuss all other revisions or changes from the previous draft of the Final RD.

13. The ED will notify the Site Coordinator of his approval or disapproval of each resubmittal of the Final RD. Each resubmittal will be submitted as specified in Paragraph 12 above. Disapproval of the first resubmittal, and each subsequent resubmittal, is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

14. Upon the ED's approval, the documents comprising the Final RD will be incorporated as requirements into and will be enforceable under this AO.

C. Remedial Action

1. Respondents and Respondents' contractors and subcontractors shall not mobilize to the Site until the Final RD is approved by the TCEQ. Under no circumstance will mobilization occur prior to TCEQ approval of the RA HASP.[2] The Respondents will be responsible for initiating, maintaining, and supervising all safety precautions and programs required for the protection of all persons who may be affected by the Work, the Work, and any property which maybe affected by the Work.

2. As soon as practicable after the award of any contract to ship solid wastes and/or hazardous substances from the Site and prior to any such actual shipment, Respondents shall submit to the Project Manager a written certification containing all relevant information regarding such shipments. The certification will include:

   a. The name and location of the facility to which the solid wastes and/or hazardous substances are to be shipped;

   b. The type and quantity of the solid wastes and/or hazardous substances to be shipped;

   c. The expected schedule for the shipment of the solid wastes and/or hazardous substances; and

   d. The method of transportation and the name, address, and phone number of the transporter.

3. In addition, Respondents shall certify that:

   a. No enforcement order is currently imposed on any selected receiving facility or transporter by any regulating authorities;

---

[2]TCEQ's "approval" or "acceptance" of the HASP will be given the meaning as explained in Section VI (Remedial Activities) Paragraph B.8.

b. The selected receiving facility and transporter are permitted to accept the specific solid wastes and/or hazardous substances to be shipped from the Site by all appropriate regulating authorities; and

c. After appropriate inquiry, they have no knowledge that either the selected receiving facility or transporter is non-compliant with any federal, state, or local requirement.

4. The ED may inspect the Remedial Activities and/or the Site at any time to evaluate compliance with this AO.

5. At least ten (10) Days prior to the expected date of achieving Substantial Completion of the RA, the Site Coordinator shall conduct a pre-Substantial Completion inspection and shall develop and submit to the ED a preliminary punch list identifying any nonconformance with the requirements of the RA Plans and Specifications.

6. At the same time that the Performing Parties submit the Substantial Completion punch list, they shall schedule a Substantial Completion inspection by the ED. The Site Coordinator shall accompany the ED during the Substantial Completion inspection.

7. Within 10 Days after the ED's on-site inspection, the Respondents shall submit to the ED in writing a revised punch list incorporating any deficiencies identified by the ED during the Substantial Completion inspection, indicating those deficiencies that are completely addressed and providing a proposed schedule and list of activities necessary to complete the RA. The ED will notify the Site Coordinator in writing of his approval or disapproval of the revised punch list.

If the ED disapproves the revised punch list, the ED will provide written comments to the Site Coordinator. Within ten (10) Days after the ED provides written comments to the Site Coordinator on the revised punch list, Respondents shall submit a final punch list, in both clean and redline, strikeout format, with a summary note that clearly and explicitly indicates how each of the ED's comments on the revised punch list has been satisfactorily addressed. The ED will notify the Site Coordinator of his approval or disapproval of the final punch list with comments. If disapproved by the ED, within fifteen (15) Days after the ED provides written comments, Respondents shall resubmit the final punch list. The ED will notify the Site Coordinator of his approval or disapproval of each resubmittal of the final punch list. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

8.  When Respondents believe that they have completed the RA, they shall submit a certification to the ED that the RA is complete. If the ED identifies RA items to be corrected or completed, Respondents shall immediately correct or complete these items.

9.  Within forty five (45) Days after Respondents certify that the RA is complete, Respondents shall submit to the ED a draft RA Report, containing the following:

    a.  A certification from a Professional Engineer licensed in the State of Texas that the RA has been completed in compliance with the Final RD and this AO and that the RA is complete;

    b.  All data collected during the RA and documentation of compliance with the terms of the RA Quality Assurance Project Plan and the RA Construction Quality Assurance Plan;

    c.  Copies of waste manifests for all Class II, Class I, and hazardous wastes and substances disposed of off-site;

    d.  As-built drawings showing:

        i)  Areas and depths of excavation, with verification sample results by grid area;

        ii) Final site plan with topographic contours;

    e.  Progress photographs;

    f.  Proposed areas for soil and groundwater that will require land use restrictions and/or other deed notices, certifications, or restrictions; and,

    g.  Proposed language for any institutional controls in accordance with and as required by this AO and TCEQ rules.

10. The ED will notify the Site Coordinator of his approval or disapproval of the draft RA Report. If the ED disapproves the draft RA Report, the ED will provide written comments to the Site Coordinator.

11. Within fifteen (15) Days after the ED provides written comments to the Site Coordinator on the draft RA Report, Respondents shall submit a final RA Report, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the

draft RA Report has been satisfactorily addressed and which also discusses all other revisions or changes from the draft RA Report.

12.    The ED will notify the Site Coordinator of his approval or disapproval of the final RA Report with comments.

13.    If disapproved by the ED, within fifteen (15) Days after the ED provides written comments, Respondents shall resubmit the RA Report as specified in Paragraph 11 above. Each resubmittal will also be submitted in accordance with Paragraph 11 above.

14.    The ED will notify the Site Coordinator of his approval or disapproval of each resubmittal of the final RA Report including written comments. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

15.    Within thirty (30) Days after approval of the final RA Report and after obtaining the required written landowner consent in accordance with Paragraph B.2 of this Section, Respondents shall:

   a.    record a copy or copies of any required institutional controls in compliance with the requirements found in 30 TEX. ADMIN. CODE Chapter 350.111 in the appropriate local or county office where land ownership and transfer records are filed or recorded;

   b.    ensure that the recording of these documents is properly indexed and recorded to each and every property at the Site in the appropriate office where land ownership and transfer records are filed so as to provide notice to third parties concerning those properties; and

   c.    send evidence of such recording, landowner consent, and indexing to the ED.

16.    After he approves the final RA Report, receives evidence of the filing of any institutional control from each property owner or other person as required by Section V (Order) Paragraph G, and determines that the financial assurance requirements of Paragraph E below have been satisfied, the ED will issue an Approval of RA Completion to the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, any Performing Parties.

D.  Post Construction Activity

1.  Concurrent with the submittal of the preliminary punch list for the Substantial Completion inspection, the Site Coordinator shall 1) submit a list of the name, title, qualifications, relevant licenses and permits of the Remedial Activities Contractors proposed to be used in carrying out any or all of the PCA and 2) submit to the ED a Revised PCA Plan.

2.  The ED will notify the Site Coordinator of his approval or disapproval of the Revised PCA Plan including written comments to the Site Coordinator.

3.  Within fifteen (15) Days after the ED provides written comments to the Site Coordinator, Respondents shall submit the Final PCA Plan, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the Revised PCA Plan has been satisfactorily addressed and which will also discuss all other revisions or changes from the Revised PCA Plan.

4.  The ED will notify the Site Coordinator of his approval or disapproval of the submittal and each resubmittal of the Final PCA Plan. Each resubmittal will be submitted as specified in Paragraph 3 above. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

5.  Upon the ED's approval of the final PCA Plan, Respondents shall begin the PCA in accordance with the schedule included in the PCA Plan.

6.  The Agreeing Respondent(s) shall submit a Five Year Review report to the TCEQ for TCEQ's approval no later than five (5) years after the ED approves the Final Remedial Action for the Site. The Five Year Review report must be conducted in accordance with the U.S. Environmental Protection Agency's "Comprehensive Five-Year Review Guidance." The Agreeing Respondent(s) shall submit Five Year Review reports for the Site to the TCEQ every five (5) years unless and until the TCEQ approves cessation.

E.  Post Construction Financial Assurance.

1.  Respondents shall provide financial assurance in the minimum amount of the final Post Construction Cost Estimate and shall maintain such financial assurance for the full duration of the PCA. Within ten (10) Days of the ED's approval of the PCA Plan, Respondents shall submit a written proposal for providing financial assurance to the ED for approval.

2.    Subject to the ED's approval, financial assurance may be demonstrated by one or a combination of the following mechanisms: letter of credit, surety bond guaranteeing payment, surety bond guaranteeing performance, fully funded trust, insurance, escrow account or other approved mechanism. Each financial assurance document will be issued by an institution with the authority to issue the document whose operations are regulated and examined by a federal or state agency.

3.    Within fifteen (15) Days after the ED provides written approval of Respondents' proposed financial assurance mechanism to the Site Coordinator, Respondents shall submit the necessary financial assurance documents to the ED. The ED will notify the Site Coordinator of his approval or disapproval of the financial assurance documents with comments. If disapproved by the ED, within fifteen (15) Days after the ED provides written comments to the Site Coordinator, Respondents shall resubmit the financial assurance documents, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the previous draft of the financial assurance documents has been satisfactorily addressed and which will also discuss all other revisions or changes from the previous draft of the financial assurance documents.

4.    The ED will notify the Site Coordinator of his approval or disapproval, with comments, of each resubmittal of the financial assurance documents. Each resubmittal will be submitted in accordance with Paragraph 3 above. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

VII.    Failure to Attain Remediation Goals or Findings of Significant Difference

A.    If at any point in the Remedial Activities the Performing Parties conclude that the Remedial Activities as implemented in accordance with this AO will not attain the Remediation Goals, or if the Performing Parties find that conditions at the Site differ from those that form the basis of the RSD and significantly change the scope, performance or costs of the Remedial Activities, then the Performing Parties shall take the actions specified in this Section.

B.    Within ten (10) Days after the Performing Parties initially determine that a failure to attain Remediation Goals or that a significant difference in the scope, performance or cost of the Remedial Activities as described in this Section exists, Performing Parties shall notify the ED of that determination with a description of its basis.

C.  Not later than sixty (60) Days after the initial assertion of a failure to attain Remediation Goals or of a significant difference in the scope, performance or cost of the Remedial Activities, the Performing Parties shall submit a Failure Evaluation Report to the ED for his approval.

D.  The Performing Parties shall submit a Failure Evaluation Report that meets the requirements of this Section. The Failure Evaluation Report will include a discussion of the following: the data related to the failure to attain Remediation Goals or to the assertion of a significant difference, conclusions concerning all such data, and any known cause of the failure to attain Remediation Goals or of the significant difference, and a recommendation for any necessary additional studies. Data presented in the Failure Evaluation Report will comply with the DQOs.

E.  The ED will not consider the failure of a design element or remedial action that is not required by this AO to be the basis for a failure to attain the Remediation Goals.

F.  The ED will consider differences in the quantity or extent of contaminants as the basis for a determination of a significant difference only when such differences are so significant as to cause the Remedy not to be the lowest cost alternative that is technologically feasible and reliable and that effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment.

G.  After receipt of the Failure Evaluation Report, the ED will notify the Site Coordinator of his approval or disapproval of the report with comments. If the ED determines that the basis of the Performing Parties' assertion of a failure to attain Remediation Goals or of a significant difference is valid, no applicable stipulated penalties will be imposed for missed deadlines subsequent to the Performing Parties' notification made in accordance with Paragraph B above, except for failure to submit documents pursuant to this Section. If the ED determines that the basis of a failure to attain Remediation Goals or of an assertion of a significant difference is not valid, the ED will direct that Remedial Activities continue and that the Performing Parties pay any applicable stipulated penalties for any missed deadlines.

H.  Unless the ED approves the Failure Evaluation Report and/or directs continuation of Remedial Activities, within thirty (30) Days after the ED provides written comments to the Site Coordinator, the Performing Parties shall resubmit the Failure Evaluation Report, in both clean and redline, strikeout format, with a summary note which clearly and explicitly indicates how each of the ED's comments on the previous draft of the Failure Evaluation Report has been satisfactorily addressed and which will also identify all other revisions or changes from the previous version of the Failure Evaluation Report.

I.      The ED will notify the Site Coordinator of his approval or disapproval, with comments, of each resubmittal of the Failure Evaluation Report. Each resubmittal will be submitted in accordance with Paragraph H above. Disapproval of the first resubmittal and each subsequent resubmittal is subject to assessment of stipulated penalties in accordance with Section XXI (Stipulated Penalties).

J.      Not later than ninety (90) Days after a determination by the ED that the Remedy will not attain the Remediation Goals or a significant difference exists, the Respondents shall submit to the ED for approval a written report evaluating alternatives to the Remedial Activities and may submit a proposal for such alternative Remedial Activities as may be necessary to achieve the Remediation Goals. Any proposed alternatives must comply with the remedy selection criteria contained in 30 TEX. ADMIN CODE Chapter 335, Subchapter K and 30 TEX. ADMIN. CODE Chapter 350. The Remedy may be modified, as stated in Section V (Order) Paragraph J, only as specified in 30 TEX. ADMIN. CODE Section 335.349.

K.      In the event TCEQ determines that alternate or additional remedial actions are necessary because of the Remedy's failure, TCEQ may terminate this AO.

VIII.  Project Manager/Site Coordinator

A.      Not later than the Effective Date, the ED will designate a Project Manager to oversee implementation of the Work and to coordinate communication between the ED and the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties.

B.      Respondents shall direct all communications regarding the Remedial Activities, whether written or oral, at a minimum, to the Project Manager or, if not available, the alternate Project Manager.

C.      In addition to fulfilling the requirements of Section V (Order) Paragraph I, within ten (10) Days after the Effective Date, the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties shall submit a written notice to the Project Manager containing the Site Coordinator's address, phone number and/or pager number at which he/she may be contacted at any time in case of emergency. The Site Coordinator shall notify the ED in writing at least seven (7) Days prior to the start date of any field activities associated with the Remedial Activities. All Performing Parties must coordinate with and cooperate with any Agreeing Respondents in the performance of any and all of the Work.

D.      The Project Manager has the authority to require that the Remedial Activities are performed in accordance with all applicable statutes and regulations and with this AO and to require a cessation of the performance of any part or all of the Remedial Activities that:

1. In the Project Manager's opinion, may present or contribute to an imminent and substantial endangerment to public health, welfare, or the environment because of an actual or threatened release of solid wastes or hazardous substances from the Site; or

2. In the Project Manager's opinion, is not in conformance with any work plan developed in accordance with this AO; or

3. In the Project Manager's opinion, is a violation of any work plan developed in accordance with this AO, HASP, or RA Quality Assurance Project Plan.

E. Within 24 hours after the Project Manager issues an oral order to halt any or all of the Remedial Activities, if time permits, the Project Manager will provide a brief explanation of the basis for the order. As soon as possible, but in any event no more than fourteen (14) Days after the initial order to halt any or all of the Remedial Activities, the Project Manager will provide a written explanation of the basis for the order to halt any or all of the Remedial Activities to the Site Coordinator. The Remedial Activities may be resumed only after the basis for the order to halt any or all of the Remedial Activities has been corrected and instructions to proceed have been provided to the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties by the Project Manager. All additional costs associated with the cessation of any or all of the Remedial Activities will be borne by Respondents.

F. During the RD and RA, the Project Manager and Site Coordinator shall hold meetings at least once per month to review the progress and details of the Remedial Activities and to review and resolve any discrepancies in data. At the ED's discretion, these meetings may be held by telephone. At least seven (7) Days prior to each meeting, the Performing Parties shall deliver an agenda for the meeting and any documents to be discussed to the Project Manager.

G. The ED and the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties may change their respective Project Manager, Alternate Project Manager, or Site Coordinator by written notice to each other of the name, address, and telephone number of the new Project Manager, Alternate Project Manager, or Site Coordinator seven (7) Days prior to the change, or if seven (7) Days notice is not feasible, as soon as possible.

H. The Project Manager may assign other persons, including other TCEQ employees or contractors, to serve as a Site Representative and may temporarily delegate her or his responsibilities to such Site Representative. The Project Manager will notify the Site Coordinator orally or in writing of such delegation.

IX.    Endangerment and Immediate Threat

    A.    In the event of any action or occurrence during the performance of the Remedial Activities which causes or threatens a release of a solid waste or hazardous substance or which may present an immediate threat to public health or welfare or the environment, Respondents shall immediately take all appropriate action to prevent, abate, or minimize such release or threat and shall immediately notify the Project Manager and Site Representative or, if the Project Manager cannot be contacted, the alternate Project Manager and Site Representative. Respondents shall also notify the TCEQ Emergency Response Unit, 1-800-832-8224, Region 5, Tyler. Respondents shall take such action in accordance with all applicable provisions of the HASP. If Respondents fail to take appropriate response action as required by this Section and the ED takes such action instead, Respondents shall reimburse the ED all costs of the response action. Respondents shall make payments of such costs as specified in Section V (Order) Paragraph C and not later than forty-five (45) Days after the ED transmits a Demand Letter stating the amount owed.

    B.    Nothing in the preceding paragraph will be deemed to limit any authority of the State of Texas to take, direct, or order all appropriate action to protect human health and the environment or to prevent, abate, or minimize an actual or threatened release of solid wastes or hazardous substances to the environment on, at, or from the Site.

X.    Submittals Requiring the ED's Approval

    A.    Upon the ED's approval of a submittal, Respondents shall proceed to implement all actions required by the submittal according to the schedule approved by the ED.

    B.    Approved submittals may be modified upon agreement by the ED and the Performing Parties. The Performing Parties shall submit proposed modifications and obtain approval in accordance with the process for submittals specified in this AO generally. Upon approval of any modification, the modification is incorporated into the original submittal for all purposes.

    C.    The ED's approval of submittals or modifications is administrative in nature and allows the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties to proceed to the next steps in the Remedial Activities. The ED's approval does not imply any warranty of performance, does not imply that the Remedy, when constructed, will meet the Remediation Goals, nor does it imply that the Remedy will function properly and ultimately be accepted by the ED.

XI.    Submittal of Documents, Sampling, and Analyses

    A.    Respondents shall provide to the ED all data, information, documents, or records related to the Site which are generated or obtained by any Respondent within twenty

(20) Days of any written request from the ED for such data, information, document, or record. Respondents shall provide written notice to the ED immediately upon generating or obtaining any such data, information, document or record.

B.      Subject to the confidentiality provisions set forth in Paragraph C below, all data, information, documents, and records developed pursuant to this AO or submitted by Respondents to the ED pursuant to this AO will be available to the public.

C.      Respondents may assert a claim of business confidentiality pursuant to the Texas Public Information Act as to any process, method, technique, or any description thereof that the Respondents claim constitutes proprietary or trade secret information developed by Respondents or developed by their contractors or subcontractors. If no confidentiality claim accompanies the process, method, technique, or description thereof when submitted to the ED, any such process, method, technique, or description thereof may be made available to the public by the ED or the State of Texas without further notice to Respondents. Respondents shall make business confidentiality determinations in good faith.

D.      The ED or his Site Representatives may take splits or duplicates of any samples obtained by any Respondent at the Site at any time including during the implementation of the Remedial Activities. The Respondents shall provide assistance necessary for the ED to take split or duplicate samples.

E.      Respondents shall provide the ED with a schedule of routine sampling and notify the ED at least seven (7) Days before any non-routine sampling is conducted at the Site, except in the event of situations provided for by Section IX (Endangerment and Immediate Threat). Respondents shall collect and analyze all Samples in accordance with approved work plans developed pursuant to this AO and shall handle all Samples in accordance with the approved RA Quality Assurance Project Plan.

F.      Respondents shall submit all data, information, reports, schedules, and other documents required by this AO in hard copy format (two hard copies of draft submittals and three of final submittals) and in specific computer software format (one electronic copy of each draft and final submittal) as determined by the Project Manager.

XII.    Notices and Submittals

Respondents shall make all notices and submittals required by this AO in writing and in accordance with the contact information contained in this Section unless otherwise expressly authorized. Receipt by the Site Coordinator of any notice or communication from the ED relating to this AO will be deemed by the ED to be receipt by all Respondents. All information required to be submitted pursuant to this AO, including data, documents, records, reports, approvals, and other correspondence, will be submitted to the following

Parties at the addressees listed below or to such other addressees as such Party hereafter may designate in a written communication to all other Parties:

*As to the Texas Commission on Environmental Quality:*

*For mail:*

> Texas Commission on Environmental Quality
> Remediation Division
> Mail Code 136
> P.O. Box 13087
> Austin, TX 78711-3087
> Attention: Project Manager/Voda Petroleum, Inc. State Superfund Site

*For overnight express mail or delivery service:*

> Project Manager
> Mail Code 136
> Voda Petroleum, Inc. State Superfund Site
> TCEQ, Remediation Division
> Building D, Floor 1, Room 277N
> 12100 Park 35 Circle
> Austin, TX 78753

*By facsimile:*

> Project Manager
> Voda Petroleum, Inc. State Superfund Site
> Superfund Cleanup Section
> (512) 239-2450

XIII. Periodic Review

A. Respondents shall provide written progress reports on the Remedial Activities to the ED, as specified below in Paragraphs B and C.

B. RD/RA Progress Reports

1. Respondents shall submit written monthly progress reports to the ED beginning on the tenth Day of the month following the Effective Date. These progress reports will describe the actions taken pursuant to this AO during the previous month, including a general description of activities and progress during the reporting period, activities projected to be commenced or completed during the next reporting period, and any problems encountered

or anticipated by Performing Parties in commencing or completing the Remedial Activities. Progress reports will include all data received during the reporting period and an up-to-date progress schedule. Progress reports will identify any violations of this AO and calculate any applicable stipulated penalty required under Section XXI (Stipulated Penalties). The requirement to submit these monthly progress reports will be terminated at the earlier of: 1) if no PCA Plan is required, when the AO is terminated in accordance with Section XXXIII (Termination of the Administrative Order) or 2) if a PCA Plan is required, upon the ED's approval of a Final PCA Plan in accordance with Section VI (Remedial Activities) Paragraph D.

2. If an RD/RA progress report submitted by Performing Parties is deficient, the ED will provide written notice to the Site Coordinator. The notice will include comments and a description of the deficiencies.

3. Within ten (10) Days of the ED providing the Site Coordinator with a notice of deficiency of an RD/RA progress report, Performing Parties shall make such changes as the ED deems necessary and resubmit the progress report to the ED.

C. Post Construction Progress Reports

1. Performing Parties shall submit written monthly post construction progress reports to the ED beginning on the tenth Day of the month following the initiation of the PCA as described in Section VI (Remedial Activities) Paragraph D.1. These progress reports will describe the actions taken pursuant to this AO, including a general description of activities and progress during the reporting period, activities projected to be commenced or completed during the next reporting period, and any problems encountered or anticipated by Performing Parties in commencing or completing the Remedial Activities. Post construction progress reports will include all data received during the reporting period and an up-to-date progress schedule. Post construction progress reports will identify any violations of this AO and calculate any applicable stipulated penalty required under Section XXI (Stipulated Penalties). The requirement to submit monthly post construction progress reports will be terminated when the conditions specified in Section XIV (Termination of Post Construction Activities) have been met as determined by the ED in his sole discretion.

2. If a monthly post construction progress report submitted by Performing Parties is deficient, the ED will provide written notice to the Site Coordinator. This notice will include comments and a description of the deficiencies.

3.     Not later than ten (10) Days after the ED provides the Site Coordinator with a notice of deficiency of a post construction progress report, Performing Parties shall make such changes as the ED deems necessary and resubmit the post construction progress report to the ED.

XIV.   Termination of Post Construction Activities

The ED will terminate the requirement to perform PCA if Respondents demonstrate that all Remediation Goals have been met. The Respondents shall satisfactorily perform PCA for the duration of time specified in the RSD, and the Remediation Goals will not be deemed achieved before the time specified in the RSD.

XV.    Records

A.     Each Respondent shall preserve and retain, and shall instruct its accountants, attorneys, employees, agents, contractors, and subcontractors and anyone else acting on its behalf at the Site to preserve and retain, in the form of originals or copies, all data, records, documents, and information of whatever kind, nature, or description that relate in any way to the Site that are now or that come to be in its possession or control. The previous sentence is meant to include data, records, documents, or information relating to each Respondent's potential liability or to any other person's potential liability for the Site under Section 361.271 of the Act.

B.     All data, records, documents, and information required to be preserved and retained in accordance with Paragraph A above will be preserved and retained for a minimum of ten (10) years after the ED's issuance of the Approval of RA Completion. At the end of this ten (10) years, each Respondent shall notify the ED at least ninety (90) Days before any such data, records, documents, or information is destroyed. If the ED requests, Respondents shall, at no cost to TCEQ, provide the ED originals or copies of such data, records, documents, or information which are not protected by a privilege as per Paragraph C below.

Until this AO is terminated in accordance with Section XXXIII (Termination of the Administrative Order), Respondents shall maintain an index of documents that Respondents claim contain privileged information. The index will contain, for each document, the date, author, addressee, and subject of the document. Respondents shall submit a copy of the index to the ED within ten (10) Days after the ED submits a written request.

C.     Any Respondent refusing to provide copies of any data, information, records, or documents based upon a claim of privilege shall identify the data, information, record, or document and explain the basis for the claim. Notwithstanding the immediately preceding sentence, any data, record, information, or document required to be developed or submitted pursuant to this AO will be available to the public.

D.   At any time prior to the completion of the Work, the ED may contact the Site Coordinator to determine the location and/or to obtain copies of any or all of the data, records, documents, or information developed in accordance with this AO. The Respondents shall provide copies of any such data, records, documents, and information to the ED at no cost to TCEQ.

E.   Upon request by the ED, Respondents shall submit to the ED all data, information, records, and documents requested, including those relevant to the items specified in Section 361.182(b) of the Act for possible inclusion in the administrative record in accordance with 30 TEX. ADMIN. CODE Section 335.345.

## XVI.   Access

A.   As of the Effective Date, any Respondent that owns, in whole or in part, the Site, an off-site area that is to be used for access to the Site, property subject to or affected by the Remedial Activities, or other property where documents generated in accordance with this AO are or come to be located shall provide access to such property to the ED; any federal, state or local authorities and their contractors approved by the ED; and the Performing Parties and their authorized representatives and contractors. Failure to provide such access may result in the imposition of statutory and/or stipulated penalties. Respondents shall indemnify TCEQ, and TCEQ will not be liable, for any loss or claim arising out of Respondents' activities at the Site, on off-site areas to be used for access to the Site, on property subject to or affected by the Remedial Activities, and on other property where documents generated in accordance with this AO are or come to be located.

B.   If a person other than a Respondent owns, in whole or in part, the Site, an off-site area that is to be used for access to the Site, property subject to or affected by the Remedial Activities, or other property where documents generated in accordance with this AO are or come to be located, Respondents shall obtain, or use their best efforts to obtain, Site access agreements from the then current owner(s) within ninety (90) Days of the Effective Date. Respondents shall secure agreements to provide access for the ED, federal, state or local authorities and their contractors as approved by the ED, and the Performing Parties and their authorized representatives and contractors. Respondents shall insure that such agreements specify that TCEQ is not liable for any loss or claim arising out of any activities at the Site, on off-site areas to be used for access to the Site, on property subject to or affected by the Remedial Activities, or on other property where documents generated in accordance with this AO are or come to be located. Respondents shall provide copies of such agreements to the ED before the Performing Parties initiate field activities. Respondents' best efforts shall include, if necessary, providing reasonable compensation to any property owner not a Party. If access agreements are not obtained within the ninety (90) Days, Respondents shall immediately notify the ED of their failure to obtain access. If the ED determines, in his sole discretion, that the Performing Parties have used best

efforts to obtain such access, the ED will, pursuant to statutory authority, make appropriate efforts to obtain such access upon reasonable terms to the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, to the Performing Parties. Any revision to the deadlines specified in this AO necessitated by Respondents' inability to obtain such access may be considered a reasonable ground for extending any affected deadline pursuant to Section XVIII (Extension of Deadlines).

C. Subject to the Agreeing Respondents' reasonable safety and internal security requirements, the ED will have the authority to enter, freely move about, and exit the Site, any off-site area that is to be used for access to the Site, property subject to or affected by the Remedial Activities, or other property where documents generated in accordance with this AO are located or come to be located, for the purposes of: inspecting conditions at the Site, the Remedial Activities and all information, documents, data, records, operating logs, and contracts related to the Site; reviewing the Performing Parties' progress in performing the Remedial Activities; conducting such tests as the ED deems necessary; using a camera, sound recording device, or other documentary type equipment; verifying the data submitted to the ED by the Performing Parties; and performing any Remedial Activities not being performed or not being satisfactorily performed by the Performing Parties. Nothing herein will be interpreted as limiting or affecting the ED's right of entry or inspection authority under state or federal law. All persons with access to the Site shall comply with the HASP.

## XVII. Delay in Performance

Respondents shall notify the ED of any delay or anticipated delay in achieving compliance with any requirement of this AO. Such notification will be made by telephone to the Project Manager or, if not available, the alternate Project Manager, within forty-eight (48) hours after Respondents first knew or should have known that an event might cause a delay. Within seven (7) Days after notifying the ED by telephone, Respondents shall provide written notification fully describing the cause of the delay, the anticipated duration of the delay, the measures taken and to be taken by Respondents, their contractors, or consultants, to prevent or minimize the delay, and the timetable by which these measures have been, are being, and will be implemented. A revised timetable will be implemented upon its approval by the ED.

## XVIII. Extension of Deadlines

Upon failure to comply with the terms and conditions of this AO, any Defaulting Performing Parties shall cease to be Performing Parties and all such rights and privileges as accrue to the Performing Parties pursuant to this AO will immediately terminate as to such Defaulting Performing Parties. At that time all responsibilities and obligations that attach to RPs in addition to those that attach to Performing Parties will attach to Defaulting Performing

Parties that are RPs, including the requirement to pay TCEQ costs in accordance with Section V (Order) Paragraph C.

Notwithstanding anything to the contrary in this AO, the Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties shall bear no costs for any fines, penalties, or increases in the ED's oversight of the Remedial Activities resulting from Defaulting Performing Parties actions or inactions. Defaulting Performing Parties and the RPs may be assessed the ED's full costs for oversight of the Work. If actions required by this AO are delayed or are not timely completed because of acts or omissions of one or more Defaulting Performing Parties, the Agreeing Respondents, or if there are no Agreeing Respondents to this AO, the Performing Parties may request a time extension. Upon such request, the ED will approve the time extension, disapprove it, or approve such alternative time extension as the ED in his sole discretion deems appropriate. Thereafter, Respondents shall adhere to all remaining deadlines in this AO and in any documents developed in accordance with this AO and approved by the ED.

The Agreeing Respondents may seek and the ED may grant an extension of any deadline contained in this AO or in any document submitted pursuant to this AO. Agreeing Respondents shall submit the request for a deadline extension no later than seven (7) Days prior to the deadline date and shall substantiate good cause for extension of the deadline. The determination of what constitutes good cause and the length of any deadline extension will be at the ED's sole discretion.

XIX. Reserved

XX. Compliance with Applicable Laws

A. Respondents shall perform all actions pursuant to this AO in accordance with the requirements of all applicable or relevant and appropriate federal, state, and local laws, including the Texas Solid Waste Disposal Act as codified in the Texas Health and Safety Code and the Texas Oil and Hazardous Substance Spill Prevention and Control Act as codified in the Texas Water Code. This AO is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

B. All materials removed from the Site shall be disposed of or treated at a facility which is in compliance with all applicable or relevant and appropriate federal, state, and local laws and shall be disposed of or treated in accordance with all such requirements.

XXI. Stipulated Penalties

A. Subject to the provisions of Sections XXII (Force Majeure) and XXIII (Resolution of Disagreements), noncompliance with this AO shall result in the imposition of stipulated penalties as set forth below.

B.     Penalties Related to Timeliness of Submittals Required by this AO

For failure to:

1.     meet the deadlines set forth in Sections V (Order) and VI (Remedial Activities);

2.     submit timely reports as set forth herein;

3.     submit data in a timely fashion or provide timely notice of sampling as required by Section XI (Submittal of Documents, Sampling, and Analyses); or

4.     resubmit a document within the timeframes specified herein;

Agreeing Respondents shall pay stipulated penalties in the following amounts for each Day and part thereof during which any delay listed in Subparagraphs B.1 through B.4 above continues:

| Period of Delay | Amount/Day |
| --- | --- |
| 1st through 14th Day | $500.00 |
| 15th through 45th Day | $2,000.00 |
| 46th Day and beyond | $3,000.00 |

C.     Penalties Related to Competency of Submittals

This Paragraph applies to submittals of any document required by Sections VI (Remedial Activities), VII (Failure to Attain Remediation Goals or Findings of Significant Difference), and XIII (Periodic Review) which fail to be responsive and acceptable. Agreeing Respondents shall pay a stipulated penalty of $5,000 for each week and part thereof that an acceptable and responsive document is not submitted. This penalty may be assessed in addition to any penalties assessed under Paragraph B of this Section.

D.     Penalties Related to Project Milestones

For failure to:

1.     achieve any RA Project Milestones in accordance with the schedule approved under Section VI (Remedial Activities) Paragraph B; or

2.     achieve any PCA Project Milestones in accordance with the schedule approved under Section VI (Remedial Activities) Paragraph B.

Agreeing Respondents shall pay stipulated penalties in the following amounts for each Day and part thereof during which any delay listed in Subparagraphs D.1 through D.2 above continues:

| *Period of Delay* | *Amount/Day* |
|---|---|
| lst through 14th Day | $1,000.00 |
| 15th through 45th Day | $3,000.00 |
| 46th Day and beyond | $10,000.00 |

E.     For disobeying an order to halt any or all of the Remedial Activities under Section VIII (Project Manager/Site Coordinator), Agreeing Respondents shall pay stipulated penalties of $10,000 per Day.

F.     For failure to use best efforts to obtain Site access in accordance with Section XVI (Access), Agreeing Respondents shall pay a stipulated penalty of $1,000 per Day.

G.     For denying access provided for in Section XVI (Access), Agreeing Respondents shall pay stipulated penalties of $10,000 per Day.

H.     Any Agreeing Respondent who fails to provide records within ten (10) Days after receipt of a written request from the ED or within such other period as specified herein shall pay a stipulated penalty of $10,000 per Day.

I.     With the exception of the stipulated penalties referenced in Paragraphs E, G and H above which attach to individual Agreeing Respondents, all stipulated penalties assessed in accordance with this Section are joint and several, not individual, obligations.

J.     Agreeing Respondents shall pay stipulated penalties assessed under this Section as specified in Paragraph K below within sixty (60) Days after ED transmits a demand letter stating that stipulated penalties have accrued or after resolution of a disagreement as specified in Section XXIII (Resolution of Disagreements), whichever comes later. Stipulated penalties will accrue from the date of noncompliance until the noncompliance is corrected, provided however, that if any Respondent prevails in resolution of disagreements as specified in Section XXIII (Resolution of Disagreements), it shall have no liability to pay stipulated penalties with regard to those matters submitted for resolution of disagreements in accordance with Section XXIII (Resolution of Disagreements) in which it prevails.

K.     Agreeing Respondents shall pay stipulated penalties to "General Revenue Fund of the State of Texas" and shall mail payments to:

Chief Fiscal Officer (MC 180)
Texas Commission on Environmental Quality
"Re: Voda Petroleum, Inc. State Superfund Site Administrative Order, Docket Number 2009-1706-SPF"
P.O. Box 13088
Austin, Texas 78711-3088

L.     The requirement to pay stipulated penalties that have been incurred prior to the termination of this AO in accordance with Section XXXIII (Termination of the Administrative Order) will survive termination of this AO.

M.     A single act or omission may be the basis for more than one type of stipulated penalty. A single act or omission may also be subject to more than one (1) Day of stipulated penalties. In cases where more than one stipulated penalty applies to a single act or omission, the ED may choose which stipulated penalties to assess.

N.     The ED has the sole discretion to reduce or waive stipulated penalties and to do so as to specific Agreeing Respondents or groups of Agreeing Respondents.

O.     Stipulated penalties against Agreeing Respondents will be in lieu of administrative and civil penalties for the same violation but will not prevent TCEQ from seeking enforcement of the ordering provisions by injunctive relief. Respondents that are not Agreeing Respondents are subject to administrative and civil penalties.

## XXII. Force Majeure

A.     If a delay in performance is caused (in whole or in part) by events beyond the reasonable control of the Agreeing Respondents, that failure will not be construed as a violation of this AO. The burden of establishing that an event is beyond their reasonable control lies with the Agreeing Respondents. The Agreeing Respondents shall notify the ED in writing within seven (7) Days of the start of the Force Majeure event and within seven (7) Days of the end of the Force Majeure event. Agreeing Respondents shall submit the notification as specified in this Section. Failure to so notify the ED will constitute a waiver of the claim of Force Majeure.

Such notice will describe in detail the cause of the delay; the anticipated duration of the delay; the measures taken and to be taken by the Agreeing Respondents, their contractors or consultants, to prevent or minimize the delay; and the timetable by which these measures have been, are being, and will be implemented. Measures to prevent or minimize the delay will be implemented upon the ED's written approval of the timetable. The Agreeing Respondents shall also submit, for the ED's approval,

a proposed schedule for subsequent Remedial Activities whose deadlines have been affected by the Force Majeure event. Neither the ED's approval of the timetable of measures to be taken to prevent or minimize delays or of the revised schedule of Remedial Activities will be construed as excusing the delay or as a waiver of TCEQ's rights to enforce this AO.

B.      Force Majeure events will not include increased costs or expenses of any part or all of the Work or the financial inability of any Agreeing Respondent to perform any part or all of the Work.

C.      If the ED and the Agreeing Respondents cannot agree that the cause for the delay was a Force Majeure event or cannot agree upon the schedule for subsequent Remedial Activities, then the disagreement will be resolved according to Section XXIII (Resolution of Disagreements). The Agreeing Respondents shall have the burden of demonstrating that Force Majeure is warranted.

## XXIII. Resolution of Disagreements

A.      The Agreeing Respondents and the ED shall attempt to resolve on an informal basis any issues arising under Sections V (Order) through XXXIII (Termination of the Administrative Order) on which there is disagreement. The Agreeing Respondents shall commence informal negotiations by notifying the Project Manager in writing that there is a disagreement and that this Section is being invoked. Except as provided below in Paragraph D, informal negotiations will not extend beyond thirty (30) Days from the date the Project Manager receives such notification, unless the Agreeing Respondents and the ED agree otherwise in writing.

B.      The Agreeing Respondents shall notify the Project Manager within thirty (30) Days after the Day the Agreeing Respondents knew or should have known of the events giving rise to the disagreement. Should the Agreeing Respondents fail to give such notice, the ED's decision on any disagreement will be binding.

C.      Notification of the Project Manager in accordance with Paragraph A above will not by itself postpone the deadlines established in accordance with this AO or stay the accrual of any applicable stipulated penalties for the matter at issue. However, the obligation to pay any applicable stipulated penalties to the TCEQ will be stayed pending resolution of the disagreement in accordance with this Section.

D.      If the ED makes a determination to perform a portion or all of the Remedial Activities, the Agreeing Respondents shall have five (5) Days after notification to the Site Coordinator to commence informal negotiations by notifying the Project Manager in accordance with Paragraph A above. Informal negotiations will not extend beyond fifteen (15) Days from the date the ED receives notification, unless the Agreeing Respondents and the ED agree otherwise in writing.

E. The procedure for any resolution of disagreements subsequent to informal negotiations will be found in Sections 361.321 and/or 361.322 of the Act.

F. Unless otherwise specifically set forth herein, the fact that resolution of disagreements is not specifically set forth in individual Sections is not intended to and will not bar the Agreeing Respondents from invoking this Section as to any disagreement arising under Sections V (Order) through XXXIII (Termination of the Administrative Order), including any disagreement concerning the ED's exercise of discretion under the terms of this AO.

## XXIV. Indemnification

Respondents agree to indemnify and hold harmless TCEQ and its officers, employees, agents, principals and assigns from and against all fines, penalties, claims, damages, losses, demands, judgments, settlements, costs of suit, and attorneys fees that arise out of or result from:

1. Respondents' performance of an inherently dangerous activity or handling of a solid waste or hazardous substance at or from the Site;

2. Respondents' negligent, reckless, or intentional acts or omissions or such acts or omissions of any of its agents or employees; and

3. the negligent, reckless, or intentional acts or omissions of any of Respondents' contractors or suppliers or their agents or employees.

## XXV. Liability

The State of Texas, by issuing this AO, assumes no liability for any injuries or damages to persons or property resulting from acts or omissions of Respondents, or their directors, officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out any of the Work. Neither TCEQ nor the State of Texas will be deemed a party to any contract entered into by any Respondent or its directors, officers, employees, agents, successors, assigns, contractors, or consultants to perform any or all of the Work or any other activity at the Site.

## XXVI. Severability

The provisions of this AO are intended to be severable and are deemed severable. Should any provision of this AO be rendered unenforceable by a court of competent jurisdiction or other appropriate authority the remaining provisions will remain valid and enforceable.

## XXVII. TCEQ's General Reservation of Rights and Retention of Claims

Except as specified herein, nothing in this AO will constitute or be construed as a covenant not to sue by TCEQ or the State of Texas or a release from any claim, cause of action, or demand in law or equity against any person, firm, partnership, or corporation. Except as specified herein, the ED reserves and this AO is without prejudice to all rights against Respondents with respect to all matters including:

1. Claims based on Respondents' failure to fulfill the requirements of this AO;

2. Liability arising from the past, present, or future disposal, release, or threat of release of solid wastes or hazardous substances outside of or not related to the Site;

3. Liability for future disposal of solid wastes or hazardous substances at the Site, other than as provided in the RSD or in any work plan required to be developed in accordance with this AO;

4. Liability for violations of federal or state law which occur during or after implementation of the Remedial Activities;

5. Claims based on criminal liability; and

6. Claims for natural resource damages as defined by CERCLA (42 U.S.C. Sections 9601 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. Sections 2701 et seq.), the Oil Spill Prevention and Response Act (Texas Natural Resources Code Chapter 40), and the Federal Water Pollution Control Act (33 U.S.C. Sections 1251 et seq.).

## XXVIII. Section Headings

Section headings are included for convenience of reference only and will be disregarded in the construction and interpretation of any of the provisions of this AO.

## XXIX. Continuing Authority

TCEQ specifically retains authority over Respondents for the duration of this AO for the purposes of issuing such further orders or directions as may be necessary or appropriate to construe, implement, modify, enforce, terminate, or reinstate the terms of this AO or for any further relief as the interest of the State of Texas may require.

## XXX. Enforcement

Except as provided in Section XXI (Stipulated Penalties) Paragraph O, nothing herein will preclude TCEQ from taking any additional enforcement actions against Respondents at any time including issuing such additional orders as TCEQ may deem necessary or from requiring Respondents to perform additional activities in the future and to completely perform all of the Work.

This AO in no way obligates the State of Texas to assist Respondents in defending contribution actions brought by other persons or entities.

XXXI. Computation of Time

    A.    Deadlines falling on a weekend or a State of Texas holiday will be extended until the next business day.

    B.    The terms "submit" and "provide" as used herein will refer to the date on which information, data, a document, or a record is to be received by the appropriate Party. Submittals received on the deadline date will be deemed timely.

XXXII. Opportunity to Conference

    A.    The Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties may, within twenty (20) Days after the Effective Date, request a conference with the Project Manager. The request must be submitted in writing to the Project Manager. Any such conference will occur at the TCEQ's main campus in Austin.

    B.    The purpose and scope of the conference will be limited to issues involving the implementation of the Remedial Activities. The conference is not an evidentiary hearing, does not constitute a proceeding to challenge this AO, and does not give Agreeing Respondents or, if there are no Agreeing Respondents to this AO, the Performing Parties the right to seek review of this AO.

XXXIII. Termination of the Administrative Order

    A.    The ED may terminate this AO when he determines that alternative or additional work is required at the Site because the Remediation Goals will not be attained by implementation of the Remedial Activities, unless Agreeing Respondents and the ED agree on such alternative or additional work, agree to modify the Remedial Action to include such additional or alternative work in accordance with Section V (Order) Paragraph J, and agree to modify this AO in accordance with Section V (Order) Paragraph J.

    B.    Except as provided in this Section, when the ED determines that the Work has been completed in accordance with this AO, the ED will provide written notice to

Agreeing Respondents that Agreeing Respondents have fully satisfied the requirements of this AO. Such notice will be issued within one hundred and eighty (180) Days after the ED determines that the Work has been completed in accordance with this AO. This notice will not, however, terminate Respondents' obligations to comply with those provisions specified herein that are intended to survive this AO, including requirements regarding record preservation and Sections XV (Records), XXI (Stipulated Penalties), XXV (Liability), XXIX (Continuing Authority), and XXX (Enforcement).

## XXXIV. Rules of Construction

The masculine, feminine, and neuter gender will each include the other and the singular and plural number will each include the other.

This AO may be executed in two or more counterparts each of which will be deemed an original but all of which together will constitute one and the same document.

## XXXV. Sovereign Immunity

The Parties hereby agree that nothing in this AO waives the State of Texas' sovereign immunity relating to suit, liability, and the payment of damages. The Parties further agree that all claims, suits, or obligations arising under or relating to this AO are subject to and limited to the availability of funds appropriated by the Texas Legislature for that respective claim, suit or obligation.

*The Chief Clerk shall send a copy of this Administrative Order to all Parties.*

Issue date: **FEB 1 2 2010**

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY


Bryan W. Shaw, Ph.D., Chairman
For the Commission

90

# VODA PETROLEUM, INC. STATE SUPERFUND SITE ADMINISTRATIVE ORDER

## EXHIBIT A

## REMEDY SELECTION DOCUMENT

# REMEDY SELECTION DOCUMENT



## VODA PETROLEUM, INC.
## STATE SUPERFUND SITE
## CLARKSVILLE CITY, GREGG COUNTY, TEXAS

## SEPTEMBER 2009

*PREPARED BY: CAROL BOUCHER, P.G., PROJECT MANAGER*
*TEXAS COMMISSION ON ENVIRONMENTAL QUALITY*
*REMEDIATION DIVISION*

# TABLE OF CONTENTS

I.     INTRODUCTION..................................................................................................... 1

II.    PURPOSE............................................................................................................... 1

III.   LEGAL AUTHORITY.......................................................................................... 1

IV.   SITE HISTORY .................................................................................................... 2

V.     SUMMARY OF REPORTS................................................................................. 3

VI.   ACTION LEVELS................................................................................................ 4

VII.  THE SELECTED REMEDIAL ACTION........................................................... 5

VIII. GLOSSARY........................................................................................................... 6

# VODA PETROLEUM, INC. STATE SUPERFUND SITE
## CLARKSVILLE CITY, GREGG COUNTY, TEXAS
### REMEDY SELECTION DOCUMENT

## I. INTRODUCTION

Voda Petroleum, Inc., (aka Ultra Oil) (Voda Site) occupies 6.12 acres at 211 Duncan Road, approximately 1.25 miles west of the intersection of FM 2275 (George Richey Road) and FM 3272 (North White Oak Road), 2.6 miles north-northeast of Clarksville City in Gregg County. The Voda Site was operated as a waste oil recycling facility from about 1981 until it was abandoned in November 1991.

The Texas Commission on Environmental Quality (TCEQ) is an agency in the State of Texas that implements many of the state laws relating to the conservation of natural resources and the protection of public health and safety and the environment. The TCEQ addresses certain sites that may constitute an imminent and substantial endangerment to public health and safety or the environment through the state Superfund program.

## II. PURPOSE

This *Remedy Selection Document* (RSD) presents the *Remedial Action* (also known as "the remedy") for the Voda Site, which is designed to address the contamination and provide protection of public health and safety and the environment.

Words appearing in italics in this document are defined in Section VIII, "Glossary," of this RSD.

## III. LEGAL AUTHORITY

The investigation of the nature and extent of contamination at the Voda Site and the selection of the *Remedial Action* is in accordance with the *Solid Waste Disposal Act*, Tex. Health & Safety Code §§ 361.001-966 (West 2008); Subchapter K: Hazardous Substance Facilities Assessment and Remediation (Subchapter K) rules found in 30 Tex. Admin. Code (TAC) §§ 335.341-351 (2009); and the *Texas Risk Reduction Program* (TRRP) rules found in 30 TAC §§ 350.1-135 (2009).

While the Subchapter K rules are specific to the Superfund process, the TRRP rules are a comprehensive program for addressing environmental contamination and apply to many different types of corrective action administered by the TCEQ. The TRRP rules establish procedures for determining the concentration of contaminants to which a person or other environmental receptor can be exposed without unacceptable risk of harm. These acceptable concentration levels are called *Protective Concentration Levels* (PCLs).

A three-tiered approach may be used under the TRRP rules to calculate the PCLs for a site. The tiers represent increasing levels of evaluation where site-specific information is factored into the process. For example, Tier 1 uses conservative, generic models that do not account for site-specific factors, Tier 2 allows for the use of site-specific information but must use PCL equations

1

provided by the TCEQ, and Tier 3 allows for more detailed and complex evaluations so that PCLs are appropriate for specific site conditions. The PCLs for the Voda Site were developed under Tier 1.

Critical to the analysis under all three of the tiers is the land use classification for the site. Under the TRRP rules, the land can be classified as either residential or commercial/industrial. Remediation to residential standards assumes that the site may be occupied by children and therefore is applicable not only to strictly residential land but also to playgrounds, schools, daycare centers and similar land uses. Remediation to commercial/industrial standards assumes that the site will not be regularly occupied by children and is protective of persons who may occupy the site as workers. Sites remediated to commercial/industrial standards cannot be used for residential-type activities unless further controls are implemented to make the site safe for that use. The TCEQ determined that a commercial/industrial use was appropriate for the Voda Site.

The TRRP rules allow risks posed by the presence of contamination above a PCL to be managed by any combination of the following: 1) removal or decontamination of contaminated media; 2) physical controls, such as landfills and caps, which limit exposure to the contaminated media; or 3) *institutional controls*, such as deed restrictions on the future use of the property, which are also intended to limit exposure to the contaminated media. These remedies under the TRRP rules are divided into two main categories: Remedy Standard A and Remedy Standard B. To meet Remedy Standard A requirements, the contaminated media must be removed and/or decontaminated such that physical controls and, in most cases, *institutional controls* are not necessary to protect human and ecological receptors from unprotective levels of contamination based on the designated land use. To meet the requirements of Remedy Standard B, however, physical controls and *institutional controls* may be relied on to limit exposure to unprotective levels of contamination. These standards are described in detail in 30 TAC § 350.32 and § 350.33. The proposed remedy at the Voda Site meets the criteria established for Remedy Standard A.

## IV.    SITE HISTORY

The Voda Site was operated as a waste oil recycling facility from about 1981 until it was abandoned in November 1991. The Voda Site is located in a rural residential neighborhood with occupied residences directly on the east and west sides of the facility. A review of the facility waste management activity records revealed that Voda Petroleum, Inc., had received, stored and processed waste gasolines; oily wastes; used oil mixed with methyl ethyl ketone, varsol, trichloroethane, toluene, and hexane; crude oil; greases; and waxes. In 1996, the EPA conducted an emergency removal of 462 fifty-five-gallon drums of grease or oily wastes, 14 fifty-five-gallon drums of corrosive wastes, 16 above-ground tanks, and associated contaminated soil. The site was then backfilled to approximate the undisturbed topography to facilitate site drainage. The EPA response action removed the immediate threat to human health and the environment but was not intended to be and did not constitute a final remediation solution. Post removal analysis of soil and groundwater samples indicated that soil and groundwater continued to be contaminated above appropriate cleanup levels.

2

## V.    SUMMARY OF REPORTS

### A.    HAZARD RANKING SYSTEM REPORT

The *Hazard Ranking System* (HRS) is a numerically-based screening system that uses information from initial, limited investigations to assess whether a site qualifies for the state or federal Superfund program.  Sites scoring 28.5 or greater may qualify for the federal Superfund program, while sites scoring 5 or greater may qualify for the state Superfund program.  The HRS scoring for the Voda Site was prepared by the TCEQ in August 1995 and is presented in the report titled "Hazard Ranking System (HRS) Documentation Record, Voda Petroleum Site, Gregg County, Texas."  The Voda Site earned a score of 23.63.  The TCEQ proposed to list the Voda Site on the State Registry of Superfund Sites and published notice of its intent in the *Texas Register* on November 17, 2000.  25 Tex. Reg. 11594-95 (Nov. 17, 2000).

### B.    REMEDIAL INVESTIGATION REPORT

The *Remedial Investigation* (RI) includes field work, laboratory analysis and interpretation of collected data for the purpose of determining the nature and extent of contamination associated with the Voda Site.  The Phase I RI Report, dated August 2002, included a summary of the RI activities conducted at the site in May 2002.  Based on the Phase I results, a second phase was conducted in April 2004, focusing on the area known as the "East Tank Farm."  The Phase II RI Technical Memorandum (TM), dated July 2004, concluded that the investigation of the extent of soil contamination above cleanup standards was complete; however, additional groundwater monitor wells were needed to complete the groundwater investigation.  Additional groundwater monitor wells were installed from April 2005 through May 2007.  The final round of monitor well installations was found to fully define the extent of the groundwater contamination.

The following summarizes the findings of the RI:

Groundwater - The Queen City Aquifer beneath the Voda Site is impacted by various volatile organic constituents (VOCs) exceeding the PCLs applicable to a Class 1 groundwater resource.

Onsite Soil - Soil containing contaminants above cleanup standards at the Voda Site is generally limited to the East Tank Farm area, encompassing an area of approximately 60 feet by 120 feet and 12 feet deep. Contaminants exceeding cleanup standards include VOCs and Total Petroleum Hydrocarbons (TPH).

Offsite Soil/Sediment - No offsite soil or sediment contamination was detected.

Ecological Risks - The Tier 1 Exclusion Criteria Checklist determined that conditions at the Voda Site precluded the need for a formal ecological risk assessment (ERA) because

3

96

the site meets the conditions for "de minimis land area," meaning there are insignificant ecological exposure pathways at the site.

## C. FEASIBILITY STUDY PHASE REPORT

The *Feasibility Study* (FS) for the Voda Site, dated January 2008, presented an evaluation of the potential remedial alternatives to address the chemicals of concern (COCs) in onsite soil and onsite and offsite groundwater found exceeding the applicable PCLs.

## D. REMEDY SELECTION PHASE REPORTS AND MEETING

The Proposed Remedial Action Document (PRAD), dated June 2008, presented a brief discussion of remedial actions evaluated and the specific remedy proposed by the TCEQ to address the contaminants exceeding the PCLs at the Voda Site.

On October 23, 2008, a public meeting was held at the Broadway Elementary School Cafeteria in Gladewater, Texas, for the purpose of presenting the PRAD and soliciting public comment about the proposed remedy. Upon consideration of the comments received during the public comment period, the TCEQ selected the remedy described in this RSD.

## E. PLUME MANAGEMENT ZONE (PMZ) DEMONSTRATION TECHNICAL MEMORANDUM (TM)

In May 2009, TCEQ technical staff reevaluated information that could be read to support the finding of two possible classifications for the groundwater at the Voda Site. As a result, pursuant to 30 TAC § 350.33(f)(4), the TCEQ conducted a PMZ demonstration in accordance with TCEQ publication RG-366/TRRP-29, Soil and Groundwater Response Objectives in July 2009. The PMZ demonstration, detailed in the PMZ Demonstration TM dated August 3, 2009, showed that the COC concentrations will exceed cleanup levels at the nearest point of exposure, an intermittent creek located on the offsite affected property. Therefore, it was confirmed that a PMZ would not meet the remedial action goals and would not be an appropriate remedy for the groundwater at the Voda Site, and the currently selected remedial action continues to best fit the statutory criteria for remedial selection.

## VI. ACTION LEVELS

*Remedial Action* Objectives are the stated goal of the remedy that must be achieved to make the site protective of human health and the environment. Action levels are the maximum numeric concentrations of the COCs which must not exceed the Tier 1 PCLs for the appropriate land use and groundwater resource classification. For the onsite and offsite groundwater, the Tier 1 PCLs are those developed for Class 1 groundwater resources established in TRRP. For the onsite soil, the Tier 1 PCLs are those developed for Commercial/Industrial Soil with a greater than 0.5 acre source area for groundwater protection, with the exception of TPH which was developed based

4

on site-specific exposure criteria. Those objectives and action levels are presented in the following table for the specific COCs found at the Voda Site:

| GROUNDWATER CONTAMINANT NAME | ACTION LEVEL (Critical PCL) | REMEDIAL ACTION OBJECTIVES |
|---|---|---|
| Benzene | 5 µg/L | Reduce COCs concentrations to levels below the action level (TRRP Tier 1 PCL for groundwater ingestion: TRRP Tier 1 $^{GW}GW_{Ing}$). |
| Dichloroethylene, 1,1- | 7 µg/L | |
| Dichloroethane, 1,2- | 5 µg/L | |
| Vinyl chloride | 2 µg/L | |

| SOIL CONTAMINANT NAME | ACTION LEVEL (Critical PCL) | REMEDIAL ACTION OBJECTIVES |
|---|---|---|
| Benzene | 0.013 mg/kg | Reduce COCs concentrations to levels below the action level (TRRP Tier 1 Commercial/Industrial Land Use PCL for surface and subsurface soil to groundwater: TRRP Tier 1 C/I $^{GW}Soil_{Ing}$). |
| Dichloroethylene, cis-1,2- | 0.12 mg/kg | |
| Ethylbenzene | 3.8 mg/kg | |
| Propylbenzene, n- | 67 mg/kg | |
| MTBE | 0.93 mg/kg | |
| Tetrachloroethylene | 0.025 mg/kg | |
| Toluene | 4.1 mg/kg | |
| Trichloroethane, 1,1,1- | 0.81 mg/kg | |
| Trichloroethylene | 0.017 mg/kg | |
| Trimethylbenzene, 1,2,4- | 72 mg/kg | |
| Trimethylbenzene, 1,3,5- | 79 mg/kg | |
| Vinyl chloride | 0.011 mg/kg | |
| Xylene, m | 53 mg/kg | |
| Xylene, o | 35 mg/kg | |
| Xylene, p | 75 mg/kg | |

## VII.   THE SELECTED REMEDIAL ACTION

In accordance with 30 TAC § 335.348(l) and the requirements of section 361.193 of the *Solid Waste Disposal Act*, the TCEQ selects the *Remedial Action* for a site by determining which remedial alternative is "the lowest cost alternative which is technologically feasible and reliable, effectively mitigates and minimizes damage to the environment, and provides adequate protection of the public health and safety and the environment." 30 TAC § 335.348(l). The TCEQ has selected excavation with offsite disposal for the onsite soil, and the installation of reactive biobarrier wells with *institutional controls* for the onsite and offsite shallow groundwater.

5

Also in accordance with TRRP, the *Performing Parties* (or the TCEQ if no parties agree to fund or perform the remedial action) shall record an *institutional control* in the real property records of Gregg County. The *institutional control* shall be placed on each property which overlies groundwater contaminated above the PCLs and shall describe the specific area of the groundwater plume on each affected property. The *institutional control* shall remain in place until such time as the TCEQ has determined that the *Remedial Action* Objectives have been permanently achieved. If the *Remedial Action* is implemented by the TCEQ, the TCEQ will request that the owner of each affected property voluntarily agree to record a restrictive covenant to serve as the *institutional control*. If the property owner does not agree to the restrictive covenant, the TCEQ shall record a deed notice to serve as the *institutional control*. If the *Remedial Action* is implemented by *Performing Parties*, the *Performing Parties* shall be responsible for securing the *institutional control* in the form of a restrictive covenant from the owner of the affected property. All of the elements of the *Remedial Action* described above shall be in accordance with detailed requirements established in TRRP.

Monitor wells installed at the Voda Site shall be sampled for the COCs identified in Section VI, Action Levels, and the hydraulic gradient shall be measured quarterly during the first two years and semi-annually for the following two years of the *Remedial Action*. Monitoring results shall be evaluated no less frequently than annually to verify that the plume has been reduced in both areal extent and concentration of COCs. Once the TCEQ determines that the Action Levels have been permanently achieved, the TCEQ will discontinue sampling and/or monitoring activities.

## VIII. GLOSSARY

*Feasibility Study* (FS) – A description, screening, and analysis of the potential *Remedial Action* alternatives for a site.

*Hazard Ranking System* (HRS) – The scoring system used by the TCEQ to evaluate a site for the state or federal Superfund program. The scoring system was developed by the United States Environmental Protection Agency as described in 40 Code of Federal Regulations Part 300, Appendix A.

*Institutional Control* – A legal instrument placed in the property records in the form of a deed notice, restrictive covenant, or other form established in the TRRP rules which indicates the limitations on or conditions governing the use of the property which ensures protection of human health and the environment.

*Performing Parties* – Collectively, 1) any parties who agreed to fund or conduct the remedial action by entering into an agreed order with the TCEQ and 2) parties that did not enter into an agreed order with the TCEQ but that fund or perform the selected *Remedial Action*.

*Plume Management Zone* (PMZ) – The area of the groundwater protective concentration level exceedance (PCLE) zone, plus any additional area allowed in accordance with 30 TAC § 350.33(f).

*Potentially Responsible Parties* (PRPs) – Persons or entities that the TCEQ considers potentially responsible for the contamination of the site pursuant to section 361.271 of the Texas Health and Safety Code.

*Proposed Remedial Action Document* (PRAD) – The document which describes the TCEQ's proposed *Remedial Action.*

*Protective Concentration Level* (PCL) – The concentration of a chemical of concern which can remain within the source medium and not result in levels which exceed the applicable human health risk-based exposure limit or ecological protective concentration level at the point of exposure for that exposure pathway.

*Remedial Action* – An action, including remedial design and post-closure care, consistent with a remedy taken instead of or in addition to a removal action in the event of a release or threatened release of hazardous substances into the environment to prevent or minimize the release of a hazardous substance so that the hazardous substance does not cause an imminent and substantial endangerment to present or future public health and safety or the environment.

*Remedial Investigation* (RI) – An investigative study which may include removals, and/or a *feasibility study,* in addition to the development of *protective concentration levels,* designed to adequately determine the nature and extent of release or threatened release of hazardous substances and, as appropriate, its impact on airs, soils, groundwater and surface water, both within and beyond the boundaries of the site.

*Solid Waste Disposal Act* – Ch. 361 of the Tex. Health & Safety Code. The purpose of the *Solid Waste Disposal Act* is to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste, including any hazardous waste that is generated. Subchapter F of Chapter 361 relates to the state Superfund process. The Texas Health and Safety Code is available online at: http://www.statutes.legis.state.tx.us.

*Texas Risk Reduction Program* (TRRP) – A program of the TCEQ that provides a consistent corrective action process directed toward protection of human health and the environment balanced with the economic welfare of the citizens of the state. The rules for this program are located in Chapter 350 of 30 Texas Administrative Code. The Texas Administrative Code is available online at: http://www.sos.state.tx.us/tac/.

# VODA PETROLEUM, INC.
# STATE SUPERFUND SITE
# ADMINISTRATIVE ORDER


# EXHIBIT B


# LIST OF SOLID WASTES AND HAZARDOUS SUBSTANCES AT THE SITE

Dichloroethylene, cis-1,2-
Benzene
Propylbenzene, n-
MTBE (methyl tertiary-butyl ether)
Tetrachloroethylene
Toluene
Trichloroethane, 1,1,1-
Trichloroethylene
Trimethylbenzene, 1,2,4-
Trimethylbenzene, 1,3,5-
Vinyl chloride
Xylene, m-
Xylene, o-
Xylene, p-
Dichloroethylene, 1,1-
Dichloroethane, 1,2-

# VODA PETROLEUM, INC.
# STATE SUPERFUND SITE
# ADMINISTRATIVE ORDER

## EXHIBIT C

## FIELD SAMPLING PLAN CONTENTS OUTLINE

# FIELD SAMPLING PLAN

# TABLE OF CONTENTS

Title and Approval Sheet

Distribution List

Table of Contents

1.0 Introduction

- **Investigation Phase: Purpose** - *Briefly states the specific purpose of this FSP relative to the Quality Assurance Project Plan, Work Plan and/or other documents. A schematic presentation of the project documents and the location of key planning components should be presented.*

- **RA Phase: Purpose** - *Briefly states the specific purpose of this FSP relative to the RA Contract Document, Quality Assurance Project Plan and/or other documents. A schematic presentation of the project documents and the location of key planning components should be presented.*

- **Project/Task Organization** - *Identifies the key individuals or organization participating in the project, their role(s) and responsibilities, and the organizational chart for the project. (Project specific information for QAPP Element A)[1]*

2.0 Site and Project Summary

- *Investigation Phase: Problem Definition/Background - Briefly states the site description, surrounding area, historical information, previous investigation, suspected contamination source, probable transport pathways and other site information. Most of this information is available from the Conceptual Site Model developed during the planning phase. Any specific data gaps and methods to fill the data gaps should also be discussed. States the specific problem to be solved or the decision to be made and identifies the decision maker. (Project specific information for QAPP Element A5)[1]*

- *RA Phase: Problem Definition/Background - Briefly states the site description, historical information, previous investigation, a summary of the selected remedy, a brief discussion of the remedial action activities. States the specific problem to be solved or the decision to be made and identifies the decision maker. (Project specific information for QAPP Element A5)[1]*

- *Project/Task Description and Schedule - Briefly summarizes the project and the project tasks, the turnaround time for the project, including the turnaround time requirement for laboratory analysis. (Project specific information for QAPP Element A6)[1]*

- *Describes any **special personnel and equipment** required for the specific type of work being planned or measurement being taken and any special training/certification requirements . (Project specific information for QAPP Element A8)[1]*

- ***Data Acquisition Requirements (Non-direct Measurements)*** *- Defines the criteria for the use of non-measurement sources, such as computer databases, programs, literature files, and historical databases. (Project specific information for QAPP Element B9)[1]*

- ***Assessment Techniques*** *- Defines the number, frequency, and type of quality assessment activities, the responsible staff, the procedures to be performed during the life of the project. (Project specific information for QAPP Element C1) [1]*

## 3.0 Analytical Requirements and Data Quality Objectives

- ***Data Quality Objectives*** *- Summarizes the project specific quality objectives and measurement performance criteria. This section should include the summary of the outcomes of the technical planning process (e.g., the 7-Step DQO process) used to develop the project objectives. The summary should also include a reference to Appendix B of the FSP, which contains a full discussion of the proposed DQOs for the project from which the summary was taken. Designates and briefly describes sampling units (e.g. AOCs, surface soil to 6 inches). States objectives by sampling unit or media. The project specific calculations or algorithms are also specified in this section. (Project specific information for QAPP Element A7) [1]*

## 4.0 Sampling Plan Design

- ***Sampling Process Design*** *- All the relevant components of the experimental design and the key parameters to be evaluated are included in this section. This section should include the sampling activities, the rational for the design (in terms of meeting the DQOs), the sampling design assumptions, the procedures for locating and selecting environmental samples, a classification of measurements as critical or noncritical, the type and number of samples required for the project including the required field QC samples, the sampling locations and frequency, the applicable sample matrices, and an identification of samples critical to the project. Most of this information should be available from the output from Step 7 of the DQO process. (Project specific information for QAPP Element B1)[1]*

- *Describes the sampling plan for each media, as applicable, including figures and tables.*

  *Surface Soil*
  *Subsurface Soil*
  *Groundwater*
  *Surface Water and Sediment*
  *Air*
  *Other Matrices*

- *This section should include a summary table containing a list of all chemicals of concern identified for the project with the corresponding Level of Required Performance (LORP) (e.g., action levels and preliminary remedial goals), analytical methods (including the preparation, analysis and cleanup methods), and the corresponding method quantitation limits for all analytes of concern.*

<u>5.0 Sampling Methods and Sample Handling</u>

- ***Sampling Method Requirements*** *- Identifies sampling methods and equipment and describes the procedures for sample collection, preparation, and decontamination. This section should reference the Standard Operating Procedures located in Appendix A. (Project specific information for QAPP Element B2)* [1]

- ***Sampling Handling and Custody Requirements*** *- This section should include the required sample volumes, container types, and preservation requirements for non-standard or other analytical methods proposed for project work that are not listed in Table B2-1 of the Superfund Program QAPP. This section also includes the field sample handling and custody requirements for the project. (Project specific information for QAPP Element B3)* [1]

- *This section contains the specific requirements for **field instrument/equipment testing, inspection and maintenance** for the project. Additionally, **field instrument calibration and frequency requirements** for water level, pH, temperature, conductivity, dissolved oxygen, redox potential, turbidity and other field measurements are addressed in this section as applicable to the project. This section also includes the critical field supplies, the inspection or acceptance testing requirements, and the acceptance criteria. (Project specific information for QAPP Element B6, B7, and B8)* [1]

<u>6.0 Field Survey and Measurements</u>

- *This section describes the sampling methods and criteria for **field survey and measurements**, such as land surveys, hydrogeological tests and measurements, geophysical surveys and soil gas surveys, required for the project.*

<u>7.0 Additional Field Activities</u>

- *This section contains descriptions and procedures for **other field activities**, such as presampling/mobilization activities, required notification, property access, site restoration and investigative-derived waste (IDW) handling and disposal.*

<u>8.0 Exceptions, Additions and Changes to the TCEQ Superfund Program QAPP</u>

- *List any **exceptions, additions and changes to the Superfund Program QAPP** in each of the appropriate sub-sections corresponding to the table of contents of the Program QAPP below. Site specific information (e.g., Group A and Group B elements) specified above should not be restated in this section. Please refer to the Program QAPP for details. This section should also include specifications for non-standard methods and other analytical methods not specified in the Program QAPP.*

    *<u>GROUP A: PROJECT MANAGEMENT</u>*
    *A.1 Title and Approval Sheet*
    *A.2 Table of Contents*
    *A.3 Distribution List*
    *A.4 Project/Task Organization*

*A.5 Problem Definition/Background*
*A.6 Project/Task Description*
*A.7 Quality Objectives and Criteria*
*A.8 Special Training/Certification*
*A.9 Documentation and Records*
  *A.9.1 Field Operation Records*
  *A.9.2 Laboratory Data Package*
  *A.9.3 Laboratory Performance Criteria Data*
  *A.9.4 Data Handling Records*
  *A.9.5 Data Reporting Package Format and Document Control*
  *A.9.6 Field Records/Data Reporting Package Archiving and Retrieval*

*GROUP B: DATA GENERATION AND ACQUISITION*
 *B.1 Sampling Process Design (Experimental Design)*
 *B.2 Sampling Methods*
  *B.2.1 Sample Containers*
  *B.2.2 Sample Volumes, Container Types, and Preservation Requirements*
 *B.3 Sample Handling and Custody*
  *B.3.1 Field Sample Handling and Custody*
  *B.3.2 Laboratory Sample Handling and Custody*
 *B.4 Analytical Methods*
  *B.4.1 Screening Methods*
  *B.4.2 Definitive Preparation Methods*
  *B.4.3 Definitive Analysis Methods*
  *B.4.4 Non-standard Method Validation*
 *B.5 Quality Control*
  *B.5.1 Definitive Analytical Methods*
  *B.5.2 Screening Methods*
  *B.5.3 Quality Control Measure Descriptions*
  *B.5.4 Elements of Quality Control*
  *B.5.5 Method Detection Limit, Method Quantitation Limit and Sample Quantitation Limit*
 *B.6 Instrument/Equipment Testing, Inspection, and Maintenance*
  *B.6.1 Maintenance Responsibilities*
  *B.6.2 Maintenance Schedules*
  *B.6.3 Spare Parts*
  *B.6.4 Maintenance Records*
 *B.7 Instrument/Equipment Calibration and Frequency*
 *B.8 Inspection/Acceptance of Supplies and Consumables*
 *B.9 Non-direct Measurements*
 *B.10 Data Management*
  *B.10.1 Logbooks and Forms*
  *B.10.2 Data Storage/Retrieval*

*GROUP C: ASSESSMENT AND OVERSIGHT*
 *C.1 Assessments and Response Actions*
 *C.2 Reports to Management*

_GROUP D: DATA VALIDATION AND USABILITY_
    _D.1 Data Review, Verification and Validation_
    _D.2 Verification and Validation Methods_
    _D.3 Reconciliation with User Requirements_

List of Tables

List of Figures

List of Appendices

• _Appendix A - Standard Operating Procedures_

• _Appendix B - Data Quality Objectives Document_

• _Appendix C-Z - Other supporting documents as necessary._ [1]

Guidelines used in the preparation of the QAPP elements are:

•     EPA Requirements for Quality Assurance Project Plans, EPA QA/R-5 (EPA/240/B-01/003), March 2001

•     EPA Guidance for Quality Assurance Project Plans, EPA QA/G-5 (EPA/240/R-02/009), December 2002

# APP. B

TCEQ's Response to Motion for Rehearing

| | | |
|---|---|---|
| IN THE MATTER OF | § | |
| THE SITE KNOWN AS | § | BEFORE THE |
| VODA PETROLEUM, INC. | § | TEXAS COMMISSION ON |
| STATE SUPERFUND SITE | § | ENVIRONMENTAL QUALITY |

EXECUTIVE DIRECTOR'S REPLY TO LUMINANT'S MOTION FOR REHEARING

To the Honorable Commissioners of the Texas Commission on Environmental Quality:

The Executive Director ("ED") of the Texas Commission on Environmental Quality ("TCEQ") files this Reply to Luminant's Motion for Rehearing and respectfully requests that the Commissioners deny the motion.

I.    Introduction

On February 10, 2010, the ED presented an Administrative Order ("Order") to the Commissioners ("Commission") for their consideration. After allowing those parties who wished to address the Commission the opportunity to speak, the Commission issued the Order pursuant to Tex. Health & Safety Code §§ 361.188 and 361.272 (West 2010). Among other things, the Order listed the Voda Petroleum, Inc., State Superfund Site ("Site") on the state registry of Superfund sites, described the facility and the selected remedial action, named those parties responsible for the solid waste and/or hazardous substances at the Site, and ordered responsible parties to remediate the Site.

Luminant now urges the Commission to reconsider its decision to issue the Order. By its motion, it reiterates a request made to and denied by the Commission at the February 10, 2010, Agenda meeting to delay issuance of the Order (and consequently the remedial action) so that Luminant might explore the possibility of there being a lower cost alternative to remediation of the Site.

II.    Luminant's Motion for Rehearing is Improper Under the Law

Luminant is not entitled to a rehearing because the law did not afford it a hearing in the first instance. See Tex. Health & Safety Code § 361.274 (West 2010) (stating that "[a]n administrative order under Section 361.272 does not require prior notice or an adjudicative hearing before the commission"); see also id. § 361.188(b) (stating that "Subchapters I [which includes Section 361.272], K, and L relating to administrative orders apply to orders issued under [Section 361.188]"). Because the Order was issued under Sections 361.272 and 361.188 (Administrative Order 1), it did not require an adjudicative hearing before the Commission. Dallas Power & Light Company and Texas Utilities Generating Company, predecessors in interest to Luminant, are parties named in and made subject to the Order (Order 5, 16) and thus are not provided an opportunity for

VODA_AR_00049650

Agenda meeting. Luminant gives no greater detail now than then. It provides no information about the proposed remedy being considered or its estimated cost (Mot. Reh'g 1). It says that "*some* of the PRPs [potentially responsible parties] *appear* willing and able to fund" this lower cost alternative, but no other PRPs joined Luminant's motion (emphasis added). Luminant's stated purpose is vague and full of uncertainty. In addition, Luminant states that granting its motion for rehearing "would not unreasonably delay cleanup of the Site" (Mot. Reh'g 1). Yet Luminant admits that it does not yet have a formal proposal for a lower cost alternative (Mot. Reh'g. 4). Luminant provides no guarantee that its "forthcoming proposal of a lower cost alternative" (Mot. Reh'g 3) will not constitute a fundamental change in the selected remedy such that another public meeting will be required with the attendant statutory time frames. *See* 30 Tex. Admin. Code § 335.349(b) (Westlaw) (describing procedures for modifying the proposed remedial action); *see also* Tex. Health & Safety Code § 361.187 (West 2010) (outlining steps to be taken to discuss the proposed action with the community). Delay under such a scenario is inevitable and unnecessary. The ED has followed applicable rules and regulations in conducting remedial investigations and activities, including extensively evaluating remedial action alternatives and selecting the remedy determined to be "the lowest cost alternative that is technologically feasible and reliable and that effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment." *Id.* § 361.193(a).

III.    The Commission Did Not Err When it Issued the Administrative Order in the Matter of the Site Known as the Voda Petroleum, Inc. State Superfund Site

The Commission would not err if it denied Luminant's motion for rehearing.[2] By its motion, Luminant requests the opportunity to consider a forthcoming proposal (Mot. Reh'g 3, 4). It is not clear who will consider the proposal. It is equally unclear whether any proposal is based, as it must be, on TCEQ rules and regulations. The motion contains assurances as to the reputation and competence of Weston Solutions ("Weston"), which Luminant states is in the process of developing a formal proposal (Mot. Reh'g 3; 4). It recounts that Weston sampled wells and reported results "that *indicate* that Weston can *likely* perform a remedial action" at a lower cost (Mot. Reh'g 3) (emphasis added). The ED, on the other hand, evaluated multiple remedial alternatives through the feasibility study process provided by rule to determine which remedy would best meet the statutorily provided remedial action criteria. *See* 30 Tex. Admin. Code § 335.348 (Westlaw). Further, the ED complied with the statutory and regulatory obligation to present the selected remedial action to the public for comment. *See* Tex. Health & Safety Code § 361.187 (West 2010); 30 Tex. Admin. Code § 335.349 (Westlaw). The law does not require the Commission to grant a motion for rehearing to consider a forthcoming proposal. What the law does provide is that the Commission shall allow PRPs within a statutorily specified time frame to fund or conduct a remedial investigation/feasibility study as approved by the executive director, Tex. Health & Safety Code § 361.185 (West 2010), which was done.

---

[2] Presumably, Luminant relies on 30 Tex. Admin. Code § 80.272 (Westlaw), which, inter alia, requires "a concise statement of each allegation of error." Alleging an error that has not yet occurred is arguably inapposite and counter to the rule.

3

VODA_AR_00049651

## IV.  Equitable Considerations

The Commission encourages PRPs to negotiate a settlement. Luminant complains that the Voda Site Group ("Group") required it to pay a disproportionate share, a complaint best made to and resolved by the Group. If no agreement can be reached and no resolution can be had, Luminant's equitable remedy is to appeal the Order to district court and request that the court apportion costs. Tex. Health & Safety Code §§ 361.321-22, 361.343 (West 2010).

## V.  Conclusion

In summary, Texas Superfund law is carefully crafted to achieve two main objectives: first, that government be given the necessary tools in order to respond promptly and effectively to environmental problems and, second, that those responsible for the problems bear the costs and responsibility for remedying the harmful conditions they created. The law governing hearings and appeals gives effect to the first of these. Granting Luminant's motion for rehearing is contrary to the law and thwarts the statutory tools provided to move forward expeditiously toward remediation of Superfund sites.

The Executive Director respectfully requests that the Commissioners deny the Motion for Rehearing.

Respectfully submitted,

Texas Commission on Environmental Quality

Mark R. Vickery, P.G.
Executive Director

Stephanie Bergeron Perdue, Deputy Director
Office of Legal Services

Kathleen C. Decker, Division Director
Litigation Division

Dated: March 23, 2010

by _Charmaine Backens_
Charmaine K. Backens
State Bar of Texas No. 24045059
Litigation Division, MC 175
P.O. Box 13087
Austin, Texas 78711-3087
(512) 239-1873
(512) 239-3434 (FAX)
Attorney for the Executive Director

5

VODA_AR_00049652

RECEIVED

MAY 12 2010

AIR QUALITY
DIVISION

## Certificate of Service

I hereby certify that on March 23, 2010, the original of the foregoing "Executive Director's Reply to Luminant's Motion for Rehearing" and seven (7) copies were filed with the Chief Clerk, Texas Commission on Environmental Quality, Austin, Texas.

I further certify that on this day a copy of the foregoing document was served each of the parties as indicated:

Via Certified Mail, Return Receipt Requested
Mr. John A. Riley
Vinson & Elkins LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746

Via Electronic Submittal
Mr. Les Trobman, Attorney
Office of the General Counsel, MC 101
Texas Commission on Environmental Quality
P.O. Box 1307
Austin, Texas 78711-3087

Via Electronic Submittal
Mr. Blas Coy, Jr., Attorney
Office of Public Interest Counsel, MC 103
Texas Commission on Environmental Quality
P.O. Box 1307
Austin, Texas 78711-3087

Via First Class Mail
Persons on the Mailing List

Charmaine K. Backens

VODA_AR_00049653

# APP. C

Plaintiffs' First Amended Original Petition
(CR:4-27)

D-1-GN-10-000772

NO. D-1-GN-10-000793

Filed
10 March 26 A10:07
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-10-000793

| | | |
|---|---|---|
| CHEVRON USA INC., EXXON MOBIL | § | IN THE DISTRICT COURT OF |
| CORPORATION, MOBIL OIL | § | |
| CORPORATION, PENNZOIL-QUAKER | § | |
| STATE COMPANY, SHELL OIL | § | |
| COMPANY, TEXACO CHEMICAL | § | |
| COMPANY, TEXACO INC., WARREN | § | |
| PETROLEUM COMPANY | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, T E X A S |
| | § | |
| TEXAS COMMISSION ON | § | |
| ENVIRONMENTAL QUALITY, AND, | § | |
| EACH IN HIS OFFICIAL CAPACITY, | § | |
| BRYAN W. SHAW AS TCEQ CHAIRMAN, | § | |
| BUDDY GARCIA AS TCEQ | § | |
| COMMISSIONER, AND CARLOS | § | |
| RUBINSTEIN AS TCEQ COMMISSIONER | § | |
| | § | |
| Defendants | § | 419th JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiffs, (as specifically identified below and collectively referred to as the "Plaintiffs"), complaining of Defendants the Texas Commission on Environmental Quality ("TCEQ") and Chairman Bryan W. Shaw, Commissioner Buddy Garcia, and Commissioner Carlos Rubinstein, each in their official capacity ("Commissioners"), by this First Amended Original Petition seeks declaratory judgments regarding, and a *de novo* review of, the TCEQ's issuance of a unilateral Administrative Order ("AO" or "Order") seeking payment from the Plaintiffs of an unspecified sum of money to be determined in the future for certain costs related to investigations undertaken at the Voda Petroleum state superfund site and directing the Plaintiffs to begin a remedial action, without an opportunity for an adjudicative hearing. As grounds for review, Plaintiffs would show as follows:

**Plaintiff's First Amended Petition**

# I.
# PARTIES

1.      Plaintiff Texaco Inc., a Delaware corporation, is successor to Texaco Chemical Company. Texaco Inc. is a subsidiary of, and Plaintiff Warren Petroleum Company is a former division of, Plaintiff Chevron USA Inc., a Pennsylvania corporation. Plaintiff Mobil Oil Corporation, a New York corporation, is a subsidiary of Exxon Mobil Corporation, a New Jersey corporation.   Plaintiff Pennzoil-Quaker State Company, a Delaware corporation, is a successor by merger to Westland Oil Company, Inc., Specialty Oil Company, Inc., and Industrial Lubricants Co. Plaintiff Shell Oil Company, is a Delaware corporation.   The TCEQ's AO names as potentially responsible parties ("PRPs") Industrial Lubricants Co., Mobil Oil Company, Shell Oil Company, Specialty Oil Company, Texaco Chemical Company, Warren Petroleum Company and Westland Oil Company Inc.

2.      Defendant TCEQ is an administrative agency of the State of Texas.  Service of process may be accomplished by personal delivery of citation to the Executive Director of the TCEQ, Mr. Mark Vickery, P.G., located at 12100 Park 35 Circle, Building F, Austin, Travis County, Texas 78753.

3.      Defendant Bryan W. Shaw is sued in his official capacity as a Commissioner and Chairman of the TCEQ.  Service of process upon Mr. Shaw may be accomplished by personal delivery of citation to Mr. Shaw at 12100 Park 35 Circle, Building F, 4th Floor, Room 4221, Austin, Travis County, Texas 78753.

4.      Defendant Buddy Garcia is sued in his official capacity as a Commissioner of the TCEQ.  Service of process upon Mr. Garcia may be accomplished by personal delivery of citation to Mr. Garcia at 12100 Park 35 Circle, Building F, 4th Floor, Room 4221, Austin, Travis County, Texas 78753.

**Plaintiff's First Amended Petition**

5.    Defendant Carlos Rubinstein is sued in his official capacity as a Commissioner of the TCEQ.  Service of process upon Mr. Rubinstein may be accomplished by personal delivery of citation to Mr. Rubinstein at 12100 Park 35 Circle, Building F, 4th Floor, Room 4221, Austin, Travis County, Texas 78753.

## II.
## DISCOVERY CONTROL PLAN

6.    Plaintiffs seek to conduct discovery under a Level 3 Discovery Control Plan.

## III.
## JURISDICTION AND VENUE

7.    This is a direct appeal of a unilateral Administrative Order issued by the TCEQ on February 12, 2010.  A copy of the Order is attached hereto.

8.    This action is brought pursuant to §§ 361.188(b), 361.321, and 361.322 of the Texas Health and Safety Code and § 37.001, *et. seq.* of the Texas Uniform Declaratory Judgments Act ("TUDJA").  Section 361.321 allows a person affected by a ruling, order, decision or other act of the TCEQ to appeal said ruling, order, decision, or other act by filing a petition in a district court of Travis County.  Plaintiffs are all named by the TCEQ in the Order as parties responsible for reimbursing the TCEQ's expenses related to certain investigations into potential environmental contamination at a state superfund site, as well as ordered to undertake remedial action; as such, Plaintiffs are affected by the Order.  Section 361.322 allows any person subject to an administrative order issued pursuant to Texas Health & Safety Code § 361.272 to appeal said order in district court.  Because the Order at issue was issued pursuant to § 361.271 and § 361.272, and the Plaintiffs are all persons subject to the Order, § 361.188(b) makes the Order subject to appeal under §§ 361.321 and 361.322.  Finally, the Texas Uniform Declaratory Judgments Act, Texas Civil Practices and Remedy Code § 37.004 allows this district court to

declare that the Order is invalid, or is an *ultra vires* action by the TCEQ and/or the Commissioners.

9.     This action is timely filed under the provisions of §§ 361.321 and 361.322. Section 361.321 provides that an appeal must be brought not later than the 30th day after the ruling, order, decision, or other act of the governmental entity (here, the TCEQ) whose action is appealed. The TCEQ issued the unilateral order effective as of February 12, 2010, but served the Order on PRPs subsequent to that date. Accordingly, this petition, which is filed within 30 days of that date, is timely. Section 361.322 provides that an appeal brought pursuant to that section must be filed before the 46th day after the date of receipt, hand delivery, or publication service of the order that is being appealed. Accordingly, this petition, which is filed within 46 days of the date of publication and receipt, is timely.

10.     Venue is proper in Travis County District Court pursuant to § 361.321(a) of the Texas Health and Safety Code. As stated above, Section 361.321 allows a person affected by a ruling, order, decision or other act of the TCEQ to appeal said ruling, order, decision, or other act by filing a petition in a district court of Travis County. Plaintiffs are "persons affected" by the Order and "persons subject to" the Order because each is named as a "responsible party" who has been ordered to conduct remedial activities and reimburse the TCEQ's Hazardous and Solid Waste Remediation Fee Account for costs the TCEQ allegedly incurred.

**IV.**
**FACTUAL BACKGROUND**

11.     The tract of land designated by the TCEQ as the "Voda Petroleum State Superfund Site" (the "Site") is comprised of approximately 6.12 acres located in Gregg County,

Texas. According to TCEQ[1] records, the Site was historically used as an oil recycling facility from approximately 1981 to 1991, when all operations ceased and the Site was essentially abandoned by the owners and operators.

12. In 1995, the TCEQ conducted an investigation of the Site to determine if the historic operations had resulted in environmental contaminants entering the groundwater and/or soils at the Site. Part of this investigation included a Hazard Ranking System ("HRS") evaluation of the Site. The HRS is a scoring system used to evaluate potential, relative risk(s) to public health and the environment from releases or threatened releases of hazardous substances. The HRS score assigned to a site as the result of the evaluation is the primary factor in deciding if that site is eligible to be placed on the federal National Priorities List. The HRS score assigned to the Site was not sufficient to qualify the Site as a federal Superfund Site. Instead, the Site was referred in 1995 to the United States Environmental Protection Agency ("EPA") for an immediate removal action to address the TCEQ's belief that the Site presented an imminent and substantial endangerment to public health and the environment.

13. An EPA Action Memorandum, dated March 27, 1996, documented that, in addition to the presence of hazardous substances, the Site received crude oil. The Action Memorandum also noted the presence of large quantities of oil that were subject to the Clean Water Act and the Oil Pollution Act.

14. In 1996, the EPA removed drums of grease or oily wastes, drums of corrosive wastes, aboveground storage tanks, and contaminated soils. Fencing was also installed around the Site at this time to restrict public access to the Site to insure public health and safety.

---

[1] During some of the events outlined in the Factual Background, the TCEQ was known as the Texas Natural Resource Conservation Commission. For convenience, the agency is referred to throughout this document by its current name, the TCEQ.

15. In December 1997, after the removal action was complete, EPA's contractor sampled both on-site soils and groundwater as part of a post-removal action assessment. EPA's assessment found that the removal action had removed minimized the threat of direct human contact and inhalation threats that may have been present pre-removal.

16. The EPA then sought recovery of the costs it incurred in undertaking this removal action, and in 1999 and 2000, the EPA settled with a number of companies that the EPA had named as potentially responsible parties for the Site, including Shell Oil Company and Industrial Lubricants Co., which settled as *de minimis* parties, and Mobil Oil Corporation, which made a significant settlement payment to EPA.

17. EPA was informed that Westland Oil, a subsidiary of Specialty Oil Company, periodically sent unused (virgin) lube oil mixed with water to Voda to be dehydrated. The oil was then returned to Westland and sold by Westland. Some of the virgin oil obtained from Westland may also have been sold by Voda to third parties, and Westland may have purchased oil that had been obtained by Voda from other facilities. The evidence regarding the Westland facts and the status of the Westland lube oils includes the Voda Petroleum documentation and sworn statements by Mr. Ron Voda, the operator of Voda Petroleum, and others. EPA determined that the Westland lube oil qualified for the CERCLA petroleum exclusion and that the transactions between Westland/Specialty and Voda did not constitute the arrangement for treatment or disposal of a hazardous substance. The factual record also demonstrates why this Westland Oil was not "waste" (it was never discarded) and thus was not "solid waste" under Section 361.003 of the Texas Health and Safety Code. EPA did not demand a settlement payment or pursue a claim for the Westland materials shipped to Voda.

18. According to the sworn statements of Mr. Voda, and upon the Plaintiffs' information and belief, different sections of the property were operated by two separate entities -

Voda Petroleum and Ultra Oil. Ultra Oil conducted operations on approximately one acre of the property (also known as the "Southwest Tank Farm"). While the Southwest Tank Farm was eventually purchased by Mr. Voda, there were no Voda Petroleum operations on the Southwest Tank Farm at any time. The EPA stated that the PRPs who sent materials to the Site would not be liable for the EPA's costs associated with the Ultra Oil operations at the Site.

19. TCEQ had knowledge of the EPA's removal action, post-removal sampling and assessment results, and of the EPA settlement. Plaintiffs are unaware of any TCEQ correspondence commenting on or disputing the sufficiency of the EPA removal action at the time of the removal action itself or immediately following the removal action.

20. On information and belief, Voda Petroleum's operation segregated paraffin materials into specific geographic areas of the Voda site, specifically the "West Tank Farm." EPA's removal action addressed the contamination in the areas where paraffin was stored or spilled.

21. Three years after the EPA removal action, and without re-scoring the Site under the HRS, the TCEQ proposed the Site for listing on the State Superfund Registry on November 17, 2000 and published a Notice of that proposal in the Texas Register ( 25 Tex. Reg. 11594).

22. In November, 2000 the TCEQ also sent correspondence to certain entities it believed had historically shipped materials to the Site. That correspondence asserted that the recipient was considered by the TCEQ to be a PRP at the Site as defined in § 361.271 of the Texas Health & Safety Code (the Texas Superfund Statute), and therefore potentially responsible for environmental investigation and eventual remediation at the Site. The correspondence informed the recipients of the Site's proposed listing on the State Registry and the date for submitting comments on the proposed listing. The correspondence included a Notice of Opportunity to Make Good Faith Offer to conduct a Remedial Investigation/Feasibility Study

**Plaintiff's First Amended Petition**

("RI/FS") at the Site. Several PRPs submitted written comments and objections, particularly complaining that there was no empirical data to support an imminent and substantial endangerment finding and no evidence to support listing the Site on the State Superfund Registry.

23.    Upon information and belief, the statutory requirement to notify all persons potentially responsible for the Site's contamination, the November, 2000 Notice of an opportunity to conduct the RI/FS, was not provided to numerous entities, for which the TCEQ had records in its possession allegedly identifying these companies as entities that had allegedly shipped hazardous materials to the Site (herein after the "No-Notice PRPs"). Accordingly, the No-Notice PRPs had no knowledge of, or opportunity to participate in, the TCEQ's proposed RI/FS or to provide comments on the Site's proposed listing on the State Registry, despite TCEQ's knowledge of their alleged shipments to the Site.

24.    On or about March 6, 2001, the TCEQ sent correspondence to several of the entities who had allegedly shipped significant quantities of material to the Site and who had received the TCEQ RI/FS Notice as PRPs. That correspondence informed each of those entities that they had been removed from the TCEQ's PRP list, purportedly releasing these entities from liability related to the Site. In several of the letters, TCEQ cited as the reason for removing the PRP, the so-called CERCLA "petroleum exclusion", which exclusion TCEQ staff currently deny exists under the Texas Health and Safety Code. The entities receiving these letters are not named as parties to the Order. The documentation those entities submitted and on which the TCEQ relied at least in part to remove them from the TCEQ PRP list, on the basis that the petroleum exclusion had been met, included EPA's conclusion that "the bulk of the material on the list" attributed to Specialty Oil/Westland Oil Co., "did not support attribution of CERCLA

liability because it appeared that the Voda facility de-watered those materials and then returned them to Specialty."

25. According to its records, the TCEQ undertook remedial investigations and a feasibility study at the Site from 2001 through 2008.

26. In June, 2008, the TCEQ issued a Remedy Selection Document. This document provides a discussion of, and the TCEQ's conclusions regarding, a proposed remedy for the Site. The remedy proposed by TCEQ consists of soil removal and off-site disposal, together with the installation of a bio-reactive barrier in the groundwater. TCEQ estimates that this remedy will cost $1.2 Million dollars.

27. On February 12, 2010, the Commission issued its unilateral Administrative Order with respect to the Site to 350 parties, including the Plaintiffs. There was no evidentiary hearing held before the Order was issued, nor was there an opportunity for such an evidentiary hearing.

28. The Order makes various Findings of Fact, including listing persons identified by the Commission as PRPs for the solid waste and/or hazardous substances at the Site. The Order further includes a Conclusion of Law that the PRPs are responsible parties ("RPs"). Among those listed as RPs are the Plaintiffs.

29. The Order purports to establish, among other things, (1) the RPs for the Site, (2) the existence of a release or threatened release of a hazardous substance or solid waste, and (3) that there is an imminent and substantial endangerment. It then orders the RPs to reimburse the TCEQ for all costs related to the RI/FS, to reimburse the TCEQ's past and future costs in some unspecified amount, to undertake remedial activities based on the Remedy Selection Document, and to provide post-construction financial assurance, among other responsibilities. The Order also asserts that stipulated penalties accrue for failure to comply with the Order or its deadlines. The Order does not specify the amount of the TCEQ costs, or explain why they are reasonable or

**Plaintiff's First Amended Petition**

appropriate or why the TCEQ's actions were necessary or appropriate. Rather, the Order states that the RPs will receive at some time in the future a demand letter from the TCEQ stating the amount owed. As authority for the Order, the Commission cites to the Texas Health and Safety Code, Chapter 361, §§ 361.188 (Final Administrative Order) and 361.272 (Administrative Orders Concerning Imminent and Substantial Endangerment).

30. Westland operated a lubricating oil blending and packaging facility in Shreveport, Louisiana. This was not a manufacturing plant per se, and did not operate processes that generated waste streams of used or waste oils. Westland, at times referenced by the name of its parent Specialty, sent unused lubricating oil to Voda Petroleum in order to have it dewatered. The oil was then returned to Westland and sold to others. Some of the oil may have been sold by Voda to others after dewatering. The Westland lubricating oil is excluded from the definition of hazardous substance under CERCLA, 42 U.S.C. § 9601(14) and the Texas SWDA (Chapter 361 of the Health and Safety Code), Tex. Health & Safety Code § 361.003(11). This material does not constitute a solid waste under §361.003(34) of the Health and Safety Code as it was never discarded. Moreover, even assuming, arguendo, it could be considered a "waste," the valuable material sent from the Westland/Specialty facility to Voda qualifies for exclusions under federal and state law from the definition of "solid waste" including, e.g., the exclusion for commercial chemical products at 30 Tex. Admin. Code § 335.1(133) (D) (iii) and 40 C.F.R. § 261.2(c) (3). For these reasons, EPA did not seek a settlement from or pursue a claim against Westland Oil or its parent Specialty Oil. TCEQ has recognized both the referenced petroleum exclusion and the exemptions from the solid waste definitions in many regulatory contexts and similar factual situations. Shell Oil Company sent no materials to Voda. A Shell branded service station operated by an independent dealer reportedly sent a single shipment of material to Voda.

31. Mobil Oil Corporation reportedly sold and sent paraffin or wax material to Voda Petroleum. The material was food grade quality for use in food packaging. It was sent to Voda because it was off specification, but it was not contaminated. This material had commercial value and was petroleum based. Neither Exxon Mobil nor Mobil Oil sent materials to Voda from gasoline service stations. Service stations branded Exxon or Mobil, on information and belief operated by independent dealers, reportedly sent material to Voda.

32. Warren Petroleum reportedly sold and sent used lubricating oil to Voda for reclaiming. Texaco Chemical Company reportedly sold and sent to Voda certain materials from a facility in Texas. Chevron USA Inc., Texaco Inc., Texaco Chemical, and Warren Petroleum did not send materials to Voda from gasoline service stations. Two Texaco branded stations, on information and belief operated by independent dealers, reportedly sent material to Voda.

## V.
## DENIAL

33. Plaintiffs demand TCEQ meet its burden of proof that the Site constitutes an imminent and substantial endangerment and that Plaintiffs are liable for Site-related environmental remediation and/or associated costs as required in § 361.322(g) of the Texas Health and Safety Code.

34. Plaintiffs deny that they have caused or contributed to the alleged release or threatened release of any solid waste or hazardous substances from or at the Site that are causing or contributing to alleged environmental contamination at the Site.

35. Plaintiffs deny that they have committed acts or omissions which have resulted in any release or threatened release of solid waste or hazardous substances from or at the Site.

36. Plaintiffs deny that they are a PRP or a RP as defined in the Order. The evidence relied upon by the Commission to establish that Plaintiffs contributed any amount of solid waste

and/or hazardous substances to the Site is inherently unreliable, constitutes hearsay, and lacks support by any other corroborating documentary evidence. Further, Plaintiffs were given no opportunity to challenge or rebut this "evidence" in violation of their due process and other legal rights.

37.     Plaintiffs deny that they sent hazardous substances or solid wastes to the Site as defined by relevant law.

38.     Plaintiffs deny that the contamination at the Site constitutes an "actual or threatened release of solid waste that presents an imminent and substantial endangerment to the public health and safety or the environment" as required to support Order issuance by Texas Health & Safety Code § 361.272(a) and § 361.188(a) (1). The definition of imminent and substantial endangerment as defined in the TCEQ's rules at 30 Texas Administrative Code § 335.342 is as follows: "[a] danger is imminent if, given the entire circumstances surrounding each case, exposure of persons or the environment to hazardous substances is more likely than not to occur in the absence of preventive action. A danger is substantial if, given the current state of scientific knowledge, the harm to public health and safety or the environment which would result from exposure could cause adverse environmental or health effects." Plaintiffs deny that this Site met this standard at the time the Order was issued because, among other things:

a.     Exposure of persons or the environment to hazardous substances was not "more likely than not" because EPA's contractor's assessment found that the 1997 EPA removal action had minimized the threat of direct human contact and inhalation threats that may have been present pre-removal, residual contamination was covered with clean soil and grass; and the Site was fenced to preclude public access;

b. TCEQ's 2009 Remedy Selection Document at p. 3-4, states that the Site is not a threat to ecological resources because there are insignificant ecological exposure pathways at the Site;

c. Exposure from contaminated groundwater is not likely, due to gradient direction and plume stability data provided to TCEQ documenting that constituents of concern have not continued to migrate and in fact may be attenuating significantly;

d. TCEQ's 2009 Remedy Selection Document at p. 2 acknowledges that the EPA response action "removed the immediate threat to human health and the environment";

e. Upon information and belief, although TCEQ has studied the Site, the TCEQ has not taken any remedial actions to protect humans or the environment from potential exposure pathways from 1997 until the present, including a three year period between the EPA removal action and the TCEQ proposed listing on the State Superfund Registry and an eight year RI/FS period.

39. Plaintiffs deny that proper statutory notice of the RI/FS was given to many of the PRPs, and thus deny that the Order is reasonable.

40. Plaintiffs deny that the Order is supported by the preponderance of the evidence as to the TCEQ's claims of necessity, appropriateness, and reasonableness of past and future investigations and remedial and removal costs incurred by the TCEQ. This includes the TCEQ determinations related to imminent and substantial endangerment.

41. Plaintiffs deny that materials they are alleged to have sent to the Site have caused or contributed to the remedial activities ordered to be conducted by the TCEQ in the Order.

42.     Plaintiffs deny that they are liable for remedial actions or costs associated with the Southwest Tank Farm, also known as Ultra Oil.

43.     Plaintiffs deny they are "arrangers" for purposes of liability under the Texas Solid Waste Disposal Act, based on the Supreme Court ruling in *Burlington Northern & Santa Fe Railway Co., et al. v. United States* ("BNSF") as the requisite intent was not present.

44.     Plaintiffs deny that they can be liable for the actions of an independent service station dealer, even assuming arguendo that the dealer sent materials to the Voda site.

45.     In the alternative, Plaintiffs assert that they are no more than *de minimis* contributors to any contamination at the Site.

46.     Plaintiffs contend that any contribution from them to the site is divisible, and they are not subject to joint and several liability.

47.     For all the reasons stated in this Petition, the Plaintiffs deny that the Order is reasonable and therefore it must be overturned pursuant to Texas Health & Safety Code § 361.321(e).

## VI.
## ORDER IS INVALID

48.     The Order lacks finality because it requires additional, discretionary actions by the TCEQ. Specifically, the Order requires the TCEQ to make discretionary decisions in the future about the eligibility, necessity, appropriateness, and reasonableness of past and future TCEQ costs to be paid by Plaintiffs as RPs, and even the amount of those costs. Accordingly, the Order is neither effective nor enforceable against any Plaintiff, and is of no legal effect. Plaintiffs seek a declaratory judgment recognizing that the Order is of no legal effect.

49.     At no time prior to the issuance of the Order did the TCEQ afford Plaintiffs an opportunity for an adjudicative hearing as to their status as a PRP. As a result, Plaintiffs have

had no opportunity to protect their interests before being adversely affected by the actions taken by the authority of the Order. The Order violates due process rights afforded by the U.S Constitution (U.S. CONST. art. XIV) and Texas Constitution (TEX. CONST. art. I, § 19).

50. The Order further violates Plaintiffs' United States and Texas due process rights because it does not afford Plaintiffs' the opportunity for an adjudicative hearing as to the necessity, appropriateness, and reasonableness of past and future investigation and remedial costs incurred by the TCEQ for which it seeks a reimbursement. As a result, Plaintiffs have had no opportunity to protect their interests before being adversely affected by the actions taken by the authority of the Order. At no time prior to the issuance of the Order were the Plaintiffs afforded an opportunity to prove by a preponderance of the evidence that the release or threatened release is divisible pursuant to Texas Health & Safety Code § 361.276. As a result, Plaintiffs have had no opportunity to protect their interests before being adversely affected by the actions taken by the authority of the Order.

51. The Order imposes liability on certain Plaintiffs who are in the same position as other entities who were released by the TCEQ from liability under the so-called "petroleum exclusion" exception of CERCLA. This is unreasonable, arbitrary and capricious and violates the equal protection clauses of both the United States and Texas Constitutions.

52. The Order constitutes an *ultra vires* act by the TCEQ and/or the Commissioners on several grounds, including the following:

 a. The Order is not properly limited in scope as contemplated by the various applicable statutory provisions of the Texas Health and Safety Code, such as §§ 361.191(d) and 361.192, both of which limit the TCEQ's recovery to "reasonable" costs.

b.  The Order names many Plaintiffs who did not receive the required statutory notice (referred to previously as the No-Notice PRPs) that was provided to some of the named RPs via the November 6, 2000, Notice of Opportunity to Make a Good Faith Offer for the RI/FS.  Texas Health & Safety Code §§ 361.184(b) and .185 require the TCEQ to make "all reasonable efforts" to identify PRPs and to provide identified PRPs with written notice of an opportunity to make a Good Faith Offer to fund or perform the RI/FS.  While the TCEQ did send correspondence to some of the PRPs seeking a good faith offer to fund or perform the RI/FS, on information and belief, approximately 150 companies (or close to 50% of the PRPs), including the No Notice Plaintiffs, did not receive an opportunity to make a good faith offer, even though the TCEQ has acknowledged that it had in its actual possession records containing the names of those companies as allegedly shipping materials to the Site.  The TCEQ did not undertake the minimal effort of reviewing the documents in its possession to make a list of those companies and include them as recipients of the November 6, 2000 Notice and thus allow them an opportunity to participate in the RI/FS process.  This defect impacts the Plaintiffs in two significant ways. First,  the TCEQ unilaterally performed the RI/FS over a period of almost eight years, incurred costs, and is now seeking reimbursement of those costs from those it failed to properly notify.  Second, the RI/FS process is so fundamental to the remedy selection process that a flaw in the RI/FS process unavoidably and profoundly taints the remedy process.  The Texas Health & Safety Code creates a statutory scheme in which the culmination of the RI/FS process -- the proposed remedy -- is what serves as the basis for the Remedy Order.  The TCEQ's RI/FS Notice defect means that approximately 50% of the identifiable PRPs at this Site had no opportunity to participate in the RI/FS

process through public comments or otherwise. Had all of the PRPs been properly notified and allowed to participate in the development and evaluation of the alternative remedies, a remedy significantly different from the one chosen by the TCEQ could have been studied, selected and implemented in an agreed manner by the parties. The failure to comply with the fundamental statutory notice requirements related to the RI/FS Notice thus renders the Order invalid, arbitrary, and unreasonable, and outside the scope of the TCEQ's statutory authority.

c. The Order is invalid because the remedy selected does not comply with the standards found in Texas Health & Safety Code § 361.193 and .322(h). Section 361.193 states that the TCEQ is required to select the "lowest cost alternative that is technologically feasible and reliable and that effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment." TEX. HEALTH & SAFETY CODE § 361.193.

　　i. The TCEQ has classified the groundwater at the Site to be Class I groundwater, when in fact it should be Class II. If the proper classification had been used by the TCEQ, the appropriate remedy for this Site would very likely have been the lowest cost alternative that is technologically feasible and reliable and that effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment. The most recent data acquired from the Site indicates that an alternative remedy would be appropriate because the groundwater plume boundary has not grown and the concentrations of the constituents of concern identified by the TCEQ have actually decreased over time.

ii. Effective on May 25, 2007, the Municipal Settings Designation ("MSD") statute was amended to allow small municipalities to have the benefit of the MSD certification. The MSD statute allows municipalities to enforce specific deed restrictions on properties within their city limits restricting the use of the groundwater beneath the property so that it cannot be used as drinking water. The deed restriction acts as an institutional control to protect human health, but at a fraction of the costs of a groundwater remediation plan. The Site is within the City of Clarksville and thus is potentially eligible for an MSD. The MSD is recognized by statute to be protective of human health and the environment. No statute or regulation prohibits the application of an MSD at a state Superfund Site. The Feasibility Study was issued in January of 2008 and the Remedy Selection Document was issued in June 2008. Neither document even evaluated the MSD option, which at that point in time was certainly available for consideration and which could very well be the lowest cost remedy for groundwater at the Site. Thus, the TCEQ's Order is invalid in that it selects a remedy that is arbitrary and unreasonable and therefore cannot be upheld pursuant to Texas Health and Safety Code § 361.323(h).

d. Plaintiffs have asserted previously in this Petition that the Order violates certain of the Plaintiffs' constitutional equal protection rights because the TCEQ relieved certain PRPs, but not others similarly situated, from liability based on the "petroleum exclusion." Without waiving that argument, Plaintiffs alternatively assert that, if the released PRPs are not entitled to the petroleum exclusion, those PRPs must be named in the Order as an RP and that TCEQ's failure to do so is arbitrary and capricious to the severe detriment of Plaintiffs. Section 361.188

**Plaintiff's First Amended Petition**

(a)(4) and (6) of the Texas Health & Safety Code states that that final administrative order must list the Responsible Parties and order the Responsible Parties to remediate the facility and reimburse the TCEQ's RI/FS costs. Nothing in that statutory provision allows the TCEQ to ignore certain otherwise Responsible Parties. In fact, § 361.1875 states exactly when the TCEQ can exclude certain PRPs from liability associated with a Site, and none of the particular exclusions apply here. The Order is invalid for failure to name all RPs.

    e. The TCEQ's unilateral order of the payment of stipulated penalties is beyond the authority of the TCEQ.

53. The Order is invalid under § 361.188(a)(1) because it does not present an imminent and substantial endangerment as needed to support listing on the State Superfund Registry. There is no evidence of imminent and substantial endangerment. Any imminent and substantial endangerment was abated by the 1996 EPA's removal action.

54. The Order should be deemed invalid as to Plaintiffs because the TCEQ did not otherwise properly carry out its statutory and regulatory duties to fully investigate and identify PRPs, RPs, and *de minimis* parties prior to naming Plaintiffs as RPs.

55. For all of the reasons previously stated in this Petition, the Order is invalid, arbitrary, and unreasonable pursuant to Texas Health & Safety Code § 361.321(e).

## VII.
## AFFIRMATIVE DEFENSES

56. Certain Plaintiffs contributed materials to the Site that are the same as those materials contributed by entities that have been released by the TCEQ pursuant to the "Petroleum Exclusion" and thus are also entitled to such a release.

57.     Even if Plaintiffs had contributed any materials to the Site, those materials were sold as a useful product, and did not constitute an arrangement for the processing, storing, or disposal of a solid waste, and did not contribute to the release or threatened release to the environment.

58.     Westland Oil's unused lube oil was a petroleum material and a valuable commercial product intended to be dehydrated by Voda and sold, and/or returned to Westland for sale to its customers, and thus the oil was neither a "solid waste" nor a "hazardous substance."

59.     ExxonMobil discharged all or part of any Voda site responsibility through its settlement with and payments to EPA. Further, the Mobil paraffin was handled at a specific area of the Voda site and was addressed by the EPA removal action. Any harm or liability attributable to Exxon Mobil or Mobil is therefore capable of being apportioned.

60.     Plaintiffs' materials, to the extent any were sent to Voda, are distinct from those chemicals causing the harm that is being addressed under TCEQ's AO. Therefore, any liability of Plaintiffs' must be apportioned and limited to the harm attributable to their materials at the Voda site.

61.     Plaintiffs did not intend for waste or hazardous substances to be disposed of at the Site.

62.     Plaintiffs assert that they are not RPs, but in the alternative assert they are no more than a *de minimis* contributor to any contamination at the Site.

63.     Plaintiffs are not liable for remedial actions or costs associated with the Southwest Tank Farm, also known as Ultra Oil.

64. The evidence demonstrates that the Site does not pose an imminent and substantial endangerment.

65. The TCEQ failed to provide the required notices necessary to support recovery of investigation costs from the PRPs.

66. The facts do not support listing the Site on the State Superfund registry or the use of the Texas Solid Waste Disposal Act to impose liability upon Plaintiffs.

67. In the alternative, even if Plaintiffs contributed solid waste or hazardous substances to the Site, the costs are subject to apportionment under the Texas Health and Safety Code § 361.276.

## VIII.
## COSTS AND ATTORNEYS FEES

68. Plaintiffs have had to employ legal counsel to contest the Order. TCEQ is liable for Plaintiffs' reasonable attorney's fees and reasonable costs pursuant to the TUDJA and Texas Health & Safety Code § 361.342.

## IX.
## JURY DEMAND

69. Plaintiffs request a jury as the trier of fact for this matter.

## X.
## PRAYER

70. WHEREFORE, Plaintiffs pray that the TCEQ be cited to appear and answer and that the TCEQ be required to prove its allegations against Plaintiffs by a preponderance of the evidence and that the Court on final trial enter an order:

a. Declaring that the TCEQ's Administrative Order lacks finality, is of no legal effect, and is not enforceable; and/or

b.  Declaring that the TCEQ's Administrative Order violates the due process laws and/or equal protection laws of the United States and Texas Constitutions and is therefore invalid, and not enforceable; and/or

c.  Declaring that the TCEQ's Administrative Order is *ultra vires*, and is therefore invalid, of no legal effect, and is not enforceable; and/or

d.  Declaring that the TCEQ's Administrative Order is invalid, arbitrary, or unreasonable and therefore must be overturned pursuant to Texas Health & Safety Code § 361.321(e).

71.  ALTERNATIVELY, the Plaintiffs pray that the Court enter an order that:

a.  Invalidates the portion of the TCEQ's Order that purports to establish Plaintiffs as PRPs or RPs; and

b.  Declares that Plaintiffs are not responsible parties in any way liable for the environmental conditions existing at the Site or responsible for any response costs.

72.  ALTERNATIVELY, the Plaintiffs pray that the Court enter an order:

a.  Declaring that any Westland Oil/Specialty Oil's (now Pennzoil-Quaker State Company) materials sent to Voda are not hazardous substances or solid waste;

b.  Declaring that Plaintiffs are not liable under TSWDA for activities of any independent gasoline station operator who may have sent material to Voda;

c.  Declaring that any Mobil Oil Corporation materials sent to Voda are not hazardous substances or solid waste;

d.    Declaring that any ExxonMobil responsibility for the Voda Site has been discharged by virtue of its settlement with EPA, or reduced by the amount of its payment to EPA;

e.    Declaring that any harms or liability attributable to Plaintiffs can and must be apportioned on the basis of geography and chemistry or otherwise.

73.    ALTERNATIVELY, Plaintiffs pray that the Court enter an Order that:

a.    Pursuant to the Texas Health and Safety Code, Plaintiffs are *de minimis* parties and their equitable and legal responsibility for those costs should not exceed a nominal share.

74.    Plaintiffs further pray for reasonable attorney's fees and reasonable costs pursuant to Texas Civil Practice and Remedies Code § 37.009 and Texas Health & Safety Code § 361.342, and for any other relief Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

HAYNES AND BOONE, LLP


/s/ Adam H. Sencenbaugh
John R. Eldridge
State Bar No. 06513520
HAYNES AND BOONE, L.L.P.
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone:　(713) 547-2000
Telecopier:　(713) 547-2600

Adam H. Sencenbaugh
State Bar No. 24060584
HAYNES AND BOONE, L.L.P.
600 Congress Avenue, Suite 1300
Austin, TX 78701
Telephone:　(512) 867-8489
Telecopier:　(512) 867-8606

**Attorneys for Plaintiffs**

# APP. D

Texas Commission on Environmental Quality's
Original Counter-Petition and Third-Party Petition
and Request for Disclosure
(CR:127-169)

Filed
11 August 1 A11:45
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-10-000772

CAUSE NO. D-1-GN-10-000772

| | | |
|---|---|---|
| YOUNG CHEVROLET, INC., et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS COMMISSION ON | § | |
| ENVIRONMENTAL QUALITY, et al., | § | TRAVIS COUNTY, TEXAS |
| Defendants, | § | |
| | § | |
| v. | § | |
| | § | |
| YOUNG CHEVROLET, INC., et al., | § | |
| Counter- and Third-Party | § | 345th JUDICIAL DISTRICT |
| Defendants | § | |

## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY'S ORIGINAL COUNTER-PETITION AND THIRD-PARTY PETITION AND REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Texas Commission on Environmental Quality ("TCEQ"), an agency of the State of Texas, by and through Greg Abbott, Attorney General of Texas, files this Original Counter-Petition and Third-Party Petition, and would respectfully show the Court as follows:

### 1. DISCOVERY

1.1. No Discovery Control Plan having been filed, pursuant to TEX. R. CIV. P. 190.3 discovery will be conducted under Level 2.

## 2.  PARTIES

### A. Counter-Plaintiff

2.1.  Counter-Plaintiff the Texas Commission on Environmental Quality ("TCEQ") is the agency of the State of Texas responsible for administering the Texas Solid Waste Disposal Act, TEX. HEALTH & SAFETY CODE § 361.001 *et seq.* (Vernon 2010) (hereinafter "TSWDA" or "the Act").

### B. Counter-Defendants

*(The Plaintiffs in AAMCO Transmissions, Inc., et al., v. Texas Commission on Environmental Quality, et al.; Cause No. D-1-GN-10-000778)*

2.2.  Counter-Defendant AAMCO Transmissions, Inc., is a corporation duly organized under the laws of the State of Pennsylvania. No service is necessary at this time.

2.3.  Counter-Defendant ACF Industries, LLC, as former parent company and indemnitor for Shippers Car Line, Inc., (now part of American Railcar Industries) is a limited liability company in Missouri. No service is necessary at this time.

2.4.  Counter-Defendant AEP Texas Central Company, f/k/a Central Power and Light Company, is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.5.  Counter-Defendant Allied Motion Technologies, Inc., as successor to Snow

2

Coil, is a corporation duly organized in the State of Colorado. No service is necessary at this time.

2.6.   Counter-Defendant Allied Waste Systems Holdings, Inc., successor to Southwest Disposal, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.7.   Counter-Defendant American Airlines, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.8.   Counter-Defendant American Marazzi Tile, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.9.   Counter-Defendant Arkema, Inc., f/k/a Pennwalt Corporation, is a corporation duly organized in the Commonwealth of Pennsylvania. No service is necessary at this time.

2.10.   Counter-Defendant Atlantic Richfield Company, on behalf of ARCO Oil and Gas Corporation, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.11.   Counter-Defendant BE&K, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.12.   Counter-Defendant Basil Oilfield Services, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

3

2.13.    Counter-Defendant Bayou State Oil Corporation is a corporation duly organized in the State of Louisiana. No service is necessary at this time.

2.14.    Counter-Defendant Ben E. Keith Company is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.15.    Counter-Defendant Bottling Group LLC, d/b/a Pepsi Beverages Company, f/k/a Pepsi Cola, is a limited liability company duly organized in the State of Delaware. No service is necessary at this time.

2.16.    Counter-Defendant BP Products North America, Inc., on behalf of Truck Stops of America, is a corporation duly organized in the State of Maryland. No service is necessary at this time.

2.17.    Counter-Defendant Bridgestone Americas Tire Operations, LLC, on behalf of The Firestone Tire and Rubber Company, Modern Tire Service, Inc., (Bridgestone Bandag), and John Crawford Firestone, Inc., is a limited liability corporation duly organized in the State of Delaware. No service is necessary at this time.

2.18.    Counter-Defendant Bright Truck Leasing, LLC, for Bright Truck Leasing Corporation – Bright Truck Leasing, is a limited liability company duly organized in the State of Texas. No service is necessary at this time.

2.19.    Counter-Defendant Brilliant National Services, Inc., as indemnitor of Brenntag Southwest, Inc., successor by merger to Delta Distributors, Inc., Delta Sol-

4

vents, Inc., and Coastal Chemical, LLC, successor by merger to Harris Bros. Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.20.    Counter-Defendant Kellogg Brown & Root LLC, successor in interest to Brown & Root, Inc., is a limited liability company duly organized in the State of Delaware. No service is necessary at this time.

2.21.    Counter-Defendant Burland Enterprises, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.22.    Counter-Defendant Cabot Corporation is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.23.    Counter-Defendant Capacity of Texas, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.24.    Counter-Defendant Carrier Corporation, a/k/a Carrier Air Conditioning, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.25.    Counter-Defendant Cascade Die Casting Group, Inc., for its former division J&E Die Casting Company, is a corporation duly organized in the State of Michigan. No service is necessary at this time.

2.26.    Counter-Defendant Centex Homes, d/b/a Fox and Jacobs Homes, is a

5

general partnership duly organized under the laws of the State of Nevada. No service is necessary at this time.

2.27. Counter-Defendant Herrick Pacific Corporation, successor by merger to Central Texas Iron Works, is a corporation duly organized in the State of California. It may be served with citation by serving its agent, Harry Kluck, at 1100 Winchell Drive, Waco, Texas 76712.

2.28. Counter-Defendant Chaparral Steel Company (a wholly owned subsidiary of Gerdau Ameristeel) is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.29. Counter-Defendant CITGO Pipeline Company, by indemnitor OXY USA, Inc., on behalf of Cities Service Pipe Line Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.30. Counter-Defendant City Motor Supply, Inc., is a Sub S corporation duly organized in the State of Texas. No service is necessary at this time.

2.31. Counter-Defendant City of Dallas is a home-rule municipal corporation duly organized in the State of Texas. No service is necessary at this time.

2.32. Counter-Defendant City of Jefferson is a home-rule municipal corporation duly organized in the State of Texas. No service is necessary at this time.

2.33. Counter-Defendant City of Plano is a home-rule municipal corporation duly

6

organized in the State of Texas. No service is necessary at this time.

2.34. Counter-Defendant City of Rockwall is a home-rule municipal corporation duly organized in the State of Texas. No service is necessary at this time.

2.35. Counter-Defendant City of University Park is a home-rule municipal corporation duly organized in the State of Texas. No service is necessary at this time.

2.36. Counter-Defendant Colgate-Palmolive Company, for CPL Industries, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.37. Counter-Defendant ConocoPhillips Company, on behalf of Kayo Oil Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.38. Counter-Defendant Crown Cork & Seal USA, Inc., on behalf of Continental Can Company USA, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.39. Counter-Defendant Custom-Bilt Cabinets & Supply, Inc., is a corporation duly organized in the State of Louisiana. No service is necessary at this time.

2.40. Counter-Defendant Dallas Area Rapid Transit is a regional transportation authority created and operating under Chapter 452 of the Texas Transportation Code. No service is necessary at this time.

7

133

2.41.    Counter-Defendant Dunlap-Swain Tire Company, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.42.    Counter-Defendant Durham School Services L.P., successor to Durham Transportation, Inc., is a limited partnership duly organized in the State of Delaware. No service is necessary at this time.

2.43.    Counter-Defendant Freeman Decorating Services, Inc., f/k/a Sullivan Transfer Company (successor by merger), for Sullivan Transfer & Storage, is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.44.    Counter-Defendant Fru-Con Construction Corporation, f/k/a Fruin-Colnon Corporation, is a corporation duly organized in the State of Missouri. No service is necessary at this time.

2.45.    Counter-Defendant General Electric Company, acting through its Energy Division, is a corporation duly organized in the State of New York. No service is necessary at this time.

2.46.    Counter-Defendant Georgia-Pacific LLC, f/k/a Georgia-Pacific Corporation, is a limited liability company duly organized in the State of Delaware. No service is necessary at this time.

2.47.    Counter-Defendant Gifford Hill Cement & Gifford Hill Ready Mix, n/k/a Hanson Aggregates LLC, is a limited liability company duly organized in the State of

8

Delaware. No service is necessary at this time.

2.48. Counter-Defendant Gulf South Pipeline Company LP, successor to United Gas Pipeline Company, is a limited partnership duly organized in the State of Delaware. No service is necessary at this time.

2.49. Counter-Defendant Halliburton Energy Services, Inc., on behalf of itself and as successor to Axelson, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.50. Counter-Defendant Harland Clarke Corp., f/k/a Clarke Checks, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.51. Counter-Defendant Hexion Specialty Chemicals, Inc., successor in interest to Borden, and f/k/a Borden, Inc., and/or Borden Chemical, Inc., is a corporation duly organized in the State of New Jersey. No service is necessary at this time.

2.52. Counter-Defendant Holloway Welding & Piping GP, General Partner of Holloway Welding & Piping LP, is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.53. Counter-Defendant Hunt Oil Company is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.54. Counter-Defendant Industrial Solvents Corporation, for Industrial Solvents

Gulf Division of Industrial Solvents Corporation, a previously used assumed name for Industrial Solvents Corporation, is a corporation duly organized in the State of New York. No service is necessary at this time.

2.55. Counter-Defendant Ingersoll-Rand Company is a corporation duly organized in the State of New Jersey. No service is necessary at this time.

2.56. Counter-Defendant International Paper Company, for itself, Champion Paper and Champion International Corporation, is a corporation duly organized in the State of New York. No service is necessary at this time.

2.57. Counter-Defendant Johns Manville, Inc., f/k/a Manville Sales Corporation, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.58. Counter-Defendant Johnson Controls Battery Group, Inc., for Johnson Controls, Inc., is a corporation duly organized in the State of Wisconsin. No service is necessary at this time.

2.59. Counter-Defendant Jones Environmental, Inc., is a corporation duly organized in the State of Louisiana. No service is necessary at this time.

2.60. Counter-Defendant Joy Technologies, Inc., for Joy Manufacturing Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

10

2.61.　Counter-Defendant Las Colinas Holding Corporation, successor by merger to Las Colinas Service Center, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.62.　Counter-Defendant Sun Engine & Transmission Sales, Inc., is a corporation duly organized in the State of Texas and may be served by serving its agent, CT Corp. System, at 350 N. Saint Paul St., Ste. 2900, Dallas TX 75201-4234.

2.63.　Counter-Defendant Luvata Grenada LLC and Luvata Astro LLC, as successors to Snow Coil, Inc., are corporations duly organized in the State of Delaware. No service is necessary at this time.

2.64.　Counter-Defendant M. Lipsitz & Co., Ltd., is a limited partnership duly organized in the State of Texas. No service is necessary at this time.

2.65.　Counter-Defendant Marathon Norco Aerospace, Inc., for Marathon Battery Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.66.　Counter-Defendant Melton Truck Lines, Inc., is an corporation duly organized in the State of Oklahoma. No service is necessary at this time.

2.67.　Counter-Defendant Metal Services, Inc., n/k/a Berns Metals Southwest, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

11

2.68. Counter-Defendant Metro Aviation, Inc., is a corporation duly organized in the State of Louisiana. No service is necessary at this time.

2.69. Counter-Defendant Nabors Well Services Co., successor to Pool Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.70. Counter-Defendant National Oilwell Varco, L.P., for itself and Martin-Decker, is a limited partnership duly organized in the State of Delaware. No service is necessary at this time.

2.71. Counter-Defendant NCH Corporation, and its division Mohawk Laboratories, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.72. Counter-Defendant E & R Noble, Inc., f/k/a Nobles Transmission, is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.73. Counter-Defendant Nucor Corporation is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.74. Counter-Defendants Occidental Chemical Corporation and Oxy USA, Inc., for themselves and Cities Service Company, Cities Service Pipe Line Company, and Oxy Cities Service NGL, Inc., are corporations duly organized in the States of New York and Delaware, respectively. No service is necessary at this time.

2.75. Counter-Defendant Oil States Industries, Inc., as successor in interest to LTV Energy Products, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.76. Counter-Defendant Oldcastle APG Texas, Inc., d/b/a Custom-Crete, for Custom-Crete, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.77. Counter-Defendant Paccar, Inc., d/b/a Peterbilt Motors Co., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.78. Counter-Defendant Paramount Packaging Corporation (n/k/a Milprint, Inc.) is a corporation duly organized in the State of Wisconsin. No service is necessary at this time.

2.79. Counter-Defendant Pengo Industries, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.80. Counter-Defendant Penske Truck Leasing Co., L.P., successor to [Hertz] Penske Truck Leasing, Inc., and Gelco Truck Leasing Division, Gelco Corporation, is a limited partnership duly organized in the State of Delaware. No service is necessary at this time.

2.81. Counter-Defendant Performance Friction Products, f/k/a Coltec Automotive Products, a division of Coltec Industries, Inc., is a corporation duly organized in the

13

State of Pennsylvania. No service is necessary at this time.

2.82. Counter-Defendant Post, Buckley, Schuh & Jernigan, Inc., d/b/a PBS&J, successor in interest to Espey Huston, is a corporation duly organized in the State of Florida. No service is necessary at this time.

2.83. Counter-Defendant Rayco Oil Company is a sole proprietorship located at 4914 Augusta Circle, College Station, TX 77845. No service is necessary at this time.

2.84. Counter-Defendant Reeves Oil Co., Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.85. Counter-Defendant Regents of New Mexico State University, d/b/a Columbia Scientific Balloon Facility, on behalf of National Scientific Balloon Facility, is a constitutionally-created institution of higher education duly organized in the State of New Mexico. No service is necessary at this time.

2.86. Counter-Defendant Rollins Leasing L.L.C., for Rollins Leasing Corp., is a limited liability company, duly organized in the State of Delaware. No service is necessary at this time.

2.87. Counter-Defendant Royle Container is a sole proprietorship duly organized in the State of Texas. No service is necessary at this time.

2.88. Counter-Defendant Ruan Logistics Corporation, f/k/a Ruan Truck Leasing/ Ruan Leasing Company, is a corporation duly organized in the State of Iowa. No

14

service is necessary at this time.

2.89.  Counter-Defendant Ryder Truck Rental, Inc., is a corporation duly organized in the State of Florida. No service is necessary at this time.

2.90.  Counter-Defendant Schlumberger Technology Corporation, on behalf of Schlumberger Well Services Division of Schlumberger Technology Corporation and Dowell Schlumberger Incorporated, is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.91.  Counter-Defendant Sears, Roebuck & Co. is a corporation duly organized in the State of New York. No service is necessary at this time.

2.92.  Counter-Defendant Sigmor Corporation, for Diamond Shamrock, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.93.  Counter-Defendant Sitton Oil and Marine Company, Inc., for Sitton Oil, is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.94.  Counter-Defendant Southern Foods Group, LLC, for Schepps Dairy, an unincorporated division of Southern Foods Group, LLC, is a limited liability company duly organized in the State of Delaware. No service is necessary at this time.

2.95.  Counter-Defendant Southwestern Bell Telephone Company, d/b/a AT&T Texas, is a corporation duly organized in the State of Missouri. No service is necessary

15

at this time.

2.96.    Counter-Defendant Southwestern Electric Power Company is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.97.    Counter-Defendant Stemco LP is a limited partnership duly organized in the State of Texas. No service is necessary at this time.

2.98.    T.E.C. Well Service, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.99.    Counter-Defendant Texas Gas Transmission, LLC, for Texas Gas Transmission Corporation, is a limited liability company duly organized in the State of Delaware. No service is necessary at this time.

2.100.    Counter-Defendant Texas Health Presbyterian Hospital Dallas, f/k/a Presbyterian Hospital of Dallas, is a non-profit corporation duly organized in the State of Texas. No service is necessary at this time.

2.101.    Counter-Defendant Texas Industries, Inc. (TXI) is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.102.    Counter-Defendant The Lubrizol Corporation is a corporation duly organized in the State of Ohio. No service is necessary at this time.

2.103.    Counter-Defendant TIN, Inc., d/b/a Temple-Inland and f/n/a Inland Container Corp., is a corporation duly organized in the State of Delaware. No service is

16

necessary at this time.

2.104.    Counter-Defendant Trinity Industries, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.105.    Counter-Defendant United States Steel Corporation (and its subsidiaries), for Oilwell Division of United States Steel Corporation and Lone Star Logistics, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.106.    Counter-Defendant VHC, Inc., f/k/a Varo, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.107.    Counter-Defendant Viking Freight Service, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.108.    Counter-Defendant Waste Management of Texas, Inc., for Texas Industrial Disposal, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.109.    Counter-Defendant Weatherford Artificial Lift Systems, Inc., as successor in interest to The Highland Pump Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.110.    Counter-Defendant Wells Fargo Bank, N.A., successor in interest by merger to First Interstate Bank of Dallas, is a national banking association doing

business in various locations in Texas. No service is necessary at this time.

2.111.   Counter-Defendant Weyerhaeuser Company, as successor in interest by merger to Willamette Industries, Inc., and MacMillan Bloedel Containers, is a corporation duly organized in the State of Washington. No service is necessary at this time.

2.112.   Counter-Defendant Wilson Industries, L.P., for Texas Mill Supply – Longview Inc., is a limited partnership duly organized in the State of Texas. No service is necessary at this time.

2.113.   Counter-Defendant Wilsonart International, Inc., f/k/a Ralph Wilson Plastics Company, is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.114.   Counter-Defendant Woods Operating Co., Inc., is a corporation duly organized in the State of Louisiana. No service is necessary at this time.

2.115.   Counter-Defendant YRC, Inc., f/k/a Roadway Express, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.116.   Counter-Defendant 7-Eleven, Inc., f/k/a The Southland Corporation, for its subsidiary Southland Sales Corporation, is a corporation duly organized in the State of Texas. No service is necessary at this time.

*(The Plaintiffs in Chevron USA Inc., et al., v. Texas Commission on Environmental Quality, et al.; No. D-1-GN-10-000793, as follows:)*

18

2.117.    Counter-Defendant Texaco, Inc., a Delaware corporation, is successor to Texaco Chemical Company and is a subsidiary of Chevron USA Inc., a Pennsylvania Corporation. No service is necessary at this time.

2.118.    Counter-Defendant Warren Petroleum Company is a former subsidiary of Chevron USA Inc., a Pennsylvania corporation. No service is necessary at this time.

2.119.    Counter-Defendant Chevron USA, Inc., is a corporation duly organized in the State of Pennsylvania. No service is necessary at this time.

2.120.    Counter-Defendant Mobil Oil Corporation, a New York corporation, is a subsidiary of Exxon Mobil Corporation, a New Jersey corporation. No service is necessary at this time.

2.121.    Counter-Defendant Pennzoil-Quaker State Company, a Delaware corporation, is a successor by merger to Westland Oil Company, Inc., Specialty Oil Company, Inc., and Industrial Lubricants Co. No service is necessary at this time.

2.122.    Counter-Defendant Shell Oil Company is a Delaware corporation. No service is necessary at this time.

*(All the other Plaintiffs who appealed the Order, as follows:)*

2.123.    Counter-Defendant Ark-La-Tex Waste Oil Co., Inc., is a corporation duly organized in the State of Louisiana. No service is necessary at this time.

2.124.    Counter-Defendant ARAMARK Uniform & Career Apparel, LLC, is a

19

limited liability company duly organized in the State of Delaware. No service is necessary at this time.

2.125.   Counter-Defendant Alcatel-Lucent USA, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.126.   Counter-Defendant The Sabine Mining Company is a corporation duly organized in the State of Nevada. No service is necessary at this time.

2.127.   Counter-Defendant Southwestern Petroleum Corporation is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.128.   Counter-Defendant Luminant Generation Company, LLC, successor to Texas Utilities Generating Company and Dallas Power & Light Company, is a corporation duly organized in the State of Texas. No service is necessary at this time.

2.129.   Counter-Defendant Air Liquide America LP, on behalf of Big Three Industrial Gas, Inc., is a corporation duly organized in the State of Delaware. No service is necessary at this time.

2.130.   Counter-Defendant Young Chevrolet, Inc., is a corporation duly organized in the State of Texas. No service is necessary at this time.

## C. Third-party Defendants Named in the Order

*(All persons or entities named in the Order, believed to be viable, are listed here or in subsec. E, below.)*

20

2.131. Third-party Defendant Norit Americas, Inc., successor to American Norit Company, Inc., is a corporation duly organized in the State of Georgia and may be served by serving its agent, CT Corp. System, at 350 N. Saint Paul St., Ste. 2900, Dallas TX 75201-4234.

2.132. Third-party Defendant Baxter Oil Service is a sole proprietorship and may be served by serving its owner, Sam L. Baxter, at 5070 Irving St., Beaumont, Texas 77705-5231.

2.133. Third-party Defendant Billy D. Cox Truck Leasing, Inc., is a corporation duly organized in the State of Texas and may be served by serving its agent, Billy D. Cox, at 10606 Goodnight Lane, Dallas TX 75220-2407.

2.134. Third-party Defendant Janet Blake, d/b/a D&D Radiator & Muffler, is an individual who may be served at 7022 Bruton Rd., Dallas TX 75217-1240.

2.135. Third-party Defendant Central Transfer & Storage Company was a corporation duly organized in the State of Texas. Its charter was forfeited in 2007. It may be served by serving its agent, David F. Zalkovsky, at 11302 Ferndale Rd., Dallas TX 75238-1020.

2.136. Third-party Defendant Channel Shipyard is a corporation duly organized in the State of Texas and may be served by serving its agent, H. Dennis Steger, at 610 S. Main, Highlands TX 77562-4205.

21

2.137. Third-party Defendant City of Garland is a home-rule municipality in the State of Texas and may be served at: City of Garland, Bill Dollar, City Manager, 200 N. 5th St., Garland TX 75040-6314.

2.138. Third-party Defendant Clements Oil Corporation is a corporation duly organized in the State of Texas and may be served by serving its agent, Robert S. Clements, at 202 2nd St., Atlanta TX 75551-1679.

2.139. Third-party Defendant Collin County is a governmental entity in the State of Texas and may be served by serving: Keith Self, Collin County Judge, 2300 Bloomdale Rd., Ste. 4192, McKinney TX 75071-8517.

2.140. Third-party Defendant Willow Distributors, LP, successor to Coors Distributor, is a limited partnership duly organized in the State of Texas and may be served by serving its agent, Rick F. Rogers, at 800 N. Shoreline, Ste. 800 S., Corpus Christi TX 78401-3765.

2.141. Third-party Defendant Dallas Dressed Beef Company, Inc., is a corporation duly organized in the State of Texas and may be served by serving its agent, Jack Hampton, at 1348 Conant Street, Dallas TX 75207-6006.

2.142. Third-party Defendant Davison Petroleum Products, LLC, is a limited liability company duly organized in the State of Louisiana and may be served by serving its agent, Mark E. Davison, at 3809 Skyline Dr., Plano TX 75025-2304.

2.143. Third-party Defendant Delmar Disposal Company is a corporation duly organized in the State of Delaware and may be served by serving its agent, Delmar R. Ham, Jr., at 8508 CF Hawn Frwy., Dallas TX 75217-7013.

2.144. Third-party Defendant Dixie Oil Company is a sole proprietorship and may be served by serving its owner, C.E. Burnham, at 8932 Highway 494, Little Rock MS 39337-9296.

2.145. Third-party Defendant Fred Jordan, Inc., was a corporation duly organized in the State of Texas, whose charter was forfeited in 1998. It may be served by serving its agent, Billy Fred Jordan, at 1414 N. Munson Rd., Royse City TX 75189-5378.

2.146. Third-party Defendant Howard Freilich, d/b/a Quick Stop Brake & Muffler, is an individual residing at 1815 Plymouth Rock Dr., Richardson TX 75081-3942, where he may be served.

2.147. Third-party Defendant G.B. Boots Smith Corporation is a corporation duly organized in the State of Delaware and may be served by serving its agent, Corporation Service Company d/b/a CSC Lawyers Incorporating Service, at 211 E. 7th St., Ste. 620, Austin TX 78701-3218.

2.148. Third-party Defendant GTE Southwest Incorporated, formerly General Telephone Company of the Southwest, is a corporation duly organized in the State of Delaware and may be served by serving its agent, CT Corp. System, at 350 N. Saint Paul

23

St., Ste. 2900, Dallas TX 75201-4234.

2.149. Third-party Defendant Continental Tire the Americas, LLC, formerly General Tire, Inc., is a limited liability company duly organized in the State of Ohio and may be served by serving its agent, CT Corp. System, 350 N. Saint Paul St., Ste. 2900, Dallas TX 75201-4234.

2.150. Third-party Defendant Greyhound Lines, Inc., is a corporation duly organized in the State of Delaware and may be served by serving its agent, CT Corp. System, at 350 N. Saint Paul St., Ste. 2900, Dallas TX 75201-4234.

2.151. Third-party Defendant Grubbs Enterprises, Ltd., is a limited partnership duly organized in the State of Texas and may be served by serving its agent, Charles S. Brown, at 4161 McKinney Ave., 4th Floor, Dallas TX 75204.

2.152. Third-party Defendant Hydraulic Service and Supply Company is a corporation duly organized in the State of Texas and may be served by serving its agent, Larry E. Spillers, at 100 Howell St., Dallas TX 75207-7104.

2.153. Third-party Defendant BAE Systems Resolution, Inc., f/k/a Stewart & Stevenson Services, Inc., successor by merger to International Electric Corporation, is a corporation duly organized in the State of Texas and may be served by serving its agent, CT Corp. System, at 350 N. Saint Paul St., Ste. 2900, Dallas TX 75201-4234.

2.154. Third-party Defendant James Gentry, LLC, successor by merger to James

24

T. Gentry, Inc., is a limited liability company duly organized in the State of Nevada and may be served by serving its agent, James T. Gentry, at 7842 Broadacres Rd., Shreveport LA 71129-3806.

2.155.   Third-party Defendant KSDR, Inc., was a corporation duly organized in the State of Texas, whose charter was forfeited in 1995. It may be served by serving its agent, Barry S. Brown, at 711 Navarro, Ste. 620, San Antonio TX 78205-1893.

2.156.   Third-party Defendant Kelly's Truck Terminal, Inc., is a corporation duly organized in the State of Louisiana and may be served by serving its agent, Richard Rosenblum, at 910 Idaho St., Hammond LA 70401-1710.

2.157.   Third-party Defendant Frank Kosar, d/b/a Rite Way Truck Rental, is an individual residing at 2606 Cartwright St., Dallas TX 75212-4306, where he may be served.

2.158.   Third-party Defendant Lake Country Trucking, Inc., was a corporation duly organized in the State of Texas, whose charter was forfeited in 1989.

2.159.   Third-party Defendant Snyder's-Lance, Inc., formerly Lance, Inc., is a corporation duly organized in the State of North Carolina and may be served by serving its agent, Registered Agent Solutions, Inc., at 515 Congress Ave., Ste. 2300, Austin TX 78701-3560.

2.160.   Third-party Defendant The Goodyear Tire & Rubber Company, successor

in interest to Long Mile Rubber Company, is a corporation duly organized in the State of Ohio and may be served by serving its agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th St., Ste. 620, Austin TX 78701-3218.

2.161.    Third-party Defendant Fargo Transport, Inc., f/k/a Davison Transport, Inc., successor by merger to Mathews Trucking Company, Inc., is a corporation duly organized in the State of Louisiana and may be served by serving its agent, James E. Davison, at 2000 Farmersville Hwy., Ruston LA 71270-3010.

2.162.    Third-party Defendant Don C. McAlister, Inc., f/d/b/a McAlister Construction Company, is a corporation duly organized in the State of Texas and may be served by serving its agent, Don C. McAlister, at 6822 Mossvine Cir., Dallas TX 75254-7952.

2.163.    Third-party Defendant McDonald's is a corporation duly organized in the State of Delaware and may be served by serving its agent, Prentice Hall Corp. System, at 211 E. 7th St., Ste. 620, Austin TX 78701-3218.

2.164.    Third-party Defendant Milagro Estates, Inc., f/k/a Mega Lubricants, Inc., is a corporation duly organized in the State of Texas and may be served by serving its agent, Lillian Trejo, at 15155 Jacintoport Blvd., Houston TX 77015-6530.

2.165.    Third-party Defendant Troy L. Morgan Jr. is an individual residing at 783 Etheredge Rd., Longview TX 75602-7061, where he may be served.

26

2.166.   Third-party Defendant Murphy Brothers Service Center, Inc., is a corporation duly organized in the State of Louisiana and may be served by serving its agent, Randall M. Murphy, at First and Hazel Streets, Arcadia LA 71001.

2.167.   Third-party Defendant Deere & Company, successor in interest to Norwel Equipment Company, is a corporation duly organized in the State of Delaware and may be served by serving its agent, CT Corp. System, 350 N. Saint Paul St., Ste. 2900, Dallas TX 75201-4234.

2.168.   Third-party Defendant Von K. Oxendine, d/b/a/ Oxendine Transmission, is an individual residing at 2319 N. Beckley Ave., Dallas TX 75208-2116, where he may be served.

2.169.   Third-party Defendant Parrott Oil Corp. is a corporation duly organized in the State of Texas and may be served by serving its agent, G.N. Parrott, at 10207 Gardner Rd., Dallas TX 75220-4209.

2.170.   Third-party Defendant Pearl Brewing, LLC, successor to Pearl Brewing Company, is a limited liability company duly organized in the State of Texas and may be served by serving its agent, Barbara J. Hruby, 121 Interpark Blvd., Ste. 300, San Antonio TX 78216-1850.

2.171.   Third-party Defendant Petroleum Distributors, Inc., was a corporation duly organized in the State of Texas, whose charter was forfeited in 1998. It may be

27

served by serving its agent, Stephen F. Holmsley, at 45 NE Loop 410, Ste. 580, San Antonio TX 78216-5854.

2.172.   Third-party Defendant Petroleum Stripping, Inc., is a corporation duly organized in the State of Texas and may be served by serving its agent, Michael Otto, Jr., at 19915 Pinehurst Trail Dr., Humble TX 77338-1732.

2.173.   Third-party Defendant Hilite Industries, Inc., f/d/b/a Pitts, is a corporation duly organized in the State of Delaware and may be served by serving the Texas Secretary of State, for mailing to 50 Public Square, 32nd Floor, Cleveland OH 44113.

2.174.   Third-party Defendant Prestige Ford Garland, LLC, successor in interest to Prestige Ford Garland Limited Partnership, is a limited liability company duly organized in the State of Texas, and may be served by serving its agent, Gach Law Firm, PLLC, 6000 Monroe Rd., Ste. 350, Charlotte NC 28212-1517.

2.175.   Third-party Defendant C.S. Residential Management, Inc., f/k/a Preston Management Company, is a corporation duly organized in the State of Texas and may be served by serving its agent, H. Craig Evans, at 8214 Westchester Dr., Ste. 850, Dallas TX 75225-6128.

2.176.   Third-party Defendant R & K Auto Repair, Inc., is a corporation duly organized in the State of Texas and may be served by serving its agent, Jose L. Rios, at 1835 Barnes Bridge Rd., Dallas TX 75228-2122.

28

2.177. Third-party Defendant Vertis, Inc., successor in interest to Retail Graphics Printing Company, is a corporation duly organized in the State of Delaware and may be served by serving its agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th St., Ste. 620, Austin TX 78701-3218.

2.178. Third-party Defendant Cecil Robison is an individual residing at 856 County Road 3315, Omaha TX 75571-5382, where he may be served.

2.179. Third-party Defendant Rock-Tenn Converting Company is a corporation duly organized in the State of Georgia and may be served by serving its agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th St., Ste. 620, Austin TX 78701-3218.

2.180. Third-party Defendant Safeway, Inc., is a corporation duly organized in the State of Delaware and may be served by serving its agent, United States Corporation Company, at 211 E. 7th St., Ste. 620, Austin TX 78701-3218.

2.181. Third-party Defendant Santos Radiator is a sole proprietorship and may be served by serving its owner, Juan J. Santos, at 2000 Fort Worth Ave., Dallas TX 75208-1304.

2.182. Third-party Defendant Barloworld Truck Center, Inc., successor by merger to Texarkana Truck Center, Inc., f/k/a Shreveport Truck Center, is a corporation duly organized in the State of Tennessee and may be served by serving its agent, Corporation

29

Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th St., Ste. 620, Austin TX 78701-3218.

2.183.   Third-party Defendant South Coast Products, LP, successor to South Coast Products, Inc., is a limited partnership duly organized in the State of Texas and may be served by serving its agent, John R. Cantu, at 20 Southbelt Industrial Dr., Houston TX 77047-7010.

2.184.   Third-party Defendant Southern Plastics, Inc., is a corporation duly organized in the State of Louisiana and may be served by serving its agent, National Registered Agents, Inc., at 16055 Space Center Blvd., Ste. 235, Houston TX 77062-6212.

2.185.   Third-party Defendant SBC Holdings, Inc., f/k/a The Stroh Brewery Company, is a corporation duly organized in the State of Arizona and may be served by serving its agent, National Registered Agents, Inc., 638 N. 5th Ave., Phoenix AZ 85003-1529.

2.186.   Third-party Defendant Texas State Technical College System is an institution of higher education and state agency duly organized in the State of Texas and may be served by serving its President, Dr. Elton E. Stuckly, Jr., at 3801 Campus Drive, Waco, TX 76705.

2.187.   Third-party Defendant Baker Hughes Oilfield Operations, Inc., successor in interest to Tri-State Oil Tools, Inc., is a corporation duly organized in the State of

30

California and may be served by serving its agent, CT Corp. System, at 350 N. Saint Paul St., Ste. 2900, Dallas TX 75201-4234.

2.188.    Third-party Defendant Twin City Transmission Service, Inc., is a corporation duly organized in the State of Louisiana and may be served by serving its agent, Tracey Ardito, at 2923 Deborah Dr., Monroe LA 71201-1953.

2.189.    Third-party Defendant Wray Ford, Inc., is a corporation duly organized in the State of Louisiana and may be served by serving its agent, George D. Wray, III, at 2851 Benton Rd., Bossier City LA 71111-2311.

## D. Third-party Defendants Not Named in the Order

2.190.    Third-Party Defendant GATX Rail Corporation is a corporation duly organized under the laws of the State of New York. It may be served with citation by serving the Texas Secretary of State for mailing to: Corporation Service Co., 800 Brazos, Austin, Texas 78701.

2.191.    Third-Party Defendant Parker-Hannifin Corporation, successor in interest to JM Clipper Corporation, is a corporation duly organized under the laws of the State of Ohio. It may be served with citation by serving its agent, CT Corp. System, at 350 N. Saint Paul St., Ste. 2900, Dallas, Texas 75201-4234.

2.192.    Third-Party Defendant Pioneer Natural Resources USA, Inc., successor to Dorchester Refining Company, is a corporation duly organized under the laws of the

31

State of Delaware and may be served by serving its agent, CT Corp. System, at 350 N. Saint Paul St., Suite 2900, Dallas TX 75201-4234.

**E. Federal Agencies**

2.193.    The United States Department of the Navy, a branch of the United States Department of Defense, is named in the Order (as "Naval Air Station Dallas") but is not a defendant in this lawsuit. No further action will be taken at this time regarding this entity.

## 3.    JURISDICTION AND VENUE

3.1.    This is a suit for the recovery of response costs at a state Superfund site pursuant to an administrative order of the TCEQ. This Court has jurisdiction over the enforcement of such administrative orders by virtue of § 2001.202 of the Texas Administrative Procedure Act ("APA"), Tex.Gov't Code § 2001.202.

3.2.    Venue is proper in Travis County, Texas, by virtue of § 2001.202 of the APA.

## 4.    BACKGROUND

4.1.    On February 12, 2010, the TCEQ issued an administrative order ("the Order") under §§ 361.188 and 361.272 of the Act, concerning a 6.12 acre tract of land at 211 Duncan Road, approximately 1.25 mile west of the intersection of FM 2275 (George Richey Road) and FM 3272 (North White Oak Road), 2.6 miles north-northeast of Clarksville City, Gregg County, Texas, known as the Voda Petroleum, Inc., State Super-

32

fund Site ("the Site").[1] A copy of the Order is attached. (*See* **Attach. 1**). The Order found that the Site was contaminated with various solid wastes, as defined in § 361.003(34) of the Act, in the soil and sediment. These solid wastes included the following hazardous substances, as defined in § 361.003(11) of the Act: cis-1,2-dichloroethylene; benzene; n-propylbenzene; MTBE (methyl tertiary-butyl ether); tetrachloroethylene; toluene; 1,1,1-trichloroethane; trichloroethylene; 1,2,4- & 1,3,5-trimethylbenzene; vinyl chloride; m-, o- & p-xylene; 1,1-dichloroethylene; and 1,2-dichloroethane. (*See* Ex. B to **Attach. 1**).

4.2.   The Site has been proposed for listing on the State Registry of Superfund Sites. 25 Tex. Reg. 11594 (Nov. 17, 2000). When ranked, the Site had a hazard ranking score of 23.6, as specified in 30 TEX. ADMIN. CODE § 335.343. The Order required certain potentially responsible parties to reimburse the Hazardous and Solid Waste Remediation Fee Account for all costs incurred by the TCEQ for the remedial investigation ("RI"), feasibility study ("FS"), and oversight of these activities. In addition, the Order required certain parties to reimburse the Hazardous and Solid Waste Fee Account for all uncompensated Pre-Remedial Investigation costs, including oversight and other costs.

4.3.   The State adopts the allegations, findings and conclusions of the Order herein by reference.

_____

[1] For further description and current status, see: http://www.tceq.state.tx.us/remediation/superfund/state/voda.html.

33

159

4.4.   The Counter-Defendants listed in subsec. 2.B, above, or their predecessors, were named as responsible parties in the Order and appealed the Order.

4.5.   The Third-Party Defendants listed in subsec. 2.C, above, or their predecessors, were named as responsible parties in the Order. These parties received copies of the Order with a certified forwarding letter, as shown on **Attach. 2**, but failed to appeal within the time specified by law. Accordingly, the Order is now final and unappealable as to them.

4.6.   The Third-Party Defendants listed in subsec. 2.D, above, were not named in the Order. Their liability arises as a matter of law and they are joined herein pursuant to TEX. HEALTH & SAFETY CODE § 361.323 ("the attorney general shall, and a party may, join as a party a person reasonably believed to be liable….").

4.7.   To date the TCEQ has spent more than $1,750,000 on pre-remedial and removal actions, the RI/FS, and remedial action. The TCEQ anticipates that total response costs will exceed $2,100,000.

4.8.   Now the State seeks to recover the costs of its remedial investigation, feasibility study, removal action, remedial design and remedial action at the Site, plus reasonable attorneys' fees. The State specifically reserves all claims for natural resource damages.

## 5. CAUSE OF ACTION FOR COST RECOVERY

5.1. The chemicals of concern found in the soil and sediment at the Site (*see* **Attach. 1**, Ex. B) were "hazardous substances," within the meaning of TEX. HEALTH & SAFETY CODE § 361.003(11) or "solid wastes" within the meaning of TEX. HEALTH & SAFETY CODE §§ 361.003(34)(B) and 361.271.

5.2. Each hazardous substance, waste or contaminant found at the Site was a "discarded material" and thus a "solid waste" within the meaning of TEX. HEALTH & SAFETY CODE §§ 361.003(34) and 361.271.

5.3. The release of hazardous substances, waste and contaminants at the Site was a discharging, depositing, dumping, spilling, leaking, or placing of solid waste into or on land or water, so that the solid waste or a constituent thereof might be emitted into the air, discharged into surface water or groundwater, or introduced into the environment in another manner, and was thus a "disposal" within the meaning of TEX. HEALTH & SAFETY CODE § 361.003(7) and 361.133.

5.4. The Site was a site "at which solid waste or hazardous substances have been disposed" of, within the meaning of TEX. HEALTH & SAFETY CODE § 361.133(c).

5.5. The Site was a tract of land on which solid waste was disposed of, and thus was a "solid waste facility" within the meaning of TEX. HEALTH & SAFETY CODE §§ 361.003(36) and 361.271.

35

5.6. Each Counter-Defendant and Third-Party Defendant is a "person" within the meaning of Tex. Health & Safety Code §§ 361.003(23) and 361.271.

5.7. Each Counter-Defendant and Third-Party Defendant owned or operated a solid waste facility at the Site at the time of processing, storage or disposal of solid waste; or arranged to process, store, or dispose of solid waste at the facility; or accepted solid waste for transport to a facility; and is thus a "person responsible for solid waste" within the meaning of Tex. Health & Safety Code § 361.271(a), and a "responsible party" within the meaning of Tex. Health & Safety Code § 361.197.

5.8. The Counter-Defendants and Third-Party Defendants are responsible parties who have not complied with the terms of the Order, within the meaning of Tex. Health & Safety Code § 361.197(a).

5.9. The Counter-Defendants and Third-Party Defendants are therefore "non-compliant parties" within the meaning of Tex. Health & Safety Code § 361.197(b).

5.10. The TCEQ's response action at the Site was a "remedial action" or "removal" within the meaning of Tex. Health & Safety Code §§ 361.003(29-30) and 361.133(c).

5.11. The funds used by the TCEQ for the response actions were taken from the Hazardous and Solid Waste Remediation Fee Account, established at Tex. Health & Safety Code § 361.133(a).

5.12. The funds expended by the TCEQ were for necessary and appropriate removal and remedial action at a site where solid waste or hazardous substances had been disposed of, within the meaning of TEX. HEALTH & SAFETY CODE § 361.133(c)(1).

5.13. Funds from a liable person or independent third person were not sufficient for the removal or remedial action, within the meaning of TEX. HEALTH & SAFETY CODE § 361.133(c)(1).

5.14. Funds from the federal government were not sufficient for the removal or remedial action, within the meaning of TEX. HEALTH & SAFETY CODE § 361.133(c)(1).

5.15. Thus, the funds expended by the TCEQ were "costs of an action taken under Section 361.133(c)(1), (2), (3), (5) or (6)," within the meaning of TEX. HEALTH & SAFETY CODE § 361.197(d).

5.16. Accordingly, the TCEQ should have judgment against the Counter-Defendants and Third-Party Defendants for all of its response costs at the Site, as allowed by TEX. HEALTH & SAFETY CODE § 361.197(d).

## 6. ACTION TO ENFORCE ADMINISTRATIVE ORDER

6.1. Each Third-Party Defendant named in subsec. 2.C, above, failed to appeal the Order within 30 days of issuance as required by TEX. HEALTH & SAFETY CODE § 361.321(c), or within 45 days of the date of receipt, hand delivery, or publication service as required by TEX. HEALTH & SAFETY CODE § 361.322(a). Thus, the Order is final

37

and unappealable as to those Third-Party Defendants.

6.2.   The Order is not "invalid, arbitrary, or unreasonable" within the meaning of TEX. HEALTH & SAFETY CODE § 361.321(e), based upon the substantial evidence rule. *See Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1966).

6.3.   There was an "actual or threatened release of solid waste or hazardous substances" at the Site that posed an "imminent and substantial endangerment to the public health and safety or the environment," and the Counter-Defendants and Third-Party Defendants were "liable for the elimination of the release or threatened release, in whole or in part," within the meaning of TEX. HEALTH & SAFETY CODE § 361.322(g).

6.4.   The remedy selected for the Site was not "arbitrary or unreasonable," based upon the substantial evidence rule. *See* TEX. HEALTH & SAFETY CODE § 361.322(h), *Gerst*, 411 S.W.2d at 354.

6.5.   Accordingly, the Order should be upheld pursuant to TEX. HEALTH & SAFETY CODE §§ 361.321 and 361.322(g).

6.6.   Each Counter-Defendant and Third-Party Defendant should be ordered to comply with all the terms and provisions of the Order.

## 7.   INJUNCTION AS ALTERNATIVE TO ADMINISTRATIVE ORDER

7.1.   The Third-Party Defendants listed in subsec. 2.D, above, are "persons responsible for solid waste," within the meaning of TEX. HEALTH & SAFETY CODE

38

§§ 361.271 & 361.273.

7.2.   Accordingly, these Third-Party Defendants should be enjoined to "provide and implement a cost effective and environmentally sound remedial action plan designed to eliminate the release or threatened release," as required by TEX. HEALTH & SAFETY CODE § 361.273(2).

7.3.   These Third-Party Defendants should be ordered to carry out all the terms and provisions of the Order.

## 8.   ATTORNEYS' FEES AND COSTS

8.1.   The TCEQ has incurred reasonable attorneys' fees, reasonable costs to prepare and provide witnesses, and reasonable costs of investigating and assessing the Site, and asks that these costs and fees be recovered from the Counter-Defendants and Third-Party Defendants as allowed by TEX. WATER CODE § 7.108, TEX. GOV'T CODE § 402.006(c) and TEX. HEALTH & SAFETY CODE § 361.341.

## 9.   PRAYER

WHEREFORE, the TCEQ requests that:

A.   Each Third-Party Defendant be served with citation;

B.   Each Counter-Defendant and Third-Party Defendant be required to appear herein and answer this petition within the time specified by law;

C.   The Court uphold the Order and require each Defendant to comply with all

of its terms and provisions;

D. The TCEQ have judgment against all Counter-Defendants and Third-Party Defendants, jointly and severally, for its costs incurred and to be incurred in responding to the release or threatened release of solid waste and hazardous substances at the Site, plus interest at the legal rate until paid;

E. The TCEQ have judgment against each Counter-Defendant and Third-Party Defendant for reasonable attorneys' fees, reasonable costs to prepare and provide witnesses, and all of its court costs; and

F. The Court grant the TCEQ such other and further relief as the Court may deem just and proper.

Respectfully submitted this __1 st__ day of August 2011.

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation

BARBARA B. DEANE
Chief, Environmental Protection and Administrative Law Division

DAVID PREISTER
Chief, Environmental Protection Section

40

_J. H. Edwards_

THOMAS H. EDWARDS
Assistant Attorney General
State Bar No. 06461800

Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0052

ATTORNEYS FOR THE TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY

## REQUEST FOR DISCLOSURE

Pursuant to Texas Rule of Civil Procedure 194, the TCEQ requests that each Counter-Defendant and Third-Party Defendant disclose, within 50 days of service of this request (or waiver of such service), the information or material described in Texas Rule of Civil Procedure 194.2.

_J. H. Edwards_

THOMAS H. EDWARDS

41

# CERTIFICATE OF SERVICE

I, Thomas H. Edwards, do certify that a true and correct copy of the foregoing document was mailed by first class U.S. mail, on the __1 st__ day of August 2011, to the following parties or attorneys of record:

| ATTORNEY | PARTY |
|---|---|
| R. Steve Morton<br>Janessa C. Glenn<br>MOLTZ MORTON O'TOOLE, LLP<br>106 E. 6th St., Ste. 700<br>Austin, Texas 78701 | Group of plaintiffs in the *AAMCO Transmissions* case |
| John R. Eldridge<br>HAYNES AND BOONE, L.L.P.<br>1221 McKinney St., Ste. 2100<br>Houston, Texas 77010 | Group of plaintiffs in the *Chevron USA* case |
| Adam H. Sencenbaugh<br>Haynes and Boone, L.L.P.<br>600 Congress Ave., Ste. 1300<br>Austin, Texas 78701 | Group of plaintiffs in the *Chevron USA* case |
| Paul M. Terrill III<br>Geoffrey P. Kirshbaum<br>THE TERRILL FIRM, P.C.<br>810 West 10th St.<br>Austin, Texas 78701 | Ark-La-Tex Waste Oil Co., Inc., and Young Chevrolet, Inc. |
| Steve McMillen<br>Amber MacIver<br>BAKER BOTTS L.L.P.<br>98 San Jacinto Blvd., Ste. 1500<br>Austin, Texas 78701-4039 | ARAMARK Uniform & Career Apparel, LLC |

Andrew C. Brought
SPENCER FANE BRITT & BROWNE LLP
1000 Walnut, Ste. 1400
Kansas City, Missouri 64106

Alcatel-Lucent USA, Inc.

Ali Abazari
JACKSON WALKER L.L.P.
100 Congress Ave., Ste. 1100
Austin, Texas 78701

The Sabine Mining Company

Steve A. Ramon
JACKSON WALKER L.L.P.
112 East Pecan, Ste. 2400
San Antonio, Texas 78205

The Sabine Mining Company

Robert T. Stewart
Brenda L. Clayton
KELLY HART & HALLMAN LLP
301 Congress Ave., Ste. 2000
Austin, Texas 78701

Southwestern Petroleum Corporation

John A. Riley
VINSON & ELKINS LLP
2801 Via Fortuna, Ste. 100
Austin, Texas 78746

Luminant Generation Company, LLC

John Dugdale
BURFORD & RYBURN, L.L.P.
500 N. Akard, Ste. 3100
Dallas, Texas 75201

Air Liquide America LP

THOMAS H. EDWARDS

U:\CASES\VODA\Counterpetition\Voda Counterpetition 110801.wpd

43

# App. E

TCEQ's Third Original Answer, responding to Shell and Exxon Mobil, and Plea to the Jurisdiction
(CR:675-687)

Filed
13 August 9 P3:09
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-10-000772

CAUSE NO. D-1-GN-10-000772

| YOUNG CHEVROLET, INC., et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS COMMISSION ON | § | |
| ENVIRONMENTAL QUALITY, et al., | § | TRAVIS COUNTY, TEXAS |
| Defendants, | § | |
| | § | |
| v. | § | |
| | § | |
| YOUNG CHEVROLET, INC., et al., | § | |
| Counter- and Third-Party | § | 345th JUDICIAL DISTRICT |
| Defendants | § | |

**TCEQ'S THIRD AMENDED ORIGINAL ANSWER, RESPONDING TO
SHELL AND EXXON MOBIL, AND PLEA TO THE JURISDICTION**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants the Texas Commission on Environmental Quality ("TCEQ"); and

Chairman Bryan W. Shaw, Ph.D., Commissioner Buddy Garcia, Commissioner Carlos

Rubinstein, and Commissioner Toby Baker,[1] in their official capacities; file this Third

Amended Original Answer, responding to the Second Amended Original Petition filed

by Chevron USA, Inc., et al.

## I. BACKGROUND

ExxonMobil Corporation and Shell Oil Company were among a group of plaintiffs

---

[1] Commissioner Toby Baker replaced Commissioner Garcia in 2012 and might be considered to have been substituted into this lawsuit; accordingly he is also listed as a respondent herein.

675

that filed their Original Petition in case that was subsequently consolidated into the present case.[2] They filed their First Amended Original Petition in that action on March 26, 2010; the TCEQ answered on March 30, 2010. That cause was consolidated with others into the present case. *See* Agreed Order for Consolidation (May 18, 2010). The TCEQ then filed a counterclaim. *See* TCEQ's Original Counter-pet. and Third-party Pet. (Aug. 1, 2011). Subsequently most parties settled their claims with the TCEQ in a severed action.[3]

Plaintiffs/Counter-Defendants ExxonMobil Corporation, Mobil Oil Corporation, Pennzoil-Quaker State Company and Shell Oil Company filed an Original Answer (Aug. 7, 2012), that contained a General Denial and incorporated the affirmative defenses from their First Amended Original Petition. The TCEQ then filed[4] a Second Supplement to Counter-petition and Third-party Petition (Feb. 7, 2013), which corrected the name of Mobil Oil Corporation to ExxonMobil Oil Corporation and added Exxon Mobil Corporation to the case. These parties filed a General Denial that, as before, incorporated the affirmative defenses in the First Amended Original Petition. *See*

---

[2] *See Chevron USA Inc. v. Tex. Comm'n on Envtl. Quality,* No. D-1-GN-10-000793 (419th Dist. Ct., Travis County, Tex. Mar. 26, 2010).

[3] *See* Agreed Final J., *Young Chevrolet, Inc. v. Tex. Comm'n on Envtl. Quality,* No. D-1-GN-12-002297 (345th Dist. Ct., Travis County, Tex. July 30, 2012).

[4] The First Supplement to Counter-petition and Third-party Petition (Oct. 5, 2011) is not relevant here.

2

Original Answer to Counter-pet. and Third-party Pet. (June 11, 2013).

Thus the remaining plaintiffs from the original Chevron USA case, properly named, are Exxon Mobil Corporation, ExxonMobil Oil Corporation, Pennzoil-Quaker State Company and Shell Oil Company. The TCEQ and the Commissioners file the following amended answer to these plaintiffs' First Amended Original Petition and also respond to their original answers, to the extent those answers incorporate affirmative defenses.

## II. PLEA TO THE JURISDICTION

### A. Request for Declaratory Judgment

The Plaintiffs' First Amended Original Petition includes a claim under the Uniform Declaratory Judgments Act ("UDJA"), TEX. CIV. PRAC. & REM. CODE § 37.001 *et seq.*, seeking a declaration that the TCEQ's Administrative Order (Docket No. 2009-1706-SPF, entered Feb. 12, 2010) ("Order") is invalid or is an *ultra vires* action by the TCEQ.[5] The Plaintiffs seek a declaratory judgment that the Order "is of no legal effect" and seeks their attorney's fees and costs under TEX. CIV. PRAC. & REM. CODE § 37.009.[6]

The court lacks jurisdiction over the Plaintiffs' UDJA claim because it seeks a redundant remedy to that afforded by the Texas Solid Waste Disposal Act, TEX. HEALTH

---

[5] *See* Pl.s' First Am. Orig. Pet. (No. D-1-GN-10-000793), paras. 8, 48, 52, 68 and 74.

[6] *See* Pl.'s First Am. Orig. Pet. paras. 48, 68 and 74.

3

& SAFETY CODE § 361.001 *et seq.* ("TSWDA"). The Texas Legislature has defined the sole method for appealing the Order at TEX. HEALTH & SAFETY CODE § 361.322. The TSWDA sets forth the burden and method for challenging the remedy detailed in the Order at TEX. HEALTH & SAFETY CODE § 361.322(g)-(h), and also sets forth the burden and means for recovering attorneys' fees and costs if the entirety of the Order itself is challenged (to be awarded only upon a finding by the Court that the Order is "frivolous, unreasonable, or without foundation").[7]

This standard subsumes any assertion that the TCEQ or its Commissioners committed an *ultra vires* act in issuing the Order. The TSWDA unambiguously sets forth the sole means and method for parties seeking to challenge the validity of a Superfund order, and the sole means and method for parties that are successful in such a challenge to recover their attorneys' fees and costs.

When a statute provides a means to attack an administrative agency's order, one

---

[7]  The Solid Waste Disposal Act provides:

Sec. 361.342. COST RECOVERY BY APPEALING OR CONTESTING PARTY. If the court finds that an administrative order [of the type relevant here] is frivolous, unreasonable, or without foundation with respect to a party named by the order, the party appealing or contesting the order is entitled to recover from the state its reasonable:
      (1) attorney's fees;
      (2) costs to prepare and provide witnesses; and
      (3) costs of studies, analyses, engineering reports, tests, or other projects the court finds were necessary to prepare the party's case.

TEX. HEALTH & SAFETY CODE § 361.342.

4

may not maintain a declaratory judgment action seeking remedies that are merely redundant with those available from the statute. *See Strayhorn v. Raytheon E-Sys., Inc.,* 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied).

Accordingly, because Plaintiffs' claims under the UDJA are redundant of and supplanted by the TSWDA, this court lacks jurisdiction to hear them and they should be struck. *See id.; see also Becon Nat'l Ins. Co. v. Montemayor,* 86 S.W.3d 260, 266-67 (Tex. App.—Austin 2002, no pet.) (merely alleging that an agency has exceeded its authority is insufficient to confer jurisdiction under the UDJA when a statute provides an express "avenue for attacking an agency order," because "a declaratory judgment action will not lie to provide redundant remedies") and *Martin v. Amerman,* 133 S.W.3d 262, 267 (Tex. 2004) (when a statute expressly governs a party's substantive claims, a party may not proceed under the UDJA and recover attorneys' fees).

For these same reasons, the court is similarly without jurisdiction over Plaintiffs' claims that the Plaintiffs' due process rights under the U.S. Constitution (U.S. CONST. art. XIV) and the Texas Constitution (TEX. CONST. art. I, § 19) were violated because the law did not "afford Plaintiffs an opportunity for an adjudicative hearing" before entry of the Order, Pl.'s First Am. Orig. Pet. para. 49, or as to the "necessity, appropriateness, and reasonableness of past and future investigation and remedial costs incurred by the TCEQ," Pl.'s First Am. Orig. Pet. para. 50, because the TSWDA provides the sole

5

method and means for attacking the Order. *See Young Chevrolet, Inc. v. Tex. Motor Vehicle Bd.*, 974 S.W.2d 906, 911 (Tex. App.—Austin 1998, pet. denied).

**B. Naming Individuals in Official Capacity**

The Plaintiffs' First Amended Original Petition names TCEQ Chairman Bryan W. Shaw and Commissioners Buddy Garcia and Carlos Rubinstein, in their official capacities. Pl.s' First Am. Orig. Pet. paras. 3-5 at 2-3. However, the Plaintiffs have an adequate statutory method of appeal against the Commission, not the Commissioners, *see* TEX. HEALTH & SAFETY CODE §§ 361.321, 361.322, and they have brought their appeal under those sections. *See* Pl.s' First Am. Orig. Pet. para. 8 at 3.

> The TSWDA specifically provides that:
>
> The person appealing the order must join the commission as a party and may join as parties any other person named as a responsible party in the administrative order and any other person who is or may be liable for the elimination of the actual or threatened release of solid waste or hazardous substances governed by the administrative order.

TEX. HEALTH & SAFETY CODE § 361.322(d). This section limits the parties whom the Plaintiffs may join to their appeal. The individual Commissioners are not included and are rightfully subsumed within the meaning of "commission as a party." Accordingly, the claims against the individual Commissioners are without statutory authority (and as set forth in II.A., any claim against the Commissioners under the UDJA is redundant and adds nothing to the Plaintiffs' remedies) and should be struck.

6

## III. PLEA IN ABATEMENT

Defendants re-allege the matters set forth in their plea to the jurisdiction and assert them also as a plea in abatement.

## IV. AFFIRMATIVE DEFENSES

Subject to the foregoing plea to the jurisdiction and plea in abatement, Defendants re-allege the matters set forth in their plea to the jurisdiction and assert them also as affirmative defenses. Additionally, Defendants assert that:

- Plaintiffs' UDJA claim is barred, in whole or in part, by the doctrine of sovereign immunity, including both immunity from suit and immunity from liability.

- The Plaintiffs' request for a declaration under the UDJA that the Order is invalid, or is an *ultra vires* action by the TCEQ or the Commissioners, is not within the scope of the actions authorized by the UDJA.

- Plaintiffs' claims against TCEQ Chairman Bryan W. Shaw and Commissioners Buddy Garcia and Carlos Rubinstein, in their official capacities, are barred, in whole or in part, by the doctrine of sovereign immunity, including both immunity from suit and immunity from liability.

- Plaintiffs' claims against TCEQ Chairman Bryan W. Shaw and Commissioners Buddy Garcia and Carlos Rubinstein, in their official capacities, are not within

7

the scope of the action provided in Section 361.322 of the Texas Health & Safety Code.

## V. SPECIAL EXCEPTIONS

Defendants specially except to the Plaintiffs' attempt to impose a burden of proof and a standard of review not contemplated by the TSWDA. Plaintiffs assert that TCEQ and/or its Commissioners committed an *ultra vires* act or acts in issuing this Superfund Order.[8] However, the TSWDA clearly sets forth the burden of proof and standards of review for appeals of Superfund orders, as follows:

> The district court shall uphold the administrative order if the commission proves by a *preponderance of the evidence* that:
> (1) there is an actual or threatened release of solid waste or hazardous substances that is an imminent and substantial endangerment to the public health and safety or the environment; and
> (2) the person made subject to the administrative order is liable for the elimination of the release or threatened release, in whole or in part.

TEX. HEALTH & SAFETY CODE § 361.322(g) (emphasis added). For parties challenging the "appropriateness of the selected remedial action … in the appeal of the administrative order, the remedial action shall be upheld unless the court determines that the remedy is *arbitrary or unreasonable*." *Id.* § 361.322(h) (emphasis added). Finally, a party challenging the administrative order as a whole may establish that it is *"frivolous, unreasonable, or without foundation* with respect to a party named by the order." *Id.* § 361.342 (emphasis

---

[8] *See* Pl.s' First Am. Orig. Pet., paras. 8, 48, 52, 68 and 74.

8

added). The TSWDA does not contemplate any other burdens or standards of review for challenges to Superfund Orders.

Therefore, the standard of review in the appeal of this Order is not whether the TCEQ committed an *ultra vires* act, but whether:

(a) TCEQ can prove, by a preponderance of the evidence, the two factors listed in § 361.322(g)(1) and (2);

(b) Plaintiffs can show that the selection of the remedy by TCEQ was arbitrary or unreasonable; or

(c) Plaintiffs can show that the Order as a whole is "frivolous, unreasonable, or without foundation with respect to a party named by the order." *Id.* § 361.342. Plaintiffs' attempts to change these standards of review and burdens (in particular in the allegations stated in para. 52 in Plaintiffs' First Amended Original Petition) are without merit and must be stricken or properly amended.

## VI. GENERAL DENIAL

The Defendants deny each and every allegation in Plaintiffs' First Amended Original Petition and demand strict proof thereof. The Defendants reserve the right to amend this Third Amended Original Answer as allowed under the Texas Rules of Civil Procedure.

WHEREFORE, PREMISES CONSIDERED, the Defendants pray judgment of this

9

Court denying the relief requested by the Plaintiffs. The Defendants further pray for all costs of court and for such other relief as to which they may be justly entitled, both in law and in equity.

Respectfully submitted this 9th day of August 2013.

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JOHN B. SCOTT
Deputy Attorney General for Civil Litigation

JON NIERMANN
Chief, Environmental Protection Division

J. H. Edwards
THOMAS H. EDWARDS
Assistant Attorney General
Tex. Bar No. 06461800
Thomas.Edwards@TexasAttorneyGeneral.gov

CRAIG J. PRITZLAFF
Assistant Attorney General
Tex. Bar No. 24046658
Craig.Pritzlaff@TexasAttorneyGeneral.gov

10

684

Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

ATTORNEYS FOR THE TEXAS
COMMISSION ON ENVIRONMENTAL
QUALITY, CHAIRMAN BRYAN W.
SHAW, PH.D., COMMISSIONER BUDDY
GARCIA, COMMISSIONER CARLOS
RUBINSTEIN, AND COMMISSIONER
TOBY BAKER

## CERTIFICATE OF SERVICE

I, Thomas H. Edwards, do hereby certify that a true and correct copy of the foregoing document was served by First Class U.S. Mail on the following parties or attorneys of record, on the _9 ᵗʰ_ day of August 2013.

**Attorneys**

John R. Eldridge
HAYNES AND BOONE, L.L.P.
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
john.eldridge@haynesboone.com

**Parties**

Exxon Mobil Corporation, ExxonMobil Oil Corporation, Pennzoil-Quaker State Company and Shell Oil Company

11

685

Paul M. Terrill III
Geoffrey P. Kirshbaum
THE TERRILL FIRM, P.C.
810 West 10th Street
Austin, Texas 78701-2005
Telephone: (512) 474-9100
Facsimile: (512) 474-9888
gkirshbaum@terrill-law.com

Ark-La-Tex Waste Oil Co., Inc.

John E. Leslie
JOHN LESLIE │ PLLC
1216 Florida Dr., Ste. 140
Arlington, Texas 76015-2393
Tel: (817) 505-1291

Howard Freilich, d/b/a Quick Stop
Brake and Muffler

Carl D. Haddad
GRAY, BURCH & HADDAD
13301 East Freeway, Ste. 225
Houston, Texas 77015
Tel: (713) 453-6339
Fax: (713) 453-6923
gbhlawfirm@yahoo.com

Petroleum Stripping, Inc.

Sam L. Baxter, Pres.
P.O. Box 20255
Beaumont TX 77720-0255
Tel: 409-840-9000
Fax: 409-840-9090
samleebaxter@gmail.com

Baxter Oil Service

Frank Kosar
2606 Cartwright St.
Dallas TX 75212-4306

d/b/a Rite Way Truck Rental

12

686

Norit Americas, Inc.
William A. Smith, Sr. Counsel
3200 University Ave.
P.O. Box 790
Marshall TX 75671
Tel: 903-923-1056
Fax: 903-938-9701
bsmith@norit-americas.com

Norit Americas, Inc., successor to
American Norit Company, Inc.



Billy D. Cox Truck Leasing, Inc.

Billy D. Cox
P.O. Box 541235
Dallas TX 75254

Janet Blake
7022 Bruton Rd.
Dallas TX 75217-1240

d/b/a D&D Radiator & Muffler

David F. Zalkovsky, Agent
11302 Ferndale Rd.
Dallas TX 75238-1020

Central Transfer & Storage Co.

George E. Kuhn
BUTZEL LONG
350 S. Main St., Ste 300
Ann Arbor MI 48104
Tel: 734-213-3257
Fax: 734-995-1777
kuehn@butzel.com

SBC Holdings, Inc., f/k/a The Stroh
Brewery Company


_____
THOMAS H. EDWARDS

13

687

# APP. F

Act approved June 2, 1969, 61st Leg., R.S., ch. 405, 1969
Tex. Gen. Laws 1320, 1320 (repealed 1989)
*recodified by* Act approved June 14, 1989, 71st Leg.,
R.S., ch. 678, 1989 Tex. Gen. Laws 2230

## SOLID WASTE DISPOSAL ACT

### CHAPTER 405 [69]

### S. B. No. 125

An Act relating to the control of the collection, handling, storage, and disposal of putrescible and non-putrescible discarded or unwanted materials, including solid materials and certain materials in liquid or semiliquid form, referred to in this Act as "solid waste"; prescribing the duties, powers, and functions of the State Department of Health, the Texas Water Quality Board, counties, cities, and certain other political subdivisions of the state relative to solid waste management programs and control; prohibiting the collection, handling, storage or disposal of solid waste or the use or operation of sites for the disposal of solid waste in violation of this Act or of any rules, regulations, permits, licenses, or other orders promulgated under this Act; prescribing penalties for violations and providing for enforcement; providing for severability; and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

Section 1.  This Act may be cited as the Solid Waste Disposal Act. It is the policy of the state and the purpose of this Act to safeguard the health, welfare, and physical property of the people through controlling the collection, handling, storage, and disposal of solid wastes.

Sec. 2.  As used in this Act, unless the context requires a different definition:

(1) "person" means individual, corporation, organization, government or governmental subdivision or agency, business trust, partnership, association, or any other legal entity;

(2) "department" means the Texas State Department of Health;

(3) "board" means the Texas Water Quality Board;

(4) "local government" means a county; an incorporated city or town; or a political subdivision exercising the authority granted under Section 6 of this Act;

(5) "solid waste" means all putrescible and nonputrescible discarded or unwanted solid materials, including municipal solid waste and industrial solid waste; as used in this Act, the term "solid waste" does not include, and this Act does not apply to: (i) soil, dirt, rock, sand and other natural and man-made inert solid materials used to fill land if the object of the fill is to make the land suitable for the construction of surface improvements; or (ii) waste materials which result from activities associated with the exploration, development, or production of oil or gas and are subject to control by the Texas Railroad Commission;

(6) "municipal solid waste" means solid waste resulting from or incidental to municipal, community, trade, business and recreational activities, including garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and all other solid waste other than industrial solid waste.

(7) "industrial solid waste" means solid waste resulting from or incidental to any process of industry or manufacturing, or mining or agricultural operations, including discarded or unwanted solid materials suspended or transported in liquids, and discarded or unwanted materials in liquid or semi-liquid form; the term "industrial solid waste" does not

69. Vernon's Ann.Clv.St. art. 4477—7, §§
1-11.

include waste materials, the discharge of which is subject to the Texas Water Quality Act;

(8) "garbage" means solid waste consisting of putrescible animal and vegetable waste materials resulting from the handling, preparation, cooking, and consumption of food, including waste materials from markets, storage facilities, handling, and sale of produce and other food products;

(9) "rubbish" means nonputrescible solid waste (excluding ashes), consisting of both combustible and noncombustible waste materials; combustible rubbish includes paper, rags, cartons, wood, excelsior, furniture, rubber, plastics, yard trimmings, leaves, and similar materials; noncombustible rubbish includes glass, crockery, tin cans, aluminum cans, metal furniture, and like materials which will not burn at ordinary incinerator temperatures (1600° F to 1800° F);

(10) "sanitary landfill" means a controlled area of land upon which solid waste is disposed of in accordance with standards, regulations or orders established by the department or the board;

(11) "incineration" means the destruction of solid waste by burning in a furnace used for the volume reduction of solid waste (an incinerator); and

(12) "composting" means the controlled biological decomposition of organic solid waste under aerobic conditions.

Sec. 3. (a) The department is hereby designated the state solid waste agency with respect to the collection, handling, storage, and disposal of municipal solid waste, and shall be the coordinating agency for all municipal solid waste activities. The department shall be guided by the State Board of Health in its activities relating to municipal solid waste. The department shall seek the accomplishment of the purposes of this Act through the control of all aspects of municipal solid waste collection, handling, storage, and disposal by all practical and economically feasible methods consistent with the powers and duties given the department under this Act and other existing legislation. The department has the powers and duties specifically prescribed in this Act and all other powers necessary or convenient to carry out its responsibilities. The department shall consult with the board with respect to the water pollution control and water quality aspects, and with the Texas Air Control Board with respect to the air pollution control and ambient air quality aspects, of the matters placed under the jurisdiction of the department by this Act.

(b) The board is hereby designated the state solid waste agency with respect to the collection, handling, storage and disposal of industrial solid waste, and shall be the coordinating agency for all industrial solid waste activities. The board shall seek the accomplishment of the purposes of this Act through the control of all aspects of industrial solid waste collection, handling, storage and disposal by all practical and economically feasible methods consistent with the powers and duties given it under this Act and other existing legislation. The board has the powers and duties specifically prescribed in this Act and all other powers necessary or convenient to carry out its responsibilities. The board shall consult with the department with respect to the public health aspects, and with the Texas Air Control Board with respect to the air pollution control and ambient air quality aspects, of the matters placed under the jurisdiction of the board by this Act.

(c) Where both municipal solid waste and industrial solid waste are involved in any activity of collecting, handling, storing or disposing of solid waste, the department is the state agency responsible and has jurisdiction over the activity; and, with respect to that activity, the depart-

ment may exercise all of the powers, duties and functions vested in the department by this Act.

Sec. 4. (a) As used in this section, the term "state agency" refers to either the department or the board, and "state agencies" means both the department and the board.

(b) The department is authorized to develop a state municipal solid waste plan, and the board is authorized to develop a state industrial solid waste plan. The state agencies shall coordinate the solid waste plans developed. Before a state agency adopts its solid waste plan or makes any significant amendments to the plan, the Texas Air Control Board shall have the opportunity to comment and make recommendations on the proposed plan or amendments, and shall be given such reasonable time to do so as the state agency may specify.

(c) Each state agency may adopt and promulgate rules and regulations consistent with the general intent and purposes of this Act, and establish minimum standards of operation for all aspects of the management and control of the solid waste over which it has jurisdiction under this Act, including but not limited to collection, handling, and storage, and disposal by incineration, sanitary landfill, composting, or other method.

(d) Each state agency is authorized to inspect and approve sites used or proposed to be used for the disposal of the solid waste over which it has jurisdiction.

(e) Except as provided in Subsection (f) of this section with respect to certain industrial solid wastes, each state agency has the power to require and issue permits authorizing and governing the operation and maintenance of sites used for the disposal of solid waste. This power may be exercised by a state agency only with respect to the solid waste over which it has jurisdiction under this Act. If this power is exercised by a state agency, that state agency shall prescribe the form of and reasonable requirements for the permit application and the procedures to be followed in processing the application, to the extent not otherwise provided for in this subsection. The following additional provisions apply if a state agency exercises the power authorized in this subsection:

(1) The state agency to whom the permit application is submitted shall mail a copy of the application or a summary of its contents to the Texas Air Control Board, to the other state agency, to the mayor and health authorities of any city or town within whose extraterritorial jurisdiction the solid waste disposal site is located, and to the county judge and health authorities of the county in which the site is located. The governmental entities to whom the information is mailed shall have a reasonable time, as prescribed by the state agency to whom the application was originally submitted, to present comments and recommendations on the permit application before that state agency acts on the application.

(2) A separate permit shall be issued for each site. The permit shall include the names and addresses of the person who owns the land where the waste disposal site is located and the person who is or will be the operator or person in charge of the site; a legal description of the land on which the site is located; and the terms and conditions on which the permit is issued, including the duration of the permit.

(3) The state agency may extend or renew any permit it issues in accordance with reasonable procedures prescribed by the state agency. The procedures prescribed in Paragraph (1) of this Subsection (e) for permit applications apply also to applications to extend or renew a permit.

(4) If a permit is issued, renewed, or extended by a state agency in accordance with this Subsection (e), the owner or operator of the site does not need to obtain a license for the same site from a county, or from a political subdivision exercising the authority granted in Section 6 of this Act.

(5) A permit is issued in personam and does not attach to the realty to which it relates. A permit may not be transferred without prior notice to and prior approval by the state agency which issued it.

(6) The state agency has the authority, for good cause, after hearing with notice to the permittee and to the governmental entities named in Paragraph (1) of this Subsection (e), to revoke or amend any permit it issues for reasons pertaining to public health, air or water pollution, land use, or violation of this Act or of any other applicable laws or regulations controlling the disposal of solid waste.

(f) This subsection applies to the collection, handling, storage, and disposal of industrial solid waste which is disposed of within the property boundaries of a tract of land owned and controlled by the owners or operators of the particular industrial plant, manufacturing plant, mining operation, or agricultural operation from which the waste results or is produced, and which tract of land is within 50 miles from the plant or operation which is the source of the industrial solid waste. This subsection does not apply if the waste is collected, handled, stored, or disposed of with solid waste from any other source or sources. The board may not require a permit under this Act for the disposal of any solid waste to which this subsection applies, but this does not change or limit any authority the board may have with respect to the requirement of permits, the control of water quality, or otherwise, under the Texas Water Quality Act. However, the board may adopt rules and regulations as provided under Subsection (c) of this section to govern and control the collection, handling, storage, and disposal of the industrial solid waste to which this subsection applies so as to protect the property of others, public property and rights-of-way, groundwater, and other rights requiring protection. The board may require a person who disposes or plans to dispose of industrial solid waste under the authority of this subsection to submit to the board such information as may be reasonably required to enable the board, or the executive director of the board when so authorized by the board, to determine whether in the judgment of the board or the executive director the waste disposal activity is one to which this subsection applies.

(g) The state agencies may, either individually or jointly:

(1) provide educational, advisory, and technical services to other agencies of the state, regional planning agencies, local governments, special districts, institutions, and individuals with respect to solid waste management and control, including collection, storage, handling and disposal;

(2) assist other agencies of the state, regional planning agencies, local governments, special districts, and institutions in acquiring federal grants for the development of solid waste facilities and management programs, and for research to improve the state of the art; and

(3) accept funds from the federal government for purposes relating to solid waste management, and to expend money received from the federal government for those purposes in the manner prescribed by law and in accordance with such agreements as may be necessary and appropriate between the federal government and each state agency.

1323

If a state agency engages in any of the programs and activities named in this subsection on an individual basis, it may do so only as the participation by that state agency is related to the management and control of the solid waste over which it has jurisdiction. When the state agencies do not participate jointly, they shall coordinate on any efforts undertaken by either one individually so that similar programs and activities of the state agencies will be compatible.

(h) The state agencies are authorized to administer and expend state funds provided to them by legislative appropriations, or otherwise, for the purpose of making grants to local governments for solid waste planning, the installation of solid waste facilities, and the administration of solid waste programs. The grants made under the terms of this Act shall be distributed in a manner determined by the state agency to whom the appropriation is made. Any financial assistance granted by the state through either of the state agencies to any local government under the terms of this Act must, at a minimum, be equally matched by local government funds.

Sec. 5. (a) Every county has the solid waste management powers which are enumerated in this Section 5. However, the exercise of the licensing authority and other powers granted to counties by this Act does not preclude the department or the board from exercising any of the powers vested in the department or the board under other provisions of this Act, including specifically the provisions authorizing the department and the board to issue permits for the operation and maintenance of sites for the disposal of solid waste. The powers specified in Subsections (d), (e), and (g) of this section may not be exercised by a county with respect to the industrial solid waste disposal practices and areas to which Subsection (f) of Section 4 of this Act applies. The department or the board, by specific action or directive, may supersede any authority or power granted to or exercised by a county under this Act, but only with respect to those matters which are, under this Act, within the jurisdiction of the state agency acting.

(b) A county is authorized to appropriate and expend money from its general revenues for the collection, handling, storage and disposal of solid waste and for administering a solid waste program; and to charge reasonable fees for the services.

(c) A county may develop county solid waste plans and coordinate those plans with the plans of local governments, regional planning agencies, other governmental entities, the department, and the board.

(d) Except as provided in Subsection (a) of this section, a county is empowered to require and issue licenses authorizing and governing the operation and maintenance of sites used for the disposal of solid waste in areas not within the territorial limits of incorporated cities and towns. If this power is exercised, the county shall prescribe the form of and reasonable requirements for the license application and the procedures to be followed in processing the application, to the extent not otherwise provided for in this subsection. The following additional provisions apply if a county exercises the power authorized in this Subsection (d):

(1) The county shall mail a copy of the license application or a summary of its contents to the department, the board, and the Texas Air Control Board, and to the mayor and health authorities of any city within whose extraterritorial jurisdiction the solid waste disposal site is located. The governmental entities to whom the information is mailed shall have a reasonable time, as prescribed by the county, to submit

comments and recommendations on the license application before the county acts on the application.

(2) A separate license shall be issued for each site. The license shall include the names and addresses of the person who owns the land where the waste disposal site is located and the person who is or will be the operator or person in charge of the site; a legal description of the land on which the site is located; and the terms and conditions on which the license is issued, including the duration of the license. The county is authorized to charge a fee for a license of not to exceed $100.00, as set by the commissioners court of the county. Receipts from the fees shall be placed in the general revenue fund of the county.

(3) The county may extend or renew any license it issues in accordance with reasonable procedures prescribed by the county. The procedures prescribed in Paragraph (1) of this Subsection (d) apply also to applications to extend or renew a license.

(4) No license for the use of a site for disposal of solid waste may be issued, renewed, or extended without the prior approval, as appropriate, of the department or the board, or the executive director of the board when so authorized by the board. If a license is issued, renewed, or extended by a county in accordance with this Subsection (d), the owner or operator of the site does not need to obtain a permit from the department or the board for the same site.

(5) A license is issued in personam and does not attach to the realty to which it relates. A license may not be transferred without prior notice to and prior approval by the county which issued it.

(6) The county has the authority, for good cause, after hearing with notice to the licensee and to the governmental entities named in Paragraph (1) of this Subsection (d), to revoke or amend any license it issues for reasons pertaining to public health, air or water pollution, land use, or violation of this Act or of any other applicable laws or regulations controlling the disposal of solid waste. For like reasons, the department and the board each may, for good cause, after hearing with notice to the licensee, the county which issued the license, and the other governmental entities named in Paragraph (1) of this Subsection (d), revoke or amend any license issued by a county, but only as to those sites which fall, under the terms of this Act, within the jurisdiction of the state agency acting.

(e) Subject to the limitation specified in Subsection (a) of this section, a county may designate land areas not within the territorial limits of incorporated cities and towns as suitable for use as solid waste disposal sites. The county shall base these designations on the principles of public health, safety, and welfare, including proper land use, compliance with state statutes, the reasonable projections of growth and development for any city or town within whose extraterritorial jurisdiction the land area may be located, and any other pertinent considerations.

(f) A county is authorized to enforce the requirements of this Act and the rules and regulations promulgated by the department and the board as related to the handling of solid waste.

(g) Subject to the limitation prescribed in Subsection (a) of this section, a county, acting through its commissioners court, may make regulations for the areas of the county not within the territorial limits of incorporated cities and towns to provide for governing and controlling solid waste collection, handling, storage and disposal. The regulations shall not authorize any activity, method of operation or procedure which is prohibited by this Act or by the rules and regulations of the department or the board. The county shall not, in its regulations, under the licensing

power granted in this Act, or otherwise, prohibit the use of a site within the county for the disposal of solid waste on the basis that the solid waste originates outside that county, or impose any unreasonable requirements on the disposal of such solid waste in the county not warranted by the circumstances. The county may institute legal proceedings to enforce its regulations.

(h) A county may enter into cooperative agreements with local governments and other governmental entities for the purpose of the joint operation of solid waste collection, handling, storage and disposal facilities, and to charge reasonable fees for the services.

Sec. 6. This section applies to a political subdivision of the state which has jurisdiction over two or more counties or parts of two or more counties, and which has been granted the power by the Legislature to regulate solid waste handling or disposal practices or activities within its jurisdiction. The governing body of such a political subdivision may, by formal resolution, assume for the political subdivision the exclusive authority to exercise, within the area subject to its jurisdiction, the powers granted in this Act to a county, to the exclusion of the exercise of the same powers by the counties otherwise having jurisdiction over the area. In the exercise of these powers the political subdivision is subject to the same duties, limitations and restrictions applicable to counties under this Act. When a political subdivision assumes this authority, it shall also serve as the coordinator of solid waste handling and disposal practices and activities for all cities, counties and other governmental entities within its jurisdiction which have solid waste disposal regulatory powers or engage in solid waste handling or disposal practices or activities. Once a political subdivision assumes the authority granted in this section, it is empowered to and shall exercise the authority so long as the resolution of the political subdivision remains in effect.

Sec. 7. The authorized agents or employees of the department, the board, and local governments have the right to enter at all reasonable times in or upon any property, whether public or private, within the governmental entity's jurisdiction, including in the case of an incorporated city or town its extraterritorial jurisdiction, for the purpose of inspecting and investigating conditions relating to solid waste management and control. Agents and employees shall not enter private property having management in residence without notifying the management, or the person in charge at the time, of their presence and exhibiting proper credentials. The agents and employees shall observe the rules and regulations of the establishment being inspected concerning safety, internal security, and fire protection.

Sec. 8. (a) No person may cause, suffer, allow or permit the collection, storage, handling or disposal of solid waste, or the use or operation of a site for the disposal of solid waste, in violation of this Act or of the rules, regulations, permits, licenses or other orders of the department or the board, or a county or a political subdivision exercising the authority granted in Section 6 of this Act within whose jurisdiction the violation occurs.

(b) Any person who violates any provision of this Act or of any rule, regulation, permit, license, or other order of the department or the board, or a county or a political subdivision exercising the authority granted in Section 6 of this Act within whose jurisdiction the violation occurs, is subject to a civil penalty of not less than $50.00 nor more than $1,000.00 for each act of violation and for each day of violation, as the court may deem proper, to be recovered in the manner provided in this Section 8.

(c) Whenever it appears that a person has violated, or is violating or threatening to violate, any provision of this Act, or of any rule, regulation, permit, or other order of the department or the board, then the department or the board, or the executive director of the board when so authorized by the board, may cause a civil suit to be instituted in a district court for injunctive relief to restrain the person from continuing the violation or threat of violation, or for the assessment and recovery of a civil penalty of not less than $50.00 nor more than $1,000.00 for each act of violation and for each day of violation, as the court may deem proper, or for both injunctive relief and civil penalty. Upon application for injunctive relief and a finding that a person is violating or threatening to violate any provision of this Act or any rule, regulation, permit, or other order of the department or the board, the district court shall grant appropriate injunctive relief. At the request of the department or the board, or the executive director of the board when so authorized by the board, the attorney general shall institute and conduct a suit in the name of the State of Texas for injunctive relief or to recover the civil penalty, or for both injunctive relief and penalty, as authorized in this subsection.

(d) Whenever it appears that a violation or threat of violation of any provision of this Act, or of any rule, regulation, permit, license, or other order of the department, the board, a county, or a political subdivision exercising the authority granted in Section 6 of this Act, has occurred or is occurring within the jurisdiction of that county or political subdivision, the county or political subdivision, in the same manner as the board and the department, may cause a civil suit to be instituted in a district court through its own attorney for the injunctive relief or civil penalties, or both, as authorized in Subsection (c) of this section, against the person who committed, is committing, or is threatening to commit, the violation.

(e) Whenever it appears that a violation or threat of violation of any provision of this Act, or of any rule, regulation, permit, license, or other order of the department, the board, a county, or a political subdivision exercising the authority granted in Section 6 of this Act, has occurred or is occurring within the area of the extraterritorial jurisdiction of an incorporated city or town, or is causing or will cause injury to or an adverse effect on the health, welfare or physical property of the city or town or its inhabitants, then the city or town, in the same manner as the board and the department, may cause a civil suit to be instituted in a district court through its own attorney for the injunctive relief or civil penalties, or both, as authorized in Subsection (c) of this section, against the person who committed, is committing, or is threatening to commit, the violation.

(f) A suit for injunctive relief or for recovery of a civil penalty, or for both injunctive relief and penalty, may be brought either in the county where the defendant resides or in the county where the violation or threat of violation occurs. In any suit brought to enjoin a violation or threat of violation of this Act or of any rule, regulation, permit, license or other order of the board, the department, a county, or a political subdivision exercising the authority granted in Section 6 of this Act, the court may grant the governmental entity bringing the suit, without bond or other undertaking, any prohibitory or mandatory injunction the facts may warrant, including temporary restraining orders after notice and hearing, temporary injunctions, and permanent injunctions.

(g) In a suit brought by a local government under Subsection (d) or (e) of this section, the board and the department are necessary and indispensable parties.

**1327**

(h) Any party to a suit may appeal from a final judgment as in other civil cases.

(i) All civil penalties recovered in suits instituted under this Act by the State of Texas through the board or the department shall be paid to the General Revenue Fund of the State of Texas. All civil penalties recovered in suits first instituted by a local government or governments under this Act shall be equally divided between the State of Texas on the one hand and the local government or governments on the other, with 50 per cent of the recovery to be paid to the General Revenue Fund of the State of Texas and the other 50 per cent equally to the local government or governments first instituting the suit.

Sec. 9. A person affected by any ruling, order, decision, or other act of the department or the board may appeal by filing a petition in a district court of Travis County. A person affected by any ruling, order, decision, or other act of a county, or of a political subdivision exercising the authority granted in Section 6 of this Act, may appeal by filing a petition in a district court having jurisdiction in the county or political subdivision. The petition must be filed within 30 days after the date of the action, ruling, order, or decision of the governmental entity complained of. Service of citation must be accomplished within 30 days after the date the petition is filed. The plaintiff shall pursue his action with reasonable diligence. If the plaintiff does not prosecute his action within one year after the action is filed, the court shall presume that the action has been abandoned. The court shall dismiss the suit on a motion for dismissal made by the governmental entity whose action is appealed, unless the plaintiff, after receiving due notice, can show good and sufficient cause for the delay. In an appeal from an action by the department, the board, a county, or a political subdivision exercising the authority granted in Section 6 of this Act, the issue is whether the action is invalid, arbitrary or unreasonable.

Sec. 10. This Act is cumulative of and supplemental to any other laws and parts of laws relating to the same subject and does not repeal those other laws or parts of laws. Nothing in this Act diminishes or limits, or is intended to diminish or limit, the authority of the department, the board, the Texas Air Control Board, or local governments in performing any of the powers, functions, and duties vested in those governmental entities by other laws.

Sec. 11. Severability Clause. The provisions of this Act are severable. If any word, phrase, clause, sentence, section, provision or part of this Act should be held to be invalid or unconstitutional, it shall not affect the validity of the remaining portions, and it is hereby declared to be the legislative intent that this Act would have been passed as to the remaining portions, regardless of the invalidity of any part.

Sec. 12. Emergency Clause. The importance to the public of the amendments in this Act creates an emergency and imperative public necessity demanding the suspension of the Constitutional Rule requiring bills to be read on three several days in each House, and the same is hereby suspended; and this Act shall take effect and be in force from and after its passage, and it is so enacted.

Passed the Senate on April 1, 1969, by a viva voce vote; May 23, 1969, Senate concurred in House amendments by a viva voce vote; passed the House on May 22, 1969, with amendments, by a non-record vote.

Approved June 2, 1969.

Effective, Sept. 1, 1969, 90 days after date of adjournment.

# APP. G

Act approved June 15, 1973, 63rd Leg., R.S., ch. 576, 1973 Tex. Gen. Laws 1595 (current version at Tex. Health & Safety Code Ann. § 361.003(24) (West 2010)

urban programming, nor shall this Act affect any institute for urban studies conducted by other institutions of higher education.

Sec. 3. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

> Passed the senate on May 10, 1973: Yeas 31, Nays 0; passed the house on May 25, 1973, by the following vote: Yeas 143, Nays 0, three present not voting.
>
> Approved June 15, 1973.
>
> Effective June 15, 1973.

---

## SOLID WASTE DISPOSAL—PERSON AFFECTED DEFINED

### CHAPTER 576

### S. B. No. 871

An Act relating to defining the term "person affected" and setting forth that definition; amending the Solid Waste Disposal Act, as amended (Article 4477—7, Vernon's Texas Civil Statutes), by adding a new Subsection (13) to Section 2; and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

Section 1. The Solid Waste Disposal Act, as amended (Article 4477—7, Vernon's Texas Civil Statutes), is amended by adding [73] a new Subsection (13) to Section 2 to read as follows:

"(13) 'Person affected' for the purpose of Section 9 hereof means any person who is a resident of a county or any county adjacent or contiguous to the county in which a site, facility or plant is to be located including any person who is doing business or owns land in the county or adjacent or contiguous county and any local government. Such person affected shall also demonstrate that he has suffered or will suffer actual injury or economic damage."

Sec. 2. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

> Passed the senate on May 3, 1973: Yeas 31, Nays 0; May 21, 1973, senate concurred in house amendments by a viva-voce vote;
>
> Passed the house, with amendments, on May 19, 1973 by a non-record vote.
>
> Approved June 15, 1973.
>
> Effective Aug. 27, 1973, 90 days after date of adjournment.

73. Vernon's Ann.Civ.St. art. 4477—7, § 2, subsec. (13).

# APP. H

Act approved June 12, 1985, 69th Leg., R.S., ch. 566,
1985 Tex. Gen. Laws 2166 (repealed 1989)
*recodified by* Act approved June 14, 1989, 71st Leg.,
R.S., ch. 678, 1989 Tex. Gen. Laws 2230

(2) Article 5176, Revised Statutes;

(3) Article 5177, Revised Statutes;

(4) Article 5178, Revised Statutes;

(5) Article 5178a, Revised Statutes; and

(6) Section 21.076, Education Code.

SECTION 3. This Act takes effect September 1, 1985.

SECTION 4. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended.

Passed by the House on May 9, 1985, by a non-record vote; passed by the Senate on May 24, 1985, by the following vote: Yeas 29, Nays 0.

Approved: June 12, 1985

Effective: August 26, 1985

---

## CHAPTER 566

### H.B. No. 2358

An Act relating to the regulation of the treatment, storage, management and disposal of hazardous waste and solid waste.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 2, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended to read as follows:

Sec. 2. DEFINITIONS. As used in this Act, unless the context requires a different definition:

(1) *"Administratively complete" means that a complete permit application form, as well as the report and fees required to be submitted with a permit application, have been submitted to the department or the department of water resources and the permit application is ready for technical review in accordance with the rules of the department or department of water resources.*

(2) *"Apparent recharge zone" means that recharge zone designated on maps prepared or compiled by, and located in the offices of, the department of water resources.*

(3) "Board" means the Texas Water Development Board.

(4) [(2)] "Board of health" means the Texas Board of Health.

(5) [(3)] "Class I industrial solid waste" means any industrial solid waste designated as Class I by the Executive Director of the Texas Department of Water Resources as any industrial solid waste or mixture of industrial solid wastes which because of its concentration or physical or chemical characteristics is toxic, corrosive, flammable, a strong sensitizer or irritant, a generator of sudden pressure by decomposition, heat, or other means and may pose a substantial present or potential danger to human health or the environment when improperly processed, stored, transported, or otherwise managed, including hazardous industrial waste.

(6) [(4)] "Commission" means the Texas Water Commission.

(7) [(5)] "Commissioner" means the Commissioner of Health.

(8) [(6)] "Composting" means the controlled biological decomposition of organic solid waste under aerobic conditions.

(9) [(7)] "Department" means the Texas Department of Health.

(10) [(8)] "Department of water resources" means the Texas Department of Water Resources.

(11) [(9)] "Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste (whether containerized or uncontainerized) into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters.

(12) *"Environmental response law" means the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Pub. L. No. 96-510).*

*(13)* [(10)] "Executive director" means the Executive Director of the Texas Department of Water Resources.

*(14)* [(11)] "Garbage" means solid waste consisting of putrescible animal and vegetable waste materials resulting from the handling, preparation, cooking, and consumption of food, including waste materials from markets, storage facilities, handling, and sale of produce and other food products.

*(15)* [(12)] "Hazardous waste" means any solid waste identified or listed as a hazardous waste by the administrator of the United States Environmental Protection Agency (EPA) pursuant to the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended.

*(16)* [(13)] "Industrial solid waste" means solid waste resulting from or incidental to any process of industry or manufacturing, or mining or agricultural operations.

*(17)* [(14)] "Local government" means a county; an incorporated city or town; or a political subdivision exercising the authority granted under Section 6 of this Act.

*(18)* [(15)] "Management" means the systematic control of any or all of the following activities of generation, source separation, collection, handling, storage, transportation, processing, treatment, recovery, or disposal of solid waste.

*(19)* [(16)] "Municipal solid waste" means solid waste resulting from or incidental to municipal, community, commercial, institutional, and recreational activities including garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and all other solid waste other than industrial solid waste.

*(20)* *"Notice of intent to file an application" means that notice filed pursuant to Section 4(e)(12) of this Act.*

*(21)* [(17)] "Person" means individual, corporation, organization, government or governmental subdivision or agency, business trust, partnership, association, or any other legal entity.

*(22)* [(18)] "Person affected" means any person who is a resident of a county or any county adjacent or contiguous to the county in which a solid waste facility is to be located including any person who is doing business or owns land in the county or adjacent or contiguous county and any local government. Such person affected shall also demonstrate that he has suffered or will suffer actual injury or economic damage.

*(23)* [(19)] "Processing" means the extraction of materials, transfer, volume reduction, conversion to energy, or other separation and preparation of solid waste for reuse or disposal, including the treatment or neutralization of hazardous waste, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, or so as to recover energy or material from the waste, or so as to render such waste nonhazardous, or less hazardous; safer to transport, store. or dispose of; or amenable for recovery, amenable for storage, or reduced in volume. Unless the state agency determines that regulation of such activity under this Act is necessary to protect human health or the environment, the definition of "processing" does not include activities relating to those materials exempted by the Administrator of the Environmental Protection Agency pursuant to the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended.

*(24)* [(20)] "Radioactive waste" means that waste which requires specific licensing under Chapter 72, Acts of the 57th Legislature, Regular Session, 1961, as amended (Article 4590f, Vernon's Texas Civil Statutes), and the rules adopted by the Texas Board of Health under that law.

*(25)* *"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, escaping, leaching, dumping, or disposing into the environment, but excludes:*

*(A) a release that results in exposure to persons solely within a workplace, with respect to a claim which those persons may assert against the employer of those persons;*

*(B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine;*

*(C) release of source, by-product, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 et seq.) if the release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under Section 170 of that Act, or, for the purposes of Section 104 of the environmental response law or any other response action, any release of source, by-product, or special nuclear material from any processing site designated under Section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. 7912 and 7942); and*

*(D) the normal application of fertilizer.*

*(26)* *"Remedial action" means those actions consistent with a permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous waste into the environment to prevent or minimize the release of hazardous wastes so that they do*

*not migrate to cause an imminent and substantial danger to present or future public health and safety or the environment. The term includes such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous wastes or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, on-site treatment or incineration, provision of alternate water supplies, and any monitoring reasonably required to assure that those actions protect the public health and safety or the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the Administrator of the United States Environmental Protection Agency or the executive director determines that alone or in combination with other measures this relocation is more cost effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition off site of hazardous wastes or may otherwise be necessary to protect the public health or safety. The term does not include off-site transport of hazardous wastes or the storage, treatment, destruction, or secure disposition off site of the hazardous wastes or contaminated materials unless the Administrator of the United States Environmental Protection Agency or the executive director determines those actions:*

(A) *are more cost effective than other remedial actions;*

(B) *will create new capacity to manage, in compliance with Subtitle C of the federal Solid Waste Disposal Act (42 U.S.C. 6921 et seq.), hazardous wastes in addition to those located at the affected facility; or*

(C) *are necessary to protect public health and safety or the environment from a present or potential risk that may be created by further exposure to the continued presence of those wastes or materials.*

(27) *"Removal" means the cleanup or removal of released hazardous wastes from the environment; the actions necessary to be taken in the event of the threat of release of hazardous wastes into the environment; the actions necessary to monitor, assess, and evaluate the release or threat of release of hazardous wastes; the disposal of removed material; or the taking of other actions as may be necessary to prevent, minimize, or mitigate damage to the public health and welfare or the environment that may otherwise result from a release or threat of release. The term also includes security fencing or other measures to limit access, provision of alternate water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under Section 104(b) of the environmental response law, and any emergency assistance that may be provided under the federal Disaster Relief Act of 1974 (42 U.S.C. 5121 et seq.).*

(28) [(21)] "Rubbish" means nonputrescible solid waste (excluding ashes), consisting of both combustible and noncombustible waste materials; combustible rubbish includes paper, rags, cartons, wood, excelsior, furniture, rubber, plastics, yard trimmings, leaves, and similar materials; noncombustible rubbish includes glass, crockery, tin cans, aluminum cans, metal furniture, and like materials which will not burn at ordinary incinerator temperatures (1600°F to 1800°F).

(29) [(22)] "Sanitary landfill" means a controlled area of land upon which solid waste is disposed of in accordance with standards, rules, or orders established by the board of health or the board.

(30) [(23)] "Sludge" means any solid, semisolid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility exclusive of the treated effluent from a wastewater treatment plant.

(31) [(24)] "Solid waste" means any garbage, rubbish, sludge from a waste treatment plant, water supply treatment plant or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations, and from community and institutional activities, but does not include: (i) solid or dissolved material in domestic sewage, or solid or dissolved material in irrigation return flows, or industrial discharges subject to regulation by permit issued pursuant to Chapter 26, Water Code; (ii) soil, dirt, rock, sand and other natural or man-made inert solid materials used to fill land if the object of the fill is to make the land suitable for the construction of surface improvements; or (iii) waste materials which result from activities associated with the exploration, development, or production of oil or gas and are subject to control by the Texas Railroad Commission.

(32) [(25)] "Solid waste facility" means all contiguous land, and structures, other appurtenances, and improvements on the land, used for processing, storing, or disposing of solid waste. A facility may be publicly or privately owned and consist of several processing, storage, or disposal operational units; e.g., one or more landfills, surface impoundments, or combinations of them.

*(33)* [(26)] "Solid waste technician" means an individual who is trained in the practical aspects of the design, operation, and maintenance of a solid waste facility in accordance with standards, rules, or orders established by the board or board of health.

*(34)* [(27)] "Storage" means the holding of solid waste for a temporary period, at the end of which the solid waste is processed, disposed of, or stored elsewhere.

**SECTION 2.** Section 3, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by adding Subsections (e), (f), (g), and (h) to read as follows:

*(e)(1) In order to protect the public health and environment, it is declared to be the public policy of this state that, in generating, treating, storing, and disposing of hazardous wastes, preference shall be given to the following methods, to the maximum extent economically and technologically feasible, in the order named:*

    *(A) minimization of waste production;*

    *(B) reuse and/or recycling of waste;*

    *(C) treatment to destroy hazardous characteristics;*

    *(D) treatment to reduce hazardous characteristics;*

    *(E) underground injection;*

    *(F) land disposal.*

*(2) In the case of treatment to destroy hazardous characteristics described in Section 3(e)(1)(C) above, on-site destruction is preferred but must be evaluated in the context of other relevant factors such as transportation hazard, distribution of risk, quality of destruction, operator capability, and site suitability.*

*(f) The department of water resources and the Railroad Commission of Texas shall jointly prepare an exclusive list of activities which are associated with oil and gas exploration, development and production and, hence, are exempted from regulation under this Act and the department of water resources' solid waste regulatory program. Such list shall be amended as necessary. Such list shall be a rule as that term is defined in Section 3(7) of the Administrative Procedure and Texas Register Act, as amended (Article 6252-13a, Vernon's Texas Civil Statutes).*

*(g)(1) There is created the interagency coordination council which shall coordinate the activities of its member agencies related to the regulation of solid waste and solid waste management facilities and the enforcement of the applicable solid waste laws and regulations. The council shall be comprised of the executive head or his/her designee of the following agencies:*

    *(A) the department of water resources;*

    *(B) the department;*

    *(C) the Texas Air Control Board; and*

    *(D) the Railroad Commission of Texas. The representative from the department of water resources shall act as chairman of the council.*

*(2) The council shall conduct meetings on at least a quarterly basis during which it shall review the solid waste regulatory and enforcement activities of the previous quarter and coordinate future planned activities in the interest of efficiency and cooperation, including, but not limited to, the consideration of the use of waste exchange programs; the establishment of a clearinghouse for scientific and engineering information and data concerning hazardous waste management; the coordination of hazardous waste research and development activities; the coordination and development of consistent agency rules relevant to regulation of hazardous waste activities; the evaluation of means to assist small quantity hazardous waste generators and affected communities in the effective and safe management and disposal of their regulated wastes; the assessment of any pre-application public interactions with applicants to evaluate their effectiveness and to consider development of rules to incorporate such activities if appropriate; the consideration of the use of incentives to encourage waste minimization, reuse, recycling, and the use of resource recovery and detoxification equipment; and evaluation of the feasibility of household hazardous waste collection and disposal programs. The chairman shall prepare a report summarizing each quarterly meeting. The report shall be submitted for approval by a majority of agencies represented by the council and shall be a public document.*

*(h) The department and department of water resources shall submit a report to the presiding officers of the legislature and the governor on January 1, 1987, and each two years thereafter, providing the following information:*

    *(1) a summary of a performance report of the imposed hazardous waste permit and disposal fees, if the fees are approved by the legislature, and related activities to determine the appropriateness of the fee structure;*

    *(2) an evaluation of progress made in accomplishing the public policy of the state in regard to the preference of waste management methods as set forth in Section (3)(e)(1) of this Act;*

    *(3) projections, for a period of three years from the due date of the report, of waste volumes by type of waste, disposition of wastes, and remaining capacity for the disposal of the wastes. The*

*department and the department of water resources shall adopt rules requiring persons who generate, store, treat, or dispose of hazardous waste to submit to the state agency of appropriate jurisdiction on an annual basis reports detailing projections of waste volumes, disposition, and remaining capacity, as it relates to each facility owned or operated by such persons, in order that the state agencies may develop their report. The first report shall be submitted by March 1, 1986, and subsequent reports shall be submitted annually by March 1 thereafter.*

SECTION 3. Subsection (c), Section 4, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended to read as follows:

(c) Each state agency may adopt and promulgate rules consistent with the general intent and purposes of this Act, and establish minimum standards of operation for all aspects of the management and control of the solid waste over which it has jurisdiction under this Act. In developing rules relating to hazardous waste, each state agency shall consult with the State Soil and Water Conservation Board, the Bureau of Economic Geology of The University of Texas at Austin, and other appropriate state sources. Each [Within one year after the effective date of this Act, each] state agency shall adopt rules that:

(1) condition issuance of a permit for a new hazardous waste management facility or the areal expansion of an existing hazardous waste management facility on selection of a facility site that reasonably minimizes possible contamination of surface water and groundwater;

(2) *prohibit the issuance of a permit for a new hazardous waste landfill or an areal expansion of such a facility, if the landfill is to be located in the 100-year floodplain existing prior to site development unless the landfill is to be located in areas with flood depths less than three feet;*

(3) *prohibit the issuance of a permit for a new hazardous waste management unit or an areal expansion of an existing hazardous waste management unit if the hazardous waste management unit is to be located in wetlands, as defined by the state agencies. For the purposes of this paragraph, a "hazardous waste management unit" means a landfill, surface impoundment, land treatment facility, waste pile, or storage or processing facility, used to manage hazardous waste;*

(4) *prohibit the issuance of a permit for a new hazardous waste landfill, land treatment facility, surface impoundment, or waste pile, or areal expansion of such a facility, if the facility is to be located on the recharge zone of a sole source aquifer;*

(5) *require applicants for a new hazardous waste landfill, land treatment facility or surface impoundment which is to be located in the apparent recharge zone of a regional aquifer to prepare and file a hydrogeologic report documenting the potential effects, if any, on the regional aquifer in the event of a release from the waste containment system;*

(6) *prohibit the issuance of a permit for a new hazardous waste landfill or land treatment facility or the areal expansion of such a facility if the boundary of such landfill or land treatment facility is to be located within 1000 feet of an established residence, church, school, or dedicated public park which is in use at the time the notice of intent to file a permit application is filed with the state agency, or if no such notice is filed, at the time the permit application is filed with the state agency;*

(7) define the characteristics that make *other areas* [an area] unsuitable for a hazardous waste management facility including, but not limited to, consideration of:

(A) flood hazards;

(B) discharge from or recharge to a groundwater aquifer; [or]

(C) soil conditions;

(D) *areas of direct drainage within one mile of a lake used to supply public drinking water;*

(E) *active geological processes;*

(F) *coastal high hazard areas, such as areas subject to hurricane storm surge and shoreline erosion; or*

(G) *critical habitat of endangered species;*

(8) [(3)] prohibit issuance of a permit for a new hazardous waste management facility or an areal expansion of an existing hazardous waste management facility if the facility is to be located in an area determined to be unsuitable under rules adopted by the agency *pursuant to Paragraph (7)* unless the design, construction, and operational features of the facility will prevent adverse effects from unsuitable site characteristics; [and]

(9) *require applicants for a new hazardous waste landfill filed after January 1, 1986, to provide an engineering report evaluating the benefits, if any, associated with the construction of the landfill above existing grade at the proposed site, the costs associated with the above grade construction, and the potential adverse effects, if any, which would be associated with the above grade construction;*

(10) *allow local governments to petition the appropriate state agency for a rule which restricts or prohibits the siting of new hazardous waste disposal facilities or other new hazardous waste management facilities in areas including, but not limited to, those meeting one or more of the*

*characteristics delineated in Paragraph (7); provided, however, that no rule adopted by a state agency under this paragraph shall affect the siting of a new hazardous waste disposal facility or other new hazardous waste management facility if an application or a notice of intent to file an application with respect to such facility has been filed with the appropriate state agency prior to the filing of a petition under this paragraph;*

*(11) prohibit issuance of a permit for a new hazardous waste landfill or the areal expansion of an existing hazardous waste landfill if there is a practical, economic, and feasible alternative to such a landfill that is reasonably available to manage the types and classes of hazardous waste which might be disposed of at the landfill;*

(12) [(4)] require persons who generate, transport, process, store, or dispose of Class I industrial solid waste or hazardous waste to provide recordkeeping and use a manifest or other appropriate system to assure that such wastes are transported to a processing, storage, or disposal facility permitted or otherwise authorized for that purpose; and

*(13) prohibit the issuance of a permit for a new hazardous waste management unit if the landfill is in a floodplain of a perennial stream subject to not less than one percent chance of flooding in any year, delineated on a flood map adopted by the Federal Emergency Management Agency after the effective date of this Act as zone A1-99, V0, or V1-30; and this paragraph applies only to units that receive hazardous waste for a fee.*

In adopting rules under Paragraphs (1)-*(13)* [(3)] of this section, the state agencies may distinguish between solid waste facilities based on type or hazard of hazardous wastes managed and the type of waste management method used. *The minimum standards set by the department of water resources for on-site storage of hazardous waste must be at least the minimum standards set by the manufacturer of the chemical.*

**SECTION 4.** Paragraphs (1), (4), (6), and (10), Subsection (e), Section 4, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), are amended to read as follows:

(1) *When a permit application has been determined to be administratively complete, the* [The] state agency to whom the permit application is submitted shall mail a copy of the application or a summary of its contents to the Texas Air Control Board, to the other state agency, to the mayor and health authorities of any city or town within whose territorial limits or extraterritorial jurisdiction the solid waste facility is located, and to the county judge and health authorities of the county in which the facility is located. The governmental entities to whom the information is mailed shall have a reasonable time, as prescribed by the state agency to whom the application was originally submitted, to present comments and recommendations on the permit application before that state agency acts on the application.

(4) Before a permit is issued, amended, extended, or renewed, the state agency to which the application is submitted shall provide an opportunity for a hearing to the applicant and persons affected; the state agency may also hold such a hearing upon its own motion.

*(A)(i) The owner or operator of a hazardous waste or solid waste management facility shall not be required to obtain a permit for the storage, processing, treatment, disposal, or destruction of solid waste or hazardous waste from any agency of the state other than the department or the department of water resources unless a permit is required under the new source review requirements of Part C or D of Title I of the federal Clean Air Act, 42 U.S.C. 7401 et seq., for a major source or a major modification, or unless a permit is required by the Railroad Commission of Texas under Chapter 27, Water Code; except with respect to major sources or major modifications described above, and except with respect to facilities required to be permitted by the Railroad Commission of Texas under Chapter 27, Water Code, all participation in the review of a permit application shall be through one agency hearing, which shall be the sole permit hearing and which shall be conducted by either the department or the department of water resources as the lead agency, in accordance with the division of jurisdiction between them established in Section 3 of this Act. The Texas Air Control Board and other agencies which might otherwise have jurisdiction for permitting hazardous or solid waste facilities shall enter into joint rules or memoranda of agreement with the department or the department of water resources. Such joint rules or memoranda of agreement shall include such criteria as the Texas Air Control Board or other agency which might otherwise have jurisdiction may prescribe for use by the lead agency in addressing the concerns of the Texas Air Control Board or other agency in the permitting process. Such joint rules or memoranda shall at a minimum be consistent with applicable requirements of the United States Environmental Protection Agency for state program authorization under the federal Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended.*

*(ii) It is the intent of the Legislature that to the extent possible in conformance with this subpart (A), the lead agency shall defer to the policies, rules, and interpretations of the Texas Air Control Board on the air quality impact of the proposed hazardous waste or solid waste management activities, and that the Texas Air Control Board remain the principal authority of the state in*

*matters of air pollution control. The Texas Air Control Board shall be responsible for performing a technical review of the air quality aspects of an application for a solid waste or a hazardous waste management facility, which relate to the criteria established under (A)(i). It shall complete such review and shall forward all recommendations or proposed permit provisions to the lead agency within the time limits established in the rules of the lead agency for the completion of technical review of the application. The lead agency shall incorporate into its proposed action all recommendations or proposed permit provisions submitted by the Texas Air Control Board, unless such recommendation or proposed permit provisions are determined by the lead agency to be less stringent than applicable requirements of the United States Environmental Protection Agency for state program authorization under the federal Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended. If the Texas Air Control Board's proposed permit provisions conflict with provisions proposed by the lead agency technical staff, the staffs of the two agencies shall attempt to resolve such conflict prior to the end of the technical review of the application. If no contested case hearing on the permit application is held by the lead agency, the recommendations or proposed permit provisions submitted by the Texas Air Control Board shall be incorporated into any permit issued by the lead agency. If a contested case hearing is held, all evidence and testimony of the state regarding air quality aspects of the application shall be developed and presented by the Texas Air Control Board. All parties, including the lead agency, shall have the right to cross-examine any testifying witnesses of the Texas Air Control Board. At the conclusion of the presentation of testimony, the hearings examiner shall afford the Texas Air Control Board at least thirty (30) days in which to submit a set of proposed findings of fact and conclusions of law and, if applicable, proposed permit language, respecting the air quality aspects of the application which relate to the criteria established under (A)(i), which shall be accepted by the hearings examiner and the final decision-making body of the lead agency unless such body finds that the recommendations of the Texas Air Control Board are not supported by a preponderance of the evidence. The Texas Air Control Board may seek judicial review of the air quality aspects of any final decision of the lead agency. Both the lead agency and the Texas Air Control Board shall have authority to enforce the terms of any permit issued by the lead agency which relate to air quality. Permit applications for hazardous waste or solid waste management facilities for which contested evidentiary hearings have commenced at the Texas Air Control Board prior to the effective date of this provision, or appeals from decisions of the Texas Air Control Board on such applications, shall not be affected by this subpart. An applicant may not withdraw a permit application to circumvent the intent of the preceding sentence. The Texas Air Control Board may delegate to its Executive Director any or all of the duties, responsibilities, or authority conferred by this subpart (A).*

*(iii)* *After the lead agency has completed its technical review of the permit application, any agency other than the Texas Air Control Board which might otherwise have jurisdiction for permitting the facility and which has requested an opportunity to review the proposed lead agency on the permit application shall have a period of twenty (20) calendar days from the end of the lead agency's technical review period to review the proposed action and determine whether its concerns have been adequately addressed. In the event such other agency determines its concerns have not been adequately addressed, its sole remedy with respect to permitting shall be to present its concerns in the permit proceedings of the lead agency; and such other agency shall have the right to request a hearing, to intervene as a matter of law, and to seek judicial review. In addition, such other agency shall have the right to enforce the aspects of any lead agency permit which relate to its jurisdiction.*

*(iv)* *The provisions of this subpart (A) shall not apply to facilities which burn hazardous waste unless they are required to obtain a permit for such burning from the department or the department of water resources under rules adopted by such agency pursuant to a state hazardous waste regulatory program.*

*(v)* *Nothing herein shall be construed to abridge, modify, or restrict the authority of the department or the department of water resources to promulgate rules under Section 4(c) of this Act, to issue permits and to enforce the terms and conditions of such permits, relating to all aspects of hazardous waste management, to the extent necessary for the department and the department of water resources to receive and maintain state program authorization under Section 3006 of the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended.*

*(B)* The state agency by rule shall establish procedures for public notice and any public hearing authorized under this paragraph. *To improve the timeliness of notice to the public pertaining to any public hearing authorized under this paragraph, public notice of receipt of the permit application shall be provided at the time a permit application is ruled administratively complete by the department or the department of water resources.* A hearing on a permit involving a solid waste facility for hazardous industrial solid waste must include one session held in the county in which the solid waste facility is located. Hearings under this paragraph shall be

conducted in accordance with the hearing rules adopted by the state agency and the applicable provisions of the Administrative Procedure and Texas Register Act, as amended (Article 6252-13a, Vernon's Texas Civil Statutes).

(6) If a permit is issued, amended, renewed, or extended by a state agency in accordance with this Subsection (e), the owner or operator of the solid waste facility does not need to obtain a license for the same facility from a county, or from a political subdivision exercising the authority granted in Section 6 of this Act. *Except as specifically provided in this Act, nothing in this section shall limit the powers and duties of any local government or other political subdivision of the state as vested under this or any other law; provided, however, that an applicant shall not be required to obtain a permit for the siting, construction or operation of a hazardous waste management facility from any local government or other political subdivision of the state, and no local government or other political subdivision of the state shall be empowered to adopt any rule, regulation, or ordinance which conflicts with or is inconsistent with the requirements for hazardous waste management facilities as specified in the rules of a state agency or any permit heretofore or hereafter issued by the state agency. In any action to enforce a rule, regulation, or ordinance of a local government or political subdivision, the burden shall be on the owner or operator of the facility or on the applicant to demonstrate conflict or inconsistency with state requirements. The validity or applicability of any such rule, regulation, or ordinance of a local government or a political subdivision may be determined in an action for declaratory judgment pursuant to the Uniform Declaratory Judgments Act (Article 2524-1, Vernon's Texas Civil Statutes), if it is alleged that the rule, regulation, or ordinance, or its threatened application, interferes with or impairs or threatens to interfere with or impair the legal rights or privileges of the plaintiff regarding any application for or the issuance of a permit for the siting, construction or operation of a hazardous waste management facility. The local government or political subdivision whose rule, regulation, or ordinance is being questioned must be made a party to the action and the department or the department of water resources shall be given written notice by certified mail of the pendency of any such action and either the department or the department of water resources may become a party thereto. A declaratory judgment may be rendered whether the plaintiff has requested the department, the department of water resources, the local government or political subdivision or any other court to pass on the validity or applicability of the rule, regulation, or ordinance in question. Nothing in this paragraph shall affect the power of local governments or political subdivisions to adopt or enforce codes for buildings.*

(10) Each state agency may issue an emergency order, either mandatory or prohibitory in nature, regarding any activity of solid waste management within its jurisdiction, whether such activity is covered by a permit or not, if the state agency determines that *an emergency exists requiring immediate action to protect the public health and safety or the environment* [~~the activity is creating or will cause extensive or severe property damage or economic loss to others or is posing an immediate and serious threat to human life or health and that other procedures available to the state agency to remedy or prevent the occurrence of the situation will result in unreasonable delay~~]. The order may be issued without notice and hearing, or with such notice and hearing as the state agency deems practicable under the circumstances.

(i) If an emergency order is issued under this authority without a hearing, the issuing agency shall fix a time and place for a hearing to be held in accordance with the departmental rules by the state agency, so as to affirm, modify, or set aside the emergency order.

(ii) The requirements of Paragraph (4) of this subsection relating to public notice do not apply to such a hearing, but such general notice of the hearing shall be given in accordance with the departmental rules of the state agency.

**SECTION 5.** Subsection (e), Section 4, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by adding Paragraphs (11) and (12) to read as follows:

*(11) Each state agency shall establish a procedure by rule for the state agency to prepare compliance summaries relating to solid waste management activities of the applicant within the jurisdiction of such state agency The compliance summaries shall be made available to the applicant and any interested person after the lead agency has completed its technical review of the permit application and prior to the issuance of the public notice relating to an opportunity for a hearing on the permit application. Evidence of compliance or noncompliance by an applicant for a solid waste facility with agency rules, permits or other orders relating to solid waste management may be offered by any party at a hearing on the applicant's application and admitted into evidence subject to applicable rules of evidence. All evidence admitted, including compliance history, shall be considered by the agency in determining whether to issue, amend, extend or renew a permit.*

*(12) The state agencies shall encourage applicants for solid waste facilities under the jurisdiction of the department or for hazardous waste management facilities to enter into agreements with affected persons through a local review committee process. During this process,*

*persons are encouraged to identify issues of concern and work with the applicant to resolve such issues.*

*(A) If an applicant decides to participate in a local review committee process, such applicant shall file with the appropriate state agency a notice of intent to file an application, setting forth the proposed location and type of hazardous waste management facility. If the proposed facility is to be located within the corporate limits or the extraterritorial jurisdiction of a city, then a copy of the notice shall be delivered to the mayor of such city and the county judge. If the proposed facility is to be located in an unincorporated area of a county, then a copy of the notice shall be delivered to the county judge. The filing of the notice with the appropriate state agency shall initiate the pre-application review process.*

*(B) Within fifteen (15) days after the filing of the notice of intent pursuant to Subparagraph (A) of this paragraph, the local review committee shall be appointed. The state agencies shall adopt rules relating to the composition and appointment of local review committees.*

*(C) The local review committee shall meet within twenty-one (21) days after the filing of the notice pursuant to Subparagraph (A) of this paragraph. The pre-application review process shall continue for a period of ninety (90) days unless the process is shortened or lengthened by mutual agreement between the applicant and the local review committee.*

*(D) Any person, other than the applicant, who has participated in the local review committee process pursuant to this paragraph with respect to an application for a hazardous waste management facility, may be awarded its reasonable costs or any part thereof for technical studies and reports and expert witnesses associated with the presentation of evidence at the public hearing relating to issues raised by such person in the local review committee process but which are still unresolved at the time of the commencement of the hearing on the permit application if the department or the department of water resources finds that such an award is appropriate; provided, however, that the total award granted to all such persons by the state agency with respect to such application may not exceed $25,000. In determining the appropriateness of such an award, the state agency shall consider the following:*

*(i) whether the evidence or analysis provided through such studies, reports, and witnesses is significant to the evaluation of the application;*

*(ii) whether the evidence or analysis would otherwise not have been provided in the proceeding; and*

*(iii) whether the local review committee was established in accordance with the rules of the department or department of water resources.*

*(E) Except as provided in Subparagraph (I) of this paragraph, when an applicant has not entered into a local review committee process, the state agency, in determining the appropriateness of an award of costs pursuant to Subparagraph (D) of this paragraph, shall waive any requirement that the person affected has participated in a local review committee process.*

*(F) Costs awarded by the department or the department of water resources pursuant to Subparagraph (D) of this paragraph shall be taxed against the applicant. Rules shall be promulgated for the award of such costs. Judicial review of any award by the department or the department of water resources shall be pursuant to the substantial evidence rule as provided by the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes).*

*(G) A local review committee shall:*

*(i) interact with the applicant in a structured manner during the pre-application review stage of the permitting process and, if necessary, during the technical review stage of the permitting process, to raise and attempt to resolve both technical and non-technical issues of concern; and*

*(ii) produce a fact-finding report documenting resolved and unresolved issues and unanswered questions. The applicant shall submit such report to the state agency with its permit application.*

*(H) For the purposes of this paragraph, "participation in a local review process" is defined as a good faith effort to identify issues of concern, describe them to the applicant through the local review committee process, and attempt to resolve such issues prior to the commencement of the hearing on the permit application. A person is not required to be a member of a local review committee in order to meet the test of "participation in a local review process."*

*(I) If an applicant, after reasonable efforts to determine whether any local opposition exists to its proposed facility including, but not limited to, discussing the proposed facility with the county judge and other elected officials, does not enter into a local review committee process because of no apparent opposition or because a local review committee is not established despite the good faith efforts of the applicant, then such applicant shall not be subject to an award of costs pursuant to Subparagraph (D) of this paragraph.*

*(J) Paragraph (12) of Section 4(e) shall not apply to a solid waste or hazardous waste management facility for which an application has been filed, or which has otherwise been authorized to operate, as of the effective date of such paragraph.*

**SECTION 6.** Subsection (f)(2), Section 4, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended to read as follows:

(2) No person shall process, store, or dispose of hazardous [industrial solid] wastes under this subsection without having first obtained a hazardous waste permit issued by the commission; provided, however, that any person who has on or before November 19, 1980, commenced on-site processing, storing or disposing of hazardous waste under this subsection and who has filed a hazardous waste permit application in accordance with the rules of the board may continue to process, store, or dispose of hazardous waste until such time as the commission approves or denies the application. Upon its own motion or the request of a person affected, the commission may hold a public hearing on an application for a hazardous waste permit *in accordance with Section 4(e)*. The board by rule shall establish procedures for public notice and any public hearing authorized by this subsection. The commission may include requirements in the permit for any remedial actions by the applicant that are determined by the commission to be necessary to protect the public health and safety and the environment

**SECTION 7.** Section 4, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by adding Subsection (k) to read as follows:

*(k) The state agencies shall provide by rule for interested persons to engage in activities which involve the collection and disposal of household materials which could be classified as hazardous wastes. Such rules shall specify any necessary requirements relating to the training of persons involved in the collection and disposal of such household materials. No person shall be liable for damages as a result of actions taken or omitted in the course of advertising, promoting or distributing educational materials relating to the collection or disposal of such household materials in accordance with the rules of the state agency. This shall not preclude liability for damages as a result of gross negligence or intentional misconduct on the part of such a person.*

**SECTION 8.** Section 7, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by redesignating existing Subsection (c) as Subsection (d) and adding Subsections (c), (e), (f), and (g) to read as follows

*(c) Regulated hazardous waste management and disposal facilities shall be inspected periodically by the department or department of water resources as required by the U.S. Environmental Protection Agency pursuant to the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as amended. In supplementing these inspections, the department and the department of water resources shall give priority to inspecting and reinspecting those facilities, including generators, deemed most likely to be noncompliant or most likely to pose an environmental or public health threat, regardless of whether they are characterized as major or non-major facilities. The state agencies may also randomly perform less comprehensive checks of facilities to supplement the more comprehensive inspections required by the U.S. Environmental Protection Agency.*

*(d)* [(c)] Records copied pursuant to Subsection (b) of this section shall be public records, except that, if a showing satisfactory to the commissioner of the department or to the executive director is made by the owner of such records that the records would divulge trade secrets if made public, then the department or the department of water resources shall consider such copied records as confidential. Nothing in this subsection shall require the department of water resources or the department to consider the composition or characteristics of solid waste being processed, stored, disposed, or otherwise handled to be held confidential

*(e) The department and department of water resources shall publish annually beginning in January, 1986, a report to be known as the annual inspection report, which shall summarize the agency's inspection strategy and the results of all inspections conducted during the previous fiscal year, and list hazardous waste treatment, storage and disposal facilities not inspected. The annual inspection report shall identify each hazardous waste facility inspected and shall include the following information. a listing of those facilities found to be compliant with all hazardous waste regulations, those facilities with only minor or clerical violations, and those found to have substantive, non-clerical violations. In addition, for substantive, non-clerical violations, the report shall identify the violations and either summarize corrective actions or describe the status of unresolved violations.*

*(f) The annual inspection report shall be submitted to the governor, lieutenant governor, and speaker of the house. The state agencies shall provide notice of the availability of the report by publication of notice in the Texas Register.*

*(g) The report of each state agency shall identify those facilities having demonstrated an exemplary record of compliance over the preceding three-year period and those facilities which have been adjudicated during the preceding three-year period to have committed substantive, non-clerical violations which have resulted in an actual release of hazardous waste that presented an imminent and substantial endangerment to the public health and safety or the environment*

**SECTION 9.** Section 8, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by adding Subsections (g) and (h) to read as follows:

*(g) Imminent and Substantial Endangerment to the Public Health and Safety or the Environment.*

*(1) Notwithstanding any other provision of this Act, wherever it appears there is an actual or threatened release of solid waste that presents an imminent and substantial endangerment to the public health and safety or the environment from a solid waste facility where solid waste is stored, processed or disposed of or at any site where any one or more of such activities with respect to solid waste have been conducted in the past, regardless of whether such activity was lawful at the time, then the department or the department of water resources, as appropriate, may issue an administrative order to the persons identified in Paragraph (2) of this subsection restraining such person or persons from allowing or continuing the release or threatened release and requiring those persons to take actions necessary to provide and implement a cost effective and environmentally sound remedial action plan designed to eliminate the release or threatened release. An administrative order issued pursuant to this subsection shall be mailed to the persons identified in the order by certified mail, return receipt requested, or may be delivered by hand delivery to the persons identified in the order; or, upon failure of service of the order by certified mail or hand delivery, such order may be served on such persons by publication one time in the Texas Register and one time in a newspaper of general circulation in each county in which any of such persons had his last known address. An administrative order under this subsection shall be an executive act and shall not require prior notice or an adjudicative hearing before the state agency. Alternatively, the department or department of water resources, as appropriate, may cause a civil suit to be instituted in a district court in the county in which the actual release is occurring or threatened release may occur for injunctive relief to restrain the person or persons, as identified in Paragraph (2) of this subsection, from allowing or continuing the release or threatened release and requiring those persons to take actions necessary to provide and implement a cost effective and environmentally sound remedial action plan designed to eliminate the release or threatened release. The provisions of this subsection are cumulative of all other remedies and nothing in this subsection exempts any person from complying with or being subject to any other provision of law.*

*(2) The persons subject to this subsection, subject only to the defenses listed in Paragraph (3) of this subsection, are as follows:*

*(A) any owner or operator of a solid waste facility;*

*(B) any person who at the time of processing, storage or disposal of any solid waste owned or operated the solid waste facility;*

*(C) any person who by contract, agreement, or otherwise, arranged for the processing, storage or disposal, or arranged with a transporter for transport for processing, storage or disposal of solid waste owned or possessed by such person, by any other party or entity, at the solid waste facility owned or operated by another party or entity and containing such solid waste, or at the site to which such solid waste was transported and which site contains such solid wastes; and*

*(D) any person who accepts or accepted any solid waste for transport to a solid waste facility or site selected by such person, from which there is a release or threatened release of a solid waste which presents an imminent and substantial endangerment to the public health and safety or the environment.*

*(3) The persons identified in Paragraph (2) of this subsection shall be liable under Paragraph (1) of this subsection unless such person can establish by a preponderance of the evidence that the release or threatened release was caused solely by:*

*(A) an act of God;*

*(B) an act of war;*

*(C) an act or omission of a third party other than an employee or agent of the defendant or other than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (i) he exercised due care with respect to the solid wastes concerned, taking into consideration the characteristics of such solid wastes, in light of all relevant facts and circumstances, and (ii) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or*

*(D) any combination of the foregoing paragraphs.*

*(4) Where the release or threatened release caused by a person's acts or omissions is proved by a preponderance of the evidence to be divisible, that person shall be liable only for the elimination of that release or threatened release attributable to him. Where the release or threatened release is not proved to be divisible, all persons liable under Paragraph (1) shall be jointly and severally liable for eliminating the release or threatened release. For purposes of this section "divisible" means*

*that the waste released or threatened to be released has been and is capable of being managed separately under the remedial action plan.*

*(5) When fewer than all of the parties identified in this subsection agree with the state to take remedial action to abate an actual or threatened release of solid waste that is an imminent and substantial endangerment to the public health and safety or the environment pursuant to an administrative order issued under this section or an action filed by the state, the state may seek a judgment against the non-settling parties for the total amount of the cost of the remedial action minus that amount agreed to be paid or expended by any settling parties. In any action for contribution brought by a non-settling party against a settling party, the non-settling party shall have the burden to prove that the amount of cleanup costs agreed to be paid by a settling party pursuant to an agreement with the state was unreasonable considering the factors delineated in Section 11(a) and the need to undertake timely cleanup action with respect to the release or threatened release.*

**SECTION 10.** Section 8, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by adding Subsection (h) to read as follows:

*(h) A state agency contracting for services or products shall take into consideration whether the person proposing to contract with the state has been adjudicated during the preceding three-year period to have committed substantive, non-clerical violations which have resulted in an actual release of hazardous waste that presented an imminent and substantial endangerment to the public health and safety or the environment.*

**SECTION 11.** Section 9, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended to read as follows:

Sec. 9. APPEALS; *JOINDER. (a)* A person affected by any ruling, order, decision, or other act of the department or the department of water resources may appeal by filing a petition in a district court of Travis County. A person affected by any ruling, order, decision, or other act of a county, or of a political subdivision exercising the authority granted in Section 6 of this Act, may appeal by filing a petition in a district court having jurisdiction in the county or political subdivision. *Except as provided in Section 9(b), the* [The] petition must be filed within 30 days after the date of the action, ruling, order, or decision of the governmental entity complained of. Service of citation must be accomplished within 30 days after the date the petition is filed. *Any person filing a petition appealing an administrative order issued pursuant to Section 8(g) must join as parties the state agency issuing the administrative order and may join as parties any other person named in the administrative order and any other person who is or may be liable for the elimination of the actual or threatened release of solid waste governed by the administrative order.* The plaintiff shall pursue his action with reasonable diligence. If the plaintiff does not prosecute his action within one year after the action is filed, the court shall presume that the action has been abandoned. The court shall dismiss the suit on a motion for dismissal made by the governmental entity whose action is appealed, unless the plaintiff, after receiving due notice, can show good and sufficient cause for the delay. *Except as provided in Section 9(c), in* [In] an appeal from an action of the department, the department of water resources, a county, or a political subdivision exercising the authority granted in Section 6 of this Act, the issue is whether the action is invalid, arbitrary or unreasonable.

*(b) The filing of a petition appealing an order issued pursuant to Section 8(g) within 45 days after the date of receipt, hand delivery, or publication service of the order shall stay the administrative order as to the appealing party pending action by the district court. However, the filing of the petition shall not affect any other enforcement powers of the department or department of water resources. An order issued pursuant to Section 8(g) shall become final as to non-appealing parties 45 days after the date of receipt, hand delivery, or publication service of the order by, to, or upon such non-appealing parties.*

*(c) The district court shall uphold an administrative order issued pursuant to Section 8(g) if the department or department of water resources, by a preponderance of the evidence, proves:*

*(1) that there is an actual or threatened release of solid waste that is an imminent and substantial endangerment to the public health and safety or the environment; and*

*(2) that the person made subject to the administrative order is liable for the elimination of the release or threatened release, in whole or in part.*

*(d) Any person made a party to an appeal of an administrative order issued pursuant to Section 8(g) may join as parties any other persons who are or may be liable for the elimination of the release or threatened release, in whole or in part.*

*(e) Failure by any party to file an action for contribution and/or indemnity in an appeal proceeding relating to an administrative order issued pursuant to Section 8(g) shall not constitute a waiver of any rights under this Act or any other provision of law.*

(f) In appeals of an administrative order issued pursuant to Section 8(g), the district court upon establishing the validity of the order, shall issue an injunction requiring all persons named or joined against whom liability has been established by the department or department of water resources or any other party to comply with the terms of the administrative order.

(g) As between parties determined to be liable pursuant to Section 8(g), the court may, as equity requires, apportion cleanup costs in accordance with the provisions of Section 11(a) and grant any other appropriate relief.

**SECTION 12.** The Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes) is amended by adding Sections 10, 11, 12, and 13 to read as follows:

Sec. 10. JOINDER OF PARTIES IN ACTIONS FILED BY THE STATE. (a) In any action brought by the attorney general under Section 8(g) of this Act seeking an injunction to eliminate a release or threatened release, the attorney general shall, and any party may, join as parties all persons reasonably believed to be liable for the release or threatened release in accordance with Section 8(g)(1) of this Act.

(b) Failure of the attorney general or any party to name or join a person as a party shall not be a defense to any action against that person for contribution and/or indemnity.

(c) In any action brought by the attorney general under Section 8(g) the district court shall grant relief on the same basis as provided in Sections 9(c), (f) and (g) of this Act.

Sec. 11. COST RECOVERY. (a) Apportionment of costs for the elimination of a release or threatened release of solid waste shall be in accordance with the following factors (provided, however, that such apportionment shall only adjust the rights of parties identified in Section 8(g)(2) among themselves, and shall not affect their liability to the State): (1) the relationship between the parties' actions in storing, processing and disposal of solid waste and the remedy required to eliminate the release or threatened release; (2) the volume of solid waste each party is responsible for at the solid waste facility or site to the extent that the costs of the remedy are based on the volume of solid waste present; (3) consideration of toxicity or other waste characteristics if these characteristics affect the cost of elimination of the release or threatened release; and (4) a party's cooperation with state agencies, its cooperation or noncooperation with the pending efforts to eliminate the release or threatened release, or a party's actions regarding the processing, storage or disposal of solid waste, as well as the degree of care which the party exercised.

(b) Persons subject to a court injunction or an administrative order issued pursuant to this Act, or those third parties identified in Section 13(g) who take action to eliminate a release or threatened release, in addition to having the right to file an action for contribution and/or indemnity in an appeal proceeding or in an action brought by the attorney general, may bring suit in the district court of the county where the release or threatened release is or was located or in such other county where venue would be proper under Article 1995, Revised Statutes, for cost recovery against any other person who is or may be liable if the persons seeking cost recovery made reasonable attempts to notify the persons against whom recovery is sought (i) of the existence of the release or threatened release and (ii) that the person seeking cost recovery intended to take steps to eliminate the release or threatened release. Any fact determination or ruling by a district court in an appeal of an administrative order under Section 9(b) shall not constitute res judicata or collateral estoppel as to any issue brought in a proceeding under this subsection with respect to any party not joined in such appeal.

(c)(1) For suits seeking cost recovery under Section 11(b), the court shall determine the amount of cost recovery based on the criteria listed in Section 11(a).

(2) Recoverable costs under this section may include not only the costs incurred in eliminating the release or threatened release, but also such other costs as the court, in its discretion, may deem reasonable to award.

Sec. 12. CREATION OF RIGHTS. The provisions of Section 8(g) and the provisions of Section 11(b) and the enforcement by the department or department of water resources of such provisions shall not create any rights or causes of action on behalf of any person other than those specifically and expressly stated herein or change any common law or rule of decision except as limited in this Act to actions by the department or department of water resources for the elimination of an actual release or threatened release of solid waste that is an imminent and substantial endangerment to the public health and safety or the environment.

Sec. 13. IDENTIFICATION AND ASSESSMENT OF HAZARDOUS WASTE FACILI-TIES. (a) The department of water resources, in cooperation with the department, shall conduct and complete a survey of the state by July 1, 1986, the purpose of which is to identify to the extent feasible every hazardous waste facility which may constitute an imminent and substantial endangerment to public health and safety or the environment. The work already performed to identify candidate sites for inclusion in the federal National Priorities List shall serve as the basis for such a survey. As soon as possible after completion of a draft survey, the department of water resources shall conduct a public hearing to solicit comments on the draft survey and information

*on additional candidate sites. Not later than January 1, 1987, the department of water resources shall publish a registry identifying each facility listed by the survey, the relative priority of the need for action at each facility to remedy environmental and health problems resulting from the presence of hazardous wastes at such facilities, and setting forth recommendations for actions which may be pursued to achieve effective, efficient, and timely cleanup or other resolution of the problems identified for each facility. Such recommendations shall not constitute the remedial investigation/feasibility study for the relevant facility, but shall form the preliminary basis for such a study. The cleanup of such facilities shall be achieved first by private party funding, second with the aid of federal funds, and third, if necessary, with state funds from the hazardous waste permit and disposal fee, if the fee is approved by the legislature. A draft copy of the registry shall be circulated to the department for comment prior to publication. Three copies of the registry, as published, shall be delivered to the Office of the Governor.*

*(b)(1) The department of water resources may conduct investigations of the facilities listed in the registry and may investigate areas or sites which it has reason to believe should be included in the registry, in accordance with Section 7 of this Act.*

*(2) The department of water resources shall, as part of the registry, assess by January 1, 1987, and each year thereafter, and, based upon new information received from sources including but not limited to public hearings, reassess, in cooperation with the department, the relative priority of the need for action at each facility listed in the registry to remedy environmental and health problems resulting from the presence of hazardous wastes at such facilities.*

*(c) The department of water resources shall update the registry periodically to add facilities which may constitute an imminent and substantial endangerment to public health and safety or the environment and to delete facilities which have been cleaned up pursuant to Subsection (g) of this section or delisted pursuant to Subsection (e) of this section.*

*(d) The department of water resources shall file an affidavit or notice in the real property records of the county in which a facility is located identifying those facilities included in the registry, as well as those facilities deleted from the registry.*

*(e)(1) Within thirty (30) days after the survey pursuant to Subsection (a) of this section is completed, the department of water resources shall notify in writing the parties identified as responsible for all or any part of each facility or area included in the registry prepared pursuant to such Subsection (a) of the inclusion of the facility or area on such survey. Thereafter, two months before any unincluded facility or area is added to the registry, the department of water resources shall notify in writing the parties identified as responsible for all or any part of such facility or area of the contemplated inclusion of such facility or area on such registry. Written notifications under this subsection shall be by certified mail, return receipt requested, by mailing notice to each such named responsible party at the party's last known address.*

*(2) Notice pursuant to Paragraph (1) of this subsection shall include but not be limited to a description of the duties and restrictions imposed by Subsection (f) of this section.*

*(3) Non-receipt of any notice mailed to a named responsible party pursuant to this subsection shall in no way affect the responsibilities, duties or liabilities imposed on any such party.*

*(4) Any owner or operator or other named responsible party of a facility listed or to be listed in the registry of the department of water resources pursuant to this section may request the department of water resources to delete such facility from the registry, modify the facility's priority within the registry or modify any information regarding such facility by submitting a written statement setting forth the grounds of the request in such form as the department of water resources may require.*

*(5) Within one hundred and eighty (180) days after the effective date of this provision, the department of water resources shall propose rules establishing procedures, including public hearings, for review of delisting requests submitted pursuant to this subsection.*

*(f)(1) Subsequent to the listing of a facility on the registry prepared and maintained by the department of water resources, no person may substantially change the manner in which the facility is used without notifying the department of water resources and receiving written approval of the department of water resources for such change. A substantial change of use shall be defined in rules adopted by the board and shall include, but not be limited to, actions such as the erection of a building or other structure at such facility, the use of such facility for agricultural production, the paving of such facility for use as a roadway or parking lot, and the creation of a park or other public or private recreational facility on such facility. Such notice shall be in writing, addressed to the executive director and shall include a brief description of the proposed change of use. Such notice shall be submitted in writing at least sixty days before any physical alteration of the land or construction will occur or, in the event any alteration or construction is not required to initiate such change of use, at least sixty days before any change of use.*

*(2) The executive director shall not approve such change of use if such new use will interfere significantly with a proposed, ongoing or completed hazardous waste facility remedial action*

*program at such facility or expose the environment or public health to a significantly increased threat of harm.*

*(g)(1) The cleanup of a facility identified by the department of water resources in the registry which constitutes an imminent and substantial endangerment to the public health and safety or the environment shall proceed on an expedited basis pursuant to the following guidelines:*

*(A) wherever possible, parties identified as liable parties pursuant to Section 8(g)(1) should be notified by the department of water resources of an opportunity to participate in a voluntary cleanup of the facility;*

*(B) if all persons liable under Section 8(g)(1) do not volunteer to develop and implement a remedial action program for the facility, then private parties who are willing to participate in cleanup activities voluntarily should be allowed to do so and they may seek cost recovery pursuant to Section 11(b) from those liable parties not participating in the voluntary cleanup;*

*(C) if no parties identified as liable under Section 8(g)(1) volunteer to develop and implement a remedial action program for the facility, then independent third parties who are willing to participate voluntarily in the cleanup of the facility should be permitted to contract with the department of water resources to do so and they may seek cost recovery pursuant to Section 11(b) from those liable parties not participating in the voluntary cleanup;*

*(D) where voluntary assistance from the private sector is not forthcoming, federal funds should be used for facility cleanup if such funds are timely available; and*

*(E) state funds should be used only when a liable party or independent third party cleanup or federal funds are not timely available.*

*(2) Whenever the department of water resources finds that there exists an actual or threatened release of hazardous wastes at a hazardous waste facility listed on the registry that presents an imminent and substantial endangerment to the public health and safety or the environment, it may order the owner and/or operator of such facility and/or any other person responsible for the release or threatened release at such facility (A) to develop a remedial action program, subject to the approval of the department of water resources, at such facility, and (B) to implement such program within reasonable time limits specified in the order. The provisions in Sections 8(g), 9, 10 and 11 of this Act relating to administrative orders shall apply to orders issued pursuant to this paragraph.*

*(3) Whenever the department of water resources, after investigation, finds that there exists a release or threatened release of hazardous wastes at a facility identified in the registry that:*

*(A) is causing irreversible or irreparable harm to the public health and safety or the environment; and*

*(B) the immediacy of the situation makes it prejudicial to the public interest to delay action until an administrative order can be issued to liable parties pursuant to Paragraph (2) of this subsection or until a judgment can be entered in an appeal of an administrative order; the department of water resources may, with the funds available to the department of water resources from the hazardous waste permit and disposal fees, if approved by the Legislature, undertake immediate removal action at the facility to alleviate the harm. After the immediate danger of irreversible or irreparable harm has been alleviated, the department of water resources shall proceed pursuant to Paragraph (2) of this subsection. Findings required pursuant to this paragraph shall be in writing and may be made by the department of water resources on an ex parte basis subject to judicial review pursuant to the substantial evidence rule as provided by the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes).*

*(4) Whenever a person ordered to eliminate an imminent and substantial endangerment to the public health and safety or the environment has failed to do so within the time limits specified in the order, and no third party has agreed to develop and implement a remedial action program for the facility pursuant to Paragraph (1)(C) of this subsection, the department of water resources may develop and implement a remedial action program for such facility. The reasonable expenses of developing and implementing such remedial action program by the department of water resources shall be paid by the persons to whom the order was issued and the state may seek to recover such reasonable expenses in any court of appropriate jurisdiction. Any action instituted by the department of water resources pursuant to this paragraph shall be subject to the provisions of Sections 8(g), 9, 10, and 11 of this Act.*

*(5) In the event that the department of water resources has found that there exists a release or threatened release of hazardous wastes at a facility on the registry which presents an imminent and substantial endangerment to the public health and safety or the environment but, after a reasonable attempt to determine who may be liable for such release or threatened release in accordance with Section 8(g), is either unable to determine who may be liable, or is unable to locate a person who may be liable, and no independent third party agrees to develop and implement a remedial action program for the facility in accordance with Paragraph (1)(C) of this*

subsection, the department of water resources may develop and implement a remedial action program for such facility. Federal funds shall be used for such cleanup to the maximum extent timely available in accordance with Paragraph (1)(D) of this subsection. The department of water resources shall make every effort to secure appropriate relief from any person subsequently identified or located who is liable for the release or threatened release of hazardous waste at such facility, including, but not limited to, development and implementation of a remedial action program, payment of the cost of such a program and recovery of any reasonable expenses incurred by the state.

(6) The goal of any remedial action program shall be the elimination of the imminent and substantial endangerment to the public health and safety or the environment posed by a release or threatened release of hazardous wastes at a facility. The appropriate extent of remedy at any particular facility shall be determined by the department of water resources' selection of the remedial alternative which the state agency determines is cost effective (i.e., the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment).

(7) All cleanup costs for which a person is liable to the state shall constitute a lien in favor of the state on the real property and the rights to such real property that are subject to or affected by a cleanup action.

(A) The lien imposed by this paragraph shall arise and attach to the real property subject to or affected by a cleanup action at the time an affidavit is recorded and indexed in accordance with this paragraph in the county in which such real property is located. For the purpose of determining rights of all affected parties, the lien shall not relate back to a time prior to the date on which the affidavit is recorded, which date shall be the lien inception date. The lien shall continue until the liability for the costs is satisfied or becomes unenforceable through operation of law.

(B) The affidavit shall be executed by an authorized representative of the department of water resources and must show:

(i) the names and addresses of the persons liable for such costs;

(ii) a description of the real property that is subject to or affected by the cleanup action for the costs or claims; and

(iii) the amount of the costs and the balance due.

(C) The county clerk shall record the affidavit in records kept for that purpose and shall index the affidavit under the names of the persons liable for such costs.

(D) The department of water resources shall record a relinquishment or satisfaction of the lien when the lien is paid or satisfied.

(E) The lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien.

(F) The lien imposed by this paragraph shall not be valid or enforceable if:

(i) real property or an interest therein, or

(ii) a mortgage, lien, or other encumbrance upon or against real property, is acquired before the affidavit is recorded unless the person acquiring the real property or an interest therein or acquiring the mortgage, lien or other encumbrance thereon had or reasonably should have had actual notice or knowledge that the real property is subject to or affected by a clean-up action, or has knowledge that the state has incurred clean-up costs.

(G) If a lien is fixed or attempted to be fixed as provided in this paragraph, the owner of the real property affected by the lien may file a bond to indemnify against the lien. The bond shall be filed with the county clerk of the county in which the real property subject to the lien is located. An action to establish, enforce, or foreclose any lien or claim of lien covered by the bond must be brought not later than the 30th day after the date of service of notice of the bond.

(H) The bond must:

(i) describe the real property upon which the lien is claimed;

(ii) refer to the lien claimed in a manner sufficient to identify it;

(iii) be in an amount double the amount of the lien referred to;

(iv) be payable to the department of water resources;

(v) be executed by the party filing the bond as principal, and a corporate surety authorized under the law of this state to execute the bond as surety; and

(vi) be conditioned substantially that the principal and sureties will pay to the department of water resources the amount of the lien claimed, plus costs, if the claim is proved to be a lien on the real property.

(I) After the bond is filed, the county clerk shall issue notice of the bond to the named obligee. A copy of the bond must be attached to the notice. The notice may be served on each obligee by having a copy delivered to the obligee by any person competent to make oath of the

*delivery. The original notice shall be returned to the office of the county clerk, and the person making service of copy shall make an oath on the back of the copies showing on whom and on what date the copies were served. The county clerk shall record the bond notice and return in records kept for that purpose. In acquiring an interest in real property, a purchaser or lender may rely on and is absolutely protected by the record of the bond, notice, and return.*

*(J) The department of water resources may sue on the bond after the 30th day following the date on which the notice is served, but may not sue on the bond later than one year after the date on which the notice is served. If the department of water resources recovers in a suit on the lien or on the bond, it is entitled to also recover a reasonable attorney's fee.*

*(8) Money for actions taken or to be taken by the department of water resources in connection with the elimination of an imminent and substantial endangerment to the public health and safety or the environment pursuant to this section shall be payable directly to the agency from the hazardous waste permit and disposal fees, if approved by the legislature. This includes any costs of inspection or sampling and laboratory analysis of wastes, soils, air, surface water and groundwater done on behalf of a state agency.*

*(9) The department of water resources shall seek private party cleanup of facilities prior to expenditure of federal or state funds for such cleanups. Private parties shall coordinate with ongoing federal and/or state hazardous waste programs and obtain necessary approvals for any such cleanup actions. No action taken by any such person to contain or remove a release or threatened release in accordance with an approved remedial action plan shall be construed as an admission of liability for said release or threatened release. No person who renders assistance in containing or removing a release or threatened release in accordance with an approved remedial action plan shall be liable for any additional cleanup costs at the facility resulting solely from acts or omissions of such person in rendering such assistance in compliance with the approvals required by this subsection, unless such cleanup costs were caused by such person's gross negligence or willful misconduct. Except as specifically provided herein, the provisions of this subsection shall not be construed to expand or diminish the common law tort liability, if any, of private parties participating in a cleanup action for civil damages to third parties.*

**SECTION 13.** Section 10, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is redesignated as Section 14 and amended to read as follows:

Sec. *14* [~~10~~]. *RELATIONS TO OTHER LAWS* [~~CUMULATIVE ACT~~]. *Except as specifically provided in this Act, nothing* [~~This Act is cumulative of and supplemental to any other laws and parts of laws relating to the same subject and does not repeal those other laws or parts of laws. Nothing~~] *in this Act diminishes or limits, or is intended to diminish or limit, the authority of the department, the department of water resources, the Texas Air Control Board, or local governments in performing any of the powers, functions, and duties vested in those governmental entities by other laws.*

**SECTION 14.** Section 27.002, Water Code, is amended by adding Subsection (15) to read as follows:

*(15) "Hazardous waste" has the meaning assigned to that term by Section 2(15), Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes).*

**SECTION 15.** Section 27.018, Water Code, is amended by adding Subsection (c) to read as follows:

*(c) An application for an injection well to dispose of hazardous waste shall be subject to the pre-application local review process established by Section 4(e)(12), Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes).*

**SECTION 16.** Section 27.051, Water Code, is amended by adding Subsections (d), (e), and (f) to read as follows:

*(d) The Texas Water Commission, in determining if the use or installation of an injection well for the disposal of hazardous waste is in the public interest under Subsection (a)(1) of this section, shall consider, but shall not be limited to the consideration of:*

*(1) compliance history of the applicant in accordance with the provisions of Subsection (e) of this section;*

*(2) whether there is a practical, economic, and feasible alternative to an injection well reasonably available to manage the types and classes of hazardous waste; and*

*(3) whether the applicant will maintain sufficient public liability insurance for bodily injury and property damage to third parties that is caused by sudden and non-sudden accidents or will otherwise demonstrate financial responsibility in a manner adopted by the department in lieu of public liability insurance. A liability insurance policy which satisfies the policy limits required by the hazardous waste management regulations of the department of water resources for the applicant's proposed pre-injection facilities shall be deemed "sufficient" under this subdivision if the policy also covers the injection well itself.*

*(e) The department of water resources shall establish a procedure by rule for its preparation of compliance summaries relating to the history of compliance and noncompliance by the applicant with the rules adopted or orders or permits issued by the department of water resources under this chapter for any injection well for which a permit has been issued under this chapter. The compliance summaries shall be made available to the applicant and any interested person after the department of water resources has completed its technical review of the permit application and prior to the promulgation of the public notice relating to the issuance of the permit. Evidence of compliance or noncompliance by an applicant for an injection well for the disposal of hazardous waste with the rules adopted or orders or permits issued by the department of water resources under this chapter may be offered by any party at a hearing on the applicant's application and admitted into evidence subject to applicable rules of evidence. All evidence admitted, including compliance history, shall be considered by the department of water resources in determining whether to issue, amend, extend or renew a permit.*

*(f) In the issuance of a permit for a hazardous waste injection well into a salt dome, the department of water resources shall consider the location of any geologic fault in the salt dome in the immediate proximity of the injection well bore, the presence of an underground water aquifer, and the presence of sulfur mines or oil and gas wells in the area.*

**SECTION 17.** The amendments to the Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes) created by Section 3 of this Act and the amendments of the Water Code set out in Section 16 of this Act shall not apply to any facility for which a notice of intent to file an application, or an application, has been filed with the Texas Department of Health or the Texas Department of Water Resources, or to a hazardous waste management facility which has otherwise been authorized to operate by the rules of the Texas Department of Health or the Texas Department of Water Resources as of the effective date of this Act, with the exception that Subsections (d)(1) and (e) of Section 16 shall apply to any application on which a hearing for the permit has not commenced prior to the effective date of this Act.

**SECTION 18.** Notwithstanding any other provision to the contrary in this Act, nothing contained in this Act shall change, alter, or enlarge upon the contractual liability of a person other than those persons listed in Section 8(g)(2), Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), for the violation of, or a duty created by, any provision herein for acts or omissions which occurred prior to the effective date hereof.

**SECTION 19.** This Act takes effect September 1, 1985.

**SECTION 20.** The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended.

Passed by the House on May 15, 1985, by the following vote: Yeas 144, Nays 0, 1 present, not voting; House concurred in Senate amendments to H B. No. 2358 on May 27, 1985, by a non-record vote; passed by the Senate, with amendments, on May 23, 1985, by a viva-voce vote.

Approved: June 12, 1985

Effective: September 1, 1985

---

## CHAPTER 567

### H.B. No. 2359

An Act relating to creation of the hazardous waste generation and facility fees fund and a hazardous waste disposal fee fund, to expenditures from the funds, and to imposition of fees on hazardous waste generation, hazardous waste facilities, and hazardous waste disposal

*Be it enacted by the Legislature of the State of Texas:*

**SECTION 1.** Section 8, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by adding Subsection (g) to read as follows·

*(g) The penalties imposed under Subsection (a) of this section do not apply to failure to pay a fee under Section 12 of this Act or failure to file a report under Section 13 of this Act. Subsection (a)(9) of this section does not apply to interest and penalties imposed under Section 14 of this Act.*

# A<span>PP</span>. I

Act approved June 14, 1989, 71st Leg., R.S., ch. 703, 1989 Tex. Gen. Laws 3212, 3217 (current version at Tex. Health & Safety Code Ann. § 361.322 (West 2010)

(5) the Texas Juvenile Probation Commission;

(6) the Texas Department of Human Services;

(7) the Texas Department of Corrections;

(8) the Texas Employment Commission;

(9) the Texas Commission on Alcohol and Drug Abuse;

(10) the Texas Department of Mental Health and Mental Retardation; and

(11) the Texas Department of Health.

SECTION 2. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

Passed the Senate on May 9, 1989, by the following vote: Yeas 31, Nays 0; passed the House on May 22, 1989, by the following vote: Yeas 141, Nays 1, one present not voting.

Approved June 14, 1989.

Effective June 14, 1989.

---

## CHAPTER 703

### S.B. No. 1502

**AN ACT**

relating to regulation of hazardous substances and solid waste.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 2, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended to read as follows:

Sec. 2. DEFINITIONS. As used in this Act, unless the context requires a different definition:

(1) "Administratively complete" means that a complete permit application form, as well as the report and fees required to be submitted with a permit application, have been submitted to the department or the commission and the permit application is ready for technical review in accordance with the rules of the department or commission.

(2) "Apparent recharge zone" means that recharge zone designated on maps prepared or compiled by, and located in the offices of, the commission.

(3) "Board of health" means the Texas Board of Health.

(4) "Class I industrial solid waste" means any industrial solid waste or mixture of industrial solid wastes which because of its concentration or physical or chemical characteristics is toxic, corrosive, flammable, a strong sensitizer or irritant, a generator of sudden pressure by decomposition, heat, or other means and may pose a substantial present or potential danger to human health or the environment when improperly processed, stored, transported, or otherwise managed, including hazardous industrial waste.

(5) "Commission" means the Texas Water Commission.

(6) "Commissioner" means the Commissioner of Health.

(7) "Composting" means the controlled biological decomposition of organic solid waste under aerobic conditions.

(8) "Department" means the Texas Department of Health.

(9) "Disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste (whether containerized or uncontainer-

ized) into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters.

(10) "Environmental response law" means the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, *42 U.S.C. Sections 9601 through 9675, as amended by the Superfund Amendments and Reauthorization Act of 1986* [(Pub.L. No. 96-510)].

(11) "Executive director" means the Executive Director of the Texas Water Commission.

(12) "Garbage" means solid waste consisting of putrescible animal and vegetable waste materials resulting from the handling, preparation, cooking, and consumption of food, including waste materials from markets, storage facilities, handling, and sale of produce and other food products.

(13) "Hazardous waste" means any solid waste identified or listed as a hazardous waste by the administrator of the United States Environmental Protection Agency (EPA) pursuant to the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended.

(14) *"Hazardous substance" means:*

*(A) a substance designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1321);*

*(B) an element, compound, mixture, solution, or substance designated pursuant to Section 102 of the environmental response law;*

*(C) a hazardous waste having the characteristics identified under or listed pursuant to Section 3001 of the federal Solid Waste Disposal Act, as amended (42 U.S.C. 6921), excluding waste, the regulation of which under the federal Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) has been suspended by Act of Congress;*

*(D) a toxic pollutant listed under Section 307(a) of the Federal Water Pollution Control Act (33 U.S.C. 1317);*

*(E) a hazardous air pollutant listed under Section 112 of the federal Clean Air Act, as amended (42 U.S.C. 7412); and*

*(F) any imminently hazardous chemical substance or mixture with respect to which the administrator of the Environmental Protection Agency has taken action pursuant to Section 7 of the Toxic Substances Control Act (15 U.S.C. 2606).*

*The term does not include petroleum, which means crude oil or any fraction of crude oil that is not otherwise specifically listed or designated as a hazardous substance under Paragraphs (A) through (F) of this subdivision; nor does it include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel mixtures of natural gas and synthetic gas; nor does it include waste materials which result from activities associated with the exploration, development, or production of oil or gas or geothermal resources or any other substance or material regulated by the Railroad Commission of Texas pursuant to Section 91.101, Natural Resources Code.*

*(15)* "Industrial solid waste" means solid waste resulting from or incidental to any process of industry or manufacturing, or mining or agricultural operations.

*(16)* [(15)] "Local government" means a county, an incorporated city or town, or a political subdivision exercising the authority granted under Section 6 of this Act.

*(17)* [(16)] "Management" means the systematic control of any or all of the following activities of generation, source separation, collection, handling, storage, transportation, processing, treatment, recovery, or disposal of solid waste.

*(18)* [(17)] "Municipal solid waste" means solid waste resulting from or incidental to municipal, community, commercial, institutional, and recreational activities including garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and all other solid waste other than industrial solid waste.

*(19)* [(18)] "Notice of intent to file an application" means that notice filed pursuant to Section 4(e)(12) of this Act.

*(20)* [(19)] "Person" means an individual, corporation, organization, government or governmental subdivision or agency, business trust, partnership, association, or any other legal entity.

*(21)* [(20)] "Person affected" means any person who is a resident of a county or any county adjacent or contiguous to the county in which a solid waste facility is to be located including any person who is doing business or owns land in the county or adjacent or contiguous county and any local government. Such person affected shall also demonstrate that he has suffered or will suffer actual injury or economic damage.

*(22)* [(21)] "Processing" means the extraction of materials, transfer, volume reduction, conversion to energy, or other separation and preparation of solid waste for reuse or disposal, including the treatment or neutralization of hazardous waste, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, or so as to recover energy or material from the waste, or so as to render such waste nonhazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amenable for storage, or reduced in volume. Unless the state agency determines that regulation of such activity under this Act is necessary to protect human health or the environment, the definition of "processing" does not include activities relating to those materials exempted by the administrator of the Environmental Protection Agency pursuant to the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended.

*(23)* [(22)] "Radioactive waste" means that waste which requires specific licensing under Chapter 72, Acts of the 57th Legislature, Regular Session, 1961, as amended (Article 4590f, Vernon's Texas Civil Statutes), and the rules adopted by the Texas Board of Health under that law.

*(24)* [(23)] "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, escaping, leaching, dumping, or disposing into the environment, but excludes:

(A) a release that results in exposure to persons solely within a workplace, with respect to a claim which those persons may assert against the employer of those persons;

(B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine;

(C) release of source, by-product, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 et seq.) if the release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under Section 170 of that Act, or, for the purposes of Section 104 of the environmental response law or any other response action, any release of source, by-product, or special nuclear material from any processing site designated under Section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. 7912 and 7942); and

(D) the normal application of fertilizer.

*(25)* [(24)] "Remedial action" means those actions consistent with a permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous waste into the environment to prevent or minimize the release of hazardous wastes so that they do not migrate to cause an imminent and substantial danger to present or future public health and safety or the environment. The term includes such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, clean-up of released hazardous wastes or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, on-site treatment or incineration, provision of alternate water supplies, and any monitoring reasonably required to assure that those actions protect the public health and safety or the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the administrator of the United States

Environmental Protection Agency or the executive director determines that alone or in combination with other measures this relocation is more cost effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition off site of hazardous wastes or may otherwise be necessary to protect the public health or safety.

*(26)* [(25)] "Removal" means the cleanup or removal of released hazardous wastes from the environment; the actions necessary to be taken in the event of the threat of release of hazardous wastes into the environment; the actions necessary to monitor, assess, and evaluate the release or threat of release of hazardous wastes; the disposal of removed material; or the taking of other actions as may be necessary to prevent, minimize, or mitigate damage to the public health and welfare or the environment that may otherwise result from a release or threat of release. The term also includes security fencing or other measures to limit access, provision of alternate water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under Section 104(b) of the environmental response law, and any emergency assistance that may be provided under the federal Disaster Relief Act of 1974 (42 U.S.C. 5121 et seq.).

*(27)* [(26)] "Rubbish" means nonputrescible solid waste (excluding ashes), consisting of both combustible and noncombustible waste materials; combustible rubbish includes paper, rags, cartons, wood, excelsior, furniture, rubber, plastics, yard trimmings, leaves, and similar materials; noncombustible rubbish includes glass, crockery, tin cans, aluminum cans, metal furniture, and like materials which will not burn at ordinary incinerator temperatures (1600°F to 1800°F).

*(28)* [(27)] "Sanitary landfill" means a controlled area of land upon which solid waste is disposed of in accordance with standards, rules, or orders established by the board of health or the commission.

*(29)* [(28)] "Sludge" means any solid, semisolid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility exclusive of the treated effluent from a wastewater treatment plant.

*(30)* [(29)](A) Until the delegation of RCRA authority to the Railroad Commission of Texas: "solid waste" means any garbage, rubbish, refuse, sludge from a waste treatment plant, water supply treatment plant or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations, and from community and institutional activities, but does not include: (i) solid or dissolved material in domestic sewage, or solid or dissolved material in irrigation return flows, or industrial discharges subject to regulation by permit issued pursuant to Chapter 26, Water Code; (ii) soil, dirt, rock, sand and other natural or man-made inert solid materials used to fill land if the object of the fill is to make the land suitable for the construction of surface improvements; or (iii) waste materials which result from activities associated with the exploration, development, or production of oil or gas or geothermal resources, and any other substance or material regulated by the Railroad Commission of Texas pursuant to Section 91.101, Natural Resources Code, unless such waste, substance, or material results from activities associated with gasoline plants, natural gas or natural gas liquids processing plants, pressure maintenance plants, or repressurizing plants and is a hazardous waste as defined by the administrator of the United States Environmental Protection Agency pursuant to the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., as amended. *For the purposes of Sections 8(g), 11, and 11b, the term "solid waste" shall also include hazardous substances, as they are defined by this Act.*

(B) On delegation of RCRA authority to the Railroad Commission of Texas: "solid waste" means any garbage, rubbish, refuse, sludge from a waste treatment plant, water supply treatment plant or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining and agricultural operations, and from

community and institutional activities, but does not include: (i) solid or dissolved material in domestic sewage, or solid or dissolved material in irrigation return flows, or industrial discharges subject to regulation by permit issued pursuant to Chapter 26, Water Code; (ii) soil, dirt, rock, sand and other natural or man-made inert solid materials used to fill land if the object of the fill is to make the land suitable for the construction of surface improvements; or (iii) waste materials which result from activities associated with the exploration, development, or production of oil or gas or geothermal resources, and any other substance or material regulated by the Railroad Commission of Texas pursuant to Section 91.101, Natural Resources Code. *For the purposes of Sections 8(g), 11, and 11b, the term "solid waste" shall also include hazardous substances, as they are defined by this Act.*

*(31)* [(30)] "Solid waste facility" means all contiguous land, and structures, other appurtenances, and improvements on the land, used for processing, storing, or disposing of solid waste. A facility may be publicly or privately owned and consist of several processing, storage, or disposal operational units; e.g., one or more landfills, surface impoundments, or combinations of them.

*(32)* [(31)] "Solid waste technician" means an individual who is trained in the practical aspects of the design, operation, and maintenance of a solid waste facility in accordance with standards, rules, or orders established by the commission or board of health.

*(33)* [(32)] "Storage" means the holding of solid waste for a temporary period, at the end of which the solid waste is processed, disposed of, or stored elsewhere.

SECTION 2. Subsection (h), Section 3, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended to read as follows:

(h) The department and department of water resources shall submit a report to the presiding officers of the legislature and the governor on January 1, 1987, and each two years thereafter, providing the following information:

(1) a summary of a performance report of the imposed hazardous waste permit and disposal fees, if the fees are approved by the legislature, and related activities to determine the appropriateness of the fee structure;

(2) an evaluation of progress made in accomplishing the public policy of the state in regard to the preference of waste management methods as set forth in Section (3)(e)(1) of this Act;

(3) projections, [for a period of three years from the due date of the report,] of waste volumes by type of waste, disposition of wastes, and remaining capacity *or capacity utilized* for the *treatment and* disposal of the wastes. The *commission* [department and the department of water resources] shall adopt rules requiring persons who generate, store, treat, or dispose of hazardous waste to *respond to a periodic survey* [submit to the state agency of appropriate jurisdiction on an annual basis reports] detailing projections of waste volumes *generated and handled, assumptions used as the bases for these projections,* disposition, and remaining capacity, as it relates to *a surveyed* [each] facility owned or operated by such persons, in order that the *commission* [state agencies] may develop *its* [their] report. [The first report shall be submitted by March 1, 1986, and subsequent reports shall be submitted annually by March 1 thereafter.]

SECTION 3. Subsections (a), (b), (c), (f), and (h), Section 9, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), are amended to read as follows:

(a) A person affected by any ruling, order, decision, or other act of the department or the commission may appeal by filing a petition in a district court of Travis County. A person affected by any ruling, order, decision, or other act of a county, or of a political subdivision exercising the authority granted in Section 6 of this Act, may appeal by filing a petition in a district court having jurisdiction in the county or political subdivision. Except as provided in Section 9(b), the petition must be filed within 30 days after the date of the action, ruling, order, or decision of the governmental entity complained of. Service of citation must be accomplished within 30 days after the date the petition is filed. [Any person filing a petition appealing an administrative order issued pursuant to Section 8(g)

~~must join as parties the state agency issuing the administrative order and may join as parties any other person named in the administrative order and any other person who is or may be liable for the elimination of the actual or threatened release of solid waste governed by the administrative order.~~] The plaintiff shall pursue his action with reasonable diligence. If the plaintiff does not prosecute his action within one year after the action is filed, the court shall presume that the action has been abandoned. The court shall dismiss the suit on a motion for dismissal made by the governmental entity whose action is appealed, unless the plaintiff, after receiving due notice, can show good and sufficient cause for the delay. Except as provided in Section 9(c), in an appeal from an action of the department, the commission, a county, or a political subdivision exercising the authority granted in Section 6 of this Act, the issue is whether the action is invalid, arbitrary or unreasonable.

(b) *Any person subject to an administrative order under Section 8(g) may appeal the order by filing a petition* [~~The filing of a petition appealing an order issued pursuant to Section 8(g)~~] within 45 days after the date of receipt, hand delivery, or publication service of the order [~~shall stay the administrative order as to the appealing party pending action by the district court~~]. *The filing of a motion for rehearing under the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes) shall not be a prerequisite for an appeal of the order. The person appealing the order must join the state agency issuing the administrative order as a party and may join as parties any other person named as a responsible party in the administrative order and any other person who is or may be liable for the elimination of the actual or threatened release of solid waste or hazardous substances governed by the administrative order. The filing of the petition shall not prevent the state agency issuing the administrative order from proceeding with the remedial action program under Section 13 of this Act unless the court enjoins the remedial action under its general equity jurisdiction.* [~~However, the filing of the petition shall not affect any other enforcement powers of the department or department of water resources.~~] An *administrative* order [~~issued pursuant to Section 8(g)~~] shall become final as to non-appealing parties 45 days after the date of receipt, hand delivery, or publication service of the order by, to, or upon such non-appealing parties.

(c)*(1)* The district court shall uphold an administrative order issued pursuant to Section 8(g) if the *commission* [~~department or department of water resources, by a preponderance of the evidence,~~] proves *by a preponderance of the evidence that*:

    *(A)* [~~(1) that~~] there is an actual or threatened release of solid waste *or hazardous substances* that is an imminent and substantial endangerment to the public health and safety or the environment; and

    *(B)* [~~(2) that~~] the person made subject to the administrative order is liable for the elimination of the release or threatened release, in whole or in part.

    *(2) If the appropriateness of the selected remedial action is contested in the appeal of the administrative order, the remedial action shall be upheld unless the court determines that the remedy is arbitrary or unreasonable.*

(f) In appeals of an administrative order issued pursuant to Section 8(g), the district court upon establishing the validity of the order, shall issue an injunction requiring all persons named or joined against whom liability has been established by the department or *the commission* [~~department of water resources~~] or any other party to comply with the terms of the administrative order.

(h)(1) In appeals of an administrative order issued pursuant to Section 8(g) or Section 13(g)(2) of this Act, in any action to enforce such an administrative order, in civil suits seeking injunctive relief under Section 8(g)(1) of this Act, and in cost recovery suits under Section 13(g)(3) or Section 13(g)(4) of this Act, the state, if it prevails, shall be entitled to recover from parties against whom liability has been established its reasonable attorney's fees, its reasonable costs of preparing and providing witnesses, and its reasonable costs of having investigated and assessed the facility or site. The court shall apportion such costs among liable parties as it determines is equitable and just. *All such costs recovered by the state pursuant to Section 13 shall be remitted to the commission and placed in a separate account of the hazardous waste disposal fee fund. All other costs recovered*

*by the state under Section 8(g) shall be remitted to the commission and placed in a separate account of the hazardous waste generation and facility fees fund.*

(2) *In the event an appeal or third party claim is found by the court to be frivolous, unreasonable, or without foundation, the court may assess damages against the party bringing such appeal or third party claim in an amount not to exceed twice the costs incurred by the state or the third party defendant, including reasonable attorney's fees, reasonable costs of preparing and providing witnesses, and reasonable costs of studies, analyses, engineering reports, tests, or other projects the court finds were necessary for the preparation of the party's case.* [Costs recovered by the state under Subdivision (1) of this subsection shall be remitted to the commission and placed in the hazardous waste generation and facility fees fund to be used by the commission for the administration of the hazardous waste management program. All amounts recovered under this subsection shall be placed by the commission in a separate account within the hazardous waste generation and facility fees fund.]

(3) In the event the state's orders enumerated under Subdivision (1) of this subsection are found by the court to be frivolous, unreasonable, or without foundation as regarding any party named in the order, such party appealing or contesting the order shall be entitled to recover from the state its reasonable attorney's fees, its reasonable costs of preparing and providing witnesses, and its reasonable costs of studies, analyses, engineering reports, tests, or other projects the court finds were necessary for the preparation of the party's case.

SECTION 4. Subsections (c) and (d), Section 11a, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), are amended to read as follows:

(c) The hazardous waste disposal fee fund shall consist of money collected by the commission from fees imposed on the operator of a solid waste facility for disposal of hazardous waste under Section 12 of this Act, from interest and penalties imposed under Section 14a of this Act for late payment of a disposal fee or late filing of a report, and from money paid by a liable party for facility cleanup and maintenance under Subsection *(m)* [(g)] of Section 13 of this Act. *In addition, the interest received from the investment of this fund, in accounts under the charge of the treasurer, shall be credited to the hazardous waste disposal fee fund on a pro rata basis. The commission may use the money credited to the account from interest received from the investment of the fund for only those purposes specified in Subsection (d) of this section.*

(d) The commission may use the money collected and deposited in the fund under Subsection (c) of this section only for:

(1) necessary and appropriate removal and remedial action at sites at which *solid* [hazardous] waste or hazardous substances have been disposed if funds from a liable party, independent third party, or the federal government are not sufficient for the removal or remedial action;

(2) necessary and appropriate maintenance of removal and remedial actions for the expected life of those actions if funds from a liable party have been collected and deposited in the fund for that purpose or if funds from a liable party, independent third party, or the federal government are not sufficient for the maintenance; and

(3) expenses related to complying with the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.), the federal Superfund Amendments and Reauthorization Act of 1986, and Sections 8(g) and 13 of this Act.

SECTION 5. Section 13, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is revised to read as follows:

*Sec. 13. IDENTIFICATION, ASSESSMENT, AND CLEANUP OF HAZARDOUS WASTE FACILITIES. (a) The commission shall annually publish an updated state registry identifying, to the extent feasible, every facility that may constitute an imminent and substantial endangerment to public health and safety or the environment due to a release or threatened release of hazardous substances into the environ-*

ment. The registry shall identify the relative priority for action at each listed facility. The relative priority for action at facilities listed on the registry shall be periodically reviewed and revised by the commission, as necessary to accurately reflect the need for action at the facilities. For the purposes of this section, "facility" means (1) any building, structure, installation, equipment, pipe, or pipeline (including any pipe into a sewer or publicly owned treatment works, well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft), or (2) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

(b) The executive director may conduct investigations of facilities which are listed on the state registry, or which it has reason to believe should be included on the state registry, in accordance with Section 7 of this Act. If there is a reasonable basis to believe there may be a release or threatened release of a hazardous substance at a facility, the executive director may submit requests for information and requests for the production of documents to any person who has or may have information or documents relevant to:

(1) the identification, nature, or quantity of materials that have been generated, treated, stored, or disposed of at a facility or transported to a facility;

(2) the identification of soils, ground water, or surface water at a facility that have been or may be affected by an actual or threatened release of a hazardous substance;

(3) the nature or extent of a release or threatened release of a hazardous substance at or from a facility; or

(4) the ability of a person to pay for or to perform a remedial action.

If the requested information or documents are not produced in a timely manner, the commission may issue an order directing compliance with the requests for information or production of documents. Information or documents requested under this subsection shall be public records, except that, if a showing satisfactory to the commission is made by the owner of the records that the records would divulge trade secrets if made public, then the commission shall consider the copied records as confidential. Nothing in this subsection shall require the commission to consider the composition or characteristics of hazardous substances being processed, stored, disposed of, or otherwise handled to be held confidential. The commission shall promulgate rules regarding the provision of notice and an opportunity for a hearing before the commission on whether the requested information or documents should be produced.

(c) Prior to the listing of a facility on the state registry, the executive director shall first determine whether the potential endangerment to public health and safety or the environment at the facility can be resolved by the present owner or operator under the federal Resource Conservation and Recovery Act of 1976 (42 U.S.C. 6901) or by some or all of the potentially responsible parties identified in Section 8(g), pursuant to an agreed administrative order issued by the commission. If the potential endangerment to public health and safety or the environment can be resolved in such a manner, the facility shall not be listed on the state registry. Notice of the approach selected to resolve the apparent endangerment to health and public safety or the environment and the fact that this action is being taken in lieu of listing the facility on the state registry shall be published in the Texas Register. If after reasonable efforts the executive director determines that the potential endangerment to public health and safety or the environment cannot be resolved by either of these approaches, the executive director shall evaluate the facility to determine whether the site exceeds the commission's minimum criteria for listing on the state registry. These minimum criteria shall be promulgated by rule. The executive director shall also evaluate the facility to determine whether it is eligible for listing on the federal National Priorities List. The commission shall proceed under this section only if, based on information available to the executive director, the facility is eligible for listing on the state registry but not eligible for the federal National Priorities List.

3219

*(1) Once the executive director has determined that the facility is eligible for listing on the state registry, the commission shall publish in the Texas Register and in a newspaper of general circulation in the county in which the facility is located a notice of intent to list the facility on the state registry. The notice shall at least specify the name and location of the facility, the general nature of the potential endangerment to public health and safety or the environment as determined by information available to the executive director at that time, and the duties and restrictions imposed by Subsection (c)(3) of this section. The notice also shall provide that interested parties may do either or both of the following: (A) submit written comments to the commission relative to the proposed listing of the facility; or (B) request a public meeting to discuss the proposed listing by submitting a request within 30 days of issuance of the notice.*

*(2) Once the facility is determined to be eligible for listing on the state registry, the executive director shall make all reasonable efforts to identify all potentially responsible parties for remediation of the facility. Concurrent with the publication of general notice in accordance with Subdivision (1) of this subsection, the executive director shall provide to each identified potentially responsible party direct, written notification of the proposed listing of the facility on the state registry and of the procedures for requesting a public meeting to discuss the listing and the information included in the general notice as required by Subdivision (1) of this subsection. Written notifications under this subsection shall be by certified mail, return receipt requested, by mailing notice to each named responsible party at the party's last known address.*

*(3) If a public meeting is requested regarding the proposed listing of a facility on the state registry, the commission shall publish general notice of the date, time, and location of the public meeting in the Texas Register and in the same newspaper in which the notice of the opportunity to request the public meeting was published. The public meeting notice shall be provided at least 30 days in advance of the meeting. Notice of the meeting also shall be provided by certified mail, return receipt requested, to all identified potentially responsible parties at the parties' last known addresses. Nonreceipt of any notice mailed to a potentially responsible party pursuant to this subdivision or Subdivision (2) of this subsection shall in no way affect the responsibilities, duties, or liabilities imposed on the party. Contemporaneously with the issuance of notice of the public meeting, the executive director shall make available to all interested parties the public records he has regarding the facility. For the purposes of providing this information, the executive director shall provide a brief summary of the public records he has and make these public records available for inspection and copying during regular business hours.*

*(4) The public meetings will be legislative in nature and not contested case hearings under the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes). The meeting shall be held for the purpose of obtaining additional information regarding the facility relative to the eligibility of the facility for listing on the state registry and the identification of potentially responsible parties.*

*(5) Subsequent to the public meeting or after opportunity to request a public meeting has passed, the commission shall file or cause to be filed an affidavit or notice in the real property records of the county in which a facility is located identifying the facility as one proposed for listing on the state registry, unless the executive director determines, based on information presented at the public meeting, that efforts to list the facility on the state registry should not be pursued.*

*(6)(A) Subsequent to the public meeting or after opportunity to request a public meeting has passed, but prior to any listing of the facility on the state registry, the commission shall allow all identified potentially responsible parties the opportunity to fund or conduct, if appropriate, a remedial investigation/feasibility study, or similar study as approved by the executive director, for the facility. The potentially responsible parties shall have 90 days from the date of the issuance of notice of the opportunity to request a public meeting to make a good faith offer to conduct the*

*study. If a good faith offer from all or some of the potentially responsible parties is received by the commission within 90 days, those making the offer shall have an additional 60 days within which to negotiate an agreed administrative order from the commission, which shall include a scope of work. The commission shall not require the participating potentially responsible parties to agree to perform the remedial action or admit liability for the facility remediation in this agreed administrative order.*

*(B) If no potentially responsible party makes a good faith offer to conduct the remedial investigation/feasibility study or similar study as approved by the executive director or .if the participating potentially responsible parties fail to conduct or complete an-approved study, the commission is authorized to conduct or complete the study using funds from the hazardous waste disposal fee fund.*

*(C) To encourage potentially responsible parties to perform the remedial investigation/feasibility study or other similar study as approved by the executive director, no costs for commission oversight of the study may be assessed against those parties who fund or perform the study. Nonparticipating potentially responsible parties who are ultimately determined to be liable for remediation of the facility under this Act or who subsequently enter into an agreed order relative to the remediation of the facility may be assessed up to the full costs for commission oversight of the study process. If all potentially responsible parties participate or agree to fund the remedial investigation/feasibility study or other similar study, all commission oversight costs shall be borne by the hazardous waste disposal fee fund.*

*(D) Once the executive director has determined that a facility is eligible for listing on the state registry, no person shall perform at the facility any partial or total removal activities except as authorized by the executive director in appropriate circumstances after notice and opportunity for comment to all other potentially responsible parties. The commission may develop rules determining what constitutes an appropriate circumstance to take removal action under this paragraph. Authorization by the executive director to conduct a partial or total removal action shall not constitute a final determination of the party's ultimate liability for remediation of the facility, nor a determination of divisibility.*

*(7)(A) Once the facility is determined to be eligible for listing on the state registry, the owner or operator of the facility must provide the executive director with written notice of any substantial change in use of the facility at least 60 days before the change in use is made. Notice of a proposed substantial change in use shall be in writing, addressed to the executive director, provided by certified mail, return receipt requested, and shall include a brief description of the proposed change in use. A substantial change in use shall be defined by rule and shall include but not be limited to actions such as the erection of a building or other structure at the facility, the use of the facility for agricultural production, the paving of the facility for use as a roadway or parking lot, and the creation of a park or other public or private recreational use on the facility.*

*(B) If, within 30 days of the notice, the executive director determines that the proposed substantial change in use will interfere significantly with a proposed or ongoing remedial investigation/feasibility study, or similar study approved by the executive director, or expose the public health and safety or the environment to a significantly increased threat of harm, then he shall notify the owner or operator of his determination. Once the determination is made and notification given, the owner or operator shall not proceed with the proposed substantial change in use. The owner or operator may request a hearing before the commission on whether the determination should be modified or set aside by submitting a request within 30 days of receipt of the executive director's determination. If a hearing is requested, the commission shall initiate the hearing within 45 days of the receipt of the request. The hearing shall be conducted in accordance with the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's*

*Texas Civil Statutes). The executive director's determination shall become unappealable 30 days after issuance if a hearing is not requested.*

*(8) Within a reasonable time following the completion of the remedial investigation/feasibility study or other similar study, if required, the executive director shall select a proposed remedial action. Subsequent to its selection of a proposed remedial action, the commission shall hold a public meeting to discuss the proposed action. The commission shall publish notice of the meeting in the Texas Register and in a newspaper of general circulation in the county where the facility is located at least 45 days prior to the public meeting. The notice shall provide information regarding the proposed remedial action and the date, time, and place of the meeting. The commission shall also mail the same information to each potentially responsible party by certified mail, return receipt requested, at each party's last known address at least 45 days prior to the public meeting Contemporaneously with the issuance of notice of the public meeting, the executive director shall make available to all interested parties the public records he has regarding the facility. For purposes of providing this information, the executive director shall provide a brief summary of the public records he has and make these public records available for inspection and copying during regular business hours. Nonreceipt of any notice mailed to a potentially responsible party pursuant to this subdivision shall in no way affect the responsibilities, duties, or liabilities imposed on any such party.*

*(9) The public meeting shall be legislative in nature and not conducted as a contested case hearing under the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes). The meeting shall be held for the purpose of obtaining additional information regarding the facility and the identification of additional potentially responsible parties. Those in attendance may present their comments on the proposed remedial action, and the executive director may revise its proposed remedial action in light of the presentations.*

*(10)(A) Subsequent to the public meeting on the proposed remedial action, the commission shall provide all identified potentially responsible parties an opportunity to fund or perform the proposed remedial action. The potentially responsible parties shall have 60 days from the date of the public meeting in which to make a good faith offer to perform or fund the proposed remedial action. If a good faith offer is made by all or some of the potentially responsible parties within the 60-day period, then these parties will have an additional 60 days to negotiate an agreed administrative order from the commission, which shall include a scope of work. The commission shall not require an admission of liability in the agreed administrative order.*

*(B) To encourage potentially responsible parties to perform the remedial action, no costs for commission oversight of the remedial action may be assessed against those parties who fund or perform the remedial action. Nonparticipating potentially responsible parties who are ultimately determined to be liable for remediation of the facility may be assessed up to the full costs for commission oversight of the remedial action. If all potentially responsible parties conduct or fund the remedial action, all commission oversight costs shall be borne by the hazardous waste disposal fee fund. Participation in the remedial action does not relieve those who did not conduct or fund the remedial investigation/feasibility study or other similar study approved by the executive director from paying their portion of the oversight costs of that phase of the remediation.*

*(C) The executive director may authorize a potentially responsible party to conduct a partial remedial action at a portion of the facility if the executive director determines that the release or threatened release is divisible after notice and opportunity for comment to all other potentially responsible parties. For purposes of this section, "divisible" means that the hazardous substance released or threatened to be released is capable of being managed separately under the remedial action plan. A determination of divisibility by the executive director shall have no res judicata or collateral estoppel effect on a potentially responsible party's ultimate liability for remediation of the facility under Section 8.*

*(11) After consideration of all good faith offers to perform a remedial action, the commission shall issue a final administrative order that shall:*

*(A) list the facility on the state registry, thus determining that the facility poses an imminent and substantial endangerment to public health and safety or the environment;*

*(B) specify the selected remedial action;*

*(C) list the parties determined to be responsible for remediating the facility;*

*(D) make findings of fact describing actions voluntarily undertaken by responsible parties;*

*(E) order the responsible parties to remediate the facility and, if appropriate, reimburse the hazardous waste disposal fee fund for remedial investigation/feasibility study and remediation costs;*

*(F) establish a schedule for completion of the remedial action;*

*(G) state any determination of divisibility of responsible party liability; and*

*(H) give notice of the duties and restrictions imposed by Subsection (f) of this section.*

*The provisions in Sections 8(g), 9, 10, and 11 of this Act relating to administrative orders shall apply to orders issued pursuant to this paragraph.*

*(12) If a potentially responsible party is newly identified after a final administrative order has been issued by the commission pursuant to Subdivision (11) of this subsection, that party shall have 60 days to negotiate an amendment to the existing order. The commission shall not be prohibited from issuing a separate order for the newly identified potentially responsible party if it determines that the circumstances warrant a separate order. The responsible parties identified in the order issued pursuant to Subdivision (11) of this subsection shall be allowed to comment on the issuance of a separate order for the newly identified potentially responsible party.*

*(d) The commission shall file or cause to be filed an affidavit or notice in the real property records of the county in which the facility is located stating that the facility has been listed on or deleted from the state registry or is no longer proposed for listing on the state registry, within a reasonable period after a determination has been made.*

*(e) Any owner or operator or other named responsible party of a facility listed or to be listed in the state registry may request the commission to delete the facility from the state registry, modify the facility's priority within the state registry, or modify any information regarding the facility by submitting a written statement setting forth the grounds of the request in the form as the commission may require pursuant to its promulgated rules. The commission shall promulgate rules establishing procedures, including public hearings, for review of requests submitted pursuant to this subsection.*

*(f) Subsequent to the listing of a facility on the state registry, no person may substantially change the manner in which the facility is used without notifying the executive director and receiving written approval of the executive director for the change. A substantial change in use shall be defined by rule and shall include but not be limited to actions such as the erection of a building or other structure at the facility, the use of the facility for agricultural production, the paving of the facility for use as a roadway or parking lot, and the creation of a park or other public or private recreational use on the facility. The notice shall be in writing, addressed to the executive director, provided by certified mail, return receipt requested, and shall include a brief description of the proposed change of use. The executive director shall approve or disapprove the proposed action within 60 days of receipt of the notice of proposed change in use. The executive director shall not approve the proposed change of use if such new use will significantly interfere with a proposed, ongoing, or completed remedial action program at a facility or expose the public health and safety or the environment to a significantly increased threat of harm.*

*(g)(1) Whenever the commission, after investigation, finds that there exists a release or threatened release of a hazardous substance at a facility that: (A) is causing irreversible or irreparable harm to the public health and safety or the environment; and (B) the immediacy of the situation makes it prejudicial to the public interest to delay action until an administrative order can be issued to potentially responsible parties or until a judgment can be entered in an appeal of an administrative order; the commission may, with the funds available to the commission from the hazardous waste disposal fee fund, undertake immediate removal action at the facility to alleviate the harm. After the immediate danger of irreversible or irreparable harm has been alleviated, the commission shall proceed pursuant to the provisions of this section. Findings required pursuant to this subsection shall be in writing and may be made by the commission on an ex parte basis subject to judicial review pursuant to the substantial evidence rule as provided by the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes).*

*(2) The reasonable expenses of any immediate removal action taken by the commission may be recoverable from the persons described in Section 8, and the state may seek to recover the reasonable expenses in any court of appropriate jurisdiction.*

*(h) Whenever a person ordered to eliminate an imminent and substantial endangerment to the public health and safety or the environment has failed to do so within the time limits specified in the order or any extension of time approved by the commission, the commission may implement the remedial action program for the facility. The reasonable expenses of implementing the remedial action program by the commission shall be paid by the persons to whom the order was issued and shall be recoverable under the provisions of Subsection (m) of this section.*

*(i)(1) The goal of any remedial action shall be the elimination of the imminent and substantial endangerment to the public health and safety or the environment posed by a release or threatened release of a hazardous substance at a facility. The appropriate extent of the remedial action at any particular facility shall be determined by the commission's selection of the remedial alternative which the state agency determines is cost effective (i.e., the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment).*

*(2) In considering the appropriate remedial action program at a particular facility, the commission may approve a program that does not attain a level or standard of control at least equivalent to a legally applicable or relevant and appropriate standard, requirement, criterion, or limitation, as required by state or local law, if the commission finds that:*

*(A) the remedial action selected is only part of a total remedial action that will attain such level or standard of control when completed;*

*(B) compliance with the requirement at that facility will result in greater risk to public health and safety or the environment than alternative options;*

*(C) compliance with the requirement is technically impracticable from an engineering perspective;*

*(D) the remedial action selected will attain a standard of performance that is equivalent to that required under the otherwise applicable standard, requirement, criterion, or limitation through use of another method or approach;*

*(E) with respect to a local standard, requirement, criterion, or limitation, the locality has not consistently applied (or demonstrated the intention to consistently apply) the standard, requirement, criterion, or limitation in similar circumstances of other remedial actions within the locality; or*

*(F) with respect to an action using solely state funds, selection of a remedial action that attains such levels or standards of control will not provide a balance between the need for protection of public health and safety or the environment at the facility and the availabilty of state funds to respond to other sites that present*

a threat to public health and safety or the environment, taking into consideration the relative immediacy of the threats.

(j) In addition to all other remedies available to the state under this Act or any other law or statute, all remediation costs for which a person is liable to the state shall constitute a lien in favor of the state on the real property and the rights to the real property that are subject to or affected by a remedial action. This provision is cumulative of other remedies available to the state under this Act.

(1) The lien imposed by this subsection shall arise and attach to the real property subject to or affected by a remedial action at the time an affidavit is recorded and indexed in accordance with this subsection in the county in which the real property is located. For the purpose of determining rights of all affected parties, the lien shall not relate back to a time prior to the date on which the affidavit is recorded, which date shall be the lien inception date. The lien shall continue until the liability for the costs is satisfied or becomes unenforceable through operation of law.

(2) The affidavit shall be executed by an authorized representative of the commission and must show:

(A) the names and addresses of the persons liable for the costs;

(B) a description of the real property that is subject to or affected by the remediation action for the costs or claims; and

(C) the amount of the costs and the balance due.

(3) The county clerk shall record the affidavit in records kept for that purpose and shall index the affidavit under the names of the persons liable for the costs.

(4) The commission shall record a relinquishment or satisfaction of the lien when the lien is paid or satisfied.

(5) The lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien.

(6) The lien imposed by this subsection shall not be valid or enforceable if real property or an interest therein or a mortgage, lien, or other encumbrance upon or against real property is acquired before the affidavit is recorded, unless the person acquiring the real property or an interest therein or acquiring the mortgage, lien, or other encumbrance thereon had or reasonably should have had actual notice or knowledge that the real property is subject to or affected by a clean-up action or has knowledge that the state has incurred clean-up costs.

(7) If a lien is fixed or attempted to be fixed as provided in this subsection, the owner of the real property affected by the lien may file a bond to indemnify against the lien. The bond shall be filed with the county clerk of the county in which the real property subject to the lien is located. An action to establish, enforce, or foreclose any lien or claim of lien covered by the bond must be brought not later than the 30th day after the date of service of notice of the bond.

(8) The bond must:

(A) describe the real property upon which the lien is claimed;

(B) refer to the lien claimed in a manner sufficient to identify it;

(C) be in an amount double the amount of the lien referred to;

(D) be payable to the commission;

(E) be executed by the party filing the bond as principal and a corporate surety authorized under the law of this state to execute the bond as surety; and

(F) be conditioned substantially that the principal and sureties will pay to the commission the amount of the lien claimed, plus costs, if the claim is proved to be a lien on the real property.

(9) After the bond is filed, the county clerk shall issue notice of the bond to the named obligee. A copy of the bond must be attached to the notice. The notice may be served on each obligee by having a copy delivered to the obligee by any person competent to make oath of the delivery. The original notice shall be returned to the

*office of the county clerk, and the person making service of copy shall make an oath on the back of the copies showing on whom and on what date the copies were served. The county clerk shall record the bond notice and return in records kept for that purpose. In acquiring an interest in real property, a purchaser or lender may rely on and is absolutely protected by the record of the bond, notice, and return.*

*(10) The commission may sue on the bond after the 30th day following the date on which the notice is served but may not sue on the bond later than one year after the date on which the notice is served. If the commission recovers in a suit on the lien or on the bond, it is entitled to also recover reasonable attorney's fees.*

*(k) Money for actions taken or to be taken by the commission in connection with the elimination of an imminent and substantial endangerment to the public health and safety or the environment pursuant to this section shall be payable directly to the commission from the hazardous waste disposal fee fund. This includes any costs of inspection or sampling and laboratory analysis of wastes, soils, air, surface water, and ground water done on behalf of a state agency and the costs of investigations to identify and locate potentially responsible parties.*

*(l) The commission shall seek remediation of facilities by potentially responsible parties prior to expenditure of federal or state funds for the remediations. Potentially responsible parties shall coordinate with ongoing federal and state hazardous waste programs, although no state or local permit shall be required for any removal or remedial action conducted on site. Subject to the provisions of Subsection (i) of this section, the state may enforce any federal or state standard, requirement, criterion, or limitation to which the remedial action would otherwise be required to conform if a permit were required. No action taken by the person to contain or remove a release or threatened release in accordance with an approved remedial action plan shall be construed as an admission of liability for said release or threatened release. No person who renders assistance in containing or removing a release or threatened release in accordance with an approved remedial action plan shall be liable for any additional remediation costs at the facility resulting solely from acts or omissions of the person in rendering the assistance in compliance with the approvals required by this subsection, unless the remediation costs were caused by the person's gross negligence or wilful misconduct. Except as specifically provided in this subsection, these provisions shall not be construed to expand or diminish the common law tort liability, if any, of private parties participating in a remediation action for civil damages to third parties.*

*(m) The commission shall file a cost recovery action against all responsible parties who have not complied with the terms of an administrative order issued pursuant to Subdivision (11) or (12) of Subsection (c) of this section. The commission shall file the cost recovery action no later than one year after all remedial action has been completed. The state may seek a judgment against the noncompliant parties for the total amount of the cost of the remedial action, including costs of any necessary studies and oversight costs, minus the amount agreed to be paid or expended by any other responsible parties pursuant to an order issued pursuant to Subdivision (11) or (12) of Subsection (c) of this section. The action may also include a plea seeking civil penalties for noncompliance with the commission's administrative order and a claim for up to double the state's costs if the responsible party's defenses are determined by the court to be unreasonable, frivolous, or without foundation.*

*(n)(1) A responsible party named in an administrative order who does not comply with the order shall become subject to the imposition of administrative or civil penalties under Section 8b of this Act. The penalties may be assessed only from the date after which the administrative order becomes nonappealable.*

*(2) The commission is authorized to include provisions within an agreed administrative order that stipulate administrative penalty amounts for failure to comply with the order. The penalty provisions may be applicable to either or both of the remedial investigation/feasibility study and remedial action orders.*

*(o)(1) The commission shall promulgate rules necessary to develop a mixed funding program in which available money from potentially responsible parties is combined*

*with state or federal funds to clean up a facility in a timely manner. Use of the state or federal funds in a mixed funding approach shall not preclude the state or federal government from seeking recovery of its costs from nonparticipating potentially responsible parties.*

*(2) The commission shall assess and may, through rulemaking, develop and implement a de minimis settlement program. Under the program, the commission shall be required to consider the advantages of developing a final settlement with potentially responsible parties that are responsible for only a minor portion of the response costs at a facility because the hazardous substances the party is responsible for are minimal in amount or in hazardous effect by comparison with the hazardous substances attributable to other parties.*

*(3) The commission shall investigate additional alternative programs to encourage potentially responsible parties to investigate or remediate facilities and report its findings to the 72nd Legislature with recommendations for legislative action.*

*(p) The commission is authorized to determine whether a potentially responsible party is. financially capable of conducting any necessary remediation studies or remedial action. The commission shall promulgate rules to develop the criteria for determination of financial capability. If no financially capable potentially responsible parties exist for a facility, the commission shall issue an administrative order stating its determination that the facility constitutes an imminent and substantial endangerment and that there are no financially capable potentially responsible parties. The commission shall then conduct its own remediation study and remedial action, using federal funds if available. If federal funds are not available, state funds from the hazardous waste disposal fee fund shall be used. Generally, the remediation of listed facilities shall be achieved first by private party funding, second with the aid of federal funds, and third, if necessary, with state funds from the hazardous waste disposal fee fund.*

*(q) The executive director or the commission shall have the authority to extend any time period specified in this section if deemed appropriate.*

[Sec. 13. IDENTIFICATION AND ASSESSMENT OF HAZARDOUS WASTE FACILITIES. (a) The department of water resources, in cooperation with the department, shall conduct and complete a survey of the state by July 1, 1986, the purpose of which is to identify to the extent feasible every hazardous waste facility which may constitute an imminent and substantial endangerment to public health and safety or the environment. The work already performed to identify candidate sites for inclusion in the federal National Priorities List shall serve as the basis for such a survey. As soon as possible after completion of a draft survey, the department of water resources shall conduct a public hearing to solicit comments on the draft survey and information on additional candidate sites. Not later than January 1, 1987, the department of water resources shall publish a registry identifying each facility listed by the survey, the relative priority of the need for action at each facility to remedy environmental and health problems resulting from the presence of hazardous wastes at such facilities, and setting forth recommendations for actions which may be pursued to achieve effective, efficient, and timely cleanup or other resolution of the problems identified for each facility. Such recommendations shall not constitute the remedial investigation/feasibility study for the relevant facility, but shall form the preliminary basis for such a study. The cleanup of such facilities shall be achieved first by private party funding, second with the aid of federal funds, and third, if necessary, with state funds from the hazardous waste permit and disposal fee, if the fee is approved by the legislature. A draft copy of the registry shall be circulated to the department for comment prior to publication. Three copies of the registry, as published, shall be delivered to the Office of the Governor.

[(b)(1) The department of water resources may conduct investigations of the facilities listed in the registry and may investigate areas or sites which it has reason to believe should be included in the registry, in accordance with Section 7 of this Act.

[(2) The department of water resources shall, as part of the registry, assess by January 1, 1987, and each year thereafter, and, based upon new information received from sources including but not limited to public hearings, reassess, in cooperation with

the department, the relative priority of the need for action at each facility listed in the registry to remedy environmental and health problems resulting from the presence of hazardous wastes at such facilities.

[(c) The department of water resources shall update the registry periodically to add facilities which may constitute an imminent and substantial endangerment to public health and safety or the environment and to delete facilities which have been cleaned up pursuant to Subsection (g) of this section or delisted pursuant to Subsection (e) of this section.

[(d) The department of water resources shall file an affidavit or notice in the real property records of the county in which a facility is located identifying those facilities included in the registry, as well as those facilities deleted from the registry.

[(e)(1) Within thirty (30) days after the survey pursuant to Subsection (a) of this section is completed, the department of water resources shall notify in writing the parties identified as responsible for all or any part of each facility or area included in the registry prepared pursuant to such Subsection (a) of the inclusion of the facility or area on such survey. Thereafter, two months before any unincluded facility or area is added to the registry, the department of water resources shall notify in writing the parties identified as responsible for all or any part of such facility or area of the contemplated inclusion of such facility or area on such registry. Written notifications under this subsection shall be by certified mail, return receipt requested, by mailing notice to each such named responsible party at the party's last known address.

[(2) Notice pursuant to Paragraph (1) of this subsection shall include but not be limited to a description of the duties and restrictions imposed by Subsection (f) of this section.

[(3) Non-receipt of any notice mailed to a named responsible party pursuant to this subsection shall in no way affect the responsibilities, duties or liabilities imposed on any such party.

[(4) Any owner or operator or other named responsible party of a facility listed or to be listed in the registry of the department of water resources pursuant to this section may request the department of water resources to delete such facility from the registry, modify the facility's priority within the registry or modify any information regarding such facility by submitting a written statement setting forth the grounds of the request in such form as the department of water resources may require.

[(5) Within one hundred and eighty (180) days after the effective date of this provision, the department of water resources shall propose rules establishing procedures, including public hearings, for review of delisting requests submitted pursuant to this subsection.

[(f)(1) Subsequent to the listing of a facility on the registry prepared and maintained by the department of water resources, no person may substantially change the manner in which the facility is used without notifying the department of water resources and receiving written approval of the department of water resources for such change. A substantial change of use shall be defined in rules adopted by the board and shall include, but not be limited to, actions such as the erection of a building or other structure at such facility, the use of such facility for agricultural production, the paving of such facility for use as a roadway or parking lot, and the creation of a park or other public or private recreational facility on such facility. Such notice shall be in writing, addressed to the executive director and shall include a brief description of the proposed change of use. Such notice shall be submitted in writing at least sixty days before any physical alteration of the land or construction will occur or, in the event any alteration or construction is not required to initiate such change of use, at least sixty days before any change of use.

[(2) The executive director shall not approve such change of use if such new use will interfere significantly with a proposed, ongoing or completed hazardous waste facility remedial action program at such facility or expose the environment or public health to a significantly increased threat of harm.

[(g)(1) The cleanup of a facility identified by the department of water resources in the registry which constitutes an imminent and substantial endangerment to the public health

and safety or the environment shall proceed on an expedited basis pursuant to the following guidelines:

[(A) wherever possible, parties identified as liable parties pursuant to Section 8(g)(1) should be notified by the department of water resources of an opportunity to participate in a voluntary cleanup of the facility;

[(B) if all persons liable under Section 8(g)(1) do not volunteer to develop and implement a remedial action program for the facility, then private parties who are willing to participate in cleanup activities voluntarily should be allowed to do so and they may seek cost recovery pursuant to Section 11(b) from those liable parties not participating in the voluntary cleanup;

[(C) if no parties identified as liable under Section 8(g)(1) volunteer to develop and implement a remedial action program for the facility, then independent third parties who are willing to participate voluntarily in the cleanup of the facility should be permitted to contract with the department of water resources to do so and they may seek cost recovery pursuant to Section 11(b) from those liable parties not participating in the voluntary cleanup;

[(D) where voluntary assistance from the private sector is not forthcoming, federal funds should be used for facility cleanup if such funds are timely available; and

[(E) state funds should be used only when a liable party or independent third party cleanup or federal funds are not timely available.

[(2) Whenever the department of water resources finds that there exists an actual or threatened release of hazardous wastes at a hazardous waste facility listed on the registry that presents an imminent and substantial endangerment to the public health and safety or the environment, it may order the owner and/or operator of such facility and/or any other person responsible for the release or threatened release at such facility (A) to develop a remedial action program, subject to the approval of the department of water resources, at such facility, and (B) to implement such program within reasonable time limits specified in the order. The provisions in Sections 8(g), 9, 10 and 11 of this Act relating to administrative orders shall apply to orders issued pursuant to this paragraph.

[(3) Whenever the commission, after investigation, finds that there exists a release or threatened release of hazardous wastes at a facility identified in the registry that:

[(A) is causing irreversible or irreparable harm to the public health and safety or the environment; and

[(B) the immediacy of the situation makes it prejudicial to the public interest to delay action until an administrative order can be issued to liable parties pursuant to Paragraph (2) of this subsection or until a judgment can be entered in an appeal of an administrative order; the commission may, with the funds available to the commission from the hazardous waste permit and disposal fees, if approved by the Legislature, undertake immediate removal action at the facility to alleviate the harm. After the immediate danger of irreversible or irreparable harm has been alleviated, the commission shall proceed pursuant to Paragraph (2) of this subsection. Findings required pursuant to this paragraph shall be in writing and may be made by the commission on an ex parte basis subject to judicial review pursuant to the substantial evidence rule as provided by the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes).

[(C) The reasonable expenses of any immediate removal action taken by the Texas Water Commission may be recoverable from the persons described in Section 8(g)(2) and the state may seek to recover such reasonable expenses in any court of appropriate jurisdiction.

[(4) Whenever a person ordered to eliminate an imminent and substantial endangerment to the public health and safety or the environment has failed to do so within the time limits specified in the order, and no third party has agreed to develop and implement a remedial action program for the facility pursuant to Paragraph (1)(C) of this subsection, the department of water resources may develop and implement a remedial action program for such facility. The reasonable expenses of developing and

implementing such remedial action program by the department of water resources shall be paid by the persons to whom the order was issued and the state may seek to recover such reasonable expenses in any court of appropriate jurisdiction. Any action instituted by the department of water resources pursuant to this paragraph shall be subject to the provis ,ns of Sections 8(g), 9, 10, and 11 of this Act.

[(5) In the event that the department of water resources has found that there exists a release or threatened release of hazardous wastes at a facility on the registry which presents an imminent and substantial endangerment to the public health and safety or the environment but, after a reasonable attempt to determine who may be liable for such release or threatened release in accordance with Section 8(g), is either unable to determine who may be liable, or is unable to locate a person who may be liable, and no independent third party agrees to develop and implement a remedial action program for the facility in accordance with Paragraph (1)(C) of this subsection, the department of water resources may develop and implement a remedial action program for such facility. Federal funds shall be used for such cleanup to the maximum extent timely available in accordance with Paragraph (1)(D) of this subsection. The department of water resources shall make every effort to secure appropriate relief from any person subsequently identified or located who is liable for the release or threatened release of hazardous waste at such facility, including, but not limited to, development and implementation of a remedial action program, payment of the cost of such a program and recovery of any reasonable expenses incurred by the state.

[(6) The goal of any remedial action program shall be the elimination of the imminent and substantial endangerment to the public health and safety or the environment posed by a release or threatened release of hazardous wastes at a facility. The appropriate extent of remedy at any particular facility shall be determined by the department of water resources' selection of the remedial alternative which the state agency determines is cost effective (i.e., the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of the public health and safety or the environment).

[(7) All cleanup costs for which a person is liable to the state shall constitute a lien in favor of the state on the real property and the rights to such real property that are subject to or affected by a cleanup action.

[(A) The lien imposed by this paragraph shall arise and attach to the real property subject to or affected by a cleanup action at the time an affidavit is recorded and indexed in accordance with this paragraph in the county in which such real property is located. For the purpose of determining rights of all affected parties, the lien shall not relate back to a time prior to the date on which the affidavit is recorded, which date shall be the lien inception date. The lien shall continue until the liability for the costs is satisfied or becomes unenforceable through operation of law.

[(B) The affidavit shall be executed by an authorized representative of the department of water resources and must show:

[(i) the names and addresses of the persons liable for such costs;

[(ii) a description of the real property that is subject to or affected by the cleanup action for the costs or claims; and

[(iii) the amount of the costs and the balance due.

[(C) The county clerk shall record the affidavit in records kept for that purpose and shall index the affidavit under the names of the persons liable for such costs.

[(D) The department of water resources shall record a relinquishment or satisfaction of the lien when the lien is paid or satisfied.

[(E) The lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien.

[(F) The lien imposed by this paragraph shall not be valid or enforceable if:

[(i) real property or an interest therein, or

[(ii) a mortgage, lien, or other encumbrance upon or against real property, is acquired before the affidavit is recorded unless the person acquiring the real property or an interest therein or acquiring the mortgage, lien or other encumbrance thereon had or reasonably should have had actual notice or knowledge that the real property is subject to or affected by a clean-up action, or has knowledge that the state has incurred clean-up costs.

[(G) If a lien is fixed or attempted to be fixed as provided in this paragraph, the owner of the real property affected by the lien may file a bond to indemnify against the lien. The bond shall be filed with the county clerk of the county in which the real property subject to the lien is located. An action to establish, enforce, or foreclose any lien or claim of lien covered by the bond must be brought not later than the 30th day after the date of service of notice of the bond.

[(H) The bond must:

[(i) describe the real property upon which the lien is claimed;

[(ii) refer to the lien claimed in a manner sufficient to identify it;

[(iii) be in an amount double the amount of the lien referred to;

[(iv) be payable to the department of water resources;

[(v) be executed by the party filing the bond as principal, and a corporate surety authorized under the law of this state to execute the bond as surety; and

[(vi) be conditioned substantially that the principal and sureties will pay to the department of water resources the amount of the lien claimed, plus costs, if the claim is proved to be a lien on the real property.

[(I) After the bond is filed, the county clerk shall issue notice of the bond to the named obligee. A copy of the bond must be attached to the notice. The notice may be served on each obligee by having a copy delivered to the obligee by any person competent to make oath of the delivery. The original notice shall be returned to the office of the county clerk, and the person making service of copy shall make an oath on the back of the copies showing on whom and on what date the copies were served. The county clerk shall record the bond notice and return in records kept for that purpose. In acquiring an interest in real property, a purchaser or lender may rely on and is absolutely protected by the record of the bond, notice, and return.

[(J) The department of water resources may sue on the bond after the 30th day following the date on which the notice is served, but may not sue on the bond later than one year after the date on which the notice is served. If the department of water resources recovers in a suit on the lien or on the bond, it is entitled to also recover a reasonable attorney's fee.

[(8) Money for actions taken or to be taken by the department of water resources in connection with the elimination of an imminent and substantial endangerment to the public health and safety or the environment pursuant to this section shall be payable directly to the agency from the hazardous waste permit and disposal fees, if approved by the legislature. This includes any costs of inspection or sampling and laboratory analysis of wastes, soils, air, surface water and groundwater done on behalf of a state agency.

[(9) The department of water resources shall seek private party cleanup of facilities prior to expenditure of federal or state funds for such cleanups. Private parties shall coordinate with ongoing federal and/or state hazardous waste programs and obtain necessary approvals for any such cleanup actions. No action taken by any such person to contain or remove a release or threatened release in accordance with an approved remedial action plan shall be construed as an admission of liability for said release or threatened release. No person who renders assistance in containing or removing a release or threatened release in accordance with an approved remedial action plan shall be liable for any additional cleanup costs at the facility resulting solely from acts or omissions of such person in rendering such assistance in compliance with the approvals required by this subsection, unless such cleanup costs were caused by such person's gross negligence or willful misconduct. Except as specifically provided herein, the

3231

~~provisions of this subsection shall not be construed to expand or diminish the common law tort liability, if any, of private parties participating in a cleanup action for civil damages to third parties.~~]

SECTION 6. The Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes) is amended by adding Section 15 to read as follows:

*Sec. 15. CONTRACTS AND COOPERATIVE AGREEMENTS FOR REMOVAL AND REMEDIAL ACTION. (a) In this section:*

*(1) "Disposal facility" means a site or area at which a hazardous substance, pollutant, or contaminant has been deposited, stored, disposed of, or placed or otherwise come to be located that no longer receives hazardous substances, pollutants, and contaminants.*

*(2) "Fund" means the hazardous waste disposal fee fund created by Section 11a of this Act.*

*(3) "Pollutant or contaminant" means any element, substance, compound, or mixture, including disease-causing agents, that after release into the environment and on exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions, including malfunctions in reproduction, or physical deformations in those organisms or their offspring. The term does not include petroleum, which means crude oil or any fraction of crude oil that is not otherwise specifically listed or designated as a hazardous substance under Sections 2(14)(A) through (F) of this Act; nor does it include natural gas, liquefied natural gas, or synthetic gas of pipeline quality or mixtures of natural gas and synthetic gas.*

*(4) "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, but excludes:*

*(A) a release that results in exposure to persons solely within a workplace, with respect to a claim which those persons may assert against the employer of those persons;*

*(B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine;*

*(C) release of source, by-product, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 et seq.), if the release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under Section 170 of that Act, or, for the purposes of Section 104 of the environmental response law or any other response action, any release of source, by-product, or special nuclear material from any processing site designated under Section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. 7912 and 7942); and*

*(D) the normal application of fertilizer.*

*(5) "Removal" means the cleanup or removal of released hazardous substances, pollutants, or contaminants from the environment; the actions necessary to be taken in the event of the threat of release of hazardous substances, pollutants, or contaminants into the environment; the actions necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, pollutants, or contaminants; the disposal of removed material; or the taking of other actions as may be necessary to prevent, minimize, or mitigate damage to the public health and safety or to the environment that may otherwise result from a release or threat of release. The term also includes security fencing or other measures to limit access, provision of alternate water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under Section 104(b) of the environmental response law, and any emergency assistance that may be provided under the Disaster Relief Act of 1974 (42 U.S.C. 5121 et seq.).*

*(6) "Remedial action" means those actions consistent with a permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance, pollutant, or contaminant into the environment to prevent or minimize the release of hazardous substances, pollutants, or contaminants so that they do not migrate to cause substantial danger to present or future public health and safety or the environment. The term includes such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances, pollutants, contaminants, or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collections of leachate and runoff, on-site treatment or incineration, provision of alternate water supplies, and any monitoring reasonably required to assure that those reactions protect the public health and safety or the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President of the United States determines that alone or in combination with other measures this relocation is more cost effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition off site of hazardous substances, pollutants, or contaminants or may otherwise be necessary to protect the public health or safety. The term does not include off-site transport of hazardous substances or the storage, treatment, destruction, or secure disposition off site of the hazardous substances, pollutants, contaminants, or contaminated materials unless the president determines that those actions:*

*(A) are more cost effective than other remedial actions;*

*(B) will create new capacity to manage, in compliance with Subtitle C of the federal Solid Waste Disposal Act (42 U.S.C. 6921 et seq.), hazardous substances in addition to those located at the affected facility; or*

*(C) are necessary to protect public health and safety or the environment from a present or potential risk that may be created by further exposure to the continued presence of those substances, pollutants, contaminants, or materials;*

*(7) "Response" means removal and remedial action.*

*(b)(1) The commission shall administer this section.*

*(2) The commission shall cooperate with cities and towns and with agencies, departments, and political subdivisions of this state and the United States and its agencies in implementing this section and the environmental response law.*

*(c)(1) The commission may enter into contracts and cooperative agreements with the federal government to carry out removal and remedial action for a specific disposal facility as authorized by Section 104(c)(3) of the environmental response law or to carry out removal and remedial action with regard to a disposal facility under Section 104(d)(1) of the environmental response law.*

*(2) After notice and hearing, the commission may authorize the executive director to enter into contracts and cooperative agreements on behalf of the commission under Subdivision (1) of this subsection pursuant to terms and conditions stated in the commission's order.*

*(3) When acting pursuant to a cooperative agreement with the federal government under Subdivision (1) of this subsection, the commission is authorized to undertake the enforcement and remedial actions authorized under the environmental response law as may be reasonably necessary, in lieu of or in conjunction with actions by the federal government.*

*(4) If the commission enters into a contract or cooperative agreement under Section 104(c)(3) of the environmental response law, the commission shall include in the contract or agreement terms and conditions:*

*(A) to assure future maintenance of the removal and remedial actions provided for the expected life of those actions as determined by the federal government;*

*(B) to assure the availability of a hazardous waste disposal facility acceptable to the federal government that complies with Subchapter III of the federal Solid Waste Disposal Act (42 U.S.C. 6921 et seq.) for any necessary off-site storage, destruction, treatment, or secure disposition of the hazardous substances, pollutants, or contaminants; and*

*(C) to assure payment by the state of:*

*(i) 10 percent of the costs of the remedial actions, including future maintenance; or*

*(ii) at least 50 percent or more of the costs as determined appropriate by the federal government, taking into account the degree of responsibility of the state for any amount spent in response to a release at a disposal facility that was owned by the state at the time of disposal of hazardou₋ substances at the disposal facility.*

*(5) A contract entered into with the federal government under Section 104(d)(1) of the environmental response law is subject to the same cost-sharing requirements provided for contracts in Subdivision (4)(C) of this subsection.*

*(6) The state's share of reasonable response costs shall be paid for from the fund.*

*(d) Before entering into a contract or cooperative agreement under Subsection (c) of this section, the commission shall consult and work with the federal government in determining the response that will be necessary under the contract or cooperative agreement with regard to the particular disposal facility.*

*(e) The commission shall collect and shall file with the federal government any information required by the environmental response law and rules adopted under that law.*

*(f)(1) In this subsection, "engineer or contractor" means a person, including the employee or subcontractor of the person, who performs a contract for evaluation, planning, designing, engineering, construction, equipment, or auxiliary services in connection with the identification of a site containing a hazardous substance, the development of a plan of response to the site, or the supervision or performance of the response to the site.*

*(2) Notwithstanding any other law or rule, the commission may agree in a contract retaining an engineer or contractor to perform a program of removal, remedial action, or cleanup of a hazardous substance in connection with a contract or cooperative agreement under Subsection (c) of this section to indemnify the engineer or contractor against any claim or liability arising from an actual or threatened release of a hazardous substance that occurs during the performance of any work, including:*

*(A) damages arising from economic loss, personal injury, property damages, or death;*

*(B) costs and expenses, including the cost of defense of a lawsuit brought against the engineer or contractor; and*

*(C) claims by third parties for indemnification, contribution, or damages for economic loss, personal injury, property damages, or death.*

*(3) In determining whether to contract to indemnify an engineer or contractor under this subsection, the commission shall consider the availability of insurance to the engineer or contractor for the claims and liabilities against which the commission may indemnify the engineer or contractor under this subsection on the date the engineer or contractor enters into a contract to perform services covered by this subsection. The commission may not contract to indemnify an engineer or contractor under this subsection if the engineer or contractor cannot demonstrate that insurance is unavailable at a reasonable cost or if another engineer or contractor submitting a comparable proposal demonstrates that insurance is available at a reasonable cost.*

*(4) The commission is not obligated to award a contract if it determines adequate liability insurance is not available to an engineer or contractor and that the award of the contract is not in the public interest.*

*(5) The commission may not contract to indemnify an engineer or contractor under this subsection unless the federal government agrees in a contract or cooperative agreement to in turn indemnify the commission under Section 119 of the environmental response law. The commission's decision to contract or not to contract to indemnify an engineer or contractor may be made as an executive act without an adjudicative public hearing and is not subject to judicial review.*

*(6) An engineer or contractor performing a program of removal, remedial action, or cleanup of a hazardous substance under a contract entered into in connection with a contract or cooperative agreement under Subsection (c) of this section that results in an actual or threatened release of hazardous substance is not liable under Sections 8(a), 8(b), or 8b of this Act for an act or failure to act during the performance of the contract. Nothing in this subdivision shall in any way limit or otherwise affect the liability of an engineer or contractor in any other action.*

*(7) Subdivisions (2) and (6) of this subsection do not apply to a grossly negligent act or omission or to wilful misconduct of an engineer or contractor during the performance of a contract.*

*(8) Notwithstanding any other law, an engineer or contractor performing a program of removal, remedial action, or cleanup of a hazardous substance under a contract entered into in connection with a contract or cooperative agreement under Subsection (c) of this section is liable for a grossly negligent act or omission or for wilful misconduct that results in an actual or threatened release of a hazardous substance in violation of Section 8 or 8b of this Act only to the extent that the act, omission, or misconduct caused the violation.*

SECTION 7. Subchapter H, Chapter 26, Water Code, is repealed.

SECTION 8. Except as otherwise provided in this section, all facilities that were listed on the state registry prior to September 1, 1989, remain on the registry and are subject to all provisions of the Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), as amended by this legislation.

(1) This legislation shall have no effect on facilities that are subject to an administrative order issued pursuant to Subsection (g), Section 8, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), requiring remedial action if the order was issued prior to September 1, 1989.

(2) With respect to facilities for which an approved work plan has been developed for a remedial investigation/feasibility study or other similar approved study, this legislation shall have no effect on those activities covered by the approved plan. Activities that are not covered within the approved work plan by September 1, 1989, shall take place in accordance with the Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), as amended by this legislation.

(A) Where activities at such facilities are completed in compliance with the approved work plan, participating responsible parties shall not be assessed costs for commission oversight of the remedial investigation/feasibility study or other similar approved study. Following completion of the approved work plan, all other activities regarding this facility shall take place in accordance with the Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), as amended by this legislation.

(B) Where activities are not conducted or completed in compliance with the approved work plan, the commission is authorized to conduct or complete the remedial investigation/feasibility study or similar study and seek recovery of the costs of conducting or completing the study, as well as any applicable oversight costs, from the potentially responsible parties. Following completion by the commission of the study, all other activities shall take place in accordance with the Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), as amended by this legislation.

(C) With respect to those facilities previously listed on the state registry for which a remedial investigation/feasibility study or other similar study has not been ap-

proved as of September 1, 1989, the executive director shall notify all potentially responsible parties that they have 90 days from receipt of the notice within which to make a good faith offer under Subdivision (7) of Subsection (c) of Section 13 of the Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), as amended by this Act. All other activities regarding the facility shall take place in accordance with that Act as amended by this legislation.

SECTION 9. This Act takes effect September 1, 1989.

SECTION 10. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended.

Passed the Senate on April 27, 1989, by a viva-voce vote; and that the Senate concurred in House amendment on May 24, 1989, by a viva-voce vote; passed the House, with amendment, on May 22, 1989, by a non-record vote.

Approved June 14, 1989.

Effective Sept. 1, 1989.

---

# CHAPTER 704

## S.B. No. 1521

### AN ACT

relating to the creation of the waste reduction advisory committee and to waste minimization and reduction activities of the Texas Water Commission.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Subsection (g), Section 3, Solid Waste Disposal Act (Article 4477-7, Vernon's Texas Civil Statutes), is amended by adding Paragraphs (3) and (4) to read as follows:

*(3) The waste reduction advisory committee, which shall advise the commission and interagency coordination council on matters the council is required to consider under Subdivision (2) of this subsection, is created. The committee also shall advise the commission and council on:*

*(A) the appropriate organization of state agencies and the financial and technical resources required to aid the state in its efforts to promote waste reduction and minimization;*

*(B) the development of public awareness programs to educate citizens about hazardous waste and the appropriate disposal of hazardous waste and hazardous materials that are used and collected by households;*

*(C) the provision of technical assistance to local governments for the development of waste management strategies designed to assist small quantity generators of hazardous waste; and*

*(D) other possible programs to more effectively implement the state's hierarchy of preferred waste management technologies as set forth in Section 3(e)(1) of this Act. The committee shall be composed of nine members with a balanced representation of environmental and public interest groups and the regulated community.*

*(4) The commission shall establish a waste minimization and reduction group to assist in developing waste minimization and reduction programs and to provide incentives for their use so as to make such programs economically and technologically feasible.*

SECTION 2. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be

# APP. J

TCEQ Agenda, February 10, 2010

*The Agenda document below includes hyperlinks (docket numbers highlighted in blue) that enable the user to view agenda backup documents [documents pertaining to a particular matter that have been filed with the Office of the Chief Clerk (OCC)]. To view all agenda backup in person including those documents not found in the hyperlinks below, please visit OCC at 12100 Park 35 Circle, Building F, Suite 1101 (30 TAC § 1.10).*

*Updates to backup documents will be noted by a purple indicator. Please note that some documents such as those of irregular size (i.e. oversized maps) cannot be viewed here and that color documents will be posted here in black and white. Finally, parties are still required to submit an original and 7 copies of documents filed for Commission consideration (30 TAC § 1.10(d)).*

Chairman Bryan W. Shaw, Ph.D.          AGENDA
Commissioner H.S. Buddy Garcia
Commissioner Carlos Rubenstein          February 10, 2010

## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

9:30 A.M.
12100 Park 35 Circle
Room 201S, Bldg. E

## PROPOSALS FOR DECISION

Item 1.     **TCEQ Docket No. 2007-1867-UCR; SOAH Docket No. 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.** Consideration of the Administrative Law Judge's Proposal for Decision and proposed Order regarding the applications of **Texas Landing Utilities** to change its water rates and tariff charges under water Certificate of Convenience and Necessity ("CCN") No. 11997 in **Polk** and **Montgomery Counties**, Texas, and to change its sewer rates and tariff charges under sewer CCN No. 20569 in **Polk County**, Texas, pursuant to rules of the Texas Commission on Environmental Quality in 30 TAC Chapter 291 and Texas Water Code Chapter 13. The Commission will also consider the application, related filings, record evidence and exhibits, exceptions and replies. (Ron Olson)

Remand the matter to the ALJ in order to: 1) take necessary evidence and complete the blank information regarding Texas Landing Utilities' ("TLU's") total allowable rate case expenses through the Commission's February 10, 2010 Agenda; 2) determine the proper rate case expense surcharge amount and time of collection; 3) include a finding on the Public Utility Commission's 2010 refund interest rate of 0.61%, fill in the time limit on completing the credit/refund in Ordering Provision No. 2, and specify 0.61% interest in Ordering Provision No. 2; 4) implement the ALJ's recommended typographical changes to Findings of Fact Nos. 28 and 46 and Conclusion of Law No. 15; 5) include a finding and ordering provision that denies TLU's requested tap fee and other tariff charge increases; 6) include a finding and ordering provision regarding the amount of transcript costs and that TLU pay 100% of that amount; and 7) take necessary evidence and provide further analysis of the line loss issue, the appropriate mechanism to handle the issue, and the implication of different gallonage amounts used for the variable cost portion of the rate design. BG/CR; all agree.

Item 2.	**TCEQ Docket No. 2008-1940-WR; SOAH Docket No. 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.** Consideration of the Administrative Law Judge's Proposal for Decision and Order regarding the Executive Director's report and petition for recommendation to add three noncontiguous areas within the **Dallam County Priority Groundwater Management Area** to the North Plains Groundwater Conservation District pursuant to Chapter 35 and 36 of the Texas Water Code and the rules of the Texas Commission on Environmental Quality, specifically 30 TAC Chapter 293. The proposed addition of the three areas to the North Plains Groundwater Conservation District would be in the Dallam County Priority Groundwater Management Area in **Dallam County**, Texas. The Commission will also consider related filings, exceptions and replies. (Peggy Hunka, Christiaan Siano)

Adopt the ALJ's proposed Order as modified by the Exceptions accepted by the ALJ in his January 15, 2010, Response to Exceptions and Replies. BG/BS; CR abstained.

Item 3.	**TCEQ Docket No. 2008-1684-WQ-E; SOAH Docket No. 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.** Consideration of the Administrative Law Judge's Proposal for Decision and Order assessing administrative penalties and requiring certain actions of **Dale Werlinger in Robertson County**, Texas; TCEQ ID No. RN105488662; regarding water quality violations pursuant to Tex. Water Code Chapters 7 and 26, 30 Tex. Admin. Code Chapter 281, and the rules of the Texas Commission on Environmental Quality. The Commission will also consider timely filed exceptions and replies. (Phillip M. Goodwin)

Adopt the Executive Director's revised proposed Order which contains the Executive Director's exceptions to the ALJ's proposed Order. CR/ BG; all agree.

## HEARING REQUESTS/REQUESTS FOR RECONSIDERATION

Item 4.	**Docket No. 2009-1866-DIS.** Consideration of an application by **Polk County Fresh Water Supply District No. 2** for approval of a standby fee. The District's application requests approval to levy a uniform annual standby fee to supplement its operations and maintenance account pursuant to Texas Water Code, Section 49.231. The Commission will consider the application, timely public comments, hearing requests, responses and replies. (Skip Ferris, Jose L. Caso)

Grant the hearing requests of Malcolm David Wyatt and Steve Zhanel and refer the matter to the State Office of Administrative Hearings, with the referral to ADR for the time period that runs concurrent with the scheduling period for the SOAH preliminary hearing. BG/CR; all agree.

## EMERGENCY ORDERS

Item 5.	**Docket No. 2009-2077-PWS-E.** Consideration of whether to modify, affirm, or set aside the Emergency Order issued on December 29, 2009, by the Executive Director of the Texas Commission on Environmental Quality pursuant to Tex. Water Code chs. 5 and 13, Tex. Health & Safety Code ch. 341, and the rules of the Texas Commission on Environmental Quality, to address the abandonment of a public water system by **Don English dba English Acres aka Coyote Water in Jim Wells County**; TCEQ ID No. RN102670783; to ensure continued operation of the Utility and to provide continuous and adequate service to the customers. The Emergency Order appointed Lonzo Gale as temporary manager of the Utility. (Jim Sallans)

Affirm the Executive Director's Emergency Order against Don English dba English Acres aka Coyote Water and appointing Lonzo Gale as temporary manager. CR/BG; all agree.

Item 6. **Docket No. 2009-1069-UCR-E.** Consideration of whether to modify, affirm, or set aside the Emergency Order issued on January 7, 2010, by the Executive Director of the Texas Commission on Environmental Quality pursuant to Tex. Water Code chs. 5 and 13, Tex. Health & Safety Code ch. 341, and the rules of the Texas Commission on Environmental Quality to address the abandonment of a retail public utility (Utility) by **Cain Addition Homeowners Association CAHA and John Lamar Cain in Kleberg County**; TCEQ ID No. RN105504567; to ensure continued operation of the Utility, and to provide continuous and adequate service to the customers. The Emergency Order renewed the appointment of Rio Bravo Resource Conservation & Development Corporation (RC&D) as temporary manager of the Utility. (Peipey Tang)

Affirm the Executive Director's Emergency Order against Cain Addition Homeowners Association CAHA and John Lamar Cain with the Executive Director's requested modification. BG/BS; CR abstained.

### SUPERFUND

Item 7. **Docket No. 2009-1706-SPF.** Consideration of a Final Administrative Order (Final Order) pursuant to Texas Health and Safety Code Sections 361.188 and 361.272 for the **Voda Petroleum, Inc.** State Superfund Site, RN101639649, which is located north-northeast of Clarksville City, Texas, near the intersection of FM 2275 and FM 3272, **Gregg County.** The Final Order includes the listing of the Site on the state registry of Superfund sites, a description of the selected remedial action, and determination of responsible parties. The Order also orders the responsible parties to remediate the Site. The Site is contaminated with the following chemicals of concern: Dichloroethylene, cis-1,2-; benzene; propylbenzene, n-; MTBE (methyl tertiary-butyl ether); tetrachloroethylene; toluene; trichloroethane, 1,1,1-; trichloroethylene; trimethylbenzene 1,2,4-; trimethylbenzene, 1,3,5-; vinyl chloride; xylene, m-; xylene, o-; xylene, p-; dichloroethylene, 1,1-; and dichloroethane, 1,2-. The proposed remedy for the soil at this Site includes excavation and off-site disposal of the contaminated soil. The proposed remedy for the groundwater at the Site includes installation of reactive biobarriers to decontaminate groundwater. (Charmaine Backens, Carol Boucher P.G.)

Adopt the Administrative Order proposed by the Executive Director. CR/BS; BG opposed.

### MISCELLANEOUS MATTER

Item 8. **Docket No. 2009-1934-UCR.** Consideration of a request for a Order approving a contract designating service areas between the **City of Gunter**, water Certificate of Convenience and Necessity ("CCN") No.13105, and **Marilee Special Utility District (SUD)** (formerly known as Gunter SUD), water CCN No.10150, in **Grayson County**, Texas pursuant to Texas Water Code Section 13.248. Under the agreement, Marilee SUD will transfer approximately 382.477 acres of its water CCN to the City of Gunter. (Erin Selvera, Heidi Graham)

Approve the agreement designating service areas between Marilee Special Utility District and the City of Gunter under TWC Section 13.248 and issue the Executive Director's revised proposed Order. BG/CR; all agree.

VODA_AR_00051127

# AIR QUALITY ENFORCEMENT AGREED ORDERS

Item 9.  **Docket No. 2009-0219-AIR-E.** Consideration of an Agreed Order assessing administrative penalties against **Equistar Chemicals, LP in Harris County**; RN102926920; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Rebecca Johnson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 10.  **Docket No. 2009-1564-AIR-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Rio Grande Valley Sugar Growers, Inc. in Hidalgo County**; RN100825405; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Kirk Schoppe, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 11.  **Docket No. 2009-1597-AIR-E.** Consideration of an Agreed Order assessing administrative penalties against **Frontera Generation Limited Partnership in Hidalgo County**; RN102344645; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Kirk Schoppe, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 12.  **Docket No. 2009-1417-AIR-E.** Consideration of an Agreed Order assessing administrative penalties against **Cabot Corporation in Gray County**; RN100210582; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Kirk Schoppe, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 13.  **Docket No. 2009-1420-AIR-E.** Consideration of an Agreed Order assessing administrative penalties against **Clearstream Wastewater Systems, Incorporated in Hardin County**; RN100214659; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Rebecca Johnson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 14.  **Docket No. 2009-1386-AIR-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **BASF Corporation in Harris County**; RN100225689; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7,

and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Nadia Hameed, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 15. **Docket No. 2009-0822-AIR-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **W & W Fiberglass Tank Company in Gray County**; RN102004314; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Suzanne Walrath, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 16. **Docket No. 2009-1335-AIR-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Flint Hills Resources, LP in Jefferson County**; RN100217389; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Audra Benoit, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 17. **Docket No. 2009-1230-AIR-E.** Consideration of an Agreed Order assessing administrative penalties against **E. I. du Pont de Nemours and Company in Jefferson County**; RN100216035; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Audra Benoit, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 18. **Docket No. 2009-1394-AIR-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **GB Biosciences Corporation in Harris County**; RN100238492; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Roshondra Lowe, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 19. **Docket No. 2009-0994-AIR-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **DCP Midstream, LP in Crockett County**; RN100219278; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (James Nolan, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 20. **Docket No. 2007-0580-AIR-E.** Consideration of an Agreed Order assessing administrative penalties against **Zoltek Corporation in Taylor County**; TCEQ ID No. RN100543867; for air quality violations pursuant to Tex. Water Code ch. 7, Tex. Health & Safety Code ch. 382, and

VODA_AR_00051129

the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Laurencia Fasoyiro, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 21. **Docket No. 2009-1380-AIR-E.** Consideration of an Agreed Order assessing administrative penalties against **Georgia-Pacific Wood Products LLC in Newton County**; RN102433299; for air quality violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Suzanne Walrath, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

## EDWARDS AQUIFER ENFORCEMENT AGREED ORDERS

Item 22. **Docket No. 2008-1495-EAQ-E.** Consideration of an Agreed Order assessing administrative penalties against **Charles Knight and Nancy Knight in Williamson County**; TCEQ ID Nos. RN105532782 and RN104671565; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Jennifer Cook, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 23. **Docket No. 2009-1404-EAQ-E.** Consideration of an Agreed Order assessing administrative penalties against the **City of Shavano Park in Bexar County**; RN105749592; for Edwards Aquifer violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Harvey Wilson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

## FIELD CITATIONS

Item 24. **Docket No. 2009-1822-WOC-E.** Consideration of a Field Citation assessing administrative penalties and requiring certain actions of **Dwayne Stailey in Collin County**; RN103406575; for occupational licensing violations pursuant to Tex. Health & Safety Code ch. 341, Tex. Water Code ch. 37, and the rules of the Texas Commission on Environmental Quality. (Kirk Schoppe, Cari-Michel La Caille)

Approve the Field Citation. CR/BG; all agree.

Item 25. **Docket No. 2009-1823-WOC-E.** Consideration of a Field Citation assessing administrative penalties and requiring certain actions of **Bobby G. Addington in Collin County**; RN105734057; for occupational licensing violations pursuant to Tex. Health & Safety Code ch. 341, Tex. Water Code ch. 37, and the rules of the Texas Commission on Environmental Quality. (Kirk Schoppe, Cari-Michel La Caille)

Approve the Field Citation. CR/BG; all agree.

Item 26.   **Docket No.  2009-1837-WOC-E.**   Consideration of a Field Citation assessing administrative penalties and requiring certain actions of **Maxwell Barker in Brown County**; RN103286522; for occupational licensing violations pursuant to Tex. Health & Safety Code ch. 341, Tex. Water Code ch. 37, and the rules of the Texas Commission on Environmental Quality. (Kirk Schoppe, Cari-Michel La Caille)

Approve the Field Citation. CR/BG; all agree.

Item 27.   **Docket No.  2009-1830-WOC-E.**   Consideration of a Field Citation assessing administrative penalties and requiring certain actions of **Jeremy King in Harris County**; RN103358636; for occupational licensing violations pursuant to Tex. Health & Safety Code ch. 341, Tex. Water Code ch. 37, and the rules of the Texas Commission on Environmental Quality. (Kirk Schoppe, Cari-Michel La Caille)

Approve the Field Citation. CR/BG; all agree.

Item 28.   **Docket No.  2009-1838-WQ-E.**   Consideration of a Field Citation assessing administrative penalties and requiring certain actions of **Don W. Bynum dba American Auto Salvage in Jefferson County**; RN101951366; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Jordan Jones, Cari-Michel La Caille)

Approve the Field Citation. CR/BG; all agree.

Item 29.   **Docket No.  2009-1719-WQ-E.**   Consideration of a Field Citation assessing administrative penalties and requiring certain actions of **Daniels Building & Construction Inc. in Jefferson County**; RN105793731; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Harvey Wilson, Cari-Michel La Caille)

Approve the Field Citation. CR/BG; all agree.

Item 30.   **Docket No.  2009-1745-WQ-E.**   Consideration of a Field Citation assessing administrative penalties and requiring certain actions of **Joe Williamson Construction Company in Hidalgo County**; RN105794705; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Jordan Jones, Cari-Michel La Caille)

Approve the Field Citation. CR/BG; all agree.

## INDUSTRIAL OR HAZARDOUS WASTE ENFORCEMENT AGREED ORDER

Item 31.   **Docket No.  2009-0475-IHW-E.**   Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **MULTI-CHEM GROUP, LLC in Sutton County**; RN103948733; for industrial and hazardous waste violations pursuant to Tex. Health & Safety Code ch. 361, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental

Quality, including specifically 30 Texas Administrative Code ch. 60. (Michael Meyer, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

### INDUSTRIAL WASTE DISCHARGE ENFORCEMENT AGREED ORDER

Item 32. **Docket No. 2009-0649-IWD-E.** Consideration of an Agreed Order assessing administrative penalties against **DuPont Performance Elastomers L.L.C. and Lucite International, Inc. in Jefferson County**; RN100218239 and RN100216035; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Jorge Ibarra, P.E., Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

### LICENSED IRRIGATORS ENFORCEMENT AGREED ORDER

Item 33. **Docket No. 2009-1552-LII-E.** Consideration of an Agreed Order assessing administrative penalties against **Taylor B. McLemore in Wise County**; RN105700843; for occupational licensing violations pursuant to Tex. Water Code chs. 7 and 37, Tex. Occupations Code ch. 1903, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Brianna Carlson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

### MULTI-MEDIA MATTER ENFORCEMENT AGREED ORDERS

Item 34. **Docket No. 2009-1178-MLM-E.** Consideration of an Agreed Order assessing administrative penalties against **Curtis Evans in Jeff Davis County**; RN103000006; for municipal solid waste and air quality violations pursuant to Tex. Health & Safety Code chs. 361 and 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Clinton Sims, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 35. **Docket No. 2008-1136-MLM-E.** Consideration of an Agreed Order assessing administrative penalties against **Mark Forster and Linda Forster in Johnson County**; TCEQ ID No. RN104947023; for air quality and municipal solid waste violations pursuant to Tex. Water Code ch. 7, Tex. Health & Safety Code chs. 361 and 382, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Anna M. Treadwell, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 36. **Docket No. 2009-1261-MLM-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Wesley Vanderpool in Starr County**; RN104159264; for municipal solid waste and water quality violations pursuant to Tex. Health & Safety Code ch.

361, Tex. Water Code chs. 7 and 26, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (John Shelton, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 37. **Docket No. 2008-1521-MLM-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **City of Corpus Christi in Nueces County**; TCEQ ID No. RN101385151; for public drinking water and water quality violations pursuant to Tex. Water Code chs. 7 and 26, Tex. Health & Safety Code ch. 341, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Kari L. Gilbreth, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

## MULTI-MEDIA MATTER ENFORCEMENT DEFAULT ORDER

Item 38. **Docket No. 2009-0569-MLM-E.** Consideration of a Default Order assessing administrative penalties and requiring certain actions of **Terry L. Babb, Sr. dba Twin Oaks Mobile Home Park in Henderson County**; TCEQ ID No. RN101192995; for public drinking water and water rights violations pursuant to Tex. Water Code chs. 5 and 11, Tex. Health & Safety Code ch. 341, and the rules of the Texas Commission on Environmental Quality. (Peipey Tang, Lena Roberts)

Approve the Default Order. CR/BG; all agree.

## MUNICIPAL SOLID WASTE ENFORCEMENT AGREED ORDERS

Item 39. **Docket No. 2008-0115-MSW-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Marvin Wayne Taylor in Shelby County**; TCEQ ID No. RN105362701; for municipal solid waste and used oil violations pursuant to Tex. Water Code ch. 7, Tex. Health & Safety Code chs. 361 and 371, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Laurencia N. Fasoyiro, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 40. **Docket No. 2007-1197-MSW-E.** Consideration of an Agreed Order assessing administrative penalties against **N. E. Construction, LLP in Dallas County**; TCEQ ID No. RN105242549; for municipal solid waste violations pursuant to Tex. Water Code ch. 7, Tex. Health & Safety Code ch. 361, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Xavier Guerra, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

## MUNICIPAL SOLID WASTE ENFORCEMENT DEFAULT ORDER

Item 41. **Docket No. 2009-0812-MSW-E.** Consideration of a Default Order assessing administrative penalties and requiring certain actions of **Santos Barcenas dba Tyre King Recycling in Hale**

County and **Swisher County**; TCEQ ID No. RN102954625; for municipal solid waste violations pursuant to Tex. Water Code ch. 7, Tex. Health & Safety Code ch. 361, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Gary K. Shiu, Lena Roberts)

Approve the Default Order. CR/BG; all agree.

## MUNICIPAL WASTE DISCHARGE ENFORCEMENT AGREED ORDERS

Item 42. **Docket No. 2009-1034-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of the **City of Bridgeport in Wise County**; RN102740230; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Tom Jecha, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 43. **Docket No. 2009-1132-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of the **City of Brazoria in Brazoria County**; RN101613552; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Jorge Ibarra, P.E., Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 44. **Docket No. 2009-1648-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Red River Authority of Texas in Hall County**; RN101702256; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Samuel Short, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 45. **Docket No. 2009-0968-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **City Public Service of San Antonio in Bexar County**; RN100217975; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Carlie Konkol, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 46. **Docket No. 2009-1054-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Spring Center, Inc. in Harris County**; RN102076825; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Harvey Wilson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 47.  **Docket No. 2005-1335-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Western Trails Water Supply Corporation in Bexar County**; TCEQ ID No. RN102096526; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Kari L. Gilbreth, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 48.  **Docket No. 2009-0998-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **North Texas District Council Assemblies of God in Ellis County**; RN101513554; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Samuel Short, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 49.  **Docket No. 2009-0671-MWD-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Laxmiben Lalbhai Patel, Maganbhai Ranchlodbhai Patel, Bhagubhai Bhulo Patel, and Vinubhai Bhulo Patel dba Holiday Motel in Liberty County**; RN101518843; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Thomas Jecha, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 50.  **Docket No. 2009-0995-MWD-E.** Consideration of an Agreed Order assessing administrative penalties against the **City of Sinton in San Patricio County**; RN101916740; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Carlie Konkol, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

## PETROLEUM STORAGE TANKS ENFORCEMENT AGREED ORDERS

Item 51.  **Docket No. 2009-1601-PST-E.** Consideration of an Agreed Order assessing administrative penalties against **STELLA LINK BUSINESS, LLC dba Corner Drive in Grocery in Harris County**; RN102036225; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Brianna Carlson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 52.  **Docket No. 2009-1212-PST-E.** Consideration of an Agreed Order assessing administrative penalties against **FASTRAC FOOD STORE'S INC. dba Fastrac 280 in Harris County**; RN101782233; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch.

382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Mike Pace, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 53. **Docket No. 2009-0617-PST-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Petrocapital Management, LLC dba Hitchcock Chevron in Galveston County**; RN101762698; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Brianna Carlson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 54. **Docket No. 2009-1151-PST-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Hempstead Independent School District in Waller County**; RN102027091; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code chs. 7 and 26, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Judy Kluge, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 55. **Docket No. 2009-1238-PST-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **SHAWNA INC. in Eastland County**; RN102911591; for petroleum storage tank violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Keith Frank, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 56. **Docket No. 2008-1254-PST-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Salim Aziz Dossani dba Short Trip Food Mart in Harris County**; TCEQ ID No. RN100860626; for petroleum storage tank violations pursuant to Tex. Water Code chs. 7 and 26, Tex. Health & Safety Code ch. 382, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Tammy L. Mitchell, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 57. **Docket No. 2009-1367-PST-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Adan O'Campo dba Adam Auto Service in Tarrant County**; RN101573566; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code chs. 7 and 26, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Mike Pace, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 58. **Docket No. 2009-1109-PST-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **City of Freeport in Brazoria County**; RN102027752; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code chs. 7 and 26, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Wallace Myers, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 59. **Docket No. 2009-1272-PST-E.** Consideration of an Agreed Order assessing administrative penalties against **OXFORD CONVENIENCE, INC dba Oxford Convenience Store in Denton County**; RN101553634; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Judy Kluge, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 60. **Docket No. 2009-0273-PST-E.** Consideration of an Agreed Order assessing administrative penalties against **Star Fuels, Inc. dba Crosstimbers Citgo in Harris County**; TCEQ ID No. RN100606276; for petroleum storage tank violations pursuant to Tex. Water Code chs. 7 and 26, Tex. Health & Safety Code ch. 382, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Laurencia Fasoyiro, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 61. **Docket No. 2009-1358-PST-E.** Consideration of an Agreed Order assessing administrative penalties against **N#1 Airline Center, Inc. dba #1 Airline Food Store in Harris County**; RN101432367; for petroleum storage tank violations pursuant to Tex. Health & Safety Code ch. 382, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Judy Kluge, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

## PETROLEUM STORAGE TANKS ENFORCEMENT DEFAULT ORDER

Item 62. **Docket No. 2009-0970-PST-E.** Consideration of a Default Order assessing administrative penalties and requiring certain actions of **James Kaufman in Jefferson County**; TCEQ ID No. RN101835395; for petroleum storage tank violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Phillip M. Goodwin, P.G., Lena Roberts)

Approve the Default Order. CR/BG; all agree.

## PUBLIC WATER SYSTEM ENFORCEMENT AGREED ORDERS

Item 63. **Docket No. 2009-0355-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **River Bend Water Services, Inc. in Matagorda County**; TCEQ ID No. RN102681467; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Barham A. Richard, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 64. **Docket No. 2009-0836-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of the **City of Slaton in Lubbock County**; RN101202604; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Stephen Thompson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 65. **Docket No. 2009-0804-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Mardoche Abdelhak dba Big Trees Trailer City in Bexar County**; RN101652048; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341, Tex. Water Code ch. 5, and the rules of the Texas Commission on Environmental Quality. (Stephen Thompson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 66. **Docket No. 2009-0952-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Mirando City Water Supply Corporation in Webb County**; RN101195360; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Andrea Linson-Mgbeoduru, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 67. **Docket No. 2008-1488-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Highland Park Water Supply Corporation in Bosque County**; TCEQ ID No. RN101254407; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Kari L. Gilbreth, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 68. **Docket No. 2009-0817-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of the **City of Palestine in Anderson County**; RN101384576; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Rebecca Clausewitz, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

VODA_AR_00051138

Item 69. **Docket No. 2009-1242-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Brandon-Irene Water Supply Corporation in Hill County**; RN101437325; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Tel Croston, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 70. **Docket No. 2009-0369-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Barranca Corporation in El Paso County**; RN101268043; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Andrea Linson-Mgbeoduru, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 71. **Docket No. 2009-1260-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Fort Gates Water Supply Corporation in Coryell County**; RN101216257; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Amanda Henry, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 72. **Docket No. 2009-1268-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Lake Palo Pinto Area Water Supply Corporation in Palo Pinto County**; RN101456911; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Amanda Henry, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 73. **Docket No. 2009-1589-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Texas Conference Association of Seventh-Day Adventists in Harris County**; RN104387543; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Amanda Henry, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 74. **Docket No. 2009-1125-PWS-E.** Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Ha Van Nguyen dba Austin Aqua System in Burnet County**; RN101197986; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Andrea Linson-Mgbeoduru, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

VODA_AR_00051139

Item 75.  **Docket No. 2009-1065-PWS-E.**  Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Texas Parks and Wildlife Department in Hamilton County**; RN101255545; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Yuliya Dunaway, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

## PUBLIC WATER SYSTEM ENFORCEMENT DEFAULT ORDER

Item 76.  **Docket No. 2009-0917-PWS-E.**  Consideration of a Default Order assessing administrative penalties and requiring certain actions of **Moore's Water System of Beaver Lake, Inc. in McLennan County**; TCEQ ID No. RN102682291; for public drinking water violations pursuant to Tex. Health & Safety Code ch. 341 and the rules of the Texas Commission on Environmental Quality. (Stephanie J. Frazee, Lena Roberts)

Approve the Default Order. CR/BG; all agree.

## SLUDGE ENFORCEMENT AGREED ORDER

Item 77.  **Docket No. 2009-0938-SLG-E.**  Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Leonard D. Olivares dba Olivares Pumping & Septic Tank Cleaning in Bee County**; RN103147559; for municipal solid waste violations pursuant to Tex. Health & Safety Code ch. 361, Tex. Water Code ch. 7, and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Jeremy Escobar, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

## WATER QUALITY ENFORCEMENT AGREED ORDERS

Item 78.  **Docket No. 2009-1241-WQ-E.**  Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Draper Construction & Land Development, LLC in Harrison County**; RN105324099; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Thomas Jecha, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

Item 79.  **Docket No. 2009-0056-WQ-E.**  Consideration of an Agreed Order assessing administrative penalties against **Kimball Hill Homes Austin, L.P. in Hays County**; TCEQ ID No. RN105519490; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Jennifer Cook, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 80.  **Docket No. 2007-1634-WQ-E.**  Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Micah Mosonyi dba Shenandoah Corp International in Tarrant County**; TCEQ ID No. RN104990445; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Tex. Admin. Code ch. 60. (Barham A. Richard, Lena Roberts)

Approve the Agreed Order. CR/BG; all agree.

Item 81.  **Docket No. 2009-1165-WQ-E.**  Consideration of an Agreed Order assessing administrative penalties and requiring certain actions of **Adrian Gomez in Palo Pinto County**; RN105670137; for water quality violations pursuant to Tex. Water Code chs. 7 and 26 and the rules of the Texas Commission on Environmental Quality, including specifically 30 Texas Administrative Code ch. 60. (Harvey Wilson, Cari-Michel La Caille)

Approve the Agreed Order. CR/BG; all agree.

### STATE IMPLEMENTATION PLANS AND RULE MATTERS

Item 82.  **Docket No. 2008-0335-SIP.**  Consideration of the adoption of revisions to the state implementation plan to implement revisions of the federal **Clean Air Interstate Rule (CAIR)** and Senate Bill (SB) 1672 of the 80th Texas Legislature, Regular Session, 2007. The revisions incorporate federal changes to the CAIR program; methodology for allocation of CAIR nitrogen oxides (NOX) allowances as specified by SB 1672; and non-substantive administrative changes. (Melissa Kuskie, Terry Salem) (Project No. 2007-051-SIP-NR)

Adopt the proposed amendments to 30 TAC Sections 101.502, 101.504 and 101.506 and the corresponding modification of the SIP. BG/CR; all agree.

Item 83.  **Docket No. 2008-0334-RUL.**  Consideration of the adoption of amendments to **30 Texas Administrative Code (TAC) Chapter 101**, General Air Quality Rules, Subchapter H, Emissions Banking and Trading, Division 7, Clean Air Interstate Rule, Sections 101.502, 101.504, and 101.506, and corresponding revisions to the state implementation plan. The adoption will implement revisions to Texas Health and Safety Code, Section 382.0173 as required by Senate Bill 1672 from the 80th Legislature, 2007, Regular Session, which revises the methodology for allocation of Clean Air Interstate Rule nitrogen oxides allowances. The adoption will also incorporate federal changes to the Clean Air Interstate Rule and make non-substantive administrative changes. The proposed rules were published in the September 25, 2009, issue of the *Texas Register* (34 TexReg 6599). (Brandon Greulich, Amy Browning) (Rule Project No. 2007-053-101-EN)

Adopt the proposed amendments to 30 TAC Sections 101.502, 101.504 and 101.506 and the corresponding modification of the SIP. BG/CR; all agree.

Item 84.  **Docket No. 2009-0845-RUL.**  Consideration for adoption of the repeal of **30 TAC Chapter 101**, General Air Quality Rules, Subchapter H, Emissions Banking and Trading, Division 8, Clean Air Mercury Rule, Sections 101.601 and 101.602; the amendments to **30 TAC Chapter 122**, Federal Operating Permits, Subchapter A, Definitions, Sections 122.10, and 122.12, and

Subchapter B, Permit Requirements, Section 122.120; and the repeal of Chapter 122, Federal Operating Permits, Subchapter E, Acid Rain Permits, Clean Air Interstate Rule, Clean Air Mercury Rule, Sections 122.440, 122.442, 122.444, 122.446, and 122.448; and the corresponding repeal of the Texas State Plan for the Control of Designated Facilities and Pollutants, Plan for Control of Mercury Emissions from Coal-Fired Electric Steam Generating Units, Clean Air Mercury Rule. The adoption will repeal the state Clean Air Mercury Rule requirements that incorporated by reference the federal Clean Air Mercury Rule. The federal Clean Air Mercury Rule, cited in Texas Health and Safety Code, Section 382.0173, promulgated by House Bill 2481, 79th Legislature, 2005, was vacated by the courts and is no longer an enforceable federal requirement. Also, a letter from the Commission will notify the United States Environmental Protection Agency (EPA) of the withdrawal from consideration of the Texas State Plan for the Control of Designated Facilities and Pollutants, Plan for Control of Mercury Emissions from Coal-Fired Electric Steam Generating Units, Clean Air Mercury Rule, which was previously adopted by the Commission on July 12, 2006. Because the rule is no longer enforceable and is being repealed, the Texas State Plan for mercury must also be repealed and withdrawn from consideration of approval by the EPA. The proposed repealed and amended sections were published in the September 25, 2009, issue of the *Texas Register* (34 TexReg 6607). (Brandon Greulich, Amy Browning) (Rule Project No. 2007-054-101-EN)

Adopt the proposed repeal of Sections 101.601, 101.602, 122.440, 122.442, 122.444, 122.446 and 122.448; Adopt the proposed amendments to Sections 122.10, 122.12 and 122.120; and Adopt the proposed repeal of the Texas State Plan for the Control of Designated Facilities and Pollutants, Plan for Control of Mercury Emissions from Coal-Fired Electric Steam Generating Units, Clean Air Mercury Rule. BG/CR; all agree

Item 85. **Docket No. 2009-0744-SIP.** Consideration for the adoption of a revision to the state implementation plan (SIP) concerning repeal of the **Texas portable fuel container (PFC) rule.** This adoption of the Texas PFC Rule Repeal SIP Revision will remove Texas PFC regulations from the control strategy for the State of Texas Air Quality Implementation Plan for the Control of Ozone Air Pollution for all affected 1997 eight-hour ozone standard nonattainment and near nonattainment areas in Texas. This adoption to the SIP revision will incorporate rulemaking repealing state PFC rules and demonstrate that federal PFC standards promulgated in 2007 provide replacement emission reductions. Because those emission reductions are estimated to be equal to or greater than those derived from the state regulations, the repeal of the Texas PFC rule will not negatively impact the State of Texas Air Quality Implementation Plan for the Control of Ozone Air Pollution. (Lisa Shuvalov, Chrissie Angeletti) (Project No. 2009-024-SIP-NR)

Adopt the repeal of 30 Texas Admin. Code Sections 115.620 – 115.622, 115.626, 115.627 and 115.629 concerning portable fuel containers and the corresponding revisions to the State Implementation Plan as recommended by the Executive Director. CR/BG; all agree.

Item 86. **Docket No. 2008-1401-RUL.** Consideration of the adoption of 30 **TAC Chapter 116**, Control of Air Pollution by Permits for New Construction or Modification, Subchapter A, Definitions, new Section 116.20, Portable Facilities Definitions; and Subchapter B, New Source Review Permits, new Division 8, Portable Facilities, new Section 116.178, Relocations and Changes of Location of Portable Facilities, and corresponding revisions to the state implementation plan. The adoption of new sections in Subchapters A and B and the corresponding state implementation plan revision would provide guidance regarding the proper procedures for

movement of portable facilities. The new rules would affect the public notice requirements for the relocation or change of location of a portable facility. The new rules would also incorporate existing guidance issued by the Air Permits Division into the TCEQ's rules. Some of EPA's comments resulted in changes to requirements and rule references within the rule. The proposed rules were published in the September 11, 2009 issue of the *Texas Register* (34 TexReg 6281). (Becky Southard, Booker Harrison) (Rule Project No. 2008-031-116-PR)

Adopt 30 TAC Sections 116.20 and 116.178 and corresponding revisions to the State Implementation Plan. BG/CR; all agree.

Item 87. **Docket No. 2009-0542-RUL.** Consideration for the adoption to repeal Sections 115.620 - 115.622, 115.626, 115.627, and 115.629 of **30 TAC Chapter 115**, Control of Air Pollution from Volatile Organic Compounds, and corresponding revisions to the state implementation plan. The proposed adoption will address adopted federal standards for Portable Fuel Containers (PFC). Specifically, the United States Environmental Protection Agency adopted a federal PFC rule (72 Federal Register 8432, February 26, 2007) that set a national standard for gasoline, diesel, and kerosene PFCs. All PFCs manufactured on or after January 1, 2009, are required to comply with the federal standards. The federal standards promulgated are more stringent than the current state PFC regulations. Therefore, it is necessary to repeal the state PFC regulations. The proposed repealed sections were published in the September 11, 2009, issue of the *Texas Register* (34 TexReg 6279). (Lisa Shuvalov, Chrissie Angeletti) (Rule Project No. 2008-032-115-EN)

Adopt the repeal 30 Texas Admin. Code Sections 115.620 – 115.622, 115.626, 115.627 and 115.629 concerning portable fuel containers and the corresponding revisions to the State Implementation Plan as recommended by the Executive Director. CR/BG; all agree.

### EXECUTIVE MEETING

Item 88. **Docket No. 2010-0001-EXE.** The Commission will conduct a closed meeting to deliberate the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of the Commission's Executive Director and General Counsel, as permitted by Section 551.074 of the Texas Open Meetings Act, Chapter 551 of the Government Code. The Commission may also meet in open meeting to take action on this matter as required by Section 551.102 of the Texas Open Meetings Act, Chapter 551 of the Government Code.

No action taken.

Item 89. **Docket No. 2010-0002-EXE.** The Commission will conduct a closed meeting to receive legal advice and will discuss pending or contemplated litigation, settlement offers, and/or the appointment, employment, evaluation, reassignment, duties, discipline or dismissal of specific Commission employees, as permitted by Sections 551.071 and 551.074, the Open Meetings Act, codified as Chapter 551 of the Government Code. The Commission may also meet in open meeting to take action on legal or personnel matters considered in the closed meeting as required by Section 551.102 of the Texas Open Meetings Act, Chapter 551 of the Government Code.

No action taken.

Item 90. Docket No. 2010-0003-EXE. The Commission will conduct a closed meeting to discuss their duties, roles, and responsibilities as Commissioners of the TCEQ pursuant to Section 551.074 of the Open Meetings Act, Codified as Chapter 551 of the Government Code. The Commission may also meet in open meeting to take action on this matter as required by Section 551.102 of the Texas Open Meetings Act, Chapter 551 of the Government Code.

No action taken.

(PERSONS WITH DISABILITIES WHO PLAN TO ATTEND THE TCEQ AGENDA AND WHO MAY NEED AUXILIARY AIDS OR SERVICES SUCH AS INTERPRETERS FOR PERSONS WHO ARE DEAF OR HEARING IMPAIRED, READERS, LARGE PRINT, OR BRAILLE ARE REQUESTED TO CONTACT OFFICE OF THE CHIEF CLERK AT (512) 239-3300 AT LEAST TWO (2) WORK DAYS PRIOR TO THE AGENDA, SO THAT APPROPRIATE ARRANGEMENTS CAN BE MADE. PERSONS WHO DESIRE THE ASSISTANCE OF AN INTERPRETER IN CONJUNCTION WITH THEIR ORAL PRESENTATION AT THIS TCEQ AGENDA ARE REQUESTED TO CONTACT THE OFFICE OF THE CHIEF CLERK AT (512) 239-3300 AT LEAST FIVE (5) WORK DAYS PRIOR TO THE AGENDA SO THAT APPROPRIATE ARRANGEMENTS CAN BE MADE.)

REGISTRATION FOR AGENDA STARTS AT 8:45 A.M. AND WILL CONTINUE UNTIL 9:30 A.M. PLEASE REGISTER BETWEEN THESE TIMES. LATE REGISTRATION COULD RESULT IN YOUR MISSING THE OPPORTUNITY TO COMMENT ON YOUR ITEM.

THE PUBLIC CAN VIEW LIVE AND ARCHIVED TCEQ MEETINGS ON THE INTERNET AT NO COST, AT: HTTP://WWW.TEXASADMIN.COM/cgi-bin/tnrcc.cgi

/s/ John Sedberry

Assistant General Counsel,
John Sedberry

2/17/10

Date

VODA_AR_00051144

# APP. K

*Texas Commission on Environmental. Quality v. City of Waco*, 413 S.W.3d 409 (Tex. 2013)



413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

H

Supreme Court of Texas.
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, Petitioner,
v.
CITY OF WACO, Respondent.

No. 11–0729.
Argued Feb. 28, 2013.
Decided Aug. 23, 2013.
Rehearing Denied Nov. 22, 2013.

**Background:** Dairy that was upriver from city applied for a major amendment to its concentrated animal feed operation (CAFO) permit to expand operations. City sought a contested case hearing. The Commission on Environmental Quality (CEQ) denied city's request. City petitioned for judicial review. The 201st Judicial District Court, Travis County, Darlene Byrne, J., affirmed. City appealed. On rehearing, the Court of Appeals, Bob Pemberton, J., 346 S.W.3d 781, reversed and remanded. CEQ sought review which was granted.

**Holding:** The Supreme Court, Devine, J., held that CEQ did not abuse its discretion in denying city's request for a contested case hearing.

Reversed; rehearing denied.

West Headnotes

**[1] Environmental Law 149E 381**

149E Environmental Law
    149EVIII Waste Disposal and Management
        149Ek377 Administrative and Local Agencies and Proceedings
            149Ek381 k. Hearing and determination. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

Likely effects of proposed amended concentrated animal feeding operations (CAFO) permit for dairy that purported to provide greater protection for water quality was a relevant consideration when evaluating the need for a public, contested case hearing under provision of administrative code that limited the right to contested case hearing where applicant was not applying to increase significantly the quantity of waste discharged or materially change the pattern or place of discharge, among other considerations. 30 TAC § 55.201(i)(1).

**[2] Administrative Law and Procedure 15A ⚷470**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak469 Hearing
                15Ak470 k. Necessity and purpose in general. Most Cited Cases

Although the Administrative Procedure Act (APA) defines "contested case" and sets the procedural framework, the agency's enabling act determines whether rights are to be determined after an opportunity for adjudicative hearing, and agency rules may decide whether that opportunity may include a contested case hearing. V.T.C.A., Government Code § 2001.003.

**[3] Environmental Law 149E ⚷381**

149E Environmental Law
    149EVIII Waste Disposal and Management
        149Ek377 Administrative and Local Agencies and Proceedings
            149Ek381 k. Hearing and determination. Most Cited Cases

Commission on Environmental Quality (CEQ) did not abuse its discretion, under provision of administrative code that limited the right to contested case hearing to when applicant was applying to increase significantly the quantity of waste discharged or materially change the pattern or place of discharge, among other considerations, in denying city's request for a contested case hearing on application by dairy for an amended concentrated animal feed operation (CAFO) permit, where there was evidence in the record to support the CEQ's determination that the proposed permit did not seek to significantly increase or materially change the authorized discharge of waste or otherwise foreclose CEQ discretion to consider the amended application at a regular meeting. 30 TAC § 55.201(i)(1).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

**\*410** Ron Beal, Professor & Attorney at Law, Waco, TX, for Amicus Curiae Ron Beal

P.M. Schenkkan, Graves Dougherty Hearon & Moody PC, Austin, TX, for Amicus Curiae Coastal Conservation Association.

Julia Brooks Jurgensen, Beard Kultgen Brophy Bostwick, Waco, TX, for Amicus Curiae Greater Waco Chamber.

Rosemarie Kanusky, Beard Kultgen Brophy Bostwick Dickson & Squires LLP, Waco, TX, for Amicus Curiae Mont Belvieu Caverns, LLC.

Hugh Rice Kelly, Texans for Lawsuit Reformfor, Austin, TX, Amicus CuriaeTexans for Lawsuit Reform.

Carlos Romo, Evan Andrew Young, Thomas R. Phillips, Baker Botts LLP, Austin, TX, for Amicus Curiae Texas Association of Business.

Emily Willms Rogers, Bickerstaff Heath Smiley Pollan Kever & McDaniel, Austin, TX, for Amicus Curiae Texas Farm Bureau.

Anthony C. Grigsby, Mark Lewis Walters, Nancy Olinger, Office of the Attorney General, Environmental Protection & Adm. Law Div., Barbara Bryant Deane, Assistant Attorney General, Daniel T. Hodge, First Asst. Attorney General, David C. Mattax, Director of Defense Litigation Office of the Attorney General, David Preister, John Barrett Scott, William J. "Bill" Cobb III, Office of the Attorney General, Elaine M. Lucas, TCEQ—Office of General Counsel, Greg W. Abbott, Attorney General of Texas, Jonathan Karl Niermann, Chief of Environmental Protection Div. Office of the Texas Attorney General, Robert Davis Brush, TCEQ—Envtl. Law Div., Austin, TX, for Petitioner Texas Commission on Environmental Quality.

Enid Allyn Patterson Wade, Scott & White Healthcare, Temple, TX, Greg White, Attorney at Law, Kerry L. Haliburton, Naman Howll Smith & Lee PLLC, Wesley David Lloyd, Naman Howell Smith & Lee PLLC, Waco, TX, for Respondent City of Waco.

Justice DEVINE delivered the opinion of the Court.

Dairies that feed large numbers of cattle for extended periods in confined areas are termed

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

"concentrated animal feeding operations" (CAFOs). Because these operations often impact their environment, they generally must obtain water-quality permits from the Texas Commission on Environmental Quality (the "TCEQ" or "Commission"). These permits are designed to control the waste produced at such facilities and through regulation prevent it from polluting nearby water sources.

When a CAFO applies for a permit, interested parties may object to the proposed permit during a comment period. These parties may also seek to intervene and request a public hearing on the proposed permit. But before granting a contested case hearing—a trial-like proceeding with attendant expense and delay—a threshold determination must be made as to whether the party is an "affected person" with standing to request such a hearing.

**\*411** In this appeal, the TCEQ granted an amendment to a dairy CAFO's water-quality permit over objections from a downstream city, which claimed that the dairy's operations under the amended permit would adversely affect the quality of the municipal water supply. The city sought to intervene in the permit process and obtain a contested case hearing. After a period for public comment and meeting, the Commission granted the amended permit without a contested case hearing, and the city sought judicial review, complaining that it was entitled to a contested case hearing because it was an "affected person." By rule, an affected person may request a contested case hearing, "when authorized by law." 30 Tex. Admin. Code § 55.201(b)(4).

The court of appeals agreed that the city was an affected person and held that the Commission abused its discretion in denying the city's request for a contested case hearing. 346 S.W.3d 781, 827 (Tex.App.-Austin 2011). The court accordingly reversed the district court's judgment, which had affirmed the Commission's decision, and remanded the matter to the TCEQ. Because we do not agree that the Commission abused its discretion in denying the hearing request, we reverse and render judgment for the Commission.

I

Waste water discharges are generally regulated and permitted through the federal Clean Water Act and the delegation of the federal National Pollutant Discharge Elimination System ("NPDES") Program to the State of Texas.[FN1] The Clean Water Act requires states to prepare reports every two years on the quality of water in the state and to make recommendations for reducing pollution. 33 U.S.C. § 1315. The federal act further requires states to update water-quality standards every three years. The standards are then used to set effluent limitations in water-quality permits. *Id.* § 1313(c)(1).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

> FN1. At one time, water quality protection was left largely to the states, but with the enactment of the Federal Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act, the federal government took on this responsibility. *See* 33 U.S.C. §§ 1251–1387. The Clean Water Act created a federal permitting system (the NPDES) that requires a permit of any person discharging pollutants into a surface water body.

In Texas, the TCEQ has the primary authority to establish surface water quality standards, which it implements, in part, in its permitting actions. *See* 33 U.S.C. § 1313(a), (d); TEX. WATER CODE § 26.023; *see also id.* § 5.013(a)(3) (granting the TCEQ general jurisdiction over "the state's water quality program including issuance of permits, enforcement of water quality rules, standards, orders, and permits, and water quality planning"). The agency continually monitors and evaluates the state's water quality as part of its primary responsibility to preserve and conserve the state's natural resources. TEX. WATER CODE § 5.012. Over the past fifteen years, the TCEQ has devoted particular attention to the water quality of the North Bosque River.

The North Bosque River extends from its headwaters in Erath County, through Hamilton and Bosque Counties, and into McLennan County where it joins two other branches of the Bosque to form Lake Waco. Lake Waco serves as the municipal water supply for the City of Waco. The City owns all adjudicated and permitted rights to the water impounded in the lake, which is the sole source of drinking water for approximately 160,000 people.

In recent decades, the dairy industry in the North Bosque watershed has experienced significant growth. This, in turn, **\*412** has raised concerns over the increasing volumes of animal waste produced by these dairies and the possibilities for such waste to damage the water quality of the North Bosque and, ultimately, Lake Waco.

The drinking water in Waco has historically had taste and odor problems. For many years, the City has attributed these problems to algae blooms in Lake Waco, which the City believes to be exacerbated by the proliferation of animal waste in the North Bosque watershed. As a result, the City and others have sought to impose stricter regulatory limits on dairies in the North Bosque watershed.

The Clean Water Act requires Texas and the other states to identify water bodies that do not meet, or are not expected to meet, water-quality standards. 33 U.S.C. § 1313(d)(1). In 1998, the Commission determined that two segments [FN2] (Segments 1255 and 1226) of the North Bosque

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

River above Lake Waco were "impaired" under "narrative" water-quality standards "related to nutrients and aquatic plant growth." [FN3] Segment 1255 extends from the North Bosque's head-waters to a point just downstream from Stephenville, and Segment 1226 extends from that point to where the river flows into Lake Waco. Lake Waco itself, however, was not determined to be an "impaired" water body.

> FN2. For purposes of water quality management, the TCEQ segments the state's major surface waters.

> FN3. The court of appeals defined a "narrative" water-quality standard as "qualitative, somewhat subjective assessments of 'too much,' in contrast to quantitative or numeric measures." 346 S.W.3d at 793.

Once a water body is identified as impaired, the state must determine a "total maximum daily load" or TMDL for the water body. The TMDL serves to budget the maximum amount of a pollutant that a water body can receive and still meet the applicable water-quality standard. *See id.* § 1313(d)(1)(C). Following study and public comment from the City and others, the Commission determined that soluble phosphorus, which it attributed primarily to dairies' waste application fields and municipal water-treatment plants, was the key variable that could be controlled to limit algal plant growth in the North Bosque River. The Commission accordingly approved TMDLs that proposed a fifty-percent reduction in soluble phosphorus loading over time. After further study and comment (including comments from the City), the Commission in 2002 proposed an implementation plan through which dairies and cities could reduce phosphorus loadings. In 2004, the Commission amended its rules, making parts of the plan legally enforceable. *See* 30 Tex. Admin. Code §§ 321.31–321.47.

Meanwhile, in 2001, the Legislature, at the City's urging, imposed new environmental restrictions on dairy CAFOs located in a "major sole source impairment zone" (MSSIZ). *See generally* TEX. WATER CODE §§ 26.501–.504. At the time of enactment, the North Bosque watershed was the only area to which the MSSIZ legislation applied. *See id.* § 26.502 (defining major sole source impairment zone). The legislation required that new or expanded CAFOs located within a MSSIZ obtain an individual water-quality permit—a permit tailored to the dairy's particular circumstances. *See id.* § 26.503(a). Before this legislation, CAFOs in the North Bosque watershed could operate under general permits, a permit type exempted from the contested-case-hearing process. *See* 30 Tex. Admin. Code § 55.201(i)(7). The MSSIZ legislation thus effectively removed that exemption for CAFOs covered by the statute, opening their permit pro-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

ceedings**\*413** to the potential for contested-case hearings.

The Commission thereafter amended its rules to incorporate the legislative changes for CAFOs in the North Bosque River impairment zone. *See* 30 TEX. ADMIN. CODE §§ 321.32–.35, .39, .48, .49. The amended rules required dairy CAFOs in the watershed to obtain individual permits when their current permits expired. *Id.* The amended rules also imposed stricter requirements on the management and disposal of wastewater and manure by the CAFOs.

About this same time, the Environmental Protection Agency adopted new rules and guidelines governing CAFOs. 40 C.F.R. §§ 122, 123, 412. The federal changes expanded the federal definition of CAFOs and imposed stricter nutrient-management and record-keeping requirements on the facilities. *See id.* In response, the Commission again rewrote its rules in 2004 to mirror the federal changes, imposing more stringent controls on CAFOs, especially those in the North Bosque watershed. *See* 30 Tex. Admin. Code §§ 321.31–.47. The rules provided, however, that CAFOs needing individual permits could continue to operate under their old authorizations so long as the operator applied for an individual permit by July 27, 2004. 30 Tex. Admin. Code § 321.33(g). In March 2004, the operators of the O–Kee Dairy applied to amend their water-quality permit.

The O–Kee Dairy is in Hamilton County about 80 miles upstream from Lake Waco. It is situated a few miles from the North Bosque River but within its watershed. Under the new regulations, O–Kee needed to convert from a general to an individual permit. In its application, the dairy also sought to expand its herd from 690 to 999 cows and its total waste-application acreage from 261 to 285.4 acres.

The Commission's executive director declared the O–Kee Dairy permit application administratively complete, conducted technical review, prepared a draft permit, and issued a preliminary decision that the draft permit met all statutory and regulatory requirements. The draft permit proposed to increase the dairy's maximum herd size and total waste application acreage as requested. The draft also proposed several new measures to strengthen the overall water-quality protections at the facility, even with the increase in the number of cows. These measures included reducing the possibility of discharges from the dairy's retention control structures (RCSs) [FN4] by, among other things, more than doubling their total storage capacity and improving monitoring of sludge and water levels. There were also new restrictions aimed at reducing the risk of waste runoff from the waste application fields. The dairy was further required to expand the size of non-vegetative buffer zones around the waste application fields and to transport excess waste off-site. The new measures purported to conform to the numerous regulatory changes imposed on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

Texas dairy CAFOs since the issuance of the dairy's previous water-quality permit.

> FN4. Retention control structures are ponds used to collect runoff of manure and wastewater from areas where cows are confined.

The executive director's preliminary decision that the draft permit met all statutory and regulatory requirements triggered a period of public notice and comment. *See* TEX. WATER CODE § 5.553(b), (c). The City submitted public comments and requested a public meeting, which was granted. *See id.* § 5.554. At the conclusion of the public comment period, the executive **\*414** director responded to the City's public comments, agreeing to make some changes to permit provisions governing waste application in the dairy's waste application fields or off-site, but otherwise rejecting the City's complaints. *See id.* § 5.555.

The City next filed a written request for a contested case hearing that incorporated its prior comments, replied to the executive director's responses, and identified the legal and factual issues it considered to be in dispute. *See id.* § 5.556; 30 Tex. Admin. Code § 55.201 (Texas Comm'n on Envtl. Quality, Requests for Reconsideration or Contested Case Hearing). In its request, the City asserted it was an "affected person" with a personal justiciable interest in the O–Kee permit application process. The City attached two affidavits to its hearing request—one from a professional engineer, Bruce L. Wiland, whom the City presented as an expert in water-quality analysis, the other from the City's water-utility director, Richard L. Garrett, also an engineer. The City's claim to affected-party status rested on the assertions and opinions of these two experts, which the court of appeals summarized as follows:

• The City possesses a personal justiciable interest in the quality of the water in Lake Waco because it owns all adjudicated and permitted rights to the water impounded in the lake and uses the water as its sole source of supply for its municipal water utility, exclusive of emergency connections. The City must treat the water to ensure that it is safe for uses that include drinking and bathing and that it will be regarded as palatable by the customers to whom the City sells the water, including 113,000 City residents, approximately 45,000 residents of surrounding municipalities, and major industrial customers "that place a premium on the quality of the water they use." Otherwise, the City is placed at a competitive disadvantage in preserving and growing its water-utility customer base and, ultimately, its broader economic health.

• For many years, the City has received complaints about offensive taste and odor in its drinking water. The source of these problems has proven to be a geosmin (earthy odor) produced by de-

caying algae that grows in Lake Waco during warm weather. Beginning in the 1980s, Lake Waco began to experience more frequent and longer durations of algal blooms, with correspondingly more taste and odor problems in the City's drinking water. To counter these problems, the City has incurred escalating costs in attempting to treat the water. Despite these additional expenditures, current treatment methods (chiefly, the use of powdered activated carbon) have repeatedly fallen short of eliminating the geosmin, necessitating that the City deliver offensive smelling and tasting water to customers for the time being and that it plan and budget to install different and more expensive water-treatment systems in the future.

• There is a causal linkage between the increasing algal growths in Lake Waco (and resultant taste and odor problems in the City's drinking water) and phosphorus loading from dairies upstream in the North Bosque watershed. The North Bosque contributes approximately 64 percent of the total flow into Lake Waco and over 72 percent of the total phosphorus loading to the lake. Between 30 to 40 percent of the lake's total phosphorus load is attributable to dairy operations in the North Bosque watershed, most of which stems from runoff and discharges that occur during heavy rainstorms. This phosphorus loading attributable to dairies in the North Bosque**\*415** watershed, in turn, is the primary cause of the lake's heavy algal growth.

• In addition to contributing nutrients that lead to algal growth and, ultimately, to taste and odor problems in drinking water, CAFOs in the North Bosque watershed are also a source of bacteria and other pathogens entering Lake Waco. In addition to driving up water treatment costs, the presence of these pathogens in the lake endanger the health and enjoyment of the City's many citizens who swim, fish, sail, ski, and engage in other water recreation there.

• If the problems with the proposed O–Kee Dairy permit identified in the City's comments are not remedied to any greater extent than described in the executive director's response, the increases in the dairy's herd size from 690 to 999 will increase the amounts of phosphorus and bacteria transmitted from the dairy, its waste application fields, and third-party fields into the North Bosque and downstream to Lake Waco, where it will contribute to increased algal growth, more bacteria, and the problems that follow. Although Lake Waco is approximately eighty miles downstream from the O—Kee Dairy, the distance does not substantially reduce these adverse effects because the primary mechanism through which these pollutants are transported are heavy rains, which can deliver the pollutants downstream in as little as 3–5 days.

346 S.W.3d at 795–96. Anyone may publicly comment on a pending water-quality permit, but only those commentators who are also "affected persons" may obtain a public hearing. TEX.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

WATER CODE § 26.028(c); 30 Tex. Admin. Code § 55.201(b).

After analyzing a non-exclusive list of factors prescribed by agency rule for making this determination, the executive director concluded that the City was not entitled to a hearing because it did not meet the requirement of an "affected person" with regard to the O–Kee Dairy permit. *See id.* § 55.203(c). The executive director accordingly recommended that the Commission deny the City's request for a contested case hearing. 30 Tex. Admin. Code § 55.209(d), (e). The City replied, filing a supplemental affidavit from its expert Wiland, who disputed the executive director's analysis and elaborated on his opinion of the causal link between claimed deficiencies in the proposed permit and water-quality problems in Lake Waco. *See id.* § 55.209(g).

After a public meeting at which the Commission considered the City's hearing request and the O–Kee Dairy permit application, *see id.* § 55.209(g), the City's hearing request was denied. *See id.* § 55.211(b). The Commission also adopted the executive director's response to public comment, approved the permit amendment, and issued the permit as the executive director proposed. Although the City was denied a contested case hearing, it was afforded several opportunities to make a record in the agency, including during the public comment period, at two public meetings, in a written request for contested case hearing, and in responses to the executive director's written comments and analysis. There is no indication that the Commission prevented the City from filing any evidence it deemed relevant to the proposed amended permit.

The City sought judicial review of the Commission's order in district court. *See* TEX. WATER CODE §§ 5.351, .354. The district court affirmed the Commission's decision. The City next appealed to the court of appeals, which reversed and remanded the case to the Commission. 346 S.W.3d 781, 827. The court of appeals concluded that the City was an affected person that **\*416** was entitled to a contested case hearing and that "the Commission acted arbitrarily and abused its discretion in concluding" otherwise. *Id.* The Commission has appealed that decision to this Court.

II

Chapter 26 of the Texas Water Code governs CAFO water-quality permits, authorizing the TCEQ to "issue permits and amendments to permits for the discharge of waste or pollutants into or adjacent to waters in the state." TEX. WATER CODE § 26.027(a). Under this chapter, the Commission is required to give public notice of a permit application and, when requested by a commissioner, the executive director, or "any affected person," hold a "public hearing" on the application. *Id.* § 26.028(a),(c), (h). Exempt from the "public hearing" requirement, however, are applications to amend or renew a water-quality permit that do not seek either to "increase signif-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

icantly the quantity of waste authorized to be discharged" or "change materially the pattern or place of discharge," if "the activities to be authorized ... will maintain or improve the quality of waste authorized to be discharged," and meet certain other requirements. *Id.* § 26.028(d).

The term "public hearing" is not defined in chapter 26, *see id.* § 26.001 (Definitions), but in context can refer either to a hearing before the Commission or a contested case hearing before the State Office of Administrative Hearings. *See id.* § 26.020 (authorizing the Commission to hold hearings "with respect to administering the provisions of this chapter"); *id.* § 26.01 (authorizing the Commission to delegate any hearing to the State Office of Administrative Hearings). Public hearings under chapter 26 can be expansive, such as a public hearing on water quality standards at which "any person may appear and present evidence" or limited, such as a public hearing on a particular application for a water quality permit. *Compare id.* § 26.024 (pertaining to public hearings on standards) *with id.* § 26.028(c) (pertaining to public hearings on permit applications). In the permit application context, the Code indicates that a public hearing means a contested case hearing under the Texas Administrative Procedure Act. *See* TEX. WATER CODE § 5.551 (referring to "an opportunity for public hearing under Subchapters C–H, Chapter 2001, Government Code, regarding commission actions relating to a permit issued under Chapter 26 [of the Water Code]"). Chapter 5, subchapter M, of the Water Code makes that connection while laying out the procedure for notice and opportunities for public comment, public meetings, and contested case hearings in the environmental permitting process. *See id.* at §§ 5.551–.559.

As part of that procedure, subchapter M provides that interested parties, who have filed comments during the process, may request a contested case hearing. *Id.* § 5.556(c). The Commission may not grant the request, however, without first determining that the requestor is an "affected person," *id.,* which subchapter M defines as:

> [A] person who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing. An interest common to members of the general public does not qualify as a personal justiciable interest.

TEX. WATER CODE § 5.115(a); *see also* 30 Tex. Admin. Code § 55.103 (Agency rule incorporating same definition of "affected person"). The Commission is further delegated the authority to promulgate "rules specifying factors which must be considered in determining whether a person is **\*417** an affected person." TEX. WATER CODE § 5.115(a). Pursuant to that authority, the Commission has drafted the following rule:
(c) In determining whether a person is an affected person, all factors shall be considered, in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

cluding, but not limited to, the following:

(1) whether the interest claimed is one protected by the law under which the application will be considered;

(2) distance restrictions or other limitations imposed by law on the affected interest;

(3) whether a reasonable relationship exists between the interest claimed and the activity regulated;

(4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;

(5) likely impact of the regulated activity on use of the impacted natural resource by the person; and

(6) for governmental entities, their statutory authority over or interest in the issues relevant to the application.

30 Tex. Admin. Code § 55.203(c)(1)–(6).

In addition to being an affected person, the requestor must timely file a written request for a contested case hearing, "identify[ing] the person's personal justiciable interest affected by the [permit] application" and "list [ing] all relevant and material disputed issues of fact that were raised during the public comment period and that are the basis of the hearing request." 30 Tex. Admin. Code § 55.201(a), (c), (d)(2), (4); *see also* TEX. WATER CODE § 5.556(d).

After a request is filed, the executive director, the public interest counsel, or the applicant for the permit can file a response to the request. 30 Tex. Admin. Code § 55.209(d). The response must address whether the requestor is an affected person and which issues raised in the request are disputed. The Commission then "evaluates" the request and must grant it if it is made by an "affected person" and is (1) timely filed, (2) "is pursuant to a right to hearing authorized by law," (3) complies with the form and content requirements of rule section 55.201, and (4) "raises disputed issues of fact that were raised during the [public] comment period, that were not withdrawn ... and that are relevant and material to the commission's decision on the application." *See* 30 Tex. Admin. Code §§ 55.211(b)(3), (c).[FN5] The Commission's evaluation of the request is thus a threshold de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

termination of whether the party is an "affected person" but by rule that determination "is not itself a contested case subject to the APA." *See id.* § 55.211(a).

> FN5. The Commission may also: (1) find the request deficient and proceed to act on the permit application without a hearing; (2) refer the request itself to State Office of Administrative Hearings for a contested case hearing on the sole question of whether the requestor is an "affected person"; or (3) grant a hearing request in the "public interest." 30 Tex. Admin. Code § 55.211(b)–(d).

As a matter of statutory interpretation, the court of appeals concluded that section 5.115's affected-person definition embodied the constitutional principles of standing. *See* 346 S.W.3d at 801 (observing that the "cornerstone" of the definition "denotes the constitutionally minimal requirements for litigants to have standing to challenge governmental actions in court"). The court explained that those principles required the City to establish a concrete and particularized injury in fact, not common to the general public, that is: (1) actual or imminent; (2) fairly traceable to the issuance of the permit as proposed; and (3) likely to be redressed by a favorable decision on its complaint. *Id.* at 801, 810–11.

**\*418** The court concluded that the City possessed a legally protected interest in Lake Waco's water quality, distinct from that of the general public, but that the City's personal justiciable interest in the O–Kee Dairy permit application—its status as an affected party—depended on the resolution of disputed fact issues. *Id.* at 811. The court further acknowledged that the Commission had weighed the evidence and found these disputed facts against the City, reasoning that the City had failed to establish "the requisite 'concrete and particularized,' imminent injury 'fairly traceable' to the issuance of the O–Kee Dairy permit and likely redressed by denying the permit or imposing additional conditions." *Id.* The court summarized the Commission's factual determinations, bearing on the City's status as an affected party, in its opinion, writing:

• the amended O–Kee Dairy permit would not increase but reduce the risk and amount of phosphorus or pathogens being contributed by the dairy to the North Bosque River;

• any phosphorus or pollutants the dairy did contribute would be "assimilated" or "diluted" as they washed downstream so as to have no ultimate impact on Lake Waco;

• assuming any phosphorus from the dairy actually reached Lake Waco, whether it would contribute to algal growth would be, at best, speculative because (a) myriad other sources also

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

contribute phosphorus to Lake Waco (e.g., other dairies, municipal water treatment plants), (b) other nutrients also contribute to algal growth (e.g., nitrogen from row-crop farms along the other rivers that flow into Lake Waco), and (c) many factors other than nutrients, such as sunlight and climate, influence algal growth;

• in any event, there is no connection between algal growth and episodes of taste and odor problems in Lake Waco drinking water, which predate the growth of the dairy industry in the North Bosque watershed; and

• bacteria is not an issue in Lake Waco, which meets regulatory standards for contact recreation, and is not among the water bodies deemed "impaired" by bacteria. Nor has North Bosque segment 1226—the segment immediately north of Lake Waco that includes the O–Kee Dairy—been deemed impaired by bacteria since 2002.

*Id.* at 811. Although not determined in a contested case hearing, the court found no reason to foreclose the Commission's discretion to consider evidence when determining "whether a 'request was filed by an affected person as defined by Section 5.115.' " *Id.* at 813 (quoting TEX. WATER CODE § 5.556(c)).

The court, however, rejected the Commission's thesis that the City could not show any concrete or imminent adverse effect or injury if the amended permit were approved simply because the amended permit was designed to be more protective of the North Bosque's water quality than the current one. The court reasoned that the relative protectiveness of the amended permit was, standing alone, irrelevant because it was an "acknowledged certainty" that there would be some discharge or runoff into the North Bosque under the amended permit. *Id.* at 822. And, if that discharge were to "harm Lake Waco's water quality and the City's legally protected interest in it, the City would have a personal justiciable interest in ensuring that the permitted activities comply with current legal requirements." *Id.* The court then concluded that "to the extent that the Commission denied the City's hearing request based on the premise that **\*419** the amended O–Kee Dairy permit would be 'more protective' of the environment than the current one, it acted arbitrarily by relying on a factor that is irrelevant to the City's standing to obtain a hearing." *Id.* at 822–23.[FN6] Finally, the court suggested that the Commission had conceded the City's entitlement to a contested case hearing by classifying the O–Kee Dairy permit as a "major amendment," because the City otherwise met the definition of an "affected person." *Id.* at 825.

FN6. Alternatively, assuming that the more protective features of the amended permit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

might be considered relevant to the City's standing, the court concluded that the Commission nevertheless abused its discretion in not referring the issue for a contested case hearing because of the overlap of disputed fact issues on standing and the merits of the permit application. 346 S.W.3d at 823. Concluding that the water code and Commission rules create an entitlement to a contested case hearing that is analogous to a civil claimant's right to have disputed material fact issues determined at trial, the court held that the Commission could not resolve disputed, merit-based issues relevant to standing without a contested case hearing. *Id.* at 824–25 (citing *Tex. Dep't of Parks and Wildlife v. Miranda,* 133 S.W.3d 217 (Tex.2004)).

## III

The Commission complains that its classification of the O–Kee permit application as a major amendment was not a concession that the City (or for that matter an affected person) was entitled to a contested case hearing. A major amendment is defined by rule as one that "changes a substantive term ... or a limiting parameter of a permit." 30 Tex. Admin. Code § 305.62(c)(1). A minor amendment, on the other hand, is one that "improve[s] or maintain[s] the permitted quality or method of disposal of waste" (among other things). *Id.* The Commission submits that the terms are not mutually exclusive. An application to amend a permit may fit both definitions. For example, an amendment that changes a substantive term and improves the quality of the waste discharge, the Commission submits, is both major and minor.

The distinction is significant in the first instance because a contested case hearing is not available for a minor amendment to an existing permit. 30 Tex. Admin. Code § 55.201(i)(1). But there is also no express right to a contested case hearing merely because the applicant seeks a major amendment. *See* 30 Tex. Admin. Code § 55.201(i)(5) (limiting right to contested case hearing where applicant is not applying to increase significantly the quantity of waste discharged or materially change the pattern or place of discharge, among other considerations).

[1] Although the Water Code generally grants a person affected by a permit application a right to a public hearing, the Code also provides exceptions to this general rule. TEX. WATER CODE § 26.028(c), (d). Exempt from this public hearing requirement is an application to amend or renew a water-quality permit that does not seek either to "increase significantly the quantity of waste authorized to be discharged" or "change materially the pattern or place of discharge," if "the activities to be authorized ... will maintain or improve the quality of waste authorized to be discharged," and meet certain other requirements. *Id.* § 26.028(d); *see also* 30 Tex. Admin. Code § 55.201(i)(5). Relying on this exemption, the Commission argued in the court of appeals that it could "consider a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

permit's likely effects in determining whether a hearing requestor is an affected person." 346 S.W.3d at 825. As noted, the court of appeals viewed the inquiry as irrelevant to the issue of the party's status as an affected person, and, in any event, conceded by **\*420** the Commission as not exempt from the hearing requirement because of the "major amendment" label it attached to the application. *Id.* at 822–25. In light of the discretion the statute confers on the Commission in determining the need for a public hearing, however, we cannot agree that a proposed amended permit that purports to provide greater protection for water quality is an irrelevant consideration when evaluating the need for a public hearing.

The Commission asserts that the more protective nature of the amended permit is a relevant factor in its determination of whether the City will be affected by the permit. But whether we accept this as part of the affected person analysis, as the Commission urges, or follow the court of appeals' analysis of "affected person" as merely a codification of the constitutional principal of standing does not ultimately determine the City's right to a hearing in this case. Under either approach, we must account for the Commission's discretion to limit or deny public hearings on amended permits that maintain or improve the quality of any discharge and that neither increase significantly the quantity of waste authorized to be discharged nor change materially the pattern or place of discharge. TEX. WATER CODE § 26.028(d). Thus, even assuming the City might otherwise qualify as an affected person under the statute's definition, it may still not be entitled to a public hearing if section 26.028(d)'s exception reasonably applies.

The Commission's list of factors to be considered in determining affected person status and the public hearing exemption expressed in section 26.028(d) overlap to some degree. *Compare* 30 Tex. Admin.Code § 55.203(c) *with* TEX. WATER CODE § 26.028. For example, one of the Commission's factors focuses on the "likely impact of the regulated activity on use of the impacted natural resource by the person." 30 Tex. Admin. Code § 55.203(c)(5). During the comment period, the City argued that the increase in the size of the O–Kee herd authorized by the amended permit would naturally lead to more waste and inevitably to more phosphorous and other nutrients and pathogens making their way into the North Bosque and eventually into Lake Waco, which, in turn, would increase the City's water treatment costs. The City supported its argument with expert opinion in affidavit form. One of the City's experts attested to a causal link between the increasing algal growths in Lake Waco and phosphorus loading from dairies upstream in the North Bosque watershed. This expert estimated that the North Bosque contributed about 64 percent of the total flow into Lake Waco. He further attributed about 30 to 40 percent of the lake's total phosphorus load to dairy operations in the North Bosque, stemming from runoff and waste discharges during heavy rainstorms. This source of phosphorus loading was in his opinion the primary cause of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

lake's heavy algal growth and resulting taste and odor problems in the City's drinking water. The executive director, however, did not agree that the proposed amendment to the O–Kee permit would have an adverse affect on Lake Waco or the City.

Relying on the sworn application, attached expert reports, the analysis and opinions of professionals on its staff, and reports, opinions and data about the North Bosque watershed gathered and analyzed by the TCEQ for nearly a decade, the executive director recommended that the Commission issue O–Kee's amended permit without a hearing. With this recommendation, he included a map and fact sheet, the draft permit, his response to public comments, and the dairy's compliance history. The fact sheet discussed the water-quality inventory for Segments 1226 and 1255, the TMDLs, the TDML implementation**\*421** plan, the "White Paper" (which was also submitted by the City), and interoffice memos of the professional staff documenting their analysis of the application.

The Commission points out that a permit application to the TCEQ amounts to an affidavit with expert reports attached. The applicant must verify that the information submitted is true, accurate, and complete. 30 Tex. Admin. Code §§ 305.44(b), 321.34(b). Maps and technical reports must be prepared by a licensed professional engineer, a licensed professional geoscientist, or other qualified person. 30 Tex. Admin. Code §§ 305.45(a)(6), (8), 321.34(f). The applications are then reviewed by the executive director's professional staff.

The Commission submits that the O–Kee permit was drafted by an engineer on the executive director's staff and reviewed by several other professionals. A geoscientist on the executive director's Water Quality Assessment Team evaluated the proposed permit, as did a soil conservationist and an engineer at the National Resource Conservation Service and the Texas Soil & Water Conservation Board. The draft permit incorporated their comments. The Land Application Team concluded that the permit application proposed adequate buffer zones, and the Water Quality Assessment Team determined that the permit terms "are expected to preclude a permitted increase in pollutant loadings from [the dairy]."

The Commission had before it evidence that the proposed permit's modifications to the dairy's management of its wastewater and manure would reduce the pollutants from the dairy that were likely to be discharged into the watershed. There was also evidence that the more stringent waste application requirements imposed by the proposed permit would reduce the amount of phosphorus runoff from waste application fields. Indeed, the proposed permit implemented the new regulations promulgated by the Commission to comply with Environmental Protection Agency rules and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

guidelines governing CAFOs. *See* 40 C.F.R. §§ 122, 123, 412. These new requirements were categorized by their intended goals: reduce the potential for discharges, minimize the nutrient loading to land and surface water, and increase Commission oversight of the dairy's operational activities.

The proposed permit thus requires the dairy to bring its operations into compliance with the new rules regulating CAFOs. This includes increasing its wastewater and manure retention control structure capacity by approximately 13 acre feet. The increased storage capacity is designed to reduce the number of discharges from the dairy during heavy rainfall events, and reflects that, under the new rules, CAFOs may only discharge during a 25 year/10 day rainfall event as opposed to a 25 year/24 hour rainfall event. The existing retention structures were designed to capture and retain runoff from a 7.3 inch rainfall; the new structures must capture and retain runoff from a 12.2 inch rainfall. The dairy is also required to implement a retained control structure management plan to assure that it maintains wastewater volumes within the designed operating capacity of the structures, except during chronic or catastrophic rainfall events, and maintain sludge at or below the design sludge volume. These management tools reduce the likelihood of discharge during smaller rainfall events and reduce overflows associated with insufficient wastewater storage capacity.

The proposed permit also requires changes in the land application of manure and wastewater from the dairy, imposing a nutrient management plan designed to **\*422** minimize nutrient loading to land and surface water through measurement of soil and waste phosphorus levels. This measurement, known as a risk potential assessment,[FN7] ensures that phosphorus levels remain in a proper balance, which, in turn, reduces runoff risk. Further, in order to minimize nutrient loading, the land application rate of manure and wastewater must be based on the crop's phosphorus requirements rather than its nitrogen requirements as under the old permit. For a coastal bermuda crop, all other things being equal, the result is a 40% decrease in the application rate. Manure, sludge, or wastewater in excess of that permitted to be applied to the land must be delivered to a composting facility, delivered to a permitted landfill, beneficially used by land application outside the watershed, or provided to operators of third-party fields for beneficial use in a manner consistent with Commission rules. The regulations on manure disposal contained in the proposed permit limit the unregulated disposal of manure and wastewater in the watershed.

> FN7. Risk potential is determined by measuring, among other things, the current phosphorus levels in the soil, the proposed phosphorus application rate, and dairy's proximity to the nearest water body—here the Bosque. Application rates are then adjusted according to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

the risk potential—i.e. the higher the risk, the lower the application rate. In addition, the application rate is determined by the amount of nutrients needed for optimal crop production and then balances that need between the nutrients in the soil and the nutrient source—manure and wastewater. Once the nutrients are in balance, it is very unlikely that excess nutrients will leave the site and affect water quality.

Any waste stored temporarily on-site must be stockpiled in well-drained areas and adequately sloped to ensure proper drainage and prevent ponding of water. To protect against discharge, stockpiles must generally be kept beneath impermeable roofs to ensure that waste does not leave the storage area. Waste may also be composted on-site so long as it is done in accordance with Commission rules. *See* 30 Tex. Admin. Code § 332.

Excess waste that cannot be used on site must be removed. *See* TEX. WATER CODE 26.503(b)(2). Most removal methods require delivery of the waste to locations outside of the North Bosque watershed, but the Code also allows delivery of waste to third-party fields—areas of land in the watershed not owned, operated or otherwise controlled by the permitee. The City objected to this aspect of the permit, but the Commission found it to be in compliance with the rules, which require all transferred waste to be applied to those fields at the proper agronomic rate based on the soil's existing phosphorus content. 30 Tex. Admin. Code §§ 321.36, 321.40. The dairy is further prohibited from delivering manure or wastewater to a third-party field once the soil test phosphorus analysis shows a level equal to or greater than 200 ppm. Moreover, the third-party fields must be identified in the dairy's pollution prevention plan, and quarterly reports with the name, locations, and amounts of manure and wastewater transferred to operators of third party fields must be submitted. To ensure compliance with all the new requirements, the permit implements increased oversight of operational activities by the Commission. These measures require O–Kee to submit reports to the Commission concerning, among other things, land application records, annual soil samples, and chronic rainfall discharges.

The Commission considered these management tools and found that although there will be more cows at the dairy, the overall impact of the permit's requirements will be to reduce the likelihood that phosphorus from the dairy will enter the **\*423** watershed. The Commission concluded that the proposed permit would effectively decrease, rather than increase, the amount of phosphorus discharged into the watershed and thus have an overall beneficial environmental impact. It therefore rejected the City's argument that the City would be adversely affected by its granting the permit.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

The City questions whether the proposed permit will improve the water quality in the North Bosque and argues that, in any event, it has a justiciable interest in the proposed permit because it authorizes the discharge of waste that ultimately affects its interests in Lake Waco. The City thus focuses on potential harm rather than any relative environmental improvement under the proposed permit. The issue, however, is whether the City has a statutory right to intervene in the permitting process and obtain a contested case hearing under the Administrative Procedure Act.

[2] Although the APA defines "contested case" and sets the procedural framework, the agency's enabling act here sets out whether rights are to be determined after an opportunity for adjudicative hearing, and agency rules may decide whether that opportunity may include a contested case hearing. For example, this court of appeals has previously affirmed the TCEQ's rule that a request for a contested case hearing is not itself a contested case hearing, concluding that a hearing request may be decided through a less formal proceeding before the Commission. *Collins v. Tex. Natural Res. Conservation Comm'n,* 94 S.W.3d 876, 884–85 (Tex.App.–Austin 2002, no pet.).

*Collins* involved a poultry farm that applied for an individual water quality permit to change from a dry waste management system to a system that generated wastewater to be stored in lined lagoons and irrigated onto crop land. A neighbor to the poultry operation protested the application and requested a contested case hearing. After briefing and a limited hearing before the State Office of Administrative Hearings to determine the neighbor's proximity, the TCEQ denied the neighbor's hearing request. Construing Water Code § 5.115, as it existed before the statute's amendment in 1999, the court found that the Commission's denial of the hearing request was supported by substantial evidence. *Id.* at 885.

The *Collins* court also rejected the neighbor's claim that he was denied due process. The court reasoned that the issuance of a permit in itself does not deprive a neighboring landowner of any concrete liberty or property interest. *Id.* at 884–85. The court observed that the Commission's rules seek to protect such interests and expressly state that "the issuance of a permit does not authorize any injury to persons or property or an invasion of any other property rights." *Id.* at 884 (quoting 30 Tex. Admin. Code § 305.122(c)). The court further concluded that even if a private property interest were at issue, "due process never requires all the trial-like procedures of a statutory contested case hearing." *Id.* at 885. The court of appeals accordingly upheld the Commission's denial of the neighbor's hearing request, concluding that the Commission's process for evaluating hearing requests by persons who claimed to be affected, satisfied procedural due process requirements. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

Focusing on its "affected party" analysis, the court of appeals concludes that the case here is controlled by other decisions which hold "that it is the existence of some impact from a permitted activity, and not necessarily the extent or amount of impact, that is relevant to standing." 346 S.W.3d at 822 (citing **\*424**_United Copper Indus., Inc. v. Grissom,_ 17 S.W.3d 797, 802– 04 (Tex.App.–Austin 2000, pet. dism'd) and _Heat Energy Advanced Tech., Inc. v. West Dall. Coal. for Envtl. Justice,_ 962 S.W.2d 288, 295 (Tex.App.–Austin 1998, pet. denied)). _United Copper_ and _Heat Energy_ likewise focus on the requestor's status as an affected person and do not otherwise consider the person's statutory right to a hearing or statutory exceptions to that right.

In _Heat Energy_, the owner of a hazardous and industrial waste storage and processing facility sought to renew its permit to conduct its business. 962 S.W.2d at 289. A coalition of nearby res- idents asked the Commission to conduct a contested case hearing on the renewal application. _Id._ The request was filed pursuant to section 361.088 of the Solid Waste Disposal Act, which requires the Commission to "provide an opportunity for a hearing to the applicant and persons affected" before a permit is issued, amended, extended or renewed. TEX. HEALTH & SAFETY CODE § 361.088(c). The requirement for a contested case hearing does not apply, however, when the ap- plication is to renew a permit for the storage or processing of hazardous waste that was generated on-site and not mixed with waste generated elsewhere, and the Commission has complied with the notice and comment requirements of the Water Code. _Id._ § 361.088(e); _see also_ TEX. WATER CODE §§ 5.552–.555. This hearing-requirement exemption was not at issue in _Heat Energy_. Similarly, no hearing-requirement exemption was discussed, or even asserted, in _United Copper._

The Commission complains that the court of appeals has misread the statutory exemption and agency rules that define hearing rights under chapter 26 of the Water Code. Agency rules provide that an affected person may request a contested case hearing "when authorized by law." 30 Tex. Admin. Code § 55.201(b)(4). But no right to a contested case hearing exists for "an application, under Texas Water Code, Chapter 26, to renew or amend a permit" under certain circumstances. _Id._ § 55.201(i)(5). Thus, a person affected by a proposed water-quality permit has the right to request a hearing (if the person meets the statutory definition of "affected person" in section 5.115 of the Water Code), but the Commission has discretion to deny the request when the proposed permit is an amendment or renewal and (1) the applicant is not applying to significantly increase the discharge of waste or materially change the pattern or place of discharge, (2) the authorization under the permit will maintain or improve the quality of the discharge, (3) when required, the Commission has given notice, the opportunity for a public meeting, and considered and responded to all timely public comments, and (4) applicant's compliance history raises no additional con- cerns. TEX. WATER CODE § 26.028(d); Tex. Admin. Code § 55.201(i)(5). And again, the court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931
**(Cite as: 413 S.W.3d 409)**

of appeals has held that that determination is not itself a contested case hearing but may be made through a less formal proceeding before the Commission. *Collins,* 94 S.W.3d at 884–85. The statute similarly supports a less formal determination when section 26.028(d) applies, stating that the Commission may under these circumstances approve an application to renew or amend a permit "at a regular meeting without the necessity of holding a public hearing." TEX. WATER CODE § 26.028(d).

[3] We conclude that there is evidence in the record to support the Commission's determination that the proposed amended permit here did not seek to significantly increase or materially change the authorized discharge of waste or otherwise foreclose Commission discretion to consider the amended application at a regular meeting**\*425** rather than after a contested case hearing. The Commission therefore did not abuse its discretion in denying the City's request for a contested case hearing on O–Kee's application for an amended permit.

The court of appeals' judgment remanding the matter to the Commission for a contested case hearing is accordingly reversed and judgment is rendered affirming the Commission's decision to deny the hearing request.

Tex.,2013.
Texas Com'n on Environmental Quality v. City of Waco
413 S.W.3d 409, 56 Tex. Sup. Ct. J. 931

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.